Civil No. 8:16-cv-01257-BRO

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

In re: JAY W. AND DEBRA JOHNSON, Debtors
Bankruptcy Court Case No. 8:06-bk-10373 ES

JAY W. JOHNSON, et al., Appellants

vs.

ROSENDO GONZALEZ, et al., Appellees.

Adversary Proceeding Case Numbers 8:06-ap-1313 ES and
8:06-ap-1311 ES (Consolidated)

On Appeal From the Order of the United States Bankruptcy Court,
The Honorable Erithe Smith, United States Bankruptcy Judge

## SUPPLEMENTAL EXCERPTS OF RECORD VOL. 3

James Andrew Hinds, Jr. (SBN 71222)
Paul R. Shankman (SBN 113608)
Rachel M. Sposato (SBN 306045)
HINDS & SHANKMAN, LLP
21257 Hawthorne Blvd., Second Floor
Torrance, California 90503
Tel: (310) 316-0500
Fax: (310) 792-5977
Attorneys for Appellees Rosendo Gonzalez, Chapter 7 Trustee,
James Andrew Hinds, Jr., Esq., and HINDS & SHANKMAN, LLP

Appellees, Rosendo Gonzalez, Chapter 7 Trustee, James Andrew Hinds, Jr.,

Esq., and HINDS & SHANKMAN, LLP, hereby submit the following attached

Appendix of the Supplemental Excerpts of Record (Vol. 3) in support of

Appellees' Response Brief:

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

# APPENDIX

## TABLE OF CONTENTS

### VOLUME 3

Trial Declaration of Rosendo Gonzalez      241 thru 275

Trial Declaration of Richard Lapides      276 thru 460

Trial Testimony of Rosendo Gonzalez      461 thru 470

Trial Testimony of Jay Johnson      471 thru 483

Trial Exhibit 001.001 - 001.032      484 thru 515

Dated:  October 6, 2016

Respectfully submitted,

JAMES ANDREW HINDS, JR.
PAUL R. SHANKMAN
RACHEL M. SPOSATO
HINDS & SHANKMAN, LLP

By: _____
JAMES ANDREW HINDS, JR.
Attorneys for Appellees Rosendo Gonzalez,
James Andrew Hinds, Jr., and
HINDS & SHANKMAN, LLP

1  JAMES ANDREW HINDS, JR. (SBN 71222)
   jhinds@jhindslaw.com
2  PAUL R. SHANKMAN (SBN 113608)
   pshankman@jhindslaw.com
3  CRISTINA F. KEITH (SBN 235578)
   ckeith@jhindslaw.com
4  HINDS & SHANKMAN, LLP
   21515 Hawthorne Blvd., Suite 1150
5  Torrance, California  90503
   Telephone: (310) 316-0500
6  Fax: (310) 792-5977

7  Attorneys for Rosendo Gonzalez, Chapter 7 Trustee
   and Plaintiff

8

9

10            **UNITED STATES BANKRUPTCY COURT**

11            **CENTRAL DISTRICT OF CALIFORNIA**

12                 **SANTA ANA DIVISION**

13  In re                          )  CASE NO.   8:06-bk-10373-ES
                                    )
14  JAY W. and DEBRA F. JOHNSON,    )  (Chapter 7)
                                    )
15            Debtors.              )  ADV. NO. 8:06-ap-01313-ES
                                    )
16  _____ )  (Consolidated with Adv. No.
                                    )  8:06-ap1311-ES)
17  ROSENDO GONZALEZ, Trustee of the )
    Bankruptcy Estate of JAY W. and DEBRA F. )
18  JOHNSON,                        )  **TRIAL DECLARATION OF ROSENDO
                                    )  GONZALEZ**
19            Plaintiff,            )
                                    )
20  v.                              )
                                    )  Date:     February 24, 2014
21  RANDAL A. JOHNSON, an individual, and )  Time:     9:00 a.m.
    JJ&A ARCHITECTS, INC., a California )  Place:    CTRM 5A
22  corporation,                    )
                                    )
23            Defendants.           )
    _____ )
24  AND RELATED ADVERSARY           )
    PROCEEDING                      )
25  _____ )

26

27

28

1       I, Rosendo Gonzalez, hereby declare and state as follows:

2       1.     I am an attorney, duly admitted to practice law before all of the courts of the

3    State of California and before this United States Bankruptcy Court.   I am a principal of the

4    law firm of Gonzalez & Associates, A Professional Law Corporation.   I am also the duly

5    appointed Trustee in the chapter 7 bankruptcy case of Jay W. and Debra Johnson

6    (hereinafter collectively referred to as the "Debtors").   I have personal knowledge of the

7    following facts and if called upon to testify, I could and would do so competently.

8       2.     I have been a member of the Texas Bar since 1987 and a member of the

9    California Bar since 1988.   I have practiced as a litigator and I have tried a number of civil

10   cases before the Superior Courts of the State, the United States District Courts, and the

11   United States Bankruptcy Courts.   I have been a member of the Central District Chapter 7

12   Trustee panel since 1998.   As a panel trustee, I have historically and currently administer

13   more than approximately 1,000 chapter 7 cases per year.   In addition to acting as a panel

14   trustee, I have represented other panel trustees in cases involving debtor fraud, debtor

15   misrepresentations, assets recovery, and other debtor misconduct.   I have represented

16   parties as debtors in bankruptcy cases.   On behalf of panel trustees, creditors, and debtors I

17   have conducted thousands of 11 U.S.C. § 341(a) meetings of creditors and hundreds of

18   Federal Rules of Bankruptcy Procedure Rule 2004 Examinations (with related extensive

19   document productions), reviewed thousands of petitions, schedules, and related documents,

20   and commenced and successfully litigated several actions involving objections and

21   revocation to discharge, turnover actions, and related relief as a panel trustee and on behalf

22   of panel trustees in numerous complex cases involving fraud and secretion of assets and

23   income.

24

25    <u>The Debtors' Chapter 7 Filing And My Appointment As The Trustee.</u>

26       3.     Having reviewed my files and the PACER docket, the Debtors commenced this

27   bankruptcy case by filing a voluntary petition under Chapter 7 of Title 11 of the United States

28

1  Code on April 5, 2001 (hereinafter referred to as the "Petition Date").  (See Trial Exhibit

2  001.)  Shortly thereafter, I was appointed, qualified, and have acted as the Chapter 7

3  Trustee in the Debtors' chapter 7 bankruptcy case.  I still hold this position to today.  The

4  Debtors received their Chapter 7 Discharge on November 6, 2001.  (See Trial Exhibit 002.)

5      4.    As a Trustee in the Central District of California, I have been trained that as part

6  of my role as a chapter 7 trustee, I have to recognize that one of the core underlying policies

7  of consumer bankruptcy law is that a discharge of indebtedness should be available only to

8  the "honest but unfortunate debtor."  See Grogan v. Garner (1991) 498 U.S. 279, 286-87

9  (stating that the fresh start provided by the Bankruptcy Code is intended for the "honest but

10  unfortunate debtor").  Consequently, as a condition precedent to receiving a discharge of

11  indebtedness, the Debtors in this case were required to demonstrate forthrightness and

12  honesty throughout their chapter 7 bankruptcy case, including voluntary disclosures of

13  financial information provided on their bankruptcy Petition, accompanying Schedules, and in

14  their dealings with me as their chapter 7 Trustee.  See In re Slentz (Bankr. N.D. Ind. 1993)

15  157 B.R. 418, 420 ("Since the proper operation of the bankruptcy system depends, to a large

16  extent, upon debtors honestly and forthrightly completing the schedules and statements

17  which are filed with the court, attempts at cheating cannot be made to appear too attractive.")

18  Indeed, accuracy, honesty, and complete disclosure by the Debtors is critical to the

19  functioning of the bankruptcy system and are "inherent in the bargain for the discharge."

20

21      I Conducted The Initial Meeting Of Creditors And The Continued Meeting For

22      Additional Testimony, Amendments And/Or Production Of Requested Documents

23      From The Debtors.

24      5.    As part of the administration of the Debtors' chapter 7 case, I conducted the

25  11 U.S.C. § 341(a) (hereinafter referred to as "§ 341(a)") Examinations of the Debtors during

26  two-sessions: one on May 8, 2001; continued to a second session taking place on June 12,

27  2001, when said exam was concluded.  (See Trial Exhibit 226.)  As is my duty as the

28

1   Trustee, prior to the § 341(a) Examinations, I carefully reviewed the Debtors' Chapter 7

2   Schedules, Statement of Financial Affairs, and related papers.   (See Trial Exhibit 001.)   On

3   the record and under oath the Debtors jointly confirmed to me that the information contained

4   in their Schedules was true and correct to the best of their knowledge, information, and belief

5   and that they had read and understood all of the disclosures made as part of their Schedules.

6          6.      By way of example only:

7   (A)     As part of the Debtors' Schedule F filed in their Chapter 7 case, the Debtors

8           listed a liability of $450,000 to Jay Johnson's 100%-owned corporation, Jay

9           Johnson A.I.A. and Associated, Inc. (hereinafter referred to as "A.I.A.");

10  (B)     As part of the Debtors' Schedule I filed in their Chapter 7 case, the Debtors

11          claimed that their total income for the year 2000 was only $55,000;

12  (C)     On the Debtors' Statement of Financial Affairs filed in their Chapter 7 case, the

13          Debtors claimed that their total year-to-date income for the period January 1,

14          2001 to April 20, 2001 was $13,000;

15  (D)     As part of the Debtors' Statement of Financial Affairs filed in their Chapter 7

16          case, the Debtors reported that their total income in 2000 was only $55,000;

17  (E)     As part of the Debtors' Statement of Financial Affairs filed in their Chapter 7

18          case, the Debtors claimed that their total income for 1999 was $149,500;

19  (F)     As part of their Schedules, the Debtors stated in their Schedule A filed in their

20          Chapter 7 case that they owned no real estate and that they were only renting

21          the Viro Road Property from Jay Johnson's brother, Randal Johnson, for

22          $4,000 per month; and

23  (G)     As part of their Schedules filed in their Chapter 7 case the Debtors identified a

24          number of unsecured creditors.

25  (See Trial Exhibit 001.)

26          7.      My review of the Debtors' sworn Schedules proved to me that there were as of

27  the Petition Date at least 10 unsecured creditors holding valid claims against the Estate.

28

1      8.     At the Debtors' § 341(a) Examination held on May 8, 2001, I asked the Debtors,

among other questions, about their interest in the real property located on 4600 Viro Road,

La Canada, California (hereinafter referred to as the "Viro Road Property").   The sole

testimony provided by the Debtors confirmed an estimated $50,000 payment for

remodeling costs at the Viro Road Property, which the Debtors asserted they rented from

Randy Johnson, the brother of Jay Johnson.   (See Trial Exhibit 226.)

      9.     At the § 341(a) Examinations held on May 8, 2001 and on June 12, 2001, I

asked the Debtors to produce to me the following documents and things:

    (A)    For A.I.A., copies of the bank statements for the last year, copies of cancelled

           checks for the last 90-days prior to the bankruptcy filing, a copy of the last A.I.A.

           tax return, and any cancelled checks post-petition.   (Trial Exhibit 226 at page

           7.)

    (B)    For Canyon Meadows, LLC, copies of the Debtors' claim to any potential right

           to payment from profits.   (Trial Exhibit 226 at page 11.)

    (C)    As to the alleged $450,000.00 transaction between the Debtors and Randy

           Johnson, copies of any documentation regarding JJ&A Associates, Inc.

           (hereinafter referred to as "JJ&A") and A.I.A. regarding all the transfers such as

           the articles, bylaws, corporate solutions for both entities related to the alleged

           transfer of $450,000.00.   (Trial Exhibit 226 at pages 12-14.)

    (D)    For A.I.A., copies of any documents regarding any contracts that the Debtor

           and the entity have entered where the Debtor and the entity ware currently

           working on, so somebody may owe you the Debtor and the entity money.

           (Trial Exhibit 226 at page 18.)

In response to these document requests the Debtors and their lawyer, David Reeder,

supplied by office with few of the requested documents.   What was missing was any

documentation on the alleged $450,000.00 transaction between the Debtors and Randy

Johnson, copies of A.I.A.'s bank statements, copies of cancelled checks, and the most

TRIAL DECLARATION OF ROSENDO GONZALEZ

1  recent tax returns for A.I.A., and for Canyon Meadows, LLC, copies of the Debtors' claim to

2  any potential right to payment from profits.   As a result of the lack of cooperation from the

3  Debtors and their counsel I was forced to seek these same items from third-parties through

4  expensive discovery.

5  　　　　10.　　At the § 341(a) Examinations held on May 8, 2001, which was continued to

6  June 12, 2001, I first met with Mr. Lapides one of the creditors listed in the Debtors'

7  Schedules.   Mr. Lapides expressed to me that the testimony given by the Debtors "didn't

8  add up" in that it appeared that the Debtors were living a lifestyle well outside of the scope of

9  the income set forth in their Schedules.   Mr. Lapides also questioned the ability of the

10  Debtors to rent the real property located in Viro Road when it appeared that the Debtors (and

11  not the owners of the Viro Road Property) had recently added a second story to the property.

12

13  　　　　<u>Documents Which The Debtors Failed To Provide To Me At The Inception Of This</u>

14  <u>Chapter 7 Case</u>.

15  　　　　11.　　As part of the administration of the Debtors' chapter 7 case, and in response to

16  formal and informal requests for documentation made on the Debtors' and their counsel, Mr.

17  Reeder, for information on their assets, liabilities, income, and expenses, as well as

18  information on the Debtors transactions with A.I.A., Randy Johnson, and Randy Johnson's

19  companies, JJ&A, and Q Financial, I received virtually nothing of merit on the financial

20  dealings involving the Debtors' pre- and post-petition activities from Randy Johnson and the

21  Debtors.   That I did receive from the Debtors and Mr. Reeder appeared to me to be

22  insufficient, incomplete and contradictory.

23  　　　　12.　　The Debtors did **not** provide me with any information that: **(1)** the Debtors had

24  paid some of the mortgage loan payments, insurance premiums, and substantial

25  maintenance costs on the Viro Road Property; or **(2)** that the Debtors were (and had been)

26  taking the owners' mortgage interest deduction on the mortgage payments on the Viro Road

27  Property.   At the time of the § 341(a) Examinations, I had no reason to guess as to the truth

28

TRIAL DECLARATION OF ROSENDO GONZALEZ                                000246

1  of these issues and I was not provided with documentation by the Debtors or their counsel,

2  David Reeder, on any of these issues.

3      13.     The Debtors' testified during their § 341(a) Examinations that Jay Johnson's

4  brother, Randy Johnson, owned a company by the name of JJ&A and that Jay Johnson

5  worked for Randy Johnson at JJ&A for a "salary."   Jay Johnson also testified that he owned

6  100% of a company by the name of A.I.A. which the Debtors listed in their Schedules as

7  having a value of "zero."   (See Trial Exhibit 226.)   At the time of the § 341(a) Examinations,

8  I had no reason to guess as to the truth of these issues and I was not provided with

9  documentation by the Debtors or their counsel, David Reeder, nor was I provided with same

10  by Randy Johnson and his counsel, David Tilem, on any of these issues.   I only discovered

11  these facts were in fact false by my counsel taking discovery during in these Adversary

12  Proceedings.

13

14      I Agree To Retain Mr. Lapides As A Consultant To The Trustee's Ongoing

15      Investigations Into The Financial Dealings Between The Debtors And Randy Johnson,

16      A.I.A., JJ&A and Q Financial.

17      14.     Mr. Lapides filed a timely proof of claim on June 21, 2004.   (See Claim No. 2.)

18  The Lapides Claim is based upon **(1)** a Note for $400,000, **(2)** a Judgment entered by the Los

19  Angeles Superior Court against the Debtors, and **(3)** an agreement dated June 8, 2000 with

20  the Debtors and Randy Johnson.   (See Trial Exhibits 060, 061, and 063.)   I examined the

21  Lapides proof of claim and found that it was consistent with state law and documented a

22  claims against the Estate.

23      15.     At the request of my counsel I agree to retain Mr. Lapides to act as a potential

24  expert witness in this case as to assist me and my counsel with review of documents supplied

25  by the Debtors, by Randy Johnson, by the Johnsons companies, but potentially documents

26  to be produced by third-parties.   The potential terms of Mr. Lapides' employment in this case

27  was fully disclosed to this Court and to all interested parties.   Attached hereto as Exhibit "1"

28

1
2
3
4

and by this reference incorporated herein as if set forth in full is a true and correct copy of Mr.
Lapides' CV and related commendations.   Based on my discussions with counsel and my
review of the Lapides CV I concluded that Mr. Lapides could act as an expert in this case

5
6
7
8

<u>The Randy Johnson 2004 Examination And His Assertion Of The Fifth Amendment
On All Material Questions Regarding His Relationship With The Debtors And The
Debtors' Assets And Liabilities.</u>

9
10
11
12
13
14

16.    In the early part of 2003, upon the prompting by creditor Richard Lapides, I
refocused <u>attention</u> on the facts that the Viro Road Property and JJ&A, which appeared to be
owned and controlled by Randy Johnson, might in fact be owned by the Debtors and yield a
recovery to the Estate.   During the early part of 2003, I instructed my then counsel, Teresa
A. Blasberg, Esq., to obtain a Court Order to examine Randy Johnson under Rule 2004 to
determine if Randy Johnson or his companies possessed recoverable assets for the Estate.

15
16
17
18
19
20

17.    I attended part of the Randy Johnson Rule 2004 Examination.   Randy
Johnson, upon advice of his then counsel David Tilem, refused to respond to most of the
substantive questions regarding the real, personal, and business interests related to the
Debtors, JJ&A, A.I.A., and Q Financial by asserting his right not to testify under the Fifth
Amendment.   In order to prepare this Declaration I reviewed parts of the Randy Johnson
2004 Examination transcript.

21
22
23

<u>I Commenced Gonzalez I To Recover Assets Of The Estate For the Benefit Of
Creditors.</u>

24
25
26
27
28

18.    After examining with my counsel certain documents provided by the Debtors
and Randy Johnson, based on conversation with Mr. Lapides, and in light of the positions
taken by Randy Johnson at his Rule 2004 Examination, I determined that the Estate
possessed enough information to support a good faith Complaint against Defendant Randy
Johnson (which also named Defendant JJ&A which was subsequently dismissed as a party

TRIAL DECLARATION OF ROSENDO GONZALEZ

defendant) to recover interests as fraudulent transfers from the Debtors and to Randy Johnson for the benefit of the Estate, including real property value in the Viro Road Property and in the La Forest Drive Property. This adversary proceeding was filed on June 2, 2003 (hereinafter sometimes referred to as "Gonzalez I.")

19. I subsequently obtained new counsel, the Law Offices of James Andrew Hinds, Jr. (later changed to Hinds & Shankman, LLP), to act as counsel for the Estate in Gonzalez I and in other litigation matters involving the Debtors, Randy Johnson, JJ&A, A.I.A., and Q Financial. As Trustee I expected that my counsel engage in an exhaustive investigation into these relationships. My focus was on third-parties in that I had not received the cooperation of the Debtors and their counsel in this case.

20. As a direct and proximate result of the failure of Randy Johnson and the Debtors to cooperate in discovery, I requested that my counsel conduct discovery against third-party banks, escrow companies, accountants for the Debtors and Randy Johnsons, and against Randy Johnson, Robin Johnson, Jay Johnson, and their companies. Most of the documents sought by me during discovery were documents and things which could have been produced to me as the Debtors' chapter 7 Trustee as part of the chapter 7 case and in response to my formal and informal requests made on the Debtors and Randy Johnson and their counsel, Messrs. Reeder and Tilem (and later Mr. Bovitz).

21. By way of example only, I was not provided with an explanation from the Debtors, nor from Randy Johnson for each of the following:

(A) The Debtors' listing in their sworn Schedules of a "liability" of the Debtors owing to A.I.A. in the sum of $450,000.00;

(B) The Debtors' stating in their sworn Statement of Financial Affairs income of just $48,000.00 which was inconsistent with documents received from third-parties;

(C) Failing to list as an asset in their sworn Schedules of any interest in the Viro Road Property;

///

1
2
(D)     Stating in their Schedules that the Debtors "rented" the Viro Road Property

3       from Randy Johnson for $4,000.00 per month rent;

4       (E)     Failing to list as an asset in their sworn Schedules the La Forest Drive Property;

5       (F)     Failing to list in their sworn Schedules and Statement of Financial Affairs

6       income from A.I.A., JJ&A, and/or Q Financial; and

7       (G)     Failing to list in their sworn Schedules the true value of the Debtors' ownership

8       interest in A.I.A.

9       22.     Each of the maneuvers on the part of the Defendants cost the Estate dearly

10      since the Estate's litigation budget was exhausted several times over as a result of having to

11      dig up information on the Debtors and their dealings with Randy Johnson, McFall, JJ&A,

12      A.I.A., and Q Financial through third-party discovery.

13      <u>I Commenced Gonzalez II Against All Of The Defendants And I Expanded The</u>

14      <u>Estate's Claims</u>.

15      23.     Ultimately, discovery was completed during the late summer and early fall of

16      2004.   The results are contained in several thousands of pages of bank account records,

17      escrow documents, related papers, and deposition testimony.   All of this third-party

18      documentation was supplied to my counsel and to my retained forensic expert, Mr. Lapides

19      to review and digest.

20      24.     The evidence adduced by my counsel gave rise to my filing on September 22,

21      2004 of a second Adversary Complaint against the Defendants to revoke the Debtors'

22      discharge for knowingly and fraudulently overstating their liabilities in their Schedules, for

23      knowingly and fraudulently understating their income in their Schedules and Statement of

24      Financial Affairs, and for their knowing and fraudulent failure to deliver or surrender to the

25      Estate all or any of the property interests of the Estate enumerated in detail in the Complaint

26      (hereinafter referred to as "<u>Gonzalez II</u>").

27      / / /

28

25.    I believe that the evidence adduced by my lawyers as part of <u>Gonzalez I</u> and <u>Gonzalez II</u> supports my <u>prima facie</u> case in the two Complaints that **(1)** the Debtors dramatically under-reported income in their sworn Statement of Financial Affairs and in their sworn testimony to me as the Chapter 7 Trustee in this case, with an intention of misleading me and the Court, **(2)** the Debtors failed to list as assets in their sworn Schedules the valuable ownership interest in real property held in the name of Defendant Randy Johnson and JJ&A and Q Financial, **(3)** the Defendants, and each of them, engaged in a conspiracy to mislead me as the Trustee, hide assets from this Court and the creditors of this case, and convert assets belonging to the Debtors and thus this Estate for their own benefit both before, during, and the filing of this chapter 7 case, and **(4)** the Defendants have continued to employ the assets which should have been part of this Estate to acquire new and valuable properties and things all traceable to the undisclosed assets of the Estate, which were withheld from me as the Trustee and the jurisdiction of this Court.

<u>The Debtors' Schedules Were Materially False And Misleading As Filed With The Court And Never Corrected By The Debtors.</u>

26.    On the Debtors' Schedule F, Creditor # 5, they listed a liability of $450,000.00 to A.I.A.   I asked the Debtors and their counsel to provide me with documentation to verify this item.   I received little from the Debtors during the course of this case and nothing which documented this item.   (See Trial Exhibit 001.)   I have no reason to believe that this liability in fact existed as of the Petition Date.

27.    Based on the Debtor's failure to come forward with proof I conclude that the Debtors did not have a $450,000.00 loan or liability to A.I.A., and therefore the Debtors significantly overstated their liabilities in their sworn Schedules which resulted in the Debtors presenting a grossly inaccurate financial disclosure of their net worth on their Bankruptcy Schedules.

1

2

<u>The Debtors Significantly Overstated Their Liabilities In Their Sworn Schedules Which Were</u>
<u>Never Corrected.</u>

3

4

5

6

7

28.     On the Debtors' Schedule F, Creditor # 8, they listed a liability of $100,000.00 allegedly owed to Randy Johnson for advances for payment of living expenses and for payments to Richard Lapides.   (See Trial Exhibit 001.)   I asked the Debtors and their counsel to provide me with documentation to verify this item.   I received little from the Debtors during the course of this case and nothing which documented this item.

8

9

10

11

12

13

29.     Based on the lack of cooperation from the Debtors and their counsel I concluded that the Debtors did not owe Randy Johnson $100,000.00, or any other significant sum, and therefore that the Debtors significantly overstated their liabilities in their sworn Schedules which resulted in the Debtors presenting a grossly inaccurate financial disclosure of their net worth on their Bankruptcy Schedules.

14

15

<u>The Debtors Understated Their Income For 2001 As Part Of Their Sworn Schedules Filed</u>
<u>With This Court Which Was Never Corrected.</u>

16

17

18

19

20

30.     On the filed Debtors' Statement of Financial Affairs, the Debtors stated that their total year-to-date income as of 4-20-2001 was $13,000.00.   (See Trial Exhibit 001.)   I asked the Debtors and their counsel to provide me with documentation to verify this item.   I received little from the Debtors during the course of this case and nothing which documented this item.

21

22

23

24

25

31.     Based on the lack of cooperation from the Debtors and their lawyers I conclude that the Debtors received significantly more income from 1-1-2001 to 4-30-2001 than the $13,000.00 reported on their Bankruptcy Schedules.   Therefore, the Debtors significantly understated their income which resulted in the Debtors presenting a materially inaccurate disclosure of their income on their Bankruptcy Schedules.

26

/ / /

27

/ / /

28

000252

1

**The Debtors Understated Their Income For 1999 And 2000 As Part Of Their Sworn**

2

**Schedules Filed With This Court And Never Corrected Same.**

3

     32.     On the filed Debtors' Statement of Financial Affairs the Debtors stated that their

4

total income for the year 1999 was $149,500.00.   (See Trial Exhibit 001.)   I asked the

5

Debtors and their counsel to provide me with documentation to verify this item.   I received

6

little from the Debtors during the course of this case and nothing which documented this item.

7

     33.     On the filed Debtors' Statement of Financial Affairs, the Debtors stated that

8

their total income for the year 2000 was $55,000.00.   (See Trial Exhibit 001.)   I asked the

9

Debtors and their counsel to provide me with documentation to verify this item.   I received

10

little from the Debtors during the course of this case and nothing which documented this item.

11

     34.     As a direct and proximate result of the failure of Randy Johnson and the

12

Debtors to cooperate in discovery, I requested that my counsel conduct discovery to verify

13

the Debtors' true income.   Most of the documents sought by me during discovery were

14

documents and things which could have been produced to me as the Debtors' chapter 7

15

Trustee as part of the chapter 7 case and in response to my formal and informal requests

16

made on the Debtors and Randy Johnson and their counsel, Messrs. Reeder and Tilem (and

17

later Mr. Bovitz).

18

     35.     Based on lack of cooperation from the Debtors and their counsel I conclude

19

that the Debtors significantly understated their true reported years 1999 and 2000 claimed

20

income and therefore the Debtors presented a materially inaccurate financial disclosure of

21

their Income on their Bankruptcy Schedules.

22

23

**The Debtors Were The Secret Owners Of The Viro Road Property And Failed To Disclose**

24

**This Ownership Interest To This Court And The Trustee.**

25

     36.     On the Debtors' filed Schedule A, the Debtors stated that they owned <u>no real</u>

26

<u>estate</u>.   (See Trial Exhibit 001.)   On the Debtors' filed Schedule J, the Debtors claimed that

27

they were only "renting" the Viro Road Property from Defendant Randy Johnson for

28

$4,000.00 per month.   (See Trial Exhibit 001.)   I asked the Debtors and their counsel to provide me with documentation to verify these items.   I received little from the Debtors during the course of this case and nothing which documented this item.   I have never been provided with a signed "lease" between Jay Johnson and Randy Johnson for the Viro Road Property.

37.      At the § 341(a) Examination, Jay Johnson testified that he spent less than $100,000.00 of his personal money for the Viro Road Property second floor addition and remodel of the residence.   (See Trial Exhibit 226 at 17:6-16.)   While I asked the Debtors and their lawyers to send me documents on this issue the Debtors failed to provide me with convincing evidence to support their sworn contentions.

38.      Based on the lack of cooperation from the Debtors and their lawyers I conclude that the Debtors had an undisclosed interest in the Viro Road Property that they failed to report on their Bankruptcy Schedules.   Therefore, the Debtors failed to report all of their assets on their Bankruptcy Schedules, which resulted in the Debtors presenting an inaccurate disclosure of their assets and Net Worth on their Bankruptcy Schedules.

The Trustee's Discovery Of The Estate's Claims In Gonzalez I and Gonzalez II Resulted From The Extensive Third-Party Discovery Conducted By The Trustee and Not From The Cooperation Of The Defendants.

39.      Simply stated, the Debtors' hidden assets were only discovered by virtue of responses to the Trustee's discovery propounded to third-party banks, escrow companies, and related entities, a forensic analysis thereof, and through the deposition testimony, among others, of the Debtors, Randy, and Robin Johnson, and various third-parties in these adversary proceedings.   The evidence revealing the transactions at issue in the two Complaints therefore not obtained by my professionals until 2004 pursuant to my third-party discovery requests.

1        I declare under the penalty of perjury and the laws of the United States of America that

2    the foregoing is true and correct.

3        Executed on this 24th day of January 2014 at Los Angeles, California.

4

5

6                      ROSENDO GONZALEZ

7    GonzalezDecOpp.1.13.14.Trustee.wpd

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

000255

# EXHIBIT "1"

# EXHIBIT "1"

000256

## IV.   Qualifications of Analyst

## Richard A. Lapides

**Professional Designation:**   Certified Review Appraiser (C.R.A.)

**1987**   Expert Witness - United States Tax Court

**1979 - Present**   Employed as an Appraiser with the Internal Revenue Service (Department of the Treasury). Independently conduct field examinations, and investigations of various real estate - securing needed public and private records and information from all available sources. Analyze data and make determinations on various technical appraisal and other issues affecting taxable income, such as: fair market value, allocation of total land and buildings, highest and best use of property, useful life, valuation of leaseholds and easements, etc. Examinations frequently require a forensic analysis of the often-voluminous records, in order to determine the true nature of the facts and circumstances involved in the issue under examination. Prepare Valuation and Forensic Analysis Reports detailing nature of findings, and basis for determinations.

Have also participated in Real Estate and Appraisal courses at local colleges and by the professional organizations. Courses completed include:

SREA 101, 201 Introduction to Appraising Real Property
SREA 301 Special Applications of Appraisal Analysis
AIREA Case Studies in Real Estate Valuation
AIREA Valuation Analysis and Report Writing
AIREA Capitalization Theory & Techniques, Part A, B
Creative Financing
Exchange Brokerage

**1977 - 1980**   Actively involved in Real Estate appraisals and related aspects of real property with R & R Properties, a partnership dealing in the acquisition, maintenance, and disposition of multiple-unit residential properties for investment purposes.

## *Qualifications of Analyst*

### *Richard A. Lapides*

| | |
|---|---|
| 1976 - 1977 | Business Auditor for the Internal Revenue Service (Department of the Treasury). Dealt with collecting, organizing, analyzing, appraising, and drawing conclusions from often-voluminous records. Gained extensive experience with residential and commercial properties. Experience included valuation of real and personal property for contribution purposes, and allocation problems. Work involved the analysis and understanding of fairly large businesses, and complex issues involved with large-income individuals. |
| 1975 - 1976 | Employed as a Business Analyst with Dun & Bradstreet, Inc. Analyzed and appraised the worth of various businesses. Often utilized the subject business balance sheet and associated financial statements while looking at the appropriate relationships, ratios, management experience, past and present records in order to place a value on the business being examined. Received an Outstanding Performance Award. |
| 1971 - 1975 | Brigham Young University. Graduated in Physics and Mathematics, with a secondary emphasis in Business. Qualified for the Dean's List. |
| 1969 - 1971 | Engineer. Involved with research and development at the George C. Marshall Space Flight Center (N.A.S.A.) at Huntsville, Alabama. Received Medallion for my contribution to the Apollo Space Program. Also involved with the Space Shuttle Program. |
| 1968 - 1969 | University of Alabama. Majored in Engineering, with a minor emphasis in Mathematics. In Mathematics aptitude tests have scored in the top 1% of the United States. |



MORRISON | FOERSTER

425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482
TELEPHONE:415.268.7000
FACSIMILE:415.268.7522
WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

DENVER, NORTHERN VIRGINIA,
ORANGE COUNTY, SACRAMENTO,
WALNUT CREEK, CENTURY CITY

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

December 22, 2008

Writer's Direct Contact
415. 

Internal Revenue Service
Real Estate Appraisal Section
Mail Stop: LA-4203 Room 5151
300 N. Los Angeles Street
Los Angeles, CA 90012
Attn: N. Mazer

RE:  Richard A. Lapides

Dear Ms. Mazer:

As you may recall from our meeting in Los Angeles, I represented H███████ Investment Company with respect to the examination of their 200603 and 200703 returns. As part of this process, I had the opportunity to communicate regularly with Richard A. Lapides, the Real Estate Appraiser assigned the case. I realize that taxpayers and their representatives do not often write letters such as this one, but as a former attorney for Los Angeles Office of District Counsel, and as an attorney who interacts regularly with the Service, I wanted to express my appreciation for the high level of expertise and professionalism demonstrated by Richard Lapides.

During the examination, Richard Lapides was an advocate for the Service, while at the same time being very reasonable. In my view, he clearly met the IRS "mission" to "provide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and by applying the tax law with integrity and fairness to all." His thoroughness helped this controversy result in an "agreed" determination.

I have dealt with quite a number of capable people at the IRS, but Richard Lapides stands out not just as someone who is an expert in his field, but as someone who provides reasonable analyses that can be understood by the taxpayer. As a closing note, please let me point out that the total of tax, penalties, and interest resulting in large part form the agreement based on Richard Lapides' analysis was in excess of $370,000. Suffice it to say, had he not been persuasive and thorough, this matter would not have "gone agreed."

C:\Documents and Settings\jkf2\Letter to Mazer re R Lapides (5).DOC

**MORRISON | FOERSTER**

Internal Revenue Service
December 22, 2008
Page Two

    As a tax professional, it is encouraging to work across the table from people who take pride in their work. Please feel free to contact me at (415)▓▓▓▓▓ should you have any questions or comments.

                  Sincerely,

                  Tax Partner
                  Morrison & Foerster LLP



# MEMORANDUM



**November 7, 2000**

**TO:** RICKY ROUSSEL, MANAGER ENGINEERING GROUP

**FROM:** ROBERT ████████ ATTORNEY, ESTATE & GIFT TAX

**RE:** Appreciation for the Engineering Group's Assistance in the M████ Estate

**CC:** Richard A. Ullman, Manager E & G, Los Angeles

The purpose of this Memorandum is to recognize the Engineering Group's assistance in the M████ Estate. This unique case involves a re-examination of a case due to possible fraudulent omission of real properties from the Form 706 on a large scale. Without cooperation from the estate's representative, an estimated 40 third party summons issued. Boxes of documents regarding building plans, leases, correspondence, property tax, zoning, deeds of transfer and myriad other issues affecting the real properties in question accumulated. Additionally, volumes of documents provided by a potential informant provided a history of a complex series of deed transfers that clouded the estate's ownership of the commercial properties. District counsel advised that although all the facts supported a fraud cause of action, the re-examination process should wind up by May 2000 to preserve the six-year statute of limitations regarding the substantial omission of assets from the estate.

In approximately October 1999, a Form 5202 requested a review appraisal of multiple properties in Torrance, California. Mr. Roussel assigned the project to ██████████ who had already appraised one of the properties at the request of Revenue Officer Gilbert Flores in 1998. However, Mr. ████████ workload proved too burdensome to initiate the review. Mr. Roussel reassigned the project to Richard Lapides.

Mr. Lapides immediately contacted me to discuss the case. I informed him that the case was complex due to the lack of cooperation and long-term concealment of the estate's interests in the properties. Mr. Lapides set up an appointment to meet me in the office. During our three-hour meeting, I acquainted him with the "tangled web" this case presented. He left the office carting three boxes of documents from various sources including the original examination file, the current examination file, voluminous summons documents, hundreds of real property profiles, the revenue officer's file and voluminous informant data.

In the weeks that followed, Mr. Lapides called me frequently to update his progress. First, he accomplished the monumental task of organizing materials in three ring binders. Second, he deciphered the complex maze of transfers among related entities to establish the estate's ownership of multiple properties. Third, he analyzed the lease data to determine the income on the properties.

Fourth, he analyzed comparable sales to determine the appropriate capitalization rates and multipliers. Fifth, Mr. Lapides completed a summary appraisal.

Mr. Lapides shared his initial conclusions in a joint meeting with ▬▬▬▬ of District Counsel, ▬▬▬▬, R.O. and myself. He explained that to do a complete appraisal of the subject properties would be a long process. However, he rose to the occasion by agreeing to submit a summary appraisal to allow me to incorporate a value into the 90-Day Letter in time for its issuance timely in the shadow of a looming statute date.

Finally, Mr. Lapides provided his conclusions in a meeting with Mr. Roussell and me. His determinations indicated that the estate had undervalued or completely omitted real property assets exceeding $30,000,000 in value. Due to Mr. Lapides's cooperation in making this project a priority and completing it in a swift manner despite adverse circumstances, I was able to complete the re-examination of this case and timely issue a 90-Day Letter incorporating the values of the real properties determined by Mr. Lapides. This Memorandum commends his and Mr. Roussell's efforts in the M▬▬ Estate. This case indicates that the Los Angeles Engineering Group provides excellent work product even under difficult circumstances. Thank you.

000262

21

**Internal Revenue Service**

# memorandum

| | |
|---|---|
| **date:** | April 23, 1998 |
| **to:** | Gus Robinson, Group Manager, SP 1125 (Los Angeles) |
| **thru:** | Richard ▓▓▓▓▓ Associate Chief Los Angeles Appeals Office (Glendale Sub-Office) |
| **from:** | ▓▓▓▓▓▓▓▓ Appeals Officer [Tel. (81▓▓▓▓▓▓▓ ] |

**subject:**   Assistance of Appraiser Richard Lapides in the Additional Development of:

Taxpayer:   ▓▓▓▓ International Corporation (formerly ▓▓▓▓▓ Inc.) and
                  Subsidiaries (CEP Case)
Tax Years:   8711, 8811, and 8911

This memorandum is to express my appreciation for the contributions of Richard Lapides, Appraiser, toward the additional development of this case while it was under consideration in this office. With his help, I was able to settle three large basis-allocation issues in this case on a basis that was fair to both the taxpayers and the government.

You assigned Richard to assist me in this case after I contacted you by telephone and formally requested assistance in this case in a memo dated December 6, 1995, and again when I asked for additional assistance in my memo dated April 8, 1997. (See copies attached for reference.) He responded to my requests by providing a comprehensive appraisal dated November 20, 1996, and an appraisal review report dated June 6, 1997, both of which I found to be very helpful.

This case had already been in Appeals for over a year when I contacted you. Consequently, the case had already taken on a high degree of urgency when Richard did the additional work which I requested. Nevertheless, he displayed a willingness to work with Appeals in a professional, team-oriented manner.

Without the additional help which he provided, I would have found it much more difficult (if not impossible) to settle the basis allocation issues in this case. Therefore, I wish to take this opportunity to acknowledge Richard's efforts, and also thank you as his manager for making him available to assist this office in this case. (A copy of the portion of the Appeals Case Memo which deals with the settlement of the basis allocation issues (pages 24 - 43, plus Attachment 2) is attached for your information.)

1852

Department of the Treasury
Internal Revenue Service

IRS–NTEU National Performance Awards Agreement

# Performance Award

Presented to

*R. Lapides*

In Recognition And Appreciation Of Your Superior Effort,
Dedication And Personal Contribution To Accomplishing The
Goals And Mission Of The Internal Revenue Service

September 8, 2002

Date

Form 9587 (Rev. 9-2002)    Cat. No. 10302V

Department of the Treasury
Internal Revenue Service

IRS-NTEU Contract Awards Program

# Performance Award

### Presented To

## Richard Lapides

In Recognition And Appreciation Of Your Superior Effort,
Dedication And Personal Contribution To Accomplishing The
Goals And Mission Of The Internal Revenue Service

July 1998

_____
Date

_____
DISTRICT DIRECTOR

000265

24

Department of the Treasury
Internal Revenue Service

IRS-NTEU Contract Awards Program

# PERFORMANCE AWARD

### Presented To

## Richard Lapides

In Recognition And Appreciation Of Your Superior Effort,
Dedication And Personal Contribution To Accomplishing The
Goals And Mission Of The Internal Revenue Service

September 1997

Date

DISTRICT DIRECTOR

000266    25    25

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

## Richard Lapides

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

September 1996

Date

DISTRICT DIRECTOR

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

RICHARD LAPIDES

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

FEBRUARY 1995

Date

DISTRICT DIRECTOR

000268

27

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

## Richard Lapides

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

June 1995

Date

DISTRICT DIRECTOR

000269

28  28

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

RICHARD LAPIDES

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT, DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

DISTRICT DIRECTOR

FEBRUARY 1994
Date

000270

Department of the Treasury
Internal Revenue Service

IRS-NTEU Contract Awards Program

# PERFORMANCE AWARD

### Presented To

RICHARD TAPIDES

In Recognition And Appreciation Of Your Superior Effort,
Dedication And Personal Contribution To Accomplishing The
Goals And Mission Of The Internal Revenue Service

DISTRICT DIRECTOR

Date                    MARCH 1992

000271

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

## PRESENTED TO

RICHARD A. LAPIDES

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

DISTRICT DIRECTOR

FEBRUARY 1991

Date

000272

3/31

Personal Information

## MY INFORMATION - PERFORMANCE

| | | | | |
|---|---|---|---|---|
| Name: | Lapides,Richard A | | PD #: | 92462A |
| Emplid: | 332378 | | | |
| Position Title: | Appraiser | GS-1171-13 / 9 | | |

### PERFORMANCE HISTORY

Customize I Find I 🔢   First ◀ 1-10 of 10 ▶ Last

| Overall Performance Rating | Review Period From | Review Period To |
|---|---|---|
| 4 - Exceeds Fully Successful | 07/01/2010 | 06/30/2011 |
| 4 - Exceeds Fully Successful | 07/01/2009 | 06/30/2010 |
| 4 - Exceeds Fully Successful | 07/01/2008 | 06/30/2009 |
| 4 - Exceeds Fully Successful | 07/01/2007 | 06/30/2008 |
| 4 - Exceeds Fully Successful | 07/01/2006 | 06/30/2007 |
| 4 - Exceeds Fully Successful | 05/31/2006 | 05/31/2006 |
| 4 - Greater than Fully Successful | 07/01/2004 | 06/30/2005 |
| 4 - Greater than Fully Successful | 07/01/2003 | 06/30/2004 |
| 4 - Greater than Fully Successful | 07/01/2002 | 06/30/2003 |
| 4 - Greater than Fully Successful | 07/01/2001 | 06/30/2002 |

My Information Menu

| In re: | CHAPTER 7 |
|---|---|
| JAY W. JOHNSON and DEBRA F. JOHNSON, Debtor(s). | CASE NUMBER: ADV. NO. 8:06-ap-01313 ES (Consolidated with Adv. No. 8:06-ap-1311 ES) |

NOTE: When using this form to indicate service of a proposed order, DO NOT list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 21515 Hawthorne Boulevard, Suite 1150, Torrance, CA 90503.

A true and correct copy of the foregoing document described as:  TRIAL DECLARATION OF ROSENDO GONZALEZ will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 23, 2014, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

J Scott Bovitz    bovitz@bovitz-spitzer.com
Rosendo Gonzalez (TR)    rgonzalez@ecf.epiqsystems.com, dgomez@gonzalezplc.com
James Andrew Hinds    jhinds@jhindslaw.com, zbilowit@jhindslaw.com
Cristina F Keith    ckeith@jhindslaw.com
Weneta        M        Kosmala        (TR)        Weneta.Kosmala@7trustee.net,
ca15@ecfcbis.com;wkosmala@kosmalalaw.com;dfitzger@kosmalalaw.com;kgeorge@kosmalalaw.com
Hanna        B        Raanan        hraanan@marlinsaltzman.com,
jhawkes@marlinsaltzman.com;smcgrath@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com
David M Reeder    david@reederlaw.com, jessica@reederlaw.com
Paul R Shankman    pshankman@jhindslaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):**
On January 23, 2014, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**The Hon. Erithe Smith (Via Federal Express)**
United States Bankruptcy Judge
411 West Fourth St., Room 5041
Santa Ana, CA 92701-4593

☐    Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 23, 2014, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

| In re:<br>JAY W. JOHNSON and DEBRA F. JOHNSON, Debtor(s). | CHAPTER 7<br>CASE NUMBER:  ADV. NO. 8:06-ap-01313 ES<br>(Consolidated with Adv. No. 8:06-ap-1311 ES) |
| --- | --- |

**Richard and Janis Lapides (Via E-Mail)**
5107 Castle Rd
La Canada, CA 91011

**Burton V. McCullough, Esq.  (Via E-Mail)**
Law Offices of Burton V. McCullough
4205 Encinas Drive
La Canada Flintridge, California 91011-3108

☐   Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 23, 2014<br>Date | Michelle Patino-Patroni<br>Type Name | /s/ Michelle Patino-Patroni<br>Signature |
| --- | --- | --- |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

James Andrew Hinds, Jr. (SBN 71222)
jhinds@hjindslaw.com
Paul R. Shankman (SBN 113608)
pshankman@jhindslaw.com
Cristina F. Keith (SBN 235578)
ckeith@jhindslaw.com
Hinds & Shankman, LLP
21515 Hawthorne Blvd., Suite 1150
Torrance, CA  90503
(310) 316-0500
Fax: (310) 792-5977

Counsel for Plaintiff and Chapter 7 Trustee, Rosendo Gonzalez

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SANTA ANA DIVISION

| | |
|---|---|
| In Re:<br><br>JAY W. and DEBRA F. JOHNSON,<br><br>          Debtors.<br>_____<br><br>ROSENDO GONZALEZ, etc.,<br><br>          Plaintiff,<br><br>v.<br><br>RANDAL A. JOHNSON, an individual,<br><br>          Defendant.<br>_____<br><br>AND RELATED CONSOLIDATED ACTION | Case No.: SA 06-10373 ES (Chapter 7)<br><br>Adv. No. 8:06-ap-01313 ES<br><br>Consolidated with<br>Adv. No. 8:06-ap-01311 ES<br><br>**TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT**<br><br>Date:  February 24, 2014<br>Time:  9:00 a.m.<br>Place:  Courtroom 5A |

000276

I, Richard Lapides, hereby declare and state as follows:

1.　　I am an individual and a resident of La Canada, California.  I am over the age of 18 and make this declaration willingly. The matters set forth hereinbelow are made of my own personal knowledge of the following facts and if called and sworn as a witness, I could and would testify competently thereto.

Pre-Petition Real Property Transaction Between Me and The Johnsons

2.　　I have known the Jay and Debbie Johnson for more than 20-years, we are all members of the same Church of Jesus Christ of Latter-day Saints located in La Canada, California.

3.　　On August 28, 1987, I purchased a parcel of real property from Jay and Debbie Johnson on La Forest Drive (hereinafter referred to as the "Lapides Property") for $220,000.

4.　　In early 1992, I discovered that, contrary to the representations and warranties contained in the Purchase Agreement, the Lapides Property did not have access to water.

5.　　In an effort to settle the dispute in which I alleged a fraud in connection with the sale of the Lapides Property, a settlement was entered into between myself and the Johnsons whereby the Johnsons signed a note in favor of myself for $225,000, initially payable at $500.00 a month

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000277

(a true and correct copy of the Note is attached as Exhibit "2" to the Lapides Proof of Claim).

6.    The first payment was due under the Note on September 1, 1993.  The Johnsons missed this payment and the subsequent $500 payment due a month later on October 1, 1993.  As a result of the default under the Note, I filed suit against the Johnsons in Los Angeles Superior Court, Case No. EC 013523.

7.    On May 12, 1994, I obtained a default judgment against the Johnsons in the amount of $383,701.73.

8.    On May 27, 1994, in order to avoid immediate enforcement of my judgment, the Johnsons signed a new $400,000 Note that called for $500.00 a month payments for two years, at which time either the balance would be due or the Johnsons could exercise an option to extend the Note for one year and increase the monthly payments to $1000.00.

9.    The Johnsons made payments totaling $24,500 and then stopped making payments under the Note, forcing me to record my judgment thereby creating a lien on additional real property owned by the Johnsons.

10.   On June 8, 2000, I entered into a new agreement with Jay Johnson and AIA. Jay Johnson made the first payment of $10,000 to me from his

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000278

personal checking account at Citizen's bank after this $10,000 was transferred to Jay Johnson's personal bank account from a Q Financial bank account.  Q Financial, an entity purportedly titled in the name of Randy Johnson, made additional payments of $22,500 to me as one of the Debtor's creditors, per the terms of the 6-8-2000 Agreement.

11.    On or around March 2, 2007, the Debtors and the Defendants sued me and my spouse, Janis Lapides, in Los Angeles Court Superior Court, Case No. BC367211 for breach of contract, fraud, and intentional infliction of emotional distress. This case is currently stayed pending the resolution of these Adversary Proceedings.

My Relationship With Opposing Counsel Burton McCullough And The Johnsons

12.    Mr. McCullough and I are both members in the same congregation of the Church of Jesus Christ of Latter-day Saints in La Canada, California and have known each other for over 15-years.

13.    On June 6, 2006, Mr. McCullough entered his appearance in Gonzalez II as counsel for the Debtors.  (DN 7).

14.    On August 15, 2006, Mr. McCullough entered his appearance in Gonzalez I as counsel for the Defendant Randy Johnson.  (DN 7).

15.    I am informed believe that in approximately 2009, Mr. McCullough filed a complaint against me with the IRS Inspection Division.  The resulting investigation lasted over two-years and the Division ultimately dismissed

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000279

the complaint as unfounded, and took no action against me. Throughout the investigation, the investigator officials referred many times to the alleged accusations of Burton McCullough, mentioning Mr. McCullough by name.

16.    I am informed and believe that sometime in 2009 to 2010, Mr. McCullough wrote a letter to the IRS alleging that I had taken inappropriate actions on my Federal Income Tax Returns. This letter prompted an extensive audit that endured for over three-years, and which resulted in my receipt of "no change" letters for both tax return years that were audited.

17.    Mr. McCullough, on behalf of Randy Johnson and Robin Johnson, JJ&A and Q Financial, filed a civil action against me and Janis Lapides seeking damages wrongfully alleging that Janis and I are the plaintiffs in the Trustee's pending adversary proceeding filed with this Court. The action is entitled <u>Johnson et al. v Lapides, et al.</u> Case No. 267 211, Los Angeles Superior Court, Mosk Courthouse. The Judge in this action has stayed prosecution of the Superior Court action pending the trial before this Court. The allegations made against me and my wife are without merit and designed to stop me from assisting the Estate as its retained expert.

000280

My Claims Against The Debtors

18.   I am a creditor of the Chapter 7 Estate of Jay W. Johnson and Debra F. Johnson, having filed a timely proof of claim on June 21, 2004. See Claim No. 2. The Lapides Claim is based upon **(1)** a Note for $400,000, **(2)** a Judgment entered by the Los Angeles Superior Court against the Debtors, **(3)** an Agreement dated June 8, 2000 with the Debtor Jay Johnson and AIA, and (4) an Option to purchase Land dated April 12, 1990. (See Trial Exhibits 060, 061, and 063.)

19.   On 10/1/04, the Debtors objected to the Lapides Proof of Claim by filing a Complaint which was assigned adversary number LA 04-02572 ES and renumbered to SA 06-1312 ES. ). This adversary proceeding is currently stayed pending the trial in these adversary proceedings. On July 15, 2004, the Trustee filed his Declaration Re; Unsecured Claim Filed by Richard Lapides in which the Trustee found merit in the Lapides claims.

Jay and Debra Johnson File This Chapter 7 Case And File Sworn Schedules And Appear Under Oath At Their First Meeting Of Creditors

20.   The Debtors, Jay and Debra Johnson, commenced this chapter 7 bankruptcy case by filing a voluntary petition on April 5, 2001 (hereinafter referred to as the "Petition Date"). In conjunction with the Petition filing, the Debtors filed their Schedules and Statement of

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000281

Financial Affairs.  Rosendo Gonzalez was duly appointed the chapter 7

trustee in this case.  (See Trial Exhibit 001.)

21.     On May 8, 2001 and June 12, 2001, I attended the First Meeting Of

Creditors conducted by Rosendo Gonzalez of the Debtors.  (See Trial

Exhibit 226.)  At the First Meeting of Creditors conducted by Rosendo

Gonzalez Mr. Gonzalez requested that the Debtors and their counsel,

David Reeder, produce to the Trustee certain documents and things

related to the operations of two businesses, Jay Johnson A.I.A. and

Associates, Inc. (hereafter referred to as "AIA") and JJ&A Associates,

Inc. (hereinafter referred to as "JJ&A").

(A)     For AIA, copies of the bank statements for the last year, copies of

cancelled checks for the last 90-days prior to the bankruptcy filing, a copy

of the last AIA tax return, and any cancelled checks post-petition.  (Trial

Exhibit 226 at page 7.)

(B)     For Canyon Meadows, LLC, copies of the Debtors' claim to any

potential right to payment from profits.  (Trial Exhibit 226 at page 11.)

(C)     As to the alleged $450,000.00 transaction between the Debtors and

AIA, copies of any documentation regarding JJ&A and AIA regarding all

the transfers such as the articles, bylaws, corporate solutions for both

entities related to the alleged transfer of $450,000.00.  (Trial Exhibit 226 at

pages 12-14.)

000282

(D)     For AIA, copies of any documents regarding any contracts that the Debtor and the entity have entered where the Debtor and the entity ware currently working on, so somebody may owe you the Debtor and the entity money.  (Trial Exhibit 226 at page 18.)

22.     I have personally reviewed the PACER docket in the main case and can report that the Debtors filed minor amendments and supplements to their Schedules and Statement of Financial Affairs in this case after all of the Schedules were filed.

**The Chapter 7 Trustee Retains Richard Lapides As A Consultant To Investigate The Relationships Between Jay Johnson, Randy Johnson, AIA, JJ&A, And Q Financial**

23.     In 2002, the Chapter 7 Trustee, Rosendo Gonzalez, and his counsel, the Law Offices of James Andrew Hinds, Jr., requested that because of my experience as a real estate specialist and analyst, I observe and review all testimony and documents produced in connection with Adversary Proceeding No. AD 03-01851-ES (hereinafter referred to as "Gonzalez I").

24.     Based on conversations with the Trustee and the Trustee's counsel, a comprehensive discovery plan was put into effect to obtain documents and testimony related to the businesses and other relationships between the Debtors, Randy Johnson, AIA, JJ&A, and Q Financial.   This discovery plan began with the depositions of Jay, Debra, Randy and

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000283

Robin Johnson.   I personally attended the depositions taken by the Trustee in these matters.  As noted below, the Trustee received little, if any, cooperation from the Defendants in these matters thus necessitating conducting extensive discovery from third-parties.

25.     Based on conversations with the Trustee and the Trustee's counsel, third-party subpoenas were issued to, among others, accountants who performed work for the Debtors, Randy Johnson, AIA, JJ&A, and Q Financial, escrows who handled real property transactions related to the Debtors, Randy Johnson, AIA, JJ&A, and Q Financial, banks who held checking and deposit accounts for the Debtors, Randy Johnson, A.I.A., JJ&A, and Q Financial, and third-parties who had documented real property dealings with the Debtors, Randy Johnson, AIA, JJ&A, and Q Financial.   In response to these third-party subpoenas, the Trustee was served with tens of thousands of pages of documents.

26.     The Exhibits referred to herein are contained in the Parties' Joint Exhibit List, and are true and correct copies of various bank records, escrow documents, and related papers produced by those third-party entities subpoenaed by the Trustee and who produced documents upon the request of the Trustee and his counsel in Gonzalez I.  I am now and have been the custodian of records for all of the discovery responses obtained by the Trustee during the course of these cases.   I have personally reviewed each record and noted below the source of the

000284

documents used by me as part of my Reports and testimony in this matter.

27. The references in this Declaration to "T" exhibit numbers refer to the corresponding exhibit numbers of the documents attached to my Reports. (See Trial Exhibits 227 and 228.)

28. I am a senior real estate specialist and I perform forensic accounting work for the Internal Revenue Service. On November 27, 2006, I was properly designated as an expert in these consolidated Adversary Proceedings pursuant to 7026 of the Rules of Bankruptcy Procedure and Rule 26(a)(2) of the Federal Rules of Civil Procedure. A true and correct copy of my qualifications and background regarding same is attached hereto as <u>Exhibit 1</u> to this Declaration and incorporated herein by this reference as if set forth in full. I have been qualified and I have testified as an Expert in United States Tax Court. I have done forensic accounting analyses in almost every case that I have worked on for the Department of the Treasury, and I have been doing this type of work for more than 30 years for the Department of the Treasury. A more detailed description of my work is attached hereto as <u>Exhibit 1,</u> which describes my main qualifications and supplemental Qualifications/Information in addition towards received, commendations received, and evaluations of my work from my direct supervisors, clients, and in connection with taxpayer cases.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000285

29.    As a senior real estate appraiser specialist and analyst for the Internal Revenue Service I have been trained in a number of methods for identifying and documenting fraudulent conduct by taxpayers.  When the IRS suspects a taxpayer is underreporting income, or has unreported real estate assets, various Internal Revenue Code sections come into play.

30.    Internal Revenue Code section 6001 requires a taxpayer to keep adequate records to compute taxable income.   When a taxpayer's accounting method does not clearly reflect income, section 446(b) gives the IRS authority to compute taxable income using alternate methods. This section allows the service to use reasonable means to determine income when accounting records do not support the income and deductions a taxpayer reports.

31.    If there is a reasonable indication of unreported income, the IRS can use an indirect method to reconstruct it. The Internal Revenue Service's use of indirect methods has proved highly successful in identifying fraud.

32.    The Internal Revenue Manual sets forth minimum income probes.  For nonbusiness returns (having no Schedule C or F), an agent is to question the taxpayer or the representative about possible sources of income other than reported on the return.  If there is no other information in the file indicating potential unreported income, the minimum income probe is met.  However, for taxpayers who are self-employed and file a

11
TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000286

Schedule C or F, or is an owner of a corporation, an analysis is made from tax return information to determine if reported income is sufficient to support the taxpayer's financial activities.

33.  I was also trained to look into the lifestyle of a taxpayer which many times gives clues as to the possibilities of unreported income.  Simply stated, if someone is spending beyond his or her apparent means, there should be a concern.

34.  Another tool I was trained to use was the Bank Deposit Analysis Method. Whereas the focus of the Net Worth Method is on the year-end bank balances, as well as other assets and liabilities, the bank deposit method looks at the funds deposited during the year.  This method attempts to reconstruct gross taxable receipts.  The bank deposit method is appropriate when most of the income is deposited in banks and most of the expenses are paid by check.  This technique may be used to audit income of professionals who normally receive payments in the form of checks. I also utilized the standard Bank Deposits Method of proving Income in my reports. The Bank Deposits method of proving income utilizes bank account records to establish a subject's income.

35.  The theory behind the Bank Deposits Method of proof is simple. There are only three things a subject can do with money once it is received, i.e., he/she can spend it, deposit it, or hoard it. Accounting for these three areas considers all funds available to the subject. If non-income

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000287

sources are eliminated, the remaining currency expenditures, deposits, and increases in cash on hand will equal the correct income. The Bank Deposits Method of proof requires the analyst to conduct a thorough analysis of the deposits and canceled checks which relate to any and all bank accounts controlled by or capable of being used by the subject party. Additionally, the analyst should document the subject's currency expenditures and cash on hand. A brief overview of the bank deposits method of proof formula is to begin with the Total Bank Deposits, Add Currency Expenditures, Subtract Non-Income Deposits and Items, Subtract verified Business Expenses, and Subtract Adjustments to Income to get the subject party's Indicated Income.

36. The Bank Deposit analysis was hampered by the debtors and defendants refusal to provide the requested financial information to the Trustee. Therefore, I utilized both the Bank Deposits Method, and Checks Method to determine income, and these analyses indicated that the debtor-claimed income was significantly understated as further discussed herein.

The Trustee Designates Me To Be His Forensic Expert In These Matters And I Prepare Two Reports On The Businesses And Other Dealings Between The Debtors, Randy Johnson, AIA, JJ&A, And Q Financial

000288

37.     The Trustee submitted my expert's Report dated November 11, 2006 entitled: A Forensic Analysis of the Bankruptcy Estate of Jay and Debra Johnson as of April 5, 2001 (hereafter referred to as "Lapides Report #1"). This Lapides Report #1 and the attached exhibits are incorporated herein as if set forth in full. This Lapides Report #1 was filed as DN 410. (See Trial Exhibit 227.)

38.     The conclusions contained in my Lapides Report #1 are based upon my careful review of thousands of pages of bank records, escrow documents, related papers, and the testimony of the Debtors and related witnesses in Gonzalez I and Gonzalez II. The Trustee only discovered these documents through extensive and expensive third-party discovery. The subject documents and testimony were completely produced for my review and analysis by approximately the late summer of the year 2004. In addition to the documents produced during the discovery period, I have reviewed additional documents that have been produced by the Defendants during the course of these Adversary Proceedings.

39.     Based on my initial review of the documents referenced in paragraphs 8 and 9 supra, I drafted my original report containing my conclusions regarding the conduct of the Debtors, their actual financial position based on the documentary evidence, and the assets that rightfully belonged to the Bankruptcy Estate. However, as a result of the Defendants' subsequent production of additional documents throughout the course of these Adversary Proceedings and after the expiration of

000289

the discovery cut-off, my original report was updated and revised, with the revised report being filed with this Court in December of 2013 (hereafter referred to as "Lapides Report #1") as was filed as Docket Item #410. This Lapides Report #1 and the attached exhibits are incorporated herein as if set forth in full. This Lapides Report #1 and the attached exhibits were submitted to the Defendants' and Debtors' attorney.

40. All in all, I have spent more than 4,000 man-hours working on my Expert's Reports in this matter. This time has been spent in, among other activities, **(1)** reviewing deposition and examination transcripts, **(2)** attending depositions and examinations if the Defendants and third-parties, **(3)** reviewing documents produced to the Trustee from escrow offices, banks, accountants, business partners of the Defendants, **(4)** review the Turne4r Expert Report submitted by the Defendants, and **(5)** in conferring with the Trustee and the Trustee's counsel. Consistent with my training I have review hundreds of checks from bank accounts associated with the Defendants.

The Trustee Files A Second Adversary Proceeding Based On Discoveries Obtained Through Discovery From Thrid-Parties

41. On September 22, 2004, the Trustee filed "Rosendo Gonzalez, Chapter 7 Trustee v. Jay W. Johnson and Debra F. Johnson," Adversary

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000290

Proceeding No. AD 04-02540 ES (hereinafter referred to as "Gonzalez II"). On March 3, 2005, these adversary proceedings were consolidated and it was stipulated on the record and incorporated in the signed Consolidation Order entered on April 11, 2005, that all of the discovery taken in Gonzalez I be allowed to be used in the Gonzalez II matter.

The Defendants Retain Their Own Expert And File An Expert's Report By Chad Turner And I Responded To Same

42.    On February 26, 2007, counsel for the defendants submitted their Expert Witness Designation and attached their Expert Witness' Report for Randy and Robin Johnson, JJ&A Architects, Inc., and Q Financial Group, LLC prepared by Chad R. Turner, CPA entitled Refutation of A Forensic Analysis of the Bankrupt Estate of Jay and Debra Johnson as of April 5, 2001 (hereafter referred to as "Turner Report"). The Defendants apparently never filed the Turner Report with this Court. The Trustee filed a copy of the Turner Report In December OF 2013. (DN #411.)  (See Trial Exhibit 222.)

43.    In addition to my Lapides Report #1, after reviewing the report prepared by Mr. Turner, I generated a second report entitled "Response to Report prepared by Chad R. Turner" (hereafter referred to as Lapides Report #2). My Lapides Report #2 contains 180 pages and Exhibits

000291

T220 to T253. The Trustee filed a copy of Lapides Report #2 on December 4, 2013. (DN #401)  (See Trial Exhibit 228.)

44.     Based upon my review and preliminary findings reached in the Lapides Report #1 and Report #2, and my personal review of the documents and things produced during discovery in these matters as referenced hereinbelow, I reached the following general conclusions:

A. The Debtors' listed liabilities on their sworn Bankruptcy Schedules including a putative $450,000.00 liability to AIA, and a putative $100,000.00 **liability to** Randy Johnson; that were not in fact liabilities of the Debtors,

B. The Debtors failed to disclose substantial income received from AIA and JJ&A for their personal benefit on their filed tax returns for the tax years 1999-2001 and on their sworn Bankruptcy Schedules;

C. The Debtors failed to disclose to this Court and to the Trustee a valuable interest in the business of JJ&A which was operated by Jay Johnson; and

D. The Debtors' failed to disclose to this Court and to the Trustee valuable interest**s** in real property, which was then used by the Debtors to acquire other valuable real properties not disclosed to the Trustee and this Court.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000292

45.  The following paragraphs provide documentary evidence that support

the conclusions contained in my Lapides Reports #1 and #2 and in this

Declaration and provides references to the evidentiary support thereto in

the form of citations to the Joint Exhibit List filed by the parties and by

reference to charts that I prepared to summarize the information

contained therein.

46.  This declaration only addresses ten (10) key issues, set out below and is

not a replacement of the full analysis in my two reports. The ten (10) key

issues covered in this declaration are:

1.  Non-Existent $450,000 AIA Liability Reported on the Debtors'
    sworn bankruptcy schedules;

2.  Non-Existent $100,000 Randy Johnson Liability Reported on the
    Debtors' sworn bankruptcy Schedules;

3.  Debtor Jay Johnson's Income for 1-1-01 to 4-20-01 was at Least
    $242,133 vs. $13,000 reported on the Debtors' sworn the
    bankruptcy Schedules;

4.  Debtor Jay Johnson's Income for 2000 was at Least $367,117 vs.
    $55,000 reported on the Debtors' sworn the bankruptcy
    Schedules;

5.  Debtor Jay Johnson's Income for 1999 was at Least $370,979 vs.
    $149,500 reported on the Debtors' sworn the bankruptcy
    Schedules;

6.  Debtor Jay Johnson's Failed to Disclose $1,959,439 Deposited to
    JJ&A Account was His or AIA's Money;

7.  Debtors Had But Did Not Report Any Ownership Interest in the
    $1,495,000 Viro Road Property;

8.  Debtors Had But Did Not Report Any Ownership Interest in the
    $775,000 La Forest Drive Property; and

9.  Debtors Did Not Disclose Income Received From Q Financial;

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000293

10.  **Debtors' Acquired Other Real Estate Assets That Were Not Disclosed to the Trustee Or The Court.**

<u>The Debtors Overstated Their Liabilities On Their Sworn Bankruptcy Schedules</u>

<u>The Putative $450,000.00 Liability Owed To AIA.</u>

47.  On the Debtors' Schedule F filed in their Chapter 7 they listed a liability of $450,000.00 to Jay Johnson's 100% owned corporation AIA.  (Trial Exhibit 001 and this Court's Order on Findings of Fact and Conclusions of Law for MSJ filed as docket item # 358, and docket item # 354, p. 168.)

48.  However, at his deposition, Jay Johnson testified that AIA had <u>not</u> loaned him any money between 1995 and 2003.  (Jay Johnson depo. p. 169:4-17 and this Court's Order on Findings of Fact and Conclusions of Law for MSJ filed as docket item # 358, and docket item # 354, p.187.)

49.  I reviewed the actual 1999 to 2003 Tax Returns of AIA and these tax returns show that there was never a $450,000.00 "Loan" to Jay Johnson from AIA (Trial Exhibits 185, 186, 187, 188, and 189.)  (<u>See also</u>, <u>Chart 1</u> attached hereto.)  Chart 1 attached hereto shows a summary of the data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000294

50.     Jay Johnson signed AIA's Year 2000 Federal Income Tax Return, and showed his title as "President" and stated "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete."  (Trial Exhibit 186 (T222, p.2250)).

51.     As part of the discovery in these matters the Debtors and the Debtors' attorney, Mr. McCullough, admitted that the Debtor did not have the claimed $450,000.00 "Loan" or "Liability" owed to AIA.  Quoting from the Debtors' attorney Mr. McCullough's declaration:

> "the existence of a $450,000 loan from Jay Johnson
> AIA to Jay Johnson on the date of bankruptcy <u>was a</u>
> <u>mistake on Jay Johnson's</u> part insomuch as the
> previous loans from the company to Jay Johnson had
> been reduced by his accountant on the tax returns to
> $17,500 by the end of the year 2000."

(Motion to Strike Lapides Declaration, docket item # 279, filed 7-5-11, at ¶ 7:1-5, emphasis added).

52.     Based on the above undisputed evidence: **(1)** Jay Johnson testified that AIA had not loaned him any money between 1995 and 2003; **(2)** the actual undisputed Federal Tax Returns of AIA show that there was not a $450,000.00 "Loan" to the Debtor from AIA; and **(3)** the Debtors'

000295

attorney, Mr. McCullough, has now admitted that there was not a

$450,000.00 "Loan" or "Liability" owed to AIA.

53.    Based on the above undisputed evidence I concluded that the Debtors

did not have a $450,000.00 "Loan" or "Liability" to AIA, and therefore the

Debtors significantly overstated their Liabilities, which resulted in the

Debtors presenting an inaccurate financial disclosure of their Net Worth

on their sworn Bankruptcy schedules.


The Putative $100,000 Liability Owed To Randy Johnson Shown On The

Debtors' Sworn Bankruptcy Schedules.

54.    The Debtors' Schedule F filed in their Chapter 7 listed a liability of

$100,000.00 to Jay Johnson's brother Randy Johnson for Advances for

Payment of Living Expenses and for Payments to Richard Lapides.

(Trial Exhibit 001.)

55.    However, at his deposition, Jay Johnson was asked if Randy Johnson

had ever loaned him any money between 1995 and 2003, and the Jay

Johnson responded that he "didn't remember."  (Jay Johnson depo. pp.

168:11-169:2, and 245:10-24.)

56.    At his deposition, Randy Johnson was asked: **(1)** if he ever made any

advances to the Debtors for living expenses; **(2)** if he ever made any

advances to the Debtors for payments to Richard Lapides; and **(3)** if the

Debtors, or Jay Johnson individually, owed him $100,000.00 for any reason. Randy Johnson asserted his 5th Amendment and refused to answer all of these questions. (2003 Randy Johnson depo. pp. 58:17-59:18.)

57. At his deposition, based on the 5th Amendment, Randy Johnson also refused to answer the Trustee's questions as to why Q Financial made payments to Lapides on a debt owed by the Debtors. (2003 Randy Johnson depo. p. 82:3-6.)

58. The Trustee's Request for Admission asked Randal Johnson to admit that the Q Financial bank account at Wells Fargo Bank was used to pay a $10,000.00 Jay Johnson obligation to Richard Lapides and was also used to pay nine (9) $2,500.00 payments made to Lapides for a total of $32,500.00 for Jay Johnson's personal debt to Lapides per the June 8, 2000 Agreement. Randy Johnson "denied" all of these assertions. (Trial Exhibit 93 (T109, p. 1122:13-21).)

59. As part of the written discovery in these matters, Jay Johnson was asked to, "Admit that in your chapter 7 bankruptcy Schedules you listed a liability of $100,000 owed to Randy Johnson." Jay Johnson admitted that they signed the Bankruptcy Schedules, but he denied the balance of this Request #3. (Trial Exhibit 180 (Request No. 3, p. 4:10-21.)

000297

60. The Trustee's Request for Production of Documents asked the Debtors to produce any and all documents related in any way to any loan taken out by the Debtors from any lender.  There was no documentation of any kind provided by the Debtors concerning the alleged $100,000.00 liability reportedly owed to Randal Johnson.

61. My review of the actual documentation and evidence revealed that during this same period of time, Jay Johnson was making monetary "gifts" and "loans" to his brother Randy, and not the other way around as shown on the sworn Bankruptcy Schedules.  As shown in <u>Chart 2</u>, the Debtor gave Randy Johnson $28,500.00 in "gifts" and "loans" from 1998 to 2001.)  Chart 2 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

62. At his deposition Jay Johnson was shown copies of the four "Gift" checks to Randy Johnson (totaling $13,500.00) and asked if he could explain them.  The Debtor responded that "he didn't remember" why he wrote the above checks.  Jay Johnson then did admit that he personally wrote out these checks to his brother Randy - but stated he didn't remember why.  (JJ depo. pp. 286:10-290:4.)

63. Jay Johnson was shown the $15,000 "Loan" check to Randy Johnson at his deposition and asked if he could explain the check. The Debtor responded that he didn't know why he wrote this $15,000 check to his

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000298

brother Randy.  The Debtor did admit that he personally wrote out the $15,000 check.  (Jay Johnson depo. pp. 281:20-284:7.)

64.     The Debtor also gave Randy Johnson $7,200.00 from 1997 to 1998 that were not identified as reimbursement for Viro mortgage payments.  (See Chart 3 attached hereto.)  Chart 3 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

65.     If Randy had loaned his brother Jay money in 1998-2001 that was still not paid back in 2001 (as claimed on the Bankruptcy Schedules), it appears that when Jay Johnson was giving Randy Johnson the above $13,500.00 in "Gifts" in 1998 and 1999, and the $7,200.00 in 1997 and 1998, that this would have been an off-set to any money that Jay Johnson actually owed Randy Johnson.  A similar assertion could be made about the $15,000.00 Loan check to Randy Johnson that was dated January 7, 2001.

66.     Based on the above undisputed evidence I concluded that the Debtors did not have a $100,000.00 liability to Randy Johnson based on **1)** the Debtor Jay Johnson's direct testimony that he didn't remember if Randy Johnson ever Loaned him any money; **(2)** the failure of the Debtors to provide any verification whatsoever for the claimed $100,000.00 loan from Randy Johnson; **(3)** Randal Johnson's refusal to answer any questions from the Trustee about any money that he may or may not

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000299

have loaned to the Debtors; **(4)** the indication that the Debtor was making monetary gifts to Randy Johnson; **(5)** the indication that the Debtor was loaning money to Randy Johnson  (and not the other way around); and **(6)** the data discussed in my Forensic Reports.

67.   Therefore, I concluded that the Debtors significantly overstated their Liabilities with respect to the $100,000 Randy Johnson Liability listed on their Bankruptcy Schedules, which resulted in the Debtors presenting an inaccurate financial disclosure of their Net Worth on their sworn Bankruptcy Schedules.

## The Debtors Failed To Disclose Significant Income For The Years 2001, 2000, And 1999

### Undisclosed Income from January 1, 2001 to April 20, 2001.

68.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I concluded that the Debtors' income from January 1, 2001 to April 20, 2001, was at least $242,133.00 as compared to the $13,000.00 reported on the Debtors' sworn Bankruptcy Schedules.  (Trial Exhibit 001.)

69.   In order to estimate the Debtors' Income for the period from January 1, 2001 to April 20, 2001, I utilized the Debtors' Individual

25

000300

Federal Income Tax Return for the Year 2001, the Debtors' 100%-owned

AIA Corporate Income Tax Return for the year 2001, AIA's financial

records and checks issued, AIA's Bank Statements, JJ&A's Corporate

Income Tax Return for the year 2001, JJ&A's Financial Statements,

JJ&A Bank statements, JJ&A Deposit Records, and JJ&A checks issued

to arrive at the Debtors' January 1, 2001 to April 20, 2001 income of

$242,021.  (See Trial Exhibits 003, 004, 020, 186, 190, 191, and 193.)

(See <u>Chart 4</u> attached hereto).   Chart 4 attached hereto shows a

summary of this data and my conclusions that are discussed herein.

This Chart was prepared by me and is incorporated herein as if set forth

in full.

70.    I did not review the Debtor Debra Johnson's stated income of $3,000 for

the period from January 1, 2001 to April 20, 2001, and therefore, I am

not rendering any opinion on this issue.

71.    On the Debtors' Statement of Financial Affairs filed in their Chapter 7,

the  Debtors  stated  that  their  total  year-to-date  income  as  of

April 20, 2001, was $13,000.00.  (Trial Exhibits 001.)

72.    Based upon my review of the documents as set forth in the Lapides

Report #1 and #2, and my personal review of the documents and things

produced  during  discovery  in  these  matters  as  referenced  herein,  I

concluded  that  the  Debtors  received  at  least  $94,721.00  in  checks

issued directly to Jay Johnson or to AIA just from January 1, 2001 to

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000301

March 4, 2001, that the Debtor deposited into an account in the name of JJ&A which was not disclosed to the Trustee or this Court. As shown, there was $57,718.00 ($1,718.00 + 56,000.00) in checks issued directly to Jay Johnson personally just in January 2001, and $37,003.00 ($9,600.00 +1,000.00 + 12,391.00 + 1,125.00 +7,857.00 + 5,030.00) in checks issued to AIA (Trial Exhibit 4C.)  (See Chart 5 attached hereto.) Chart 5 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

73.     These checks totaling $94,721.00 received from January 1, 2001 to March 4, 2001, were deposited into a Bank of America account (bank account #04889-04352) in the name of JJ&A, which bank account was not disclosed to the Trustee of this Court. (Trial Exhibit 4C.)

74.     Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I concluded that in addition to the above $94,721.00 income that the Debtor received from January 1, 2001 to March 4, 2001 and deposited into the undisclosed JJ&A bank account, the Debtor also received: **(1)** additional income of $15,000.00 in checks that JJ&A paid to AIA; **(2)** $5,800.00 from AIA salary checks; **(3)** $9,794.00 from checks that AIA paid for the Debtors' personal bills and expenses; **(4)** $12,615.00 from

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000302

JJ&A salary checks; and **(5)** $104,203.00 in checks that JJ&A paid for the Debtors' personal bills and expenses for total income of at least $242,133.00 for the period of time from January 1, 2001 to April 20, 2001. This compares unfavorably to the $13,000.00 in income reported as part of the Debtors' limited disclosures to the Trustee. (See <u>Chart 4</u> attached hereto). Chart 4 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

75.    Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I concluded that in addition to the above $94,721.00 received by the Debtors, the Debtors also received $15,000.00 in checks that JJ&A paid to AIA during January 1, 2001 to April 20, 2001. (See <u>Chart 6</u> attached hereto). Chart 6 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

76.    Jay Johnson reported that he received $20,000.00 from A.I.A. in the year 2001 on his Federal Income Tax Return, which would yield at least $5,800.00 ($20,000.00 x 3.5 months ÷ 12) from January 1, 2001 to April 20, 2001. Although the Debtors failed to supply the Trustee with the requested AIA financial records requested, I did find one $3,000.00

000303

AIA check #1927 to the Debtor Jay Johnson dated March 10, 2001, as well as two $1,000.00 checks (check #1934 dated April 5, 2001, for $1,000.00; and check #1936 dated April 19, 2001, for $1,000.00. (See Trial Exhibits 20A, 20B and 202A.)

77.     Jay Johnson testified during his deposition in this matter that AIA paid many of his personal bills and expenses including his Master Charge bills, Visa bills, family members' health insurance payments, and life insurance payments (Jay Johnson depo. pp. 44:20-45:2, 238:14-239:8).

78.     Also, AIA issued $9,794 in checks for the Debtors personal bills and expenses during January 1, 2001 to April 20, 2001. (See <u>Chart 7</u> attached hereto). Chart 7 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

79.     Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I concluded that JJ&A issued $12,615.00 in salary checks directly to Jay Johnson from January 1, 2001 to April 20, 2001. (See <u>Chart 8</u> attached hereto.) Chart 8 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000304

**80.** The debtor Jay Johnson testified that JJ&A paid many of his personal bills and expenses, including payments for his BMW car, insurance payments, medical expenses, travel expenses, physical therapy bills, his children's dental bills, his wife's OB/GYN appointments, his Master Charge bills, his Visa bills, his family members health insurance payments, and his life insurance payments (JJ Depo, 228:25 to 229:6; 230:2 to 231:12; and 238:14 to 239:8).

**81.** Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I concluded that JJ&A also issued $104,203.00 in checks for the Debtors' personal bills and expenses during January 1, 2001 to April 20, 2001. (See <u>Chart 9</u> and <u>Chart 10</u> <u>through</u> <u>Chart 19</u> attached hereto.) Charts 9 and 10 through 19 attached hereto show summaries of this data and my conclusions that are discussed herein. These Charts were prepared by me and **are** incorporated herein as if set forth in full.

**82.** Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein and utilizing the Checks Method, the Debtors received a minimum income of $242,133.00 during the period January 1, 2001 to April 20, 2001, compared to the Debtors' bankruptcy-listed scheduled income of only

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000305

$13,000.00 from January 1, 2001 to April 20, 2001.   (See Chart 4 attached hereto.)  Chart 4 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.   The indicated minimum income of $242,133.00 for January 1, 2001 to April 20, 2001, was more than 18 times the $13,000.00 that the Debtors reported on their sworn Bankruptcy Schedules as income from January 1, 2001 to April 20, 2001.

83.    Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein I concluded that the Debtors received significantly more income from January 1, 2001 to April 20, 2001, than the $13,000.00 that the Debtors reported on their sworn Bankruptcy Schedules.  Therefore, the Debtors significantly understated their Income, which resulted in the Debtors presenting an inaccurate disclosure of their Income on their bankruptcy Schedules.  (See Trial Exhibits 227 and 228.)


Evidence of Undisclosed Income from the Year 2000.

84.    Based upon my review of the third-party documents I have conclude that the Debtors' income for 2000 was at least $367,117.00 compared to the

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000306

$55,000.00 reported on the Debtors' sworn Bankruptcy Schedules.  (See Trial Exhibit 001.)

85.    To calculate the Debtors' Income for the year 2000, I utilized the Debtors' Individual Federal Income Tax Return for the Year 2000, the Debtors' 100%-owned AIA Corporate Income Tax Return for the year 2000, AIA Bank Statements, AIA's financial records and checks issued, JJ&A's Corporate Income Tax Return for the year 2000, JJ&A's Financial Statements, JJ&A Bank statements, JJ&A Deposit Records, and JJ&A checks issued.  (See Trial Exhibits 004, 009A, 020, 186, 190, 193, and 203.)  (See also Chart 20 attached hereto). Chart 20 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart 20 was prepared by me and is incorporated herein as if set forth in full.

86.    I did not review the Debtor Debra Johnson's stated Year 2000 income of $10,000.00 and, therefore, I am not rendering any opinion on this issue.

87.    On the Debtors' sworn Statement of Financial Affairs filed in this Chapter 7 case, Jay Johnson stated that his total income for the year 2000 was $55,000.00.   (Trial Exhibit 001.)

88.    On the Debtors' Federal Individual Income Tax Return for the year 2000, the Debtors listed total wages received from JJ&A as $17,500.00. (Trial Exhibit 9A.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000307

89.  JJ&A issued $111,469.00 in salary checks directly to Jay Johnson.  (See Chart 21A and Chart 21B attached hereto).   Charts 21A and 21B attached hereto show a summary of this data and my conclusions that are discussed herein. These Charts were prepared by me and is incorporated herein as if set forth in full.

90.  The JJ&A Balance Sheet as of December 31, 2000 under Assets, showed No Loans Receivable from Debtor Jay Johnson.   (Trial Exhibit 190.)

91.  The JJ&a Trial Balance Sheet as of December 31, 2000 under "Assets," showed zero (0) due from Shareholder, and zero (0) due from Jay Johnson. (See Trial Exhibit 190.)

92.  Based on my experience as a IRS real estate specialist and analyst, an individual taxpayer such as Jay Johnson, is required to report any wages or salaries received from a corporation (such as JJ&A or AIA) on their Individual Income Tax Return Form 1040 on page 1, line 7 of as shown on the Form 1040.  (See Trial Exhibit 9A.)

93.  According to the Internal Revenue Service rules and regulations, an individual taxpayer such as Jay Johnson, is required to deduct any unreimbursed employee expenses on Schedule A, line 20 as shown on the Debtors' Schedule A.  (See Trial Exhibit 9A.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000308

94.    Nevertheless, Jay Johnson reported that he received $135,000.00 from AIA, which is a California corporation, on a Schedule C, which is only for sole proprietorships, as specifically stated on the Schedule C.   Under Name of Proprietor, the Debtor listed Jay W. Johnson.  (See Trial Exhibit 9A.)

95.    AIA filed its Federal Corporate Income Tax Return for the year 2000 and on this tax return the Debtor Jay Johnson listed his title as "corporate President," with Jay Johnson owning 100% of AIA (Trial Exhibit 186.)

96.    AIA's year 2000 Federal Corporation Income Tax Return listed Total Income as $42,973.00 and Total AIA corporation expenses of $42,764.00 (including car and truck expenses of $3,326.00) yielding a Total Taxable Income of $209.00   (See Trial Exhibit 186.)

97.    On his Individual Federal Individual Income Tax Return for the year 2000, Jay Johnson showed salary from AIA of $135,000 and deducted additional AIA corporate expenses of $75,385.00 (including car and truck expenses of $4,030.00) on a Schedule C Sole Proprietorship, and reported a Net Profit from AIA of $59,615.00 in the year 2000.  (Trial Exhibit 9A.)

98.    The Debtors' Federal Individual Income Tax Return for the year 2000 listed total income received from JJ&A of $17,500.00 and a net profit received from AIA of $59,615.00 ($135,000.00 less $75,385.00) for a

34

000309

total <u>reported</u> year 2000 income of $77,115.00 on their Federal Tax Return compared to the total of $55,000.00 income that the Debtors reported on their sworn Bankruptcy Schedules.   (See Trial Exhibit 001 and <u>Chart 20</u> attached hereto.)

99.    Therefore, the Debtors' Individual Income Tax Return for the year 2000, the Debtors received $22,115.00 more ($77,115.00 less $55,000.00) income in 2000 than they reported on their sworn Bankruptcy Schedules. (See Trial Exhibit 001 and Chart 20 attached hereto.)

100.    Therefore, according to his own Federal Income Tax return, the Debtors underreported his income for the year 2000 by at least 40%, which resulted in the Debtors presenting an inaccurate disclosure of their Income in their sworn Bankruptcy Schedules.

101.    Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I reached the following general conclusion that as to income using the verified $111,469.00 in income that JJ&A paid to the Debtors in the year 2000 plus the $59,615.00 net income that the Debtors reported that they received from AIA, the Debtors received at least $171,084.00 ($59,615.00 + $111,469.00) in income in the year 2000. (See <u>Chart 21A</u> and <u>Chart 21B</u> attached hereto).  Chart 21A and Chart 21B attached hereto show a summary of this data and my conclusions that are

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000310

discussed herein.    These Charts were prepared by me and are incorporated herein as if set forth in full.

102.    Therefore, the Debtors received at least more than three times (3x) the year 2000 income that they reported on their sworn Bankruptcy Schedules, which resulted in the Debtors presenting an inaccurate disclosure of their income on their sworn Bankruptcy Schedules.

103.    Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, in addition to the minimum $171,084.00 income that the Debtors received in the year 2000, the Debtors also received: **(1)** $39,653.00 in checks made out to the Debtors personally and to AIA that the Debtors deposited into the undisclosed JJ&A bank account; **(2)** additional income of $8,125.00 in checks that JJ&A paid to AIA; **(3)** $12,059.00 in checks that AIA paid for the Debtors' personal bills and expenses; and **(4)** $136,196.00 in checks that JJ&A paid for the Debtors' personal bills and expenses, for a total year 2000 Income of at least $367,117.00. (See Trial Exhibits 003, 004, 020, 186, 190, 191, and 193.)    (See Chart 20 attached hereto.)    Chart 20 attached hereto shows a summary of this data and my conclusions that are discussed herein.    This Chart was prepared by me and is incorporated herein as if set forth in full.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000311

104.  As part of the assignment in this case I reviewed the JJ&A deposit **receipts** from 10-12-2000 to 12-31-2000.  During this time period, the Debtors received at least $39,653.00 in checks made out to Jay Johnson personally and checks made out to AIA that the Debtors deposited into an undisclosed JJ&A bank.  (See <u>Chart 22</u> attached hereto.)

105.  JJ&A issued $8,125.00 in checks to the Debtors' 100%-owned AIA in the year 2000.  (See <u>Chart 23</u> attached hereto.)  Chart 23 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

106.  Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I have concluded that AIA issued $12,059.00 in checks for the Debtors personal bills and expenses in the year 2000.  (See <u>Chart 24</u> attached hereto.)  Chart 24 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

107.  JJ&A issued an additional $136,196.00 in checks for the Debtors' personal bills and expenses.  (See <u>Chart 25</u> attached hereto; see also, <u>Chart 27</u> through <u>Chart 35</u> attached hereto).  Chart 25, and Charts 27 through 35 attached hereto show a summary of this data and my

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000312

1    conclusions that are discussed herein. These Charts were prepared by
2    me and are incorporated herein as if set forth in full.

108.  As part of my assignment in this matter I attended the depositions of
most of the deponents, including, but not limited to, Jay Johnson, Randy
Johnson, Robin Johnson and Debra Johnson.  During his deposition Jay
Johnson testified that JJ&A paid many of his personal bills and
expenses, (Jay Johnson depo. pages 228:25-229:6, 230:2-231:12, and
238:14-239:8).

109.  Based upon my review of the documents as set forth in the Lapides
Report #1 and #2, and my personal review of the documents and things
produced during discovery in these matters as referenced herein, and
utilizing the Checks Method, I concluded that Jay Johnson received a
minimum income of $367,117.00 in the year 2000 compared to the
bankruptcy-listed scheduled year 2000 income of $55,000.00.  (See
Chart 26 attached hereto).  Chart 26 attached hereto shows a summary
of this data and my conclusions that are discussed herein.  This Chart
was prepared by me and is incorporated herein as if set forth in full.

110.  The debtors are members of the Church of Jesus Christ of Latter-day
Saints. The church asks its members to contribute 10% of their net
income as a Tithing Contribution. The records of the LDS Church show
that the Debtors contributed $22,000.00.00 to the LDS Church in the
year 2000.  The LDS Church's records show that for the year 2000, the

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000313

Debtors contributed $20,400.00 for Tithing Contributions plus an additional $1,600.00 for other than Tithing Contributions. (See Trial Exhibit 3A, 3B, and 92.)

111. Per Debtors Year 2000 Tax Return, the Debtors claimed that they made voluntary charitable contributions of $25,680.00 in the year 2000. (Trial Exhibit 9A.)

112. In preparing my Reports I also utilized the standard Bank Deposits Method of proving the Debtors' income in this matter as previously discussed herein.

113. In my second Report, the Bank Deposits Method verified that in the year 2000, $2,367,788.00 was deposited into six (6) bank accounts controlled by or used by the Debtors, and that the Debtors' income for the year 2000 was $1,998,729.00. If I hypothetically eliminated all of the Q Financial deposits and just utilized the benefits that the Debtor received from Q Financial, the total bank deposits and benefits received by the Debtors in the year 2000 would be $978,659.00 and the Debtors' indicated income for the year 2000 would be at least $679,019.00. (See Trial Exhibits 190.)

114. Based upon my review using both the Check Method and Bank Deposits Method, I concluded that the Debtors' claimed income of $55,000.00 for the year 2000 was significantly understated and thus misleading.

000314

115.    Based on the above evidence and documentation, as well as the discussion in my two Reports, I concluded that the Debtors significantly understated their reported $55,000.00 in income in 2000 as part of their sworn Bankruptcy Schedules and, therefore, I concluded that the Debtors presented an inaccurate financial disclosure of their income on their sworn Bankruptcy Schedules.  (Trial Exhibits 227 and 228.)

Evidence of Undisclosed Income From the Year 1999.

116.    Based on the documents in this case, Debtor's Income for 1999 **was** estimated to be at least $370,979.00 as compared to the $149,500.00 reported on Debtors' sworn Bankruptcy Schedules.  (Trial Exhibit 001.)

117.    To estimate the Debtor Jay Johnson's Income for the year 1999, I utilized the Debtors' Individual Federal Income Tax Return for the Year 1999 (Trial Exhibit 201), the Debtors' AIA Corporate Income Tax Return for the year 1999 (Trial Exhibit 185), AIA Bank Statements (Trial Exhibit 020), AIA's checks issued (Trial Exhibit 020), JJ&A's Corporate Income Tax Return for the year 1999 (Trial Exhibit 192), JJ&A Bank statements (Trial Exhibit 004), JJ&A Deposit Records (Trial Exhibit 004), and JJ&A checks issued (Trial Exhibit 0004).  Chart 36 attached hereto shows a summary of this data and my conclusions that will be discussed below. This Chart 36 was prepared by me and is incorporated herein as if set forth in full.

118.  I did not review the Debtor Debra Johnson's reported Year 1999 income of $10,000 and therefore, I am not rendering any opinion on this issue. I did note that there was no income for Debtor Debra Johnson reported on the Debtors' Federal Income Tax Return for the Year 1999.  (Trial Exhibit 201.)

119.  On the Debtors' sworn Statement of Financial Affairs filed in this case Jay Johnson stated that his total income for the year 1999 was $149,500.00.  (Trial Exhibit 001, p. 23.)

120.  On the Debtors' Federal Individual Income Tax Return for the year 1999, the Debtors did not show that any income was received from JJ&A. (Trial Exhibit 201.)

121.  In spite of this omission, the documents indicate that (1) in the year 1999, JJ&A made payments of $30,000.00 to the Debtor, and to the Debtors' 100%-owned entity, AIA, (2) that JJ&A made payments of $50,000.00 to the Debtors' creditors, and (3) that Jay Johnson deposited $83,101.00 of his income into a JJ&A bank account.  Moreover, the JJ&A bank account was not disclosed to the Trustee during the pendency of the bankruptcy case and was only discovered during third-party discovery conducted as part of the Adversary Proceedings.  These documents show that $163,101.00 **was** received by the Debtors as additional income from JJ&A in 1999 (See Chart 36 attached hereto).

000316

122. JJ&A's Tax Return for the Year 1999 shows no liability ($0) to Debtor Jay Johnson, and no liability to Jay Johnson's 100%-Owned AIA. (Trial Exhibit 192.)

123. Based on my work as a **senior** Internal Revenue Service **analyst**, I am familiar with the rule and regulations pertaining to personal and business tax returns. According to the Internal Revenue Service rules and regulations, an individual taxpayer, such as Jay Johnson is required to report any "wages" or "salaries" received from a corporation (such as JJ&A or AIA) on page 1, line 7 of their Individual Federal Income Tax Return Form 1040, as shown on the Form 1040. The Debtor listed zero ($0) Wages and Salaries from any corporation on this line of his 1999 personal tax return. (Trial Exhibit 201.)

124. According to the Internal Revenue Service rules and regulations, an individual taxpayer, such as the Debtor Jay Johnson, is required to deduct any unreimbursed employee expenses on Schedule A, line 20 as shown on the Debtors' Schedule A. (Trial Exhibit 201.)

125. The Debtor Jay Johnson reported that he received $152,700 from AIA, which is a California corporation, on a Schedule C, which is only for sole proprietorships, as specifically shown on the Schedule C. Under Name of Proprietor, the Debtor listed Jay W. Johnson. (Trial Exhibit 201.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000317

126.   AIA filed its Federal Corporate Income Tax Return for the year 1999 and on this tax return the Debtor Jay Johnson stated he owned 100% of the corporation.  (Trial Exhibits 185 and 201.)

127.   AIA's year 1999 Federal Corporation Income Tax Return listed Total Gross Income as $479,520.00 and total AIA corporation expenses of $479,520.00 (including car and truck expenses of $11,724.00) yielding a Total Taxable Income of exactly Zero ($0).  (Trial Exhibit 186.)

128.   On his Individual Federal Income Tax Return for the year 1999, the Jay Johnson reported AIA gross income received of $152,700.00 and the individual debtor deducted additional AIA corporation expenses of $3,154.00 for car and truck expenses on a Schedule C, which is for a Sole Proprietorship, and reported a Net Profit from AIA of $149,546.00 in the year 1999.  (Trial Exhibit 201.)

129.   Pursuant to the Debtors' Federal Individual Income Tax Return for the year 1999, the Debtors listed Total Income received from JJ&A of zero ($0) and a net income received from AIA of $149,546.00 ($152,700.00 less $3,154.00) for a total reported year 1999 income of $149,546.00. (Trial Exhibit 201.)

130.   On the Jay Johnson's Individual Tax return for the year 2000, he deducted $70,635.00 for AIA corporation expense for Form 1099, but on the Debtors' Individual Tax Return for the year 1999, the Debtor

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000318

126.    AIA filed its Federal Corporate Income Tax Return for the year 1999 and on this tax return the Debtor Jay Johnson stated he owned 100% of the corporation.  (Trial Exhibits 185 and 201.)

127.    AIA's year 1999 Federal Corporation Income Tax Return listed Total Gross Income as $479,520.00 and total AIA corporation expenses of $479,520.00 (including car and truck expenses of $11,724.00) yielding a Total Taxable Income of exactly Zero ($0).  (Trial Exhibit 186.)

128.    On his Individual Federal Income Tax Return for the year 1999, the Jay Johnson reported AIA gross income received of $152,700.00 and the individual debtor deducted additional AIA corporation expenses of $3,154.00 for car and truck expenses on a Schedule C, which is for a Sole Proprietorship, and reported a Net Profit from AIA of $149,546.00 in the year 1999.  (Trial Exhibit 201.)

129.    Pursuant to the Debtors' Federal Individual Income Tax Return for the year 1999, the Debtors listed Total Income received from JJ&A of zero ($0) and a net income received from AIA of $149,546.00 ($152,700.00 less $3,154.00) for a total reported year 1999 income of $149,546.00. (Trial Exhibit 201.)

130.    On the Jay Johnson's Individual Tax return for the year 2000, he deducted $70,635.00 for AIA corporation expense for Form 1099, but on the Debtors' Individual Tax Return for the year 1999, the Debtor

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000319

126. AIA filed its Federal Corporate Income Tax Return for the year 1999 and on this tax return the Debtor Jay Johnson stated he owned 100% of the corporation. (Trial Exhibits 185 and 201.)

127. AIA's year 1999 Federal Corporation Income Tax Return listed Total Gross Income as $479,520.00 and total AIA corporation expenses of $479,520.00 (including car and truck expenses of $11,724.00) yielding a Total Taxable Income of exactly Zero ($0). (Trial Exhibit 186.)

128. On his Individual Federal Income Tax Return for the year 1999, the Jay Johnson reported AIA gross income received of $152,700.00 and the individual debtor deducted additional AIA corporation expenses of $3,154.00 for car and truck expenses on a Schedule C, which is for a Sole Proprietorship, and reported a Net Profit from AIA of $149,546.00 in the year 1999. (Trial Exhibit 201.)

129. Pursuant to the Debtors' Federal Individual Income Tax Return for the year 1999, the Debtors listed Total Income received from JJ&A of zero ($0) and a net income received from AIA of $149,546.00 ($152,700.00 less $3,154.00) for a total reported year 1999 income of $149,546.00. (Trial Exhibit 201.)

130. On the Jay Johnson's Individual Tax return for the year 2000, he deducted $70,635.00 for AIA corporation expense for Form 1099, but on the Debtors' Individual Tax Return for the year 1999, the Debtor

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000320

deducted zero ($0) for any AIA Form 1099 corporation expense. As previously noted, according to the Internal Revenue Service rules and regulations, an individual Debtor is not allowed to deduct any AIA corporate expenses on his Individual Tax Return. (Trial Exhibit 9A.)

131. In addition to the above documented $149,546.00 of AIA income that the Debtor reported in the year 1999, the Debtor also received $58,332.00 in the form of checks that AIA paid for the Debtors' personal bills and expenses for a total 1999 AIA income of $207,878.00 (See Chart 36, Chart 38, and Chart 39 through Chart 43 showing that the AIA income received in 1999 from AIA was at least $207,878.00).   Chart 36, Chart 38, and Charts 39 through 43 were prepared by me and are incorporated herein as if set forth in full.

**132.** In addition to the $207,878.00 income that the debtor received from AIA in the year 1999, the debtor also received $163,101 from JJ&A in the year 1999 as documented in Chart 36 and Chart 37A, Chart 37B, and Chart 37C.

133. In completing my review of the Defendant's data in this case, and utilizing the Checks Method, the Debtor Jay Johnson received a minimum income of $370,979.00 income in the year 1999 ($163,101.00 from JJ&A plus $207,878.00 from A.I.A.) compared to the $149,500.00 reported on their sworn Bankruptcy Schedules.  This is roughly 2.5x the

000321

amount reported in the Debtors' sworn Bankruptcy Schedules.   (See Chart 36 attached hereto.)

134.   The Debtors are members of The Church of Jesus Christ of Latter-day Saints (hereinafter referred to as the "LDS Church").   The LDS Church asks its members to contribute 10% of their Net Income as a Tithing Contribution.   As part of the third-party discovery in these cases the Trustee subpoenaed records of the Church.   The records of the Church of Jesus Christ of Latter-day Saints show that the Debtors contributed $28,300.00 to the Church in the year 1999.   The Church's records show that for the year 1999, the Debtors contributed $25,150.00 for Tithing Contributions plus an additional $3,150.00 for other than Tithing Contributions.   (See Trial Exhibit 92.)

135.   Per the Debtors Year 1999 Tax Return, the Debtors claimed that they made voluntary charitable contributions of $39,852 with $28,300 to the Church of Jesus Christ of Latter-day Saints. (See Trial Exhibit 201.)

136.   Based on the above evidence and documentation, as well as the discussion in my two Reports, I concluded that the Debtors significantly understated their bankruptcy-reported year 1999-claimed income of $149,500.00 and that the Debtors presented an inaccurate financial disclosure of their income on their Bankruptcy schedules.   (Trial Exhibits 227 and 228.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000322

The Debtor Failed To Disclose To This Court Or Their Trustee That The $1,959,439.00 Deposited Into The JJ&A Bank Account Was The Debtors' Money Or Belonged To AIA

137.  As part of their sworn Bankruptcy Schedules the Debtors failed to list any ownership in JJ&A and did not list: **(1)** JJ&A Bank of America account #04889-04352, or **(2)** JJ&A Bank of America account #04882-05393 existed as part of the case.  (Trial Exhibit 001.)

138.  Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein I concluded that there was $1,959,439.00 deposited into the main JJ&A account #04889-04352 from 1999 to 2004   (See <u>Chart 44</u> attached hereto).   Chart 44 attached hereto shows a summary of this data and my conclusions that are discussed herein.   This Chart was prepared by me and is incorporated herein as if set forth in full.    My figure of $1,959,439.00 is very close to the $1,958,489.00 figure utilized by the Defendant's Chad Turner Expert Report.  (Trial Exhibits 4B and 222.)

139.  This court granted partial adjudication on Trustee's Claim of Alter Ego as between Defendant Jay Johnson, JJ&A, and AIA (this Court's Order on Findings of Fact and Conclusions of Law for MSJ filed as Docket Item # 354).

000323

140.   JJ&A paid $136,196.00 for the Debtors personal bills and expenses in the year 2000 (Chart 25, and Charts 27 to 35), and JJ&A paid $104,203.00 for the Debtors' personal bills and expenses just from January 1, 2001 to April 20, 2001 (Chart 9, and Charts 10 to 19). These Charts were prepared by me and **are** incorporated herein as if set forth in full.

141.   The initial deposit to the JJ&A bank account on May 5, 1999, was a $50,000.00 check from William or Judy Kerler labeled as for 780 Greenridge profit (Trial Exhibit 4C). Based upon my review of the document, and my personal review of the documents and things produced during discovery in these matters as referenced herein, the first three checks on the JJ&A bank account written immediately thereafter on May 5, 1999, May 6, 1999, and May 7, 1999 were for $10,000.00 each payable to: **(1)** AIA; **(2)** AIA; and **(3)** to Jay Johnson personally.  (Trial Exhibit 4A.)

142.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, Jay Johnson, deposited at least $134,374.00 ($39,653.00 + 94,721.00) to JJ&A accounts for the 6-months before the Bankruptcy from checks that he received written out to him personally, or to AIA (See Chart 22, and Chart 5).  Chart 22 and Chart 5 attached hereto show summaries of this

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000324

data and my conclusions that are discussed herein.  These Charts were

prepared by me and are incorporated herein as if set forth in full.

143.  Based upon my review of the documents as set forth in the Lapides

Reports #1 and #2, and my personal review of the documents and things

produced during discovery in these matters as referenced herein, the

Debtors also transferred at least $120,228.00 to the two **undisclosed**

JJ&A bank accounts from the bankruptcy-listed AIA account, and from

one of the Debtors' personal bank accounts (see <u>Chart 45</u>).  The checks

shown were signed by the Debtor Jay Johnson (Trial Exhibit 20A and

3A).  Chart 45 attached hereto shows a summary of this data and my

conclusions that are discussed herein. This Chart 45 was prepared by

me and is incorporated herein as if set forth in full.

144.  The debtor, Jay Johnson, testified that he thought that he paid for all of

the real property insurance premiums on the Viro Rd. property when it

was in the name of Michael McFall, and that sometimes he took these

Viro Rd. insurance premiums out of his personal bank account, and that

sometimes he took these Viro Road insurance premiums out of the AIA

bank account, or out of the JJ&A bank account. (JJ Depo. 55:23 to 56:1;

and 98:1-20.)

145.  The court has stated, *"Significantly, Jay Johnson admits to using the*

*automatic payroll systems of both JJ&A and A.I.A. "depending on which*

*account had funds in it when payroll was due, even though the work now*

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000325

*preformed was again for Jay Johnson AIA." (Jay Johnson Decl., ¶6).*

*"Therefore JJ&A & AIA had the same employees, office location, used the same telephone and were both used to pay Debtors personal expenses."* (Court's Order on Findings of Fact and Conclusions of Law for MSJ filed as doc 358, and doc 354, page 190.)

146.    During his deposition taken on April 29, 2003, Randal Johnson testified that he was not an officer or director of any entity.  When specifically asked about JJ&A, he testified that he didn't know if he were an officer or director of JJ&A. When asked why he didn't know if he were an officer or director of JJ&A, Randy Johnson asserted the 5th Amendment right and refused to answer that question. (2003 Randy Johnson depo. pp. 11:24-12:7, 16:7-11.)

147.    Based upon my review of the third-party documents produced in this matter, JJ&A was shown as an asset owned on AIA's 2003 Balance Sheet. (Trial Exhibit 91.)

148.    Based upon my review if the third-party documents produced in this matter, JJ&A issued a $10,000.00 check to Randy Johnson on December 30, 2002, for the Debtors' Viro Road "rent" even though the Viro Road property was in the name of Michael McFall as of October 11, 2001.  JJ&A then deducted this $10,000.00 "rent payment" as a valid JJ&A business expense. (Trial Exhibit 154.)

000326

149. Based upon my review of the third-party documents produced in this matter, Randy Johnson transferred the 5485 La Forest Drive property to JJ&A for zero (0) consideration on November 15, 2001. (Trial Exhibit 86.).

150. All of the $223,789.58 sale proceeds from the $775,000 sale of the La Forest Dr. property were deposited to a JJ&A account on November 21, 2001. (Trial Exhibits 87, 88, and 4B.)

151. The Defendant's Expert, Chad Turner, used all of the JJ&A deposits, including the La Forest Drive property sale proceeds, to value the Debtors' 100%-owned interest in AIA. (Trial Exhibit 222.)

152. The Debtors' position on JJ&A and the JJ&A deposits is most easily understood by reviewing the Expert's Report prepared by Chad R. Turner, CPA. Mr. Turner explained why JJ&A was formed in his Report, and made several significant conclusions about the JJ&A bank account, and utilized all of the deposits made to the JJ&A bank account: **(1)** to value the Debtors' 100%-owned AIA; and **(2)** to calculate the Debtor Jay Johnson's projected year 2000 income.

153. I believe that the Debtors' position could best be explained by quoting from Mr. Turner's report as shown below (emphasis added):

> ... consideration in creating a new entity [JJ&A] was that Lapides was continually threatening to drain the

000327

corporate bank accounts of AIA by levying against the accounts to pay his judgment against Jay … <u>Thus, in order to avoid the … unpredictable seizure of corporate assets … Randy formed JJ&A … Jay is not an officer of the corporation, but he did have check-signing authority over its bank accounts … Over a period of months Randy and Jay transitioned AIA's business to JJ&A.</u>

(Trial Exhibit 222, at p. 19:6-8, emphasis added.)

…there were numerous occasions where Jay used the business [JJ&A] accounts to pay for personal expenses … In almost every small business you will find either an owner or key employee who for tax purposes, will classify some personal expenses as business expenses … I cannot speak to the accuracy of the segregation between legitimate business expenses as it relates to JJ&A … I would expect to find some areas crossing the line …

(Trial Exhibit 222, at p. 20:1-2.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000328

… If I look to both businesses as one [AIA and JJ&A], as the Analysis suggests, then I must also consider their value as one.

(Trial Exhibit 222, at p. 20:3.)

I used $600,000 as an annual revenue number [in valuing AIA] … the deposits that went into the general account of AIA from 1997 to 2003 of $2,264,492 and the deposits into the general account of JJ&A from 1999 to 2003 of $1,958,489 [JJ&A deposits were actually $1,959,439] and exclude the deposits to the payroll account … then I arrive at total deposits of $4,222,981. This number divided by seven years from 1997 to 2003 yields an annual deposit number of $603,283…I'll assume…that this number [$603,283] is reliable.

(Trial Exhibit 222, at pp. 226-231.)

154.    Based on the above evidence and documentation, as well as the discussion in my two reports, I concluded that the Debtor Jay Johnson had a significant asset in the JJ&A Bank accounts that he failed to report on his sworn Bankruptcy Schedules.  Therefore, the Debtors failed to report all of their assets on their Bankruptcy Schedules, which resulted in

000329

the Debtors presenting an inaccurate disclosure of their assets and Net

Worth on their Bankruptcy schedules. (Trial Exhibits 227 and 228.)

### As Part Of This Case The Debtors Had But Did Not Disclosure Any Ownership In The Viro Road Property

155.   On the Debtors' Schedule A filed in their Chapter 7, the Debtors stated

that they owned no real estate, and on their Schedule J, claimed that

they were only renting the Viro Road property (from the Debtor Jay

Johnson's brother Randy Johnson) for $4,000.00 per month.    (Trial

Exhibit 001.)

156.   Based upon my review of the documents as set forth in the Lapides

Report #1 and #2, and my personal review of the documents and things

produced during discovery in these matters as referenced herein, in

spite of this representation made as part of the Debtors' sworn

Schedules, the documents I reviewed in this case demonstrate the

Debtors: **(1)** paid at least $10,000.00 of the Viro property purchase Down

Payment; **(2)** received the entire refund from the Purchase Escrow

closing; **(3)** paid more than $90,000.00 for the construction of a 2nd-

story addition to the Viro Road Property; **(4)** paid for all of the Viro

property mortgage payments; **(5)** paid for all of the payments on the loan

to fund the 2nd-story addition; **(6)** paid all of the real estate tax

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000330

payments; **(7)** paid all of the fire insurance premiums; **(8)** claimed the Home Owner's Mortgage Interest Deduction on their Federal Income Tax Returns for the years 2000, 2002, and 2003; and **(9)** the defendant Randy Johnson did not report that he received any "rental income" from the Debtors from the Viro Road Property on Randy Johnson's 1995, 1996, 1997, 1998, or 1999 Federal Income Tax Returns  (See <u>Chart 46</u> attached hereto). Chart 46 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

157.    The Debtors rented the Viro Road Property from the former owner, Robert Mitchell, for approximately six (6) months in 1995 for $1,600 per month rent pursuant to a Lease dated June 23, 1995.  The Debtors' Viro Road Lease showed that a Security Deposit of $10,000 received from the Debtors had been deposited into escrow.  (Trial Exhibit 220.)

158.    On June 28, 1995, the Debtor Jay Johnson wrote a letter to Desert Pacific Financial (right after the Debtor received the $10,000.00 credit as part of the Viro Road Property Lease) stating that he [Jay Johnson] had another $15,000.00 cash to contribute to the Viro Road Property purchase.  (Trial Exhibit 221**.**)

159.    The Debtor stated that he wanted to use this $15,000.00 to build a permanent pool on the property but, if needed, he [Jay Johnson] would

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000331

be willing to use this $15,000 for a further contribution towards the Viro Road Property down payment.  (Trial Exhibit 221.)

160.   During his deposition, Jay Johnson, testified that he thought that he paid for all of the real property insurance premiums on the Viro Road Property when it was in the name of Michael McFall, and that sometimes he took these Viro Road insurance premiums out of his personal bank account, and that sometimes he took these Viro Road insurance premiums out of the AIA bank account, or out of the JJ&A bank account.  (Jay Johnson depo. pp. 55:23-56:1, 98:1-20.)

161.   During his deposition Randy Johnson testified that he did not know who paid the down payment on the Viro Road property, and he asserted the 5th Amendment, and refused to answer the direct question if he contributed any of the money for the down payment. (2003 RJ Depo, 36:24 to 37:4.)

162.   During his deposition Randy Johnson was asked if he ever had any ownership interest in the 4600 Viro Road property, and Randy refused to answer that question, asserting his 5th amendment right. (2003 Depo. of RJ, 32:6-12.)

163.   During his deposition Randy Johnson was asked if he ever had any ownership interest in the Viro Road Property, and Randy Johnson

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000332

refused to answer that question, asserting his 5th Amendment right. (2003 Randy Johnson depo. p. 32:6-12.)

164.    Based on information supplied to the Trustee by the Debtors and Defendants herein, the Debtors and their family were the only occupants of the Viro Road Property for the entire time the Viro Road Property was titled in the name of Randy Johnson and also when the property was later transferred into the name of Michael McFall.

165.    Jay Johnson testified that Randy Johnson never lived in the 4600 Viro Road Property.   (Jay Johnson depo. pp. 73:23-25, 75:9-18, 76:13-20, 78:1-20, and 79:5-21.)

166.    Randy Johnson testified that he never lived in the Viro Road Property. (2004 Randy Johnson depo. p. 36:7-9.)

167.    Jay Johnson testified that Michael McFall never lived in the Viro Road Property. (Jay Johnson depo. pp. 80:25-81:2, 98:21-99:3.)

168.    At the §341(a) Meeting of Creditors, which I personally attended, Jay Johnson testified that he spent less than $100,000.00 of his personal money for the Viro Road Property second floor addition and remodel. (Trial Exhibit 226, at 17:6-16.)

169.    At his deposition Jay Johnson testified that he spent about $30,000.00 to $40,000.00 of his personal money for the Viro Road Property second floor construction and remodeling expenses, plus another $15,000.00

000333

after the rehab of the Viro Road Property.  (Jay Johnson depo. pp. 91:9-14, 91:19-92:4.)

170.   At his deposition the Debtor testified that he traded (paid) for $13,000.00 of the landscaping work on the Viro Road property. (Jay Johnson depo. pp. 117:17 -118:4.)

171.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, the Debtors' paid at least $90,568.00 for the Viro Road Property construction, including $81,019.00 for the 2nd floor addition and improvement expenses, $9,209.00 for interior design expenses, and $340.0 for pest control expenses  (See Trial Exhibits 003, 004, 020, 021, 091, 094, 100, 190, 191, 198, 199, 200, 201, and 202, and Chart 47, Chart 48, and Chart 49 attached hereto). Chart 47 through Chart 49 attached hereto show summaries of this data and my conclusions that are discussed herein.  These Charts were prepared by me and are incorporated herein as if set forth in full.

172.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, part of these $90,568.00 Viro Road Property expenses paid by Debtor Jay Johnson were paid when the property was in the name of Randy

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000334

Johnson and part of these Viro Road Property expenses were paid by the Debtors when the property was in the name of Michael McFall.  Jay Johnson paid for these Viro Road Property construction and other Viro Road Property expenses in addition to the mortgage payments, real estate tax payments, and real property insurance payments that the Debtor also paid. Randy Johnson did not report on any of his Income Tax Returns the $90,568.00 that Jay Johnson paid for the Viro Road Property that was titled in his name.

173.    When questioned by the Trustee Randy Johnson refused to answer if he paid anything for the Viro Road Property improvements.

   Q: Did you ever provide any funds for any improvements to 4600 Viro Road?

   A: (Mr. Tilem, Randy Johnson's attorney) I do think that you've asked that before, but it's the same instruction. (Instruction not to answer.)

(2003 Randy Johnson depo. at p. 78:5-9.)

174.    On December 15, 1995, 4600 the Viro Road property was purchased for $325,000 in the name of Randal and Robin Johnson.   (Trial Exhibit 209 and 99.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000335

175.   The Viro Road property was purchased with a $562,500.00 Purchase and Construction Loan recorded in the name of Keros Mozilo Mortgage to build the second floor.  (Trial Exhibits 99, 100, 207, and 209.)

176.   Per the Viro Road closing statement, there was $276,660 deposited into the construction account to fund the Viro Road Property 2nd floor addition and remodel.  (Trial Exhibit 209.)

177.   The Viro Road Property only had one floor when it was originally purchased.  (Trial Exhibit 219.)

178.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters, as referenced herein, Jay Johnson paid all of the monthly mortgage payments on the $562,500.00 Viro Road Property Purchase Loan and Construction Loan, which included payments on the $276,660.00 that was used to construct the 2nd Floor addition, and all of the payments on the Downey S&L Refinance Loan, and all of the payments on the McFall 2nd TD Loan by either: **(1)** making the mortgage payment directly to the Lender from one of his personal accounts; or **(2)** paying the lender from his 100% owned AIA business account; or **(3)** by reimbursing Randy for the amount he paid for the Viro Road Property mortgage payments, the Viro Road Property Real Estate taxes, and the Viro Road Property real property insurance payments.  (See Trial Exhibits 20A, 3A, and 21.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000336

179. During his deposition, Jay Johnson testified that he paid for the mortgage payments, the taxes, and other property expenses while the Viro Road property was titled in the name of Randy Johnson. (Jay Johnson depo. at p. 47:9-14.)

180. Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I have concluded that the Debtors paid every Viro Road Property 1st Trust Deed mortgage payment directly to the Wells Fargo Home Mortgage lender while the Viro Road property was titled Michael McFall's name (See <u>Chart 50</u> attached hereto). Chart 50 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

181. Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, the Debtors paid every Viro Road Property 2nd Trust Deed mortgage payment directly to the Wells Fargo Bank West lender while the Viro Road Property was titled in Michael McFall's name. (See <u>Chart 51</u> attached hereto). Chart 51 attached hereto shows a summary of this

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000337

data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

182. During his deposition Randy Johnson testified that he didn't know if the Viro Road Property had a 2nd floor when he allegedly purchased the property.

> Q: Do you know whether a second floor was built on the Viro Road residence? That's at any time following your acquisition.

> A: "I know that there is a second floor. I don't know if it was there before or not."

(2003 Randy Johnson depo. at p. 36:12-16.)

183. During his deposition Randy Johnson was asked who paid the mortgage payments on the 4600 Viro Road property, and Randy refused to answer the question asserting his 5th amendment right.

> Q: Who paid the mortgage if there was one on 4600 Viro Road?

> A: (Mr. Tilem, Randy Johnson's attorney) Same Instruction. (Instruction not to answer.)

(2003 Randy Johnson depo. at p. 50:2-5.)

184. During his deposition Randy Johnson was asked if Jay Johnson ever made any mortgage payment on the Viro Road Property, and Randy

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000338

Johnson refused to answer the question asserting his 5th Amendment right. (2003 Randy Johnson depo. at p. 34:10-14.)

185. The Viro Road Property was refinanced by Randy Johnson through Downey S&L on January 24, 1997, with a $620,000.00 1st Trust Deed Loan.

186. As part of the January 24, 1997 Downey S&L Refinance of the Viro Road Property by Randy Johnson, Michael McFall wrote a January 16, 1997-Letter representing himself as the General Manager of Presence Information Design and stating that Randy Johnson was employed by him and his company at a base salary of $120,000.00 with Randy Johnson's expected compensation to be over $200,000.00 per year. (Trial Exhibit 235.)

187. In 1997, Randy Johnson earned a total of $124,133 and this entire amount was from Fidelity Federal Bank with no income at all received from McFall's company, as shown on Randy Johnson's Income Tax return for 1997. (Trial Exhibit 24.)

188. Defendants Randal and Robin Johnson, as the purported owners of **the** Viro Road Property did not report as income on any of their Federal Income Tax Returns for 1995, 1996, 1997, 1998, or 1999, any of the payments that Jay Johnson paid for the Viro Road Property mortgage payments, or the money that the Debtors paid for the Viro Road Property

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000339

improvements, construction expenses, **or** the payments made by the Debtor for the Viro Road Property real estate taxes, the Viro Road Property real property insurance premiums, or the other Viro Road Property expenses that were paid by the Debtor.  (Trial Exhibits 22 through 26.)

189.   During his deposition Randy Johnson was asked if he ever had any ownership interest in the 4600 Viro Road Property, he refused to answer, asserting his 5th Amendment right. (2003 Randy Johnson depo. at p. 32:6-12.)

190.   On October 11, 2001, the Viro Road Property was transferred from Randy Johnson to Michael McFall in a curious transaction summarized in Chart 52 (See Chart 52 attached hereto).  Chart 52 attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

191.   The facts summarized in Chart 52 for the Randy Johnson to Michael McFall transaction allowed the Viro Road Property to be refinanced with a new higher 1st Trust Deed Loan and 2nd Trust Deed Loan.  (See Chart 52 attached hereto.)

192.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000340

produced during discovery in these matters as referenced herein, the facts of **the** Randy Johnson/McFall transaction led me to conclude that the transfer from Randy Johnson to Michael McFall of the Viro Road Property was a sham transaction which should be disregarded.

193.  Shortly before the Viro Road Property was sold, Jay Johnson decided on his own to recarpet the Viro Road Property and paid for this on May 21, 2003, per check #3163 from one of his personal bank accounts. Jay Johnson testified in his deposition that he did not recarpet the Viro Road Property at the owner's request.    (Jay Johnson depo. at p. 122:9-14 **and** Trial Exhibit 3A.)

194.  The Viro Road Property was sold for $1,495,000.00 on July 25, 2003, to Michael Burnstine. Property entered escrow on June 20, 2003. (Trial Exhibits 101 and 37.)

195.  From the proceeds of the Viro Road Property sale, McFall wire transferred $100,000.00 from Idaho to the bank account of MVM Franchise Partners, LLC back in California.  (Trial Exhibits 31 through 37, 39, and 42.)

196.  The $100,000.00 wire transfer from McFall was received by Wells Fargo Bank on August 19, 2003.  On the wire transfer instructions, McFall showed the address of MVM Franchise Partners, LLC as 2926 Foothill Blvd., La Crescenta, CA.    This address at 2926 Foothill Blvd.,

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000341

La Crescenta, CA is the location of a Goodwill Donation Center, which has been at that location for at least 5-years.

197.   On the wire transfer instructions, McFall showed the phone number of MVM Franchise Partners, LLC as: 818-248-8003. This phone number of 818-248-8003 is the home phone number of Randy Johnson and has been so for many years. This was Randy Johnson's phone number at 5118 Circle Vista Ave., La Crescenta, CA **and is still his home phone number** at his current address at 2602 Pontiac Street, La Crescenta, CA. (2003 Randy Johnson depo. at pp. 10:23-11:2.)

198.   In a similar transaction to the Viro Road property transaction between Randy Johnson and Michael McFall, Defendant Randy Johnson sold the Circle Vista Ave. Property titled in his name to Michael McFall on August 14, 2001.  After the close of escrow Randy and Robin Johnson continued to live in the house.  McFall later transferred the Circle Vista Ave. Property to the Ostlers on March 15, 2002.  Following this sale of the Circle Vista Ave. property, McFall transferred proceeds from the Circle Vista property sale to Greg Litster (brother of defendant Robin Johnson) who then gave the money to the defendant Robin Johnson (wife of Randy Johnson).  (See Lapides Report #1, pp. 116-118 and exhibits referred to therein.)  These facts are being brought up here to show a very similar behavior pattern of the defendant Randy Johnson in

000342

both the Viro Road Property transactions and in the Circle Vista Property transactions.

199. At his deposition Jay Johnson testified that the monthly amount that he paid for the Viro Road Property was the amount of the Viro Road mortgage payment, real property taxes, and other property expenses. (Jay Johnson depo. p. 47:9-14.)

200. It is the testimony of the Debtors that they actually paid for the Viro Road Property mortgage payments, real estate tax payments, real property insurance premium payments, and other Viro Road Property expenses. The Debtors also testified that they paid for a substantial amount for the Viro Road Property construction and remodel expenses. The Debtors' Federal Income Tax Returns show that they took the home owners mortgage interest deduction for their Viro Road property when the property was titled in the name of Randy Johnson and Michael McFall. Pursuant to IRS Publication 936, "[m]ortgage Interest is only deductible if the mortgage is a secured debt on a qualified home in which you have an ownership interest. This testimony of the Debtors establishes that, the Debtors had an undisputed equity interest in the Viro Road Property that they failed to report to the Trustee and on their bankruptcy Schedules. (Attached hereto as Exhibit 2 is a true and correct copy of "IRS Publication 936".)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000343

201. The Defendants Randy and Robin Johnson did not report on their Federal Income Tax Returns that they received any rent from the debtors for the Viro Road property for 1995, 1996, 1997, 1998 or 1999. Pursuant to IRS Publication 527, "[y]ou must include in your gross income all amounts you receive as rent. Renal income is any payment you received the use or occupancy of the property." (Attached hereto as Exhibit "2" is a true and correct copy of "IRS Publication 527".)

202. Based on the above evidence and documentation, as well as the discussion in my two Reports, I concluded that the Debtors had an undisclosed interest in the Viro Road Property that they failed to report on their Bankruptcy Schedules (Trial Exhibits 227 and 228). Therefore, the Debtors failed to report all of their assets on their bankruptcy schedules, which resulted in the Debtors presenting an inaccurate disclosure of their Assets and Net Worth on their Bankruptcy Schedules.

<u>The Debtors Had But Did Not Report Any Ownership In the $775,000.00 La Forest Drive Property Sale Proceeds</u>

203. On the Debtors' Schedule A filed in their Chapter 7, the Debtors stated that they owned no real estate. (Trial Exhibit 001.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000344

204.  As summarized in <u>Chart 53</u>: **(1)** the Debtor Jay Johnson testified that he could have paid the $25,000.00 down payment on the La Forest Drive Property; **(2)** the balance of the La Forest Drive Property down payment came from a refinance of the 4600 Viro Road Property; **(3)** the La Forest Drive Property mortgage payments were made by JJ&A both before and after the property was transferred to JJ&A; **(4)** payments to develop the La Forest Drive Property were made by JJ&A before the La Forest Drive Property was transferred to JJ&A; **(5)** the La Forest Drive Property was transferred by Defendant Randy Johnson to JJ&A for zero ($0) consideration; **(6)** JJ&A was shown as an Asset Owned on the Debtor Jay Johnson's 100% Owned AIA's Balance Sheet; **(7)** after the La Forest Drive Property was sold for $775,000.00 all of the $223,790.00 sale proceeds were deposited to a JJ&A bank account; and **(10)** the Defendants' Expert, Chad Turner, used all of the JJ&A deposits, including the La Forest Drive Property sale proceeds, to value the Debtors' 100%-Owned A.I.A. business  (see <u>Chart 53</u> attached hereto). <u>Chart 53</u> attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

205.  On June 8, 2000, a $500,000.00 2nd Trust Deed Mortgage Loan from Michael McFall's Fame 10 Productions, LLC company was placed on the Viro Road Property and the initial draw of $348,207.00 was placed in a

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000345

bank account in the name of Q Financial. Based upon my review of the documents as set forth in the Lapides Report # 1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I have concluded that Q Financial was a company used by the Debtors to pay many of their bills and expenses despite the fact that Q Financial was supposedly owned by Randy Johnson. (See Trial Exhibits 17, 68, 69, 70, 65) (See also Chart 56 and Chart 57 attached hereto.) Chart 56 and Chart 57 attached hereto shows a summary of this data and my conclusions that are discussed herein. These Charts were prepared by me and are incorporated herein as if set forth in full.

206.    On August 31, 2000, the La Forest Drive Property was purchased and placed in the name of Randy Johnson as his sole and separate property, with two purchaser deposits in the amounts of $25,000.00 and $212,339.02. (Trial Exhibits 66 and 67.)

207.    The initial $25,000.00 deposit was paid by check #1191 on June 12, 2000, from the Q Financial bank account. The additional $212,339.02 deposit was transferred from the Q Financial bank account. (Trial Exhibits 27A, 37, and 65.)

208.    The down payment for the La Forest Drive Property purchase came from the $348,207.00 Viro Road Property 2nd Trust Deed proceeds deposited into a Q Financial bank account from Michael McFall's company, Fame

000346

10 Productions, LLC. The Viro Road property second TD Loan closed escrow on June 8, 2000. (Trial Exhibits 65, 17, 68, 69, 70, and 235.)

209. At his deposition, Defendant Randy Johnson was asked where the two La Forest Drive Property initial escrow purchases payments of $25,000.00 and $212,339.02 came from. Randy Johnson refused to answer the Trustee's question asserting his 5th Amendment right. (2003 Randy Johnson depo. p. 76:1-10.)

210. Debtor Jay Johnson testified that he "could have" paid the $25,000.00 down payment on the La Forest Drive Property. (Jay Johnson depo. p. 162:12-21.)

211. At his deposition, Jay Johnson referred to the La Forest Dr. property as: "… the property we were purchasing." (Jay Johnson depo. p. 156:7-25, emphasis added.)

212. At both of his depositions, the defendant Randy Johnson refused to answer if he ever purchased the La Forest Drive Property. (2003 Randy Johnson depo. pp. 61:20-23, 62:5-8; and 2004 Randy Johnson depo. pp. 35:14-17, 35:21-23.)

213. At both of his depositions, Randy Johnson refused to answer if he paid the down payment for the La Forest Drive Property. (2003 Randy Johnson depo. pp. 67:11-14, 76:1-10; and 2004 Randy Johnson depo. pp. 35:18-20, 24-25, 36:1-3.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000347

214. Randy Johnson testified that he did not know who paid the real estate property taxes on the La Forest Drive Property that was titled in his name. (2004 Randy Johnson depo. p. 39:23-25.)

215. Debtor Jay Johnson testified that it was his understanding that the down payment to acquire the La Forest Property came from the refinancing of the Viro Road Property. (Jay Johnson depo. p. 159:16-19.)

216. In his deposition, Jay Johnson testified that the La Forest Drive Property mortgage payments were going to be made from the proceeds from the refinance of the Viro Road Property. (Jay Johnson depo. pp. 160:22-161:4.)

217. JJ&A (the alter ego of the debtor Jay Johnson) issued checks to pay for the La Forest Drive Property mortgage payments in the amount of $30,578.00 both before and after the La Forest Drive Property was transferred to JJ&A. (See Chart 54 attached hereto.) Chart 54 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

218. JJ&A issued checks to pay for the La Forest Drive Property development expenses in the amount of $1,900.00 even before the property was transferred to JJ&A. (Trial Exhibits 4A, 116, 117, and 191.) (See Chart 55 attached hereto). Chart 55 attached hereto shows a summary

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000348

of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

219.   On November 14, 2001, Randy Johnson transferred the La Forest Drive Property to JJ&A for zero (0) consideration.  (See Trial Exhibit 86.)

220.   JJ&A was shown as an Asset Owned on the Debtor Jay Johnson's 100% owned AIA's Balance Sheet.  (See Trial Exhibit 91.)

221.   I have reviewed the Defendant's Expert Report on file in this matter. Both myself and Defendants' expert, Chad Turner, used all of the money deposited to the JJ&A bank accounts from 1999 to 2003 to value the Debtors' 100%-owned AIA and to determine the Debtors' income. Mr. Turner valued the Debtors' 100%-owned AIA by including all of the assets and income of JJ&A including the proceeds from the sale of the La Forest Drive Property.  (Trial Exhibit 222 at pp. 20¶3, 23¶1.)  I concur with the Turner analysis on these crucial points.

222.   Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I concluded that the Debtor Jay Johnson had an undisclosed interest in the La Forest Drive Property that the Debtors failed to report on their Bankruptcy Schedules. Therefore, the Debtors failed to report all of their assets on their Bankruptcy Schedules, which resulted in the Debtors

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000349

presenting an inaccurate disclosure of their assets and Net Worth on
their Bankruptcy schedules.  (Trial Exhibits 227 and 28.)

## The Defendants' Misuse Of Q Financial To Further Their Misdirection Of Assets Of The Debtors

223.   Q Financial's business address shown on its Federal Income Tax
Returns for 1997 and 1998 was Jay Johnson's personal residence at
4600 Viro Road, La Canada, CA 91011.  (Trial Exhibits 82 and 83.)

224.   Q Financial's address shown on its 1999 State of California Tax Voucher
was 4600 Viro Rd., La Canada, CA 91011.  (Trial Exhibit 130.)

225.   Q Financial's address shown on its Federal Employee's Federal Tax
Return dated January 25, 2000, was also 4600 Viro Road, La Canada,
CA 91011.  (Trial Exhibit 155.)

226.   Q Financial's address shown on all of its W-2 Wage and Tax Statements
was also 4600 Viro Road, La Canada, CA 91011.  (Trial Exhibit 155.)

227.   I reviewed Randal Johnson's W-2 forms from 1997, 1998 and 1999,
which was the same time period that Q Financial showed their address
as 4600 Viro Road, La Canada, CA 91011. Randal Johnson's W-2 forms
were sent to him at the following addresses:

73

000350

1997 W-2 Wage Statement for Randy Johnson sent to: 10141 Samoa Ave., Tujunga, CA 91042;

1998 W-2 Wage Statement for Randy Johnson sent to: 10141 Samoa Ave., Tujunga, CA 91042;

1999 W-2 Wage Statement for Randy Johnson sent to: 5118 Circle Vista, La Crescenta, CA 91214.

(Trial Exhibits 24 and 26.)

**228.** Based on discovery obtained during the case, I have found that the house at 5118 Circle Vista, La Crescenta, CA 91214, shown above, was titled in the name of Randy and Robin Johnson.

229. Q Financial also made payments Jay Johnson's personal debts to creditor Richard Lapides. The source of these payments from Q Financial was from the Viro Road Property refinance proceeds of $348,207.00 deposited into the Q Financial Bank account on June 8, 2000. The payments to Richard Lapides from the Q Financial bank account were all made on or after the June 8, 2000 date **that the** Viro Road Property Refinance proceeds were deposited into this Q Financial bank account. (See Chart 56 attached hereto.) Chart 56 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000351

230. Q Financial also made payments for the Viro Road Property's 1st and 2nd Trust Deed Loans. All of these payments from Q Financial for the Viro Road Property 1st and 2nd TD Loans were made immediately after the June 8, 2000 date that the Viro Road Property refinance proceeds of $348,207.00 was deposited into the Q Financial Bank account. (See Chart 57 attached hereto). Chart 57 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

231. Q Financial also issued checks to pay for the La Forest Property mortgage payments in the amount of $35,343.00 both before and after the La Forest Property was transferred to JJ&A. All of these payments from Q Financial for the La Forest Property mortgage payments were made shortly after the June 8, 2000, when the Viro Road Refinance Proceeds of $348,207.00 had been deposited into the Q Financial Bank account. (See Chart 58 attached hereto.) Chart 58 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

232. Q Financial also issued checks for $3,010.00 to pay for the La Forest Drive Property development expenses even before the La Forest Drive Property was transferred to JJ&A. The $3,010.0 La Forest Drive Property development expenses were made after the $348,207.00 Viro

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000352

Road Property Refinance proceeds were deposited into the Q Financial bank account on June 8, 2000.   (See <u>Chart 59</u> attached hereto.) <u>Chart 59</u> attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

233.   On November 21, 2001, the La Forest Drive Property was sold to Daniel and Lynn O'Leary for $775,000.00.  (Trial Exhibits 87, 88, and 223.)

234.   The net proceeds received from the La Forest property sale were $223,789.58 and all of these proceeds were deposited to JJ&A Account #04889-04352 at Bank of America on November 23, 2001.   (Trial Exhibits 4B.)

**235.**   The La Forest Grant Deed exhibit shows Documentary Transfer Tax of $852.50 – corresponding to a sales price of $775,000 ($1.10 per $1,000).  (Trial Exhibit 88.)

236.   At his deposition, Randy Johnson refused to answer if Jay Johnson ever received the proceeds from the sale of the La Forest Drive Property.  (2003 Randy Johnson depo. p. 76:21-24.)

237.   The documentation confirms that JJ&A made $87,750.00 in payments to Q Financial.  (See <u>Chart 60</u> attached hereto.)  <u>Chart 60</u> attached hereto shows a summary of this data and my conclusions that are discussed

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000353

herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

238.  Jay Johnson testified there was "no reason" for JJ&A to pay Q Financial for anything. Yet the documents demonstrate that JJ&A issued $87,750.00 in payments to Q Financial and JJ&A deducted these payments on its Federal Income Tax returns as a valid JJ&A business expense.  (Jay Johnson depo. at p. 275:6-12.)  (See <u>Chart 60</u> attached hereto.)  This Chart was prepared by me and is incorporated herein as if set forth in full.

239.  My investigation also found that Q Financial gave $5,000.00 to JJ&A as documented in <u>Chart 61</u> attached hereto.   <u>Chart 61</u> attached hereto shows a summary of this data and my conclusions that are discussed herein.  This Chart was prepared by me and is incorporated herein as if set forth in full.

240.  At his depositions taken in this case Randy Johnson refused to discuss if he had any ownership or interest in Q Financial.  (2003 Randy Johnson depo. at pp. 79:1-83:22; and 2004 Randy Johnson depo. at pp. 79:19-80:13 and 80:21-84:1.)

241.  Based upon my review of the documents as set forth in the Lapides Report #1 and #2, and my personal review of the documents and things produced during discovery in these matters as referenced herein, I

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000354

concluded that the Debtor Jay Johnson had an undisclosed interest in Q Financial that was not shown on the debtor's bankruptcy schedules, and that the Debtors employed Q Financial to hide assets in their chapter 7 case. Therefore, I concluded that the Debtors failed to report all of their assets on their Bankruptcy Schedules, which resulted in the Debtors presenting an inaccurate disclosure of their assets and Net Worth on their sworn Bankruptcy Schedules.

The The Defendants' Prior Conspiratorial Conduct, The Debtors Acquired Other Real Estate Assets That Were No Disclosed To The Trustee

The San Juan Way And Carmel Road Properties With Lawrence Gillins

242.    Besides the Viro Road Property purchase and sale, and La Forest Drive Property purchase and sale, my investigation revealed that the Debtors were also involved in another twelve (12) separate real estate transactions involving seventeen (17) separate properties. (See Chart 62 attached hereto.) Chart 62 attached hereto shows a summary of this data and my conclusions that are discussed herein. This Chart was prepared by me and is incorporated herein as if set forth in full.

317 San Juan Way, La Canada, CA,

311 San Juan Way, La Canada, CA, and

4810 Carmel Road, La Canada, CA.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000355

243.    Jay Johnson testified at his deposition that he had a 30% ownership interest in two houses that were being developed: 313 San Juan Way, La Canada, CA and 4810 Carmel Road, La Canada, CA. Jay Johnson's partner in this development was Larry Gillins. (Jay Johnson depo. at pp. 246:23-247:18.)

244.    Jay Johnson further testified at his deposition that he had an "Option" to purchase the 317 San Juan Way, La Canada, CA house for $1,400,000.00 where he was residing "rent-free." (Jay Johnson depo. at pp. 252:6-9, 254:5-13.)

245.    My review of the documents provided by third-parties showed that Jay Johnson was directly involved in the sales and signing of the seller's paperwork for these properties. (Trial Exhibits 103, 108, 134 through 146, 152, and 153.)

246.    My review of the documents provided by third-parties showed that Jay Johnson purchased the residence at 317 San Juan Way, La Canada, CA 91011 on 12 9-2004 for $1,400,000.00 with a new 1st Trust Deed for $980,000.00 **with a** $420,000.00 cash down payment. (Trial Exhibits 104 through 109.)

247.    On March 16, 2004, 313 San Juan Way, La Canada, CA was sold for $1,200,000.00 with a closing check issued for $377,465.00. (Lapides Report #1, pp. 128-132 and Lapides Report Exhibit T117.)

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000356

248.    On March 24, 2004, 4810 Carmel Road, La Canada, CA was sold on for $975,000.00 with a closing check issued for $963,273.00.    (Lapides Report #1, pp. 133-134).  (Trial Exhibits 103, 108, 134 through 146, 152, and 153.)

249.    On May 14, 2009, the Debtors sold the 317 San Juan Way residence, which was titled in the Debtors Jay and Debra Johnson's names only, for $1,695,000.00. Attached hereto as Exhibit 3 is a true and correct copy of Los Angeles County Public Records, document #715456.)  (See also Trial Exhibits 104 through 109.)

5284 Gould Avenue, La Canada, CA

250.    On. May 3, 2003, Jay Johnson personally purchased the residential lot at 5284 Gould Avenue, La Canada, CA for $400,000.00.    (Lapides Report #1, p. 136.)   (Trial Exhibits 130 through 132.)

251.    On August 19, 2008, Jay Johnson sold the 5284 Gould Avenue, La Canada, CA property for $950,000.00.  Attached here to as Exhibit 4 is a true and correct copy of Los Angeles County Public Records, document #1490570.) (See also Trial Exhibits 130 through 132.)

Twelve (12) Residential Lots Located In Fallbrook, CA.

252.    On July 22, 2004, Jay Johnson purchased twelve (12) residential lots located in Fallbrook, California (San Diego County) for $3,252,000.00. This Purchase Escrow closed with all cash for the Fallbrook Lots.

000357

(Lapides Report #1, pages 135-136.)   (Trial Exhibits 3A, 3B, and 118 through 132.)

253.   The Fallbrook Properties were titled in the name of 8000M, LLC (a California Limited Liability Company) but the original $20,000.00 down payment was issued by debtor Jay Johnson from his personal bank account at Citizens Business Bank.   Jay Johnson signed all of the original acquisition paper work including the Offer and the Counter Offer. In addition, the two (2) Sale Deeds for the Parcel 67 and Parcel 71 sales showed the seller as 8000 M, LLC with the Debtor Jay Johnson's name typed in on the Grant Deed as the "seller," but Jay Johnson's name was crossed out, and the name Steven F. Nelson was hand-written in, with Mr. Nelson signing the Deed.  (Trial Exhibits 3A, 3B, and 118 through 132.)

254.   On August 27, 2004, Parcel 121-220-67, one of the twelve Fallbrook lots, sold for $475,000.00.  (Trial Exhibits 3A, 3B, and 118 through 132.)

255.   On August 27, 2004, Parcel 121-220-71, one of the twelve Fallbrook lots, sold for $475,000.00.  (Trial Exhibits 3A, 3B, and 118 through 132.)

256.   Based on my review of the public records in San Diego County, on August 8, 2012, the remaining ten (10) Fallbrook lots were sold for $3,573,500.00.   All twelve (12) Fallbrook lots were sold for a total of $4,523,500.00 ($475,000.00 + 475,000.00 + 3,573,500.00). Attached

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000358

here to as Exhibit 5 is a true and correct copy of Los Angeles County Public Records document #467298.

<u>1127 Atlee Drive, La Canada, CA 91011</u>

257. Based on my review of the public records in **Los Angeles** County, the Debtors personally purchased the single-family residence at 1127 Atlee Dr., La Canada, CA on 8 26-2009 for $661,000.00 with a $132,200.00 cash down payment. This property is still currently titled in the names of Debtors Jay and Debra Johnson.  Attached here to as Exhibit 6 is a true and correct copy of Los Angeles County Public Records document #1310620.

258. Based on the above evidence and documentation, as well as the discussion in my two Reports, I concluded that the Debtor Jay Johnson had undisclosed interests in real estate that he did not disclose to the Bankruptcy Trustee.  (Trial Exhibits 227 and 228.)

000359

1
2
3   I declare under the penalty of perjury and the laws of the United States of America that
4   the foregoing is true and correct and that this Declaration was executed on this   23rd
5   day of January 2014 at La Canada, California.
6
7
8                                   *Richard Lapides*
                                    RICHARD LAPIDES
9
    LAPIDES.Dec.MSJ.CK.v.2wpd.wpd
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

83
TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

# EXHIBIT "1"

# EXHIBIT "1"

000361

## Qualifications of Analyst

Richard A. Lapides

| | |
|---|---|
| Professional Designation: | Certified Review Appraiser (C.R.A.) |
| 1987 | Expert Witness - United States Tax Court |

**1979 - Present**

Employed as an Appraiser with the Internal Revenue Service (Department of the Treasury). Independently conduct field examinations, and investigations of various real estate - securing needed public and private records and information from all available sources. Analyze data and make determinations on various technical appraisal and other issues affecting taxable income, such as: fair market value, allocation of total land and buildings, highest and best use of property, useful life, valuation of leaseholds and easements, etc. Examinations frequently require a forensic analysis of the often-voluminous records, in order to determine the true nature of the facts and circumstances involved in the issue under examination. Prepare Valuation and Forensic Analysis Reports detailing nature of findings, and basis for determinations.

Have also participated in Real Estate and Appraisal courses at local colleges and by the professional organizations. Courses completed include:

SREA 101, 201  Introduction to Appraising Real Property
SREA 301 Special Applications of Appraisal Analysis
AIREA Case Studies in Real Estate Valuation
AIREA Valuation Analysis and Report Writing
AIREA Capitalization Theory & Techniques, Part A, B
Creative Financing
Exchange Brokerage

**1977 - 1980**

Actively involved in Real Estate appraisals and related aspects of real property with R & R Properties, a partnership dealing in the acquisition, maintenance, and disposition of multiple-unit residential properties for investment purposes.

000362

<u>Qualifications of Analyst</u>

Richard A. Lapides

| | |
|---|---|
| 1976 - 1977 | Business Auditor for the Internal Revenue Service (Department of the Treasury). Dealt with collecting, organizing, analyzing, appraising, and drawing conclusions from often-voluminous records. Gained extensive experience with residential and commercial properties. Experience included valuation of real and personal property for contribution purposes, and allocation problems. Work involved the analysis and understanding of fairly large businesses, and complex issues involved with large-income individuals. |
| 1975 - 1976 | Employed as a Business Analyst with Dun & Bradstreet, Inc. Analyzed and appraised the worth of various businesses. Often utilized the subject business balance sheet and associated financial statements while looking at the appropriate relationships, ratios, management experience, past and present records in order to place a value on the business being examined. Received an Outstanding Performance Award. |
| 1971 - 1975 | Brigham Young University. Graduated in Physics and Mathematics, with a secondary emphasis in Business. Qualified for the Dean's List. |
| 1969 - 1971 | Engineer. Involved with research and development at the George C. Marshall Space Flight Center (N.A.S.A.) at Huntsville, Alabama. Received Medallion for my contribution to the Apollo Space Program. Also involved with the Space Shuttle Program. |
| 1968 - 1969 | University of Alabama. Majored in Engineering, with a minor emphasis in Mathematics. In Mathematics aptitude tests have scored in the top 1% of the United States. |

000363

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

<u>Qualifications of Analyst</u>

Richard A. Lapides

Lapides has been doing this type of analysis and work for over 32 years from 1979 through 2014. I have attached Letters of Commendation received by Lapides from (1) the taxpayer's he assessed tax and penalties against, (2) the expert's clients, and (3) the expert's supervisors.

(A) <u>Letter of Commendation</u> from Taxpayer's attorney dated 12-22-08 involving a case where the taxpayer agreed to pay over $370,000 in tax and penalties. The taxpayer's attorney described Lapides as "someone who is an expert in his field" and "someone who provides reasonable analyses" (see <u>Exhibit 1</u>, pages 3-4, the taxpayer's names have been redacted for privacy purposes).

(B) <u>Letter of Commendation</u> from Lapides' client, IRS Estate and Gift Tax attorney dated 11-2-2000 regarding a case worked where there was a complete lack of cooperation from the taxpayer, where forty (40) 3rd-party subpoenas were issued, many boxes of information was analyzed, and which case involved a complex series of Deed transfers that clouded the estate's ownership of commercial properties involving fraud. Lapides discovered multiple unreported real estate properties exceeding $30,000,000 in value (see <u>Exhibit 1</u>, pages 5-6, the taxpayer's names have been redacted for privacy purposes).

(C) <u>Letter of Commendation</u> from Lapides' client, IRS Appeals Officer and Chief of Appeals regarding the resolution of a large case that "was fair to both taxpayer and the government." (See <u>Exhibit 1</u>, page 7, the taxpayer's names have been redacted for privacy purposes).

(D) <u>Letter of Commendation</u> from Lapides' supervisor dated 8-1-1994 involving a case where Lapides analyzed a complex case that resulted in an increase of the taxpayer's income by $105,100,000 (see <u>Exhibit 1</u>, pages 8-9, the taxpayer's names have been redacted for privacy purposes).

(E) <u>Performance Appraisal</u> from Lapides' supervisor dated 11-22-82 involving a case where Lapides analyzed a complex case involving over 2,100 real estate properties in Hawaii that resulted in an agreement for over $8,200,000 in taxes, and which case involved title searches in this potential Tax Court litigation case. Lapides' supervisor commented that Lapides had the ability to analyze difficult tax shelter schemes (see <u>Exhibit 1</u>, pages 10-16).

Also attached hereto are eight (8) sample Outstanding Performance Awards received by Lapides (see <u>Exhibit 1</u>, pages 17-25).

Also attached hereto is a Summary of Lapides' Performance Evaluations from 2001 through 2011 (<u>Exhibit 1</u>, page 26) showing that his performance "Exceeded Fully Successful" every year, a sample Performance Evaluation dated 6-12-2003 (see <u>Exhibit 1</u>, pages 27-28).

000364

## IV.   *Qualifications of Analyst*

### *Richard A. Lapides*

| | |
|---|---|
| Professional Designation: | Certified Review Appraiser (C.R.A.) |

**1987**

Expert Witness - United States Tax Court

**1979 - Present**

Employed as an Appraiser with the Internal Revenue Service (Department of the Treasury). Independently conduct field examinations, and investigations of various real estate - securing needed public and private records and information from all available sources. Analyze data and make determinations on various technical appraisal and other issues affecting taxable income, such as: fair market value, allocation of total land and buildings, highest and best use of property, useful life, valuation of leaseholds and easements, etc. Examinations frequently require a forensic analysis of the often-voluminous records, in order to determine the true nature of the facts and circumstances involved in the issue under examination. Prepare Valuation and Forensic Analysis Reports detailing nature of findings, and basis for determinations.

Have also participated in Real Estate and Appraisal courses at local colleges and by the professional organizations. Courses completed include:

SREA 101, 201 Introduction to Appraising Real Property
SREA 301 Special Applications of Appraisal Analysis
AIREA Case Studies in Real Estate Valuation
AIREA Valuation Analysis and Report Writing
AIREA Capitalization Theory & Techniques, Part A, B
Creative Financing
Exchange Brokerage

**1977 - 1980**

Actively involved in Real Estate appraisals and related aspects of real property with R & R Properties, a partnership dealing in the acquisition, maintenance, and disposition of multiple-unit residential properties for investment purposes.

16

1800365

## _Qualifications of Analyst_

### _Richard A. Lapides_

| | |
|---|---|
| 1976 - 1977 | Business Auditor for the Internal Revenue Service (Department of the Treasury). Dealt with collecting, organizing, analyzing, appraising, and drawing conclusions from often-voluminous records. Gained extensive experience with residential and commercial properties. Experience included valuation of real and personal property for contribution purposes, and allocation problems. Work involved the analysis and understanding of fairly large businesses, and complex issues involved with large-income individuals. |
| 1975 - 1976 | Employed as a Business Analyst with Dun & Bradstreet, Inc. Analyzed and appraised the worth of various businesses. Often utilized the subject business balance sheet and associated financial statements while looking at the appropriate relationships, ratios, management experience, past and present records in order to place a value on the business being examined. Received an Outstanding Performance Award. |
| 1971 - 1975 | Brigham Young University. Graduated in Physics and Mathematics, with a secondary emphasis in Business. Qualified for the Dean's List. |
| 1969 - 1971 | Engineer. Involved with research and development at the George C. Marshall Space Flight Center (N.A.S.A.) at Huntsville, Alabama. Received Medallion for my contribution to the Apollo Space Program. Also involved with the Space Shuttle Program. |
| 1968 - 1969 | University of Alabama. Majored in Engineering, with a minor emphasis in Mathematics. In Mathematics aptitude tests have scored in the top 1% of the United States. |

000366



425 MARKET STREET
SAN FRANCISCO
CALIFORNIA 94105-2482

TELEPHONE:415.268.7000
FACSIMILE:415.268.7522

WWW.MOFO.COM

MORRISON & FOERSTER LLP

NEW YORK, SAN FRANCISCO,
LOS ANGELES, PALO ALTO,
SAN DIEGO, WASHINGTON, D.C.

DENVER, NORTHERN VIRGINIA,
ORANGE COUNTY, SACRAMENTO,
WALNUT CREEK, CENTURY CITY

TOKYO, LONDON, BEIJING,
SHANGHAI, HONG KONG,
SINGAPORE, BRUSSELS

December 22, 2008

Writer's Direct Contact

415 

Internal Revenue Service
Real Estate Appraisal Section
Mail Stop: LA-4203   Room 5151
300 N. Los Angeles Street
Los Angeles, CA 90012
Attn: N. Mazer

     RE:  Richard A. Lapides

Dear Ms. Mazer:

    As you may recall from our meeting in Los Angeles, I represented H██████ Investment Company with respect to the examination of their 200603 and 200703 returns. As part of this process, I had the opportunity to communicate regularly with Richard A. Lapides, the Real Estate Appraiser assigned the case. I realize that taxpayers and their representatives do not often write letters such as this one, but as a former attorney for Los Angeles Office of District Counsel, and as an attorney who interacts regularly with the Service, I wanted to express my appreciation for the high level of expertise and professionalism demonstrated by Richard Lapides.

    During the examination, Richard Lapides was an advocate for the Service, while at the same time being very reasonable. In my view, he clearly met the IRS "mission" to "provide America's taxpayers top-quality service by helping them understand and meet their tax responsibilities and by applying the tax law with integrity and fairness to all." His thoroughness helped this controversy result in an "agreed" determination.

    I have dealt with quite a number of capable people at the IRS, but Richard Lapides stands out not just as someone who is an expert in his field, but as someone who provides reasonable analyses that can be understood by the taxpayer. As a closing note, please let me point out that the total of tax, penalties, and interest resulting in large part form the agreement based on Richard Lapides' analysis was in excess of $370,000. Suffice it to say, had he not been persuasive and thorough, this matter would not have "gone agreed."

C:\Documents and Settings\jkf2\Letter to Mazer re R Lapides (5).DOC

000367



Internal Revenue Service
December 22, 2008
Page Two

As a tax professional, it is encouraging to work across the table from people who take pride in their work. Please feel free to contact me at (415)▒▒▒▒▒▒should you have any questions or comments.

Sincerely,

Tax Partner
Morrison & Foerster LLP

000368



# MEMORANDUM



November 7, 2000

**TO:**    RICKY ROUSSEL, MANAGER ENGINEERING GROUP

**FROM:**  ROBERT ████████ATTORNEY, ESTATE & GIFT TAX

**RE:**    Appreciation for the Engineering Group's Assistance in the M████ Estate

**CC:**    Richard A. Ullman, Manager E & G, Los Angeles

The purpose of this Memorandum is to recognize the Engineering Group's assistance in the M████ Estate. This unique case involves a re-examination of a case due to possible fraudulent omission of real properties from the Form 706 on a large scale. Without cooperation from the estate's representative, an estimated 40 third party summons issued. Boxes of documents regarding building plans, leases, correspondence, property tax, zoning, deeds of transfer and myriad other issues affecting the real properties in question accumulated. Additionally, volumes of documents provided by a potential informant provided a history of a complex series of deed transfers that clouded the estate's ownership of the commercial properties. District counsel advised that although all the facts supported a fraud cause of action, the re-examination process should wind up by May 2000 to preserve the six-year statute of limitations regarding the substantial omission of assets from the estate.

In approximately October 1999, a Form 5202 requested a review appraisal of multiple properties in Torrance, California. Mr. Roussel assigned the project to ████████████ who had already appraised one of the properties at the request of Revenue Officer Gilbert Flores in 1998. However, Mr. ████████ workload proved too burdensome to initiate the review. Mr. Roussel reassigned the project to Richard Lapides.

Mr. Lapides immediately contacted me to discuss the case. I informed him that the case was complex due to the lack of cooperation and long-term concealment of the estate's interests in the properties. Mr. Lapides set up an appointment to meet me in the office. During our three-hour meeting, I acquainted him with the "tangled web" this case presented. He left the office carting three boxes of documents from various sources including the original examination file, the current examination file, voluminous summons documents, hundreds of real property profiles, the revenue officer's file and voluminous informant data.

In the weeks that followed, Mr. Lapides called me frequently to update his progress. First, he accomplished the monumental task of organizing materials in three ring binders. Second, he deciphered the complex maze of transfers among related entities to establish the estate's ownership of multiple properties. Third, he analyzed the lease data to determine the income on the properties.

000369

Fourth, he analyzed comparable sales to determine the appropriate capitalization rates and multipliers. Fifth, Mr. Lapides completed a summary appraisal.

Mr. Lapides shared his initial conclusions in a joint meeting with ▮▮▮▮▮▮ of District Counsel, ▮▮▮▮▮▮▮, R.O. and myself. He explained that to do a complete appraisal of the subject properties would be a long process. However, he rose to the occasion by agreeing to submit a summary appraisal to allow me to incorporate a value into the 90-Day Letter in time for its issuance timely in the shadow of a looming statute date.

Finally, Mr. Lapides provided his conclusions in a meeting with Mr. Roussell and me. His determinations indicated that the estate had undervalued or completely omitted real property assets exceeding $30,000,000 in value. Due to Mr. Lapides's cooperation in making this project a priority and completing it in a swift manner despite adverse circumstances, I was able to complete the re-examination of this case and timely issue a 90-Day Letter incorporating the values of the real properties determined by Mr. Lapides. This Memorandum commends his and Mr. Roussell's efforts in the M▮▮▮ Estate. This case indicates that the Los Angeles Engineering Group provides excellent work product even under difficult circumstances. Thank you.

**Internal Revenue Service**

# memorandum

**date:**  April 23, 1998

**to:**  Gus Robinson, Group Manager, SP 1125 (Los Angeles)

**thru:**  Richard ███████ Associate Chief
Los Angeles Appeals Office (Glendale Sub-Office)

**from:**  ███████ Appeals Officer [Tel. (818 ███████ ]

**subject:**  Assistance of Appraiser Richard Lapides in the Additional Development of:

**Taxpayer:**  ███████ International Corporation (formerly ███████ Inc.) and Subsidiaries (CEP Case)

**Tax Years:**  8711, 8811, and 8911

This memorandum is to express my appreciation for the contributions of Richard Lapides, Appraiser, toward the additional development of this case while it was under consideration in this office. With his help, I was able to settle three large basis-allocation issues in this case on a basis that was fair to both the taxpayers and the government.

You assigned Richard to assist me in this case after I contacted you by telephone and formally requested assistance in this case in a memo dated December 6, 1995, and again when I asked for additional assistance in my memo dated April 8, 1997. (See copies attached for reference.) He responded to my requests by providing a comprehensive appraisal dated November 20, 1996, and an appraisal review report dated June 6, 1997, both of which I found to be very helpful.

This case had already been in Appeals for over a year when I contacted you. Consequently, the case had already taken on a high degree of urgency when Richard did the additional work which I requested. Nevertheless, he displayed a willingness to work with Appeals in a professional, team-oriented manner.

Without the additional help which he provided, I would have found it much more difficult (if not impossible) to settle the basis allocation issues in this case. Therefore, I wish to take this opportunity to acknowledge Richard's efforts, and also thank you as his manager for making him available to assist this office in this case. (A copy of the portion of the Appeals Case Memo which deals with the settlement of the basis allocation issues (pages 24 - 43, plus Attachment 2) is attached for your information.)

1852

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS–NTEU NATIONAL PERFORMANCE AWARDS AGREEMENT

# PERFORMANCE AWARD

PRESENTED TO

*B. Lapides*

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

*Chalie O. Rosso H.*
Date                                              September 8, 2002

Form 9567 (Rev. 9-2002)   Cat. No. 10259V

23 23 000372

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

## Richard Lapides

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

July 1998

Date

DISTRICT DIRECTOR

24   000373

Department of the Treasury
Internal Revenue Service

IRS-NTEU Contract Awards Program

# Performance Award

Presented To

## Richard Lapides

In Recognition And Appreciation Of Your Superior Effort, Dedication And Personal Contribution To Accomplishing The Goals And Mission Of The Internal Revenue Service

September 1997

Date

District Director

25  25
000374

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

## Richard Lapides

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

September 1996

_____
Date

_____
DISTRICT DIRECTOR

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

RICHARD LAPIDES

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

FEBRUARY 1995
_____
Date

DISTRICT DIRECTOR

27  27  000376

Department of the Treasury
Internal Revenue Service

IRS-NTEU Contract Awards Program

# Performance Award

Presented To

## Richard Lapides

In Recognition And Appreciation Of Your Superior Effort,
Dedication And Personal Contribution To Accomplishing The
Goals And Mission Of The Internal Revenue Service

June 1995

_____
Date

DISTRICT DIRECTOR

28 28  000377

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

RICHARD LAPIDES

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

FEBRUARY 1994

Date

DISTRICT DIRECTOR

DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE

IRS-NTEU CONTRACT AWARDS PROGRAM

# PERFORMANCE AWARD

PRESENTED TO

RICHARD LAPIDES

IN RECOGNITION AND APPRECIATION OF YOUR SUPERIOR EFFORT,
DEDICATION AND PERSONAL CONTRIBUTION TO ACCOMPLISHING THE
GOALS AND MISSION OF THE INTERNAL REVENUE SERVICE

DISTRICT DIRECTOR

MARCH 1992

Date

Department of the Treasury
Internal Revenue Service

IRS-NTEU Contract Awards Program

# Performance Award

## Presented To

RICHARD A. LAPIDES

In Recognition And Appreciation Of Your Superior Effort,
Dedication And Personal Contribution To Accomplishing The
Goals And Mission Of The Internal Revenue Service

FEBRUARY 1991

Date

DISTRICT DIRECTOR

3131    000380

Personal Information                                             Page 1 of 1

# MY INFORMATION - PERFORMANCE

| Name: | Lapides,Richard A | | PD #: | 92462A |
|---|---|---|---|---|
| **Emplid:** | 332878 | | | |
| **Position Title:** | Appraiser | GS-1171-13  / 9 | | |

**PERFORMANCE HISTORY**

Customize | Find | 🔢      First ◁ 1-10 of 10 ▷ Last

| Overall Performance Rating | Review Period From | Review Period To |
|---|---|---|
| 4 - Exceeds Fully Successful | 07/01/2010 | 06/30/2011 |
| 4 - Exceeds Fully Successful | 07/01/2009 | 06/30/2010 |
| 4 - Exceeds Fully Successful | 07/01/2008 | 06/30/2009 |
| 4 - Exceeds Fully Successful | 07/01/2007 | 06/30/2008 |
| 4 - Exceeds Fully Successful | 07/01/2006 | 06/30/2007 |
| 4 - Exceeds Fully Successful | 06/31/2005 | 05/31/2006 |
| 4 - Greater than Fully Successful | 07/01/2004 | 06/30/2005 |
| 4 - Greater than Fully Successful | 07/01/2003 | 06/30/2004 |
| 4 - Greater than Fully Successful | 07/01/2002 | 06/30/2003 |
| 4 - Greater than Fully Successful | 07/01/2001 | 06/30/2002 |

My Information Menu

32  000381

32

# EXHIBIT "2"

# EXHIBIT "2"

000382



**IRS**

Publication 936 - Main Content

**Table of Contents**

- Part I. Home Mortgage Interest
  - Secured Debt
  - Qualified Home
  - Special Situations
  - Points
  - Mortgage Insurance Premiums
  - Form 1098, Mortgage Interest Statement
  - How To Report
  - Special Rule for Tenant-Stockholders in Cooperative Housing Corporations
- Part II. Limits on Home Mortgage Interest Deduction
  - Home Acquisition Debt
  - Home Equity Debt
  - Grandfathered Debt
  - Table 1 Instructions
- How To Get Tax Help
  - Low Income Taxpayer Clinics

Part I. Home Mortgage Interest

This part explains what you can deduct as home mortgage interest. It includes discussions on points, mortgage insurance premiums, and how to report deductible interest on your tax return.

Generally, home mortgage interest is any interest you pay on a loan secured by your home (main home or a second home). The loan may be a mortgage to buy your home, a second mortgage, a line of credit, or a home equity loan.

You can deduct home mortgage interest if all the following conditions are met.

- You file Form 1040 and itemize deductions on Schedule A (Form 1040).
- The mortgage is a secured debt on a qualified home in which you have an ownership interest. *Secured Debt* and *Qualified Home* are explained later.

Both you and the lender must intend that the loan be repaid.

**Fully deductible interest.**   In most cases, you can deduct all of your home mortgage interest. How much you can deduct depends on the date of the mortgage, the amount of the mortgage, and how you use the mortgage proceeds.

If all of your mortgages fit into one or more of the following three categories at all times during the year, you can deduct all of the interest on those mortgages. (If any one mortgage fits into more than one category, add the debt that fits in each category to your other debt in the same category.) If one or more of your mortgages does not fit into any of these categories, use Part II of this publication to figure the amount of interest you can deduct.

The three categories are as follows.

1. Mortgages you took out on or before October 13, 1987 (called grandfathered debt).

2. Mortgages you took out after October 13, 1987, to buy, build, or improve your home (called home acquisition debt), but only if throughout 2013 these mortgages plus any grandfathered debt totaled $1 million or less ($500,000 or less if married filing separately).

3. Mortgages you took out after October 13, 1987, other than to buy, build, or improve your home (called home equity debt), but only if throughout 2013 these mortgages totaled $100,000 or less ($50,000 or less if married filing separately) and totaled no more than the fair market value of your home reduced by (1) and (2).

The dollar limits for the second and third categories apply to the combined mortgages on your main home and second home.

See Part II for more detailed definitions of grandfathered, home acquisition, and home equity debt.

You can use Figure A to check whether your home mortgage interest is fully deductible.

This image is too large to be displayed in the current screen. Please click the link to view the image.

Figure A. Is My Home Mortgage Interest Fully Deductible?

*Secured Debt*

You can deduct your home mortgage interest only if your mortgage is a secured debt. A secured debt is one in which you sign an instrument (such as a mortgage, deed of trust, or land contract) that

- Makes your ownership in a qualified home security for payment of the debt,
- Provides, in case of default, that your home could satisfy the debt, and
- Is recorded or is otherwise perfected under any state or local law that applies.

In other words, your mortgage is a secured debt if you put your home up as collateral to protect the interests of the lender. If you cannot pay the debt, your home can then serve as payment to the lender to satisfy (pay) the debt. In this publication, mortgage will refer to secured debt.

**Debt not secured by home.** A debt is not secured by your home if it is secured solely because of a lien on your general assets or if it is a security interest that attaches to the property without your consent (such as a mechanic's lien or judgment lien).

A debt is not secured by your home if it once was, but is no longer secured by your home.

*Wraparound mortgage.* This is not a secured debt unless it is recorded or otherwise perfected under state law.

**Example.**

Beth owns a home subject to a mortgage of $40,000. She sells the home for $100,000 to John, who takes it subject to the $40,000 mortgage. Beth continues to make the payments on the $40,000 note. John pays $10,000 down and gives Beth a $90,000 note secured by a wraparound mortgage on the home. Beth does not record or otherwise perfect the $90,000 mortgage under the state law that applies. Therefore, the mortgage is not a secured debt and John cannot deduct any of the interest he pays on it as home mortgage interest.

**Choice to treat the debt as not secured by your home.** You can choose to treat any debt secured by your qualified home as not secured by the home. This treatment begins with the tax year for which you make the choice and continues for all later tax years. You can revoke your choice only with the consent of the Internal Revenue Service (IRS).

You may want to treat a debt as not secured by your home if the interest on that debt is fully deductible (for example, as a business expense) whether or not it qualifies as home mortgage interest. This may allow you, if the limits in *Part II* apply, more of a deduction for interest on other debts that are deductible only as home mortgage interest.

**Cooperative apartment owner.** If you own stock in a cooperative housing corporation, see the *Special Rule for Tenant-Stockholders in Cooperative Housing Corporations*, near the end of this Part I

*Qualified Home*

For you to take a home mortgage interest deduction, your debt must be secured by a qualified home. This means your main home or your second home. A home includes a house, condominium, cooperative, mobile home, house trailer, boat, or similar property that has sleeping, cooking, and toilet facilities.

The interest you pay on a mortgage on a home other than your main or second home may be deductible if the proceeds of the loan were used for business, investment, or other deductible purposes. Otherwise, it is considered personal interest and is not deductible.

**Main home.** You can have only one main home at any one time. This is the home where you ordinarily live most of the time.

**Second home.** A second home is a home that you choose to treat as your second home.

*Second home not rented out.* If you have a second home that you do not hold out for rent or resale to others at any time during the year, you can treat it as a qualified home. You do not have to use the home during the year.

*Second home rented out.* If you have a second home and rent it out part of the year, you also must use it as a home during the year for it to be a qualified home. You must use this home more than 14 days or more than 10% of the number of days during the year that the home is rented at a fair rental, whichever is longer. If you do not use the home long enough, it is considered rental property and not a second home. For information on residential rental property, see Publication 527.

*More than one second home.* If you have more than one second home, you can treat only one as the qualified second home during any year. However, you can change the home you treat as a second home during the year in the following situations.

- If you get a new home during the year, you can choose to treat the new home as your second home as of the day you buy it.

- If your main home no longer qualifies as your main home, you can choose to treat it as your second home as of the day you stop using it as your main home.

- If your second home is sold during the year or becomes your main home, you can choose a new second home as of the day you sell the old one or begin using it as your main home.

**Divided use of your home.** The only part of your home that is considered a qualified home is the part you use for residential living. If you use part of your home for other than residential living, such as a home office, you must allocate the use of your home. You must then divide both the cost and fair market value of your home between the part that is a qualified home and the part that is not. Dividing the cost may affect the amount of your home acquisition debt, which is limited to the cost of your home plus the cost of any improvements. (See *Home Acquisition Debt* in Part II.) Dividing the fair market value may affect your home equity debt limit, also explained in *Part II*.

**Renting out part of home.** If you rent out part of a qualified home to another person (tenant), you can treat the rented part as being used by you for residential living only if all of the following conditions apply.

- The rented part of your home is used by the tenant primarily for residential living.

- The rented part of your home is not a self-contained residential unit having separate sleeping, cooking, and toilet facilities.

- You do not rent (directly or by sublease) the same or different parts of your home to more than two tenants at any time during the tax year. If two persons (and dependents of either) share the same sleeping quarters, they are treated as one tenant.

**Office in home.** If you have an office in your home that you use in your business, see Publication 587, Business Use of Your Home. It explains how to figure your deduction for the business use of your home, which includes the business part of your home mortgage interest.

**Home under construction.** You can treat a home under construction as a qualified home for a period of up to 24 months, but only if it becomes your qualified home at the time it is ready for occupancy.

The 24-month period can start any time on or after the day construction begins.

**Home destroyed.** You may be able to continue treating your home as a qualified home even after it is destroyed in a fire, storm, tornado, earthquake, or other casualty. This means you can continue to deduct the interest you pay on your home mortgage, subject to the limits described in this publication.

You can continue treating a destroyed home as a qualified home if, within a reasonable period of time after the home is destroyed, you.

- Rebuild the destroyed home and move into it, or

- Sell the land on which the home was located.

This rule applies to your main home and to a second home that you treat as a qualified home.

**Time-sharing arrangements.** You can treat a home you own under a time-sharing plan as a qualified home if it meets all the requirements. A time-sharing plan is an arrangement between two or more people that limits each person's interest in the home or right to use it to a certain part of the year.

*Rental of time-share.* If you rent out your time-share, it qualifies as a second home only if you also use it as a home during the year. See *Second home rented out*, earlier, for the use requirement. To know whether you meet that requirement, count your days of use and rental of the home only during the time you have a right to use it or to receive any benefits from the rental of it.

**Married taxpayers.** If you are married and file a joint return, your qualified home(s) can be owned either jointly or by only one spouse.

Case 8:06-ap-01251-ES Doc 414-5 Filed 01/23/15 Entered 01/23/15 13:55 ID esc 2
Exhibit Page 4 of 30
Publication 936 (2013), Home Mortgage Interest Deduction

Page 3 of 14

*Separate returns.* If you are married filing separately and you and your spouse own more than one home, you can each take into account only one home as a qualified home. However, if you both consent in writing, then one spouse can take both the main home and a second home into account.

*Special Situations*

This section describes certain items that can be included as home mortgage interest and others that cannot. It also describes certain special situations that may affect your deduction.

**Late payment charge on mortgage payment.** You can deduct as home mortgage interest a late payment charge if it was not for a specific service performed in connection with your mortgage loan.

**Mortgage prepayment penalty.** If you pay off your home mortgage early, you may have to pay a penalty. You can deduct that penalty as home mortgage interest provided the penalty is not for a specific service performed or cost incurred in connection with your mortgage loan.

**Sale of home.** If you sell your home, you can deduct your home mortgage interest (subject to any limits that apply) paid up to, but not including, the date of the sale.

**Example.**

John and Peggy Harris sold their home on May 7. Through April 30, they made home mortgage interest payments of $1,220. The settlement sheet for the sale of the home showed $50 interest for the 6-day period in May up to, but not including, the date of sale. Their mortgage interest deduction is $1,270 ($1,220 + $50).

**Prepaid interest.** If you pay interest in advance for a period that goes beyond the end of the tax year, you must spread this interest over the tax years to which it applies. You can deduct in each year only the interest that qualifies as home mortgage interest for that year. However, there is an exception that applies to points, discussed later.

**Mortgage interest credit.** You may be able to claim a mortgage interest credit if you were issued a mortgage credit certificate (MCC) by a state or local government. Figure the credit on Form 8396, Mortgage Interest Credit. If you take this credit, you must reduce your mortgage interest deduction by the amount of the credit.

See Form 8396 and Publication 530 for more information on the mortgage interest credit.

**Ministers' and military housing allowance.** If you are a minister or a member of the uniformed services and receive a housing allowance that is not taxable, you can still deduct your home mortgage interest.

**Hardest Hit Fund and Emergency Homeowners' Loan Programs.** You can use a special method to compute your deduction for mortgage interest and real estate taxes on your main home if you meet the following two conditions.

1. You received assistance under:

    a. A State Housing Finance Agency (State HFA) Hardest Hit Fund program in which program payments could be used to pay mortgage interest, or

    b. An Emergency Homeowners' Loan Program administered by the Department of Housing and Urban Development (HUD) or a state.

2. You meet the rules to deduct all of the mortgage interest on your loan and all of the real estate taxes on your main home.

If you meet these tests, then you can deduct all of the payments you actually made during the year to your mortgage servicer, the State HFA, or HUD on the home mortgage (including the amount shown in box 3 of Form 1098–MA, Mortgage Assistance Payments), but not more than the sum of the amounts shown on Form 1098, Mortgage Interest Statement, in box 1 (mortgage interest received from payer(s) / borrower(s)), box 4 (mortgage insurance premiums), and box 5 (other information including real property taxes paid). However, you are not required to use this special method to compute your deduction for mortgage interest and real estate taxes on your main home.

**Mortgage assistance payments under section 235 of the National Housing Act.** If you qualify for mortgage assistance payments for lower-income families under section 235 of the National Housing Act, part or all of the interest on your mortgage may be paid for you. You cannot deduct the interest that is paid for you.

*No other effect on taxes.* Do not include these mortgage assistance payments in your income. Also, do not use these payments to reduce other deductions, such as real estate taxes.

**Divorced or separated individuals.** If a divorce or separation agreement requires you or your spouse or former spouse to pay home mortgage interest on a home owned by both of you, the payment of interest may be alimony. See the discussion of *Payments for jointly-owned home* under *Alimony* in Publication 504, Divorced or Separated Individuals.

**Redeemable ground rents.** In some states (such as Maryland), you can buy your home subject to a ground rent. A ground rent is an obligation you assume to pay a fixed amount per year on the property. Under this arrangement, you are leasing (rather than buying) the land on which your home is located.

If you make annual or periodic rental payments on a redeemable ground rent, you can deduct them as mortgage interest.

A ground rent is a redeemable ground rent if all of the following are true.

- Your lease, including renewal periods, is for more than 15 years.

- You can freely assign the lease.

- You have a present or future right (under state or local law) to end the lease and buy the lessor's entire interest in the land by paying a specific amount.

- The lessor's interest in the land is primarily a security interest to protect the rental payments to which he or she is entitled.

Payments made to end the lease and to buy the lessor's entire interest in the land are not deductible as mortgage interest.

**Nonredeemable ground rents.** Payments on a nonredeemable ground rent are not mortgage interest. You can deduct them as rent if they are a business expense or if they are for rental property.

**Reverse mortgages.** A reverse mortgage is a loan where the lender pays you (in a lump sum, a monthly advance, a line of credit, or a combination of all three) while you continue to live in your home. With a reverse mortgage, you retain title to your home. Depending on the plan, your reverse mortgage becomes due with interest when you move, sell your home, reach the end of a pre-selected loan period, or die. Because reverse mortgages are considered loan advances and not income, the amount you receive is not taxable. Any interest (including original issue discount) accrued on a reverse mortgage is not deductible until you actually pay it, which is usually when you pay off the loan in full. Your deduction may be limited because a reverse mortgage loan generally is subject to the limit on *Home Equity Debt* discussed in Part II.

**Rental payments.** If you live in a house before final settlement on the purchase, any payments you make for that period are rent and not interest. This is true even if the settlement papers call them interest. You cannot deduct these payments as home mortgage interest.

**Mortgage proceeds invested in tax-exempt securities.** You cannot deduct the home mortgage interest on grandfathered debt or home equity debt if you used the proceeds of the mortgage to buy securities or certificates that produce tax-free income. "Grandfathered debt" and "home equity debt" are defined in *Part II* of this publication.

**Refunds of interest.** If you receive a refund of interest in the same tax year you paid it, you must reduce your interest expense by the amount refunded to you. If you receive a refund of interest you deducted in an earlier year, you generally must include the refund in income in the year you receive it. However, you need to include it only up to the amount of the deduction that reduced your tax in the earlier year. This is true whether the interest overcharge was refunded to you or was used to reduce the outstanding principal on your mortgage. If you need to include the refund in income, report it on Form 1040, line 21.

If you received a refund of interest you overpaid in an earlier year, you generally will receive a Form 1098, Mortgage Interest Statement, showing the refund in box 3. For information about Form 1098, see *Form 1098, Mortgage Interest Statement,* later.

For more information on how to treat refunds of interest deducted in earlier years, see *Recoveries* in Publication 525, Taxable and Nontaxable Income.

**Cooperative apartment owner.**  If you own a cooperative apartment, you must reduce your home mortgage interest deduction by your share of any cash portion of a patronage dividend that the cooperative receives. The patronage dividend is a partial refund to the cooperative housing corporation of mortgage interest it paid in a prior year.

If you receive a Form 1098 from the cooperative housing corporation, the form should show only the amount you can deduct.

*Points*

The term "points" is used to describe certain charges paid, or treated as paid, by a borrower to obtain a home mortgage. Points may also be called loan origination fees, maximum loan charges, loan discount, or discount points.

This image is too large to be displayed in the current screen. *Please click the link to view the image.*

Figure B. Are My Points Fully Deductible This Year?

A borrower is treated as paying any points that a home seller pays for the borrower's mortgage. See *Points paid by the seller*, later.

General Rule

You generally cannot deduct the full amount of points in the year paid. Because they are prepaid interest, you generally deduct them ratably over the life (term) of the mortgage. See *Deduction Allowed Ratably*, next.

For exceptions to the general rule, see *Deduction Allowed in Year Paid*, later.

Deduction Allowed Ratably

If you do not meet the tests listed under *Deduction Allowed in Year Paid*, later, the loan is not a home improvement loan, or you choose not to deduct your points in full in the year paid, you can deduct the points ratably (equally) over the life of the loan if you meet all the following tests

1. You use the cash method of accounting  This means you report income in the year you receive it and deduct expenses in the year you pay them. Most individuals use this method

2. Your loan is secured by a home. (The home does not need to be your main home.)

3. Your loan period is not more than 30 years

4. If your loan period is more than 10 years, the terms of your loan are the same as other loans offered in your area for the same or longer period.

5. Either your loan amount is $250,000 or less, or the number of points is not more than:

   a.  4, if your loan period is 15 years or less, or

   b.  6, if your loan period is more than 15 years.


**Example.**

You use the cash method of accounting. In 2013, you took out a $100,000 loan payable over 20 years. The terms of the loan are the same as for other 20-year loans offered in your area. You paid $4,800 in points. You made 3 monthly payments on the loan in 2013. You can deduct $60 [($4,800 ÷ 240 months) x 3 payments] in 2013. In 2014, if you make all twelve payments, you will be able to deduct $240 ($20 x 12).

Deduction Allowed in Year Paid

You can fully deduct points in the year paid if you meet all the following tests  (You can use Figure B as a quick guide to see whether your points are fully deductible in the year paid.)

1. Your loan is secured by your main home. (Your main home is the one you ordinarily live in most of the time.)

2. Paying points is an established business practice in the area where the loan was made.

3. The points paid were not more than the points generally charged in that area.

4. You use the cash method of accounting. This means you report income in the year you receive it and deduct expenses in the year you pay them. Most individuals use this method.

5. The points were not paid in place of amounts that ordinarily are stated separately on the settlement statement, such as appraisal fees, inspection fees, title fees, attorney fees, and property taxes.

6. The funds you provided at or before closing, plus any points the seller paid, were at least as much as the points charged. The funds you provided are not required to have been applied to the points. They can include a down payment, an escrow deposit, earnest money, and other funds you paid at or before closing for any purpose. You cannot have borrowed these funds from your lender or mortgage broker.

7. You use your loan to buy or build your main home.

8. The points were computed as a percentage of the principal amount of the mortgage.

9. The amount is clearly shown on the settlement statement (such as the Settlement Statement, Form HUD-1) as points charged for the mortgage. The points may be shown as paid from either your funds or the seller's.

Note.

If you meet all of these tests, you can choose to either fully deduct the points in the year paid, or deduct them over the life of the loan.

**Home improvement loan.**   You can also fully deduct in the year paid points paid on a loan to improve your main home, if tests (1) through (6) are met.



**Second home.** You cannot fully deduct in the year paid points you pay on loans secured by your second home. You can deduct these points only over the life of the loan.

**Refinancing.** Generally, points you pay to refinance a mortgage are not deductible in full in the year you pay them. This is true even if the new mortgage is secured by your main home.

However, if you use part of the refinanced mortgage proceeds to improve your main home and you meet the first 6 tests listed under Deduction Allowed in Year Paid , you can fully deduct the part of the points related to the improvement in the year you paid them with your own funds. You can deduct the rest of the points over the life of the loan.

**Example 1.**

In 1998, Bill Fields got a mortgage to buy a home. In 2013, Bill refinanced that mortgage with a 15-year $100,000 mortgage loan. The mortgage is secured by his home. To get the new loan, he had to pay three points ($3,000). Two points ($2,000) were for prepaid interest, and one point ($1,000) was charged for services, in place of amounts that ordinarily are stated separately on the settlement statement. Bill paid the points out of his private funds, rather than out of the proceeds of the new loan. The payment of points is an established practice in the area, and the points charged are not more than the amount generally charged there. Bill's first payment on the new loan was due July 1. He made six payments on the loan in 2013 and is a cash basis taxpayer.

Bill used the funds from the new mortgage to repay his existing mortgage. Although the new mortgage loan was for Bill's continued ownership of his main home, it was not for the purchase or improvement of that home. He cannot deduct all of the points in 2013. He can deduct two points ($2,000) ratably over the life of the loan. He deducts $67 [($2,000 ÷ 180 months) × 6 payments] of the points in 2013. The other point ($1,000) was a fee for services and is not deductible.

**Example 2.**

The facts are the same as in Example 1, except that Bill used $25,000 of the loan proceeds to improve his home and $75,000 to repay his existing mortgage. Bill deducts 25% ($25,000 ÷ $100,000) of the points ($2,000) in 2013. His deduction is $500 ($2,000 × 25%).

Bill also deducts the ratable part of the remaining $1,500 ($2,000 − $500) that must be spread over the life of the loan. This is $50 [($1,500 ÷ 180 months) × 6 payments] in 2013. The total amount Bill deducts in 2013 is $550 ($500 + $50).

Special Situations

This section describes certain special situations that may affect your deduction of points.

**Original issue discount.** If you do not qualify to either deduct the points in the year paid or deduct them ratably over the life of the loan, or if you choose not to use either of these methods, the points reduce the issue price of the loan. This reduction results in original issue discount, which is discussed in chapter 4 of Publication 535.

**Amounts charged for services.** Amounts charged by the lender for specific services connected to the loan are not interest. Examples of these charges are:

- Appraisal fees,
- Notary fees, and
- Preparation costs for the mortgage note or deed of trust.

You cannot deduct these amounts as points either in the year paid or over the life of the mortgage.

**Points paid by the seller.** The term "points" includes loan placement fees that the seller pays to the lender to arrange financing for the buyer.

**Treatment by seller.** The seller cannot deduct these fees as interest. But they are a selling expense that reduces the amount realized by the seller. See Publication 523 for information on selling your home.

**Treatment by buyer.** The buyer reduces the basis of the home by the amount of the seller-paid points and treats the points as if he or she had paid them. If all the tests under Deduction Allowed in Year Paid , earlier, are met, the buyer can deduct the points in the year paid. If any of those tests are not met, the buyer deducts the points over the life of the loan.

If you need information about the basis of your home, see Publication 523 or Publication 530.

**Funds provided are less than points.** If you meet all the tests in Deduction Allowed in Year Paid , earlier, except that the funds you provided were less than the points charged to you (test (6)), you can deduct the points in the year paid, up to the amount of funds you provided. In addition, you can deduct any points paid by the seller.

**Example 1.**

When you took out a $100,000 mortgage loan to buy your home in December, you were charged one point ($1,000). You meet all the tests for deducting points in the year paid, except the only funds you provided were a $750 down payment. Of the $1,000 charged for points, you can deduct $750 in the year paid. You spread the remaining $250 over the life of the mortgage.

**Example 2.**

The facts are the same as in Example 1, except that the person who sold you your home also paid one point ($1,000) to help you get your mortgage. In the year paid, you can deduct $1,750 ($750 of the amount you were charged plus the $1,000 paid by the seller). You spread the remaining $250 over the life of the mortgage. You must reduce the basis of your home by the $1,000 paid by the seller.

**Excess points.** If you meet all the tests in Deduction Allowed in Year Paid , earlier, except that the points paid were more than generally paid in your area (test (3)), you deduct in the year paid only the points that are generally charged. You must spread any additional points over the life of the mortgage.

**Mortgage ending early.** If you spread your deduction for points over the life of the mortgage, you can deduct any remaining balance in the year the mortgage ends. However, if you refinance the mortgage with the same lender, you cannot deduct any remaining balance of spread points. Instead, deduct the remaining balance over the term of the new loan.

A mortgage may end early due to a prepayment, refinancing, foreclosure, or similar event.

**Example.**

Dan paid $3,000 in points in 2002 that he had to spread out over the 15-year life of the mortgage. He deducts $200 per year. Through 2012, Dan has deducted $2,200 of the points.

Dan prepaid his mortgage in full in 2013. He can deduct the remaining $800 of points in 2013.

**Limit on deduction.** You cannot fully deduct points paid on a mortgage that exceeds the limits discussed in Part II. See the Table 1 Instructions for line 10.

000387

Case 8:06-ap-01231-ES   Doc 414-10 Filed 01/23/15   Entered 01/23/14 09:32:55   Desc
Exhibit    Page 7 of 30
Publication 936 (2013), Home Mortgage Interest Deduction

Page 6 of 14

**Form 1098.**   The mortgage interest statement you receive should show not only the total interest paid during the year, but also your deductible points paid during the year. See *Form 1098, Mortgage Interest Statement*, later.

*Mortgage Insurance Premiums*

You can treat amounts you paid during 2013 for qualified mortgage insurance as home mortgage interest. The insurance must be in connection with home acquisition debt, and the insurance contract must have been issued after 2006.

**Qualified mortgage insurance.**   Qualified mortgage insurance is mortgage insurance provided by the Department of Veterans Affairs, the Federal Housing Administration, or the Rural Housing Service, and private mortgage insurance (as defined in section 2 of the Homeowners Protection Act of 1998 as in effect on December 20, 2006).

Mortgage insurance provided by the Department of Veterans Affairs is commonly known as a funding fee. If provided by the Rural Housing Service, it is commonly known as a guarantee fee. The funding fee and guarantee fee can either be included in the amount of the loan or paid in full at the time of closing. These fees can be deducted fully in 2013 if the mortgage insurance contract was issued in 2013. Contact the mortgage insurance issuer to determine the deductible amount if it is not reported in box 4 of Form 1098.

**Special rules for prepaid mortgage insurance.**   Generally, if you paid premiums for qualified mortgage insurance that are properly allocable to periods after the close of the tax year, such premiums are treated as paid in the period to which they are allocated. You must allocate the premiums over the shorter of the stated term of the mortgage or 84 months, beginning with the month the insurance was obtained. No deduction is allowed for the unamortized balance if the mortgage is satisfied before its term. This paragraph does not apply to qualified mortgage insurance provided by the Department of Veterans Affairs or the Rural Housing Service.

**Example.**

Ryan purchased a home in May of 2012 and financed the home with a 15-year mortgage. Ryan also prepaid all of the $9,240 in private mortgage insurance required at the time of closing in May. Since the $9,240 in private mortgage insurance is allocable to periods after 2012, Ryan must allocate the $9,240 over the shorter of the life of the mortgage or 84 months. Ryan's adjusted gross income (AGI) for 2012 is $76,000. Ryan can deduct $880 ($9,240 ÷ 84 x 8 months) for qualified mortgage insurance premiums in 2012. For 2013, Ryan can deduct $1,320 ($9,240 ÷ 84 x 12 months) if his AGI is $100,000 or less.

In this example, the mortgage insurance premiums are allocated over 84 months, which is shorter than the life of the mortgage of 15 years (180 months).

**Limit on deduction.**   If your adjusted gross income on Form 1040, line 38, is more than $100,000 ($50,000 if your filing status is married filing separately), the amount of your mortgage insurance premiums that are otherwise deductible is reduced and may be eliminated. See *Line 13* in the instructions for Schedule A (Form 1040) and complete the *Mortgage Insurance Premiums Deduction Worksheet* to figure the amount you can deduct. If your adjusted gross income is more than $109,000 ($54,500 if married filing separately), you cannot deduct your mortgage insurance premiums.

**Form 1098.**   The mortgage interest statement you receive should show not only the total interest paid during the year, but also your mortgage insurance premiums paid during the year, which may qualify to be treated as deductible mortgage interest. See *Form 1098, Mortgage Interest Statement*, next.

*Form 1098, Mortgage Interest Statement*

If you paid $600 or more of mortgage interest (including certain points and mortgage insurance premiums) during the year on any one mortgage, you generally will receive a Form 1098 or a similar statement from the mortgage holder. You will receive the statement if you pay interest to a person (including a financial institution or cooperative housing corporation) in the course of that person's trade or business. A governmental unit is a person for purposes of furnishing the statement.

The statement for each year should be sent to you by January 31 of the following year. A copy of this form will also be sent to the IRS.

The statement will show the total interest you paid during the year, any mortgage insurance premiums you paid, and if you purchased a main home during the year, it also will show the deductible points paid during the year, including seller-paid points. However, it should not show any interest that was paid for you by a governmental agency.

As a general rule, Form 1098 will include only points that you can fully deduct in the year paid. However, certain points not included on Form 1098 also may be deductible, either in the year paid or over the life of the loan. See the earlier discussion of *Points* to determine whether you can deduct points not shown on Form 1098.

**Prepaid interest on Form 1098.**   If you prepaid interest in 2013 that accrued in full by January 15, 2014, this prepaid interest may be included in box 1 of Form 1098. However, you cannot deduct the prepaid amount for January 2014 in 2013. (See *Prepaid interest*, earlier.) You will have to figure the interest that accrued for 2014 and subtract it from the amount in box 1. You will include the interest for January 2014 with other interest you pay for 2014.

**Refunded interest.**   If you received a refund of mortgage interest you overpaid in an earlier year, you generally will receive a Form 1098 showing the refund in box 3. See *Refunds of interest*, earlier.

**Mortgage insurance premiums.**   The amount of mortgage insurance premiums you paid during 2013 may be shown in Box 4 of Form 1098. See *Mortgage Insurance Premiums*, earlier.

*How To Report*

Deduct the home mortgage interest and points reported to you on Form 1098 on Schedule A (Form 1040), line 10. If you paid more deductible interest to the financial institution than the amount shown on Form 1098, show the larger deductible amount on line 10. Attach a statement explaining the difference and print "See attached" next to line 10.

Deduct home mortgage interest that was not reported to you on Form 1098 on Schedule A (Form 1040), line 11. If you paid home mortgage interest to the person from whom you bought your home, show that person's name, address, and taxpayer identification number (TIN) on the dotted lines next to line 11. The seller must give you this number and you must give the seller your TIN. A Form W-9, Request for Taxpayer Identification Number and Certification, can be used for this purpose. Failure to meet any of these requirements may result in a $50 penalty for each failure. The TIN can be either a social security number, an individual taxpayer identification number (issued by the Internal Revenue Service), or an employer identification number.

If you can take a deduction for points that were not reported to you on Form 1098, deduct those points on Schedule A (Form 1040), line 12.

Deduct mortgage insurance premiums on Schedule A (Form 1040), line 13.

**More than one borrower.**   If you and at least one other person (other than your spouse if you file a joint return) were liable for and paid interest on a mortgage that was for your home, and the other person received a Form 1098 showing the interest that was paid during the year, attach a statement to your return explaining this. Show how much of the interest each of you paid, and give the name and address of the person who received the form. Deduct your share of the interest on Schedule A (Form 1040), line 11, and print "See attached" next to the line. Also, deduct your share of any qualified mortgage insurance premiums on Schedule A (Form 1040), line 13.

Similarly, if you are the payer of record on a mortgage on which there are other borrowers entitled to a deduction for the interest shown on the Form 1098 you received, deduct only your share of the interest on Schedule A (Form 1040), line 10. Let each of the other borrowers know what his or her share is.

**Mortgage proceeds used for business or investment.**   If your home mortgage interest deduction is limited under the rules explained in *Part II*, but all or part of the mortgage proceeds were used for business, investment, or other deductible activities, see Table 2 near the end of this publication. It shows where to deduct the part of your excess interest that is for those activities. The *Table 1 Instructions* for line 13 in *Part II* explain how to divide the excess interest among the activities for which the mortgage proceeds were used.

*Special Rule for Tenant-Stockholders in Cooperative Housing Corporations*

A qualified home includes stock in a cooperative housing corporation owned by a tenant-stockholder. This applies only if the tenant-stockholder is entitled to live in the house or apartment because of owning stock in the cooperative.

**Cooperative housing corporation.** This is a corporation that meets all of the following conditions.

1. Has only one class of stock outstanding,

2. Has no stockholders other than those who own the stock that can live in a house, apartment, or house trailer owned or leased by the corporation,

3. Has no stockholders who can receive any distribution out of capital other than on a liquidation of the corporation, and

4. Meets at least one of the following requirements.

    a. Receives at least 80% of its gross income for the year in which the mortgage interest is paid or incurred from tenant-stockholders. For this purpose, gross income is all income received during the entire year, including amounts received before the corporation changed to cooperative ownership.

    b. At all times during the year, at least 80% of the total square footage of the corporation's property is used or available for use by the tenant-stockholders for residential or residential-related use.

    c. At least 90% of the corporation's expenditures paid or incurred during the year are for the acquisition, construction, management, maintenance, or care of corporate property for the benefit of the tenant-stockholders.

**Stock used to secure debt.** In some cases, you cannot use your cooperative housing stock to secure a debt because of either:

- Restrictions under local or state law, or

- Restrictions in the cooperative agreement (other than restrictions in which the main purpose is to permit the tenant-stockholder to treat unsecured debt as secured debt).

However, you can treat a debt as secured by the stock to the extent that the proceeds are used to buy the stock under the allocation of interest rules. See chapter 4 of Publication 535 for details on these rules.

**Figuring deductible home mortgage interest.** Generally, if you are a tenant-stockholder, you can deduct payments you make for your share of the interest paid or incurred by the cooperative. The interest must be on a debt to buy, build, change, improve, or maintain the cooperative's housing, or on a debt to buy the land.

Figure your share of this interest by multiplying the total by the following fraction.

$$\frac{\text{Your shares of stock in the cooperative}}{\text{The total shares of stock in the cooperative}}$$

**Limits on deduction.** To figure how the limits discussed in *Part II* apply to you, treat your share of the cooperative's debt as debt incurred by you. The cooperative should determine your share of its grandfathered debt, its home acquisition debt, and its home equity debt. (Your share of each of these types of debt is equal to the average balance of each debt multiplied by the fraction just given.) After your share of the average balance of each type of debt is determined, you include it with the average balance of that type of debt secured by your stock.

**Form 1098.** The cooperative should give you a Form 1098 showing your share of the interest. Use the rules in this publication to determine your deductible mortgage interest.

Part II. Limits on Home Mortgage Interest Deduction

This part of the publication discusses the limits on deductible home mortgage interest. These limits apply to your home mortgage interest expense if you have a home mortgage that does not fit into any of the three categories listed at the beginning of *Part I* under *Fully deductible interest*.

Your home mortgage interest deduction is limited to the interest on the part of your home mortgage debt that is not more than your qualified loan limit. This is the part of your home mortgage debt that is grandfathered debt or that is not more than the limits for home acquisition debt and home equity debt. Table 1 can help you figure your qualified loan limit and your deductible home mortgage interest.

*Home Acquisition Debt*

Home acquisition debt is a mortgage you took out after October 13, 1987, to buy, build, or substantially improve a qualified home (your main or second home). It also must be secured by that home.

If the amount of your mortgage is more than the cost of the home plus the cost of any substantial improvements, only the debt that is not more than the cost of the home plus improvements qualifies as home acquisition debt. The additional debt that is more than home equity debt (discussed later).

**Home acquisition debt limit.** The total amount you can treat as home acquisition debt at any time on your main home and second home cannot be more than $1 million ($500,000 if married filing separately). This limit is reduced (but not below zero) by the amount of your grandfathered debt (discussed later). Debt over this limit may qualify as home equity debt (also discussed later).

**Refinanced home acquisition debt.** Any secured debt you use to refinance home acquisition debt is treated as home acquisition debt. However, the new debt will qualify as home acquisition debt only up to the amount of the balance of the old mortgage principal just before the refinancing. Any additional debt not used to buy, build, or substantially improve a qualified home is not home acquisition debt, but may qualify as home equity debt (discussed later).

**Mortgage that qualifies later.** A mortgage that does not qualify as home acquisition debt because it does not meet all the requirements may qualify at a later time. For example, a debt that you use to buy your home may not qualify as home acquisition debt because it is not secured by the home. However, if the debt is later secured by the home, it may qualify as home acquisition debt after that time. Similarly, a debt that you use to buy property may not qualify because the property is not a qualified home. However, if the property later becomes a qualified home, the debt may qualify after that time.

**Mortgage treated as used to buy, build, or improve home.** A mortgage secured by a qualified home may be treated as home acquisition debt, even if you do not actually use the proceeds to buy, build, or substantially improve the home. This applies in the following situations.

1. You buy your home within 90 days before or after the date you take out the mortgage. The home acquisition debt is limited to the home's cost, plus the cost of any substantial improvements within the limit described below in (2) or (3). (See *Example 1* later.)

2. You build or improve your home and take out the mortgage before the work is completed. The home acquisition debt is limited to the amount of the expenses incurred within 24 months before the date of the mortgage.

3. You build or improve your home and take out the mortgage within 90 days after the work is completed. The home acquisition debt is limited to the amount of the expenses incurred within the period beginning 24 months before the work is completed and ending on the date of the mortgage. (See *Example 2* later.)

**Example 1.**

Case 3:06-cv-01571-BES Doc#414-510 Filed 01/23/015/16 Entered 05/23/14 09:32:55 ID #362
Exhibit    Page 9 of 30
Publication 936 (2013), Home Mortgage Interest Deduction

Page 8 of 14

You bought your main home on June 3 for $175,000. You paid for the home with cash you got from the sale of your old home. On July 15, you took out a mortgage of $150,000 secured by your main home. You used the $150,000 to invest in stocks. You can treat the mortgage as taken out to buy your home because you bought the home within 90 days before you took out the mortgage. The entire mortgage qualifies as home acquisition debt because it was not more than the home's cost.

**Example 2.**

On January 31, John began building a home on the lot that he owned. He used $45,000 of his personal funds to build the home. The home was completed on October 31. On November 21, John took out a $36,000 mortgage that was secured by the home. The mortgage can be treated as used to build the home because it was taken out within 90 days after the home was completed. The entire mortgage qualifies as home acquisition debt because it was not more than the expenses incurred within the period beginning 24 months before the home was completed. This is illustrated by Figure C.

Figure C.



Please click here for the text description of the image.

Figure C. John's example

**Date of the mortgage.** The date you take out your mortgage is the day the loan proceeds are disbursed. This is generally the closing date. You can treat the day you apply in writing for your mortgage as the date you take it out. However, this applies only if you receive the loan proceeds within a reasonable time (such as within 30 days) after your application is approved. If a timely application you make is rejected, a reasonable additional time will be allowed to make a new application.

**Cost of home or improvements.** To determine your cost, include amounts paid to acquire any interest in a qualified home or to substantially improve the home.

The cost of building or substantially improving a qualified home includes the costs to acquire real property and building materials, fees for architects and design plans, and required building permits.

**Substantial improvement.** An improvement is substantial if it:

- Adds to the value of your home,
- Prolongs your home's useful life, or
- Adapts your home to new uses.

Repairs that maintain your home in good condition, such as repainting your home, are not substantial improvements. However, if you paint your home as part of a renovation that substantially improves your qualified home, you can include the painting costs in the cost of the improvements.

**Acquiring an interest in a home because of a divorce.** If you incur debt to acquire the interest of a spouse or former spouse in a home, because of a divorce or legal separation, you can treat that debt as home acquisition debt.

**Part of home not a qualified home.** To figure your home acquisition debt, you must divide the cost of your home and improvements between the part of your home that is a qualified home and any part that is not a qualified home. See *Divided use of your home* under Qualified Home in Part I.

*Home Equity Debt*

If you took out a loan for reasons other than to buy, build, or substantially improve your home, it may qualify as home equity debt. In addition, debt you incurred to buy, build, or substantially improve your home, to the extent it is more than the home acquisition debt limit (discussed earlier), may qualify as home equity debt.

Home equity debt is a mortgage you took out after October 13, 1987, that:

- Does not qualify as home acquisition debt or as grandfathered debt, and
- Is secured by your qualified home.

**Example.**

You bought your home for cash 10 years ago. You did not have a mortgage on your home until last year, when you took out a $50,000 loan, secured by your home, to pay for your daughter's college tuition and your father's medical bills. This loan is home equity debt.

**Home equity debt limit.** There is a limit on the amount of debt that can be treated as home equity debt. The total home equity debt on your main home and second home is limited to the smaller of:

- $100,000 ($50,000 if married filing separately), or
- The total of each home's fair market value (FMV) reduced (but not below zero) by the amount of its home acquisition debt and grandfathered debt. Determine the FMV and the outstanding home acquisition and grandfathered debt for each home on the date that the last debt was secured by the home.

**Example.**

You own one home that you bought in 2000. Its FMV now is $110,000, and the current balance on your original mortgage (home acquisition debt) is $95,000. Bank M offers you a home mortgage loan of 125% of the FMV of the home less any outstanding mortgages or other liens. To consolidate some of your other debts, you take out a $42,500 home mortgage loan [(125% × $110,000) − $95,000] with Bank M.

Your home equity debt is limited to $15,000. This is the smaller of:

- $100,000, the maximum limit, or

Publication 936 (2013), Home Mortgage Interest Deduction                                Page 9 of 14

* $15,000, the amount that the FMV of $110,000 exceeds the amount of home acquisition debt of $95,000.

**Debt higher than limit.**   Interest on amounts over the home equity debt limit (such as the interest on $27,500 ($42,500 − $15,000) in the preceding example) generally is treated as personal interest and is not deductible. But if the proceeds of the loan were used for investment, business, or other deductible purposes, the interest may be deductible. If it is, see the Table 1 Instructions for line 13 for an explanation of how to allocate the excess interest.

**Part of home not a qualified home.**   To figure the limit on your home equity debt, you must divide the FMV of your home between the part that is a qualified home and any part that is not a qualified home. See *Divided use of your home* under *Qualified Home* in Part I.

**Fair market value (FMV).**   This is the price at which the home would change hands between you and a buyer, neither having to sell or buy, and both having reasonable knowledge of all relevant facts. Sales of similar homes in your area, on about the same date your last debt was secured by the home, may be helpful in figuring the FMV.

*Grandfathered Debt*

If you took out a mortgage on your home before October 14, 1987, or you refinanced such a mortgage, it may qualify as grandfathered debt. To qualify, it must have been secured by your qualified home on October 13, 1987, and at all times after that date. How you used the proceeds does not matter.

Grandfathered debt is not limited. All of the interest you paid on grandfathered debt is fully deductible home mortgage interest. However, the amount of your grandfathered debt reduces the $1 million limit for home acquisition debt and the limit based on your home's fair market value for home equity debt.

**Refinanced grandfathered debt.**   If you refinanced grandfathered debt after October 13, 1987, for an amount that was not more than the mortgage principal left on the debt, then you still treat it as grandfathered debt. To the extent the new debt is more than that mortgage principal, it is treated as home acquisition or home equity debt, and the mortgage is a mixed-use mortgage (discussed later under *Average Mortgage Balance* in the *Table 1 Instructions*). The debt must be secured by the qualified home.

   You treat grandfathered debt that was refinanced after October 13, 1987, as grandfathered debt only for the term left on the debt that was refinanced. After that, you treat it as home acquisition debt or home equity debt, depending on how you used the proceeds.

**Exception.**   If the debt before refinancing was like a balloon note (the principal on the debt was not amortized over the term of the debt), then you treat the refinanced debt as grandfathered debt for the term of the first refinancing. This term cannot be more than 30 years.

Example.

Chester took out a $200,000 first mortgage on his home in 1986. The mortgage was a five-year balloon note and the entire balance on the note was due in 1991. Chester refinanced the debt in 1991 with a new 20-year mortgage. The refinanced debt is treated as grandfathered debt for its entire term (20 years).

**Line-of-credit mortgage.**   If you had a line-of-credit mortgage on October 13, 1987, and borrowed additional amounts against it after that date, then the additional amounts are either home acquisition debt or home equity debt depending on how you used the proceeds. The balance on the mortgage before you borrowed the additional amounts is grandfathered debt. The newly borrowed amounts are not grandfathered debt because the funds were borrowed after October 13, 1987. See *Average Mortgage Balance* in the *Table 1 Instructions* that follow.

*Table 1 Instructions*

Unless you are subject to the overall limit on itemized deductions, you can deduct all of the interest you paid during the year on mortgages secured by your main home or second home in either of the following two situations.

* All the mortgages are grandfathered debt.

* The total of the mortgage balances for the entire year is within the limits discussed earlier under *Home Acquisition Debt* and *Home Equity Debt*.

In either of those cases, you do not need Table 1. Otherwise, you can use Table 1 to determine your qualified loan limit and deductible home mortgage interest.



Fill out only one Table 1 for both your main and second home regardless of how many mortgages you have.

**Table 1. Worksheet To Figure Your Qualified Loan Limit and Deductible Home Mortgage Interest For the Current Year** See the Table 1 Instructions.

**Part I Qualified Loan Limit**

| | | |
|---|---|---|
| 1 | Enter the average balance of all your grandfathered debt. See line 1 instructions | 1 |
| 2 | Enter the average balance of all your home acquisition debt. See line 2 instructions | 2 |
| 3 | Enter $1,000,000 ($500,000 if married filing separately) | 3 |
| 4 | Enter the larger of the amount on line 1 or the amount on line 3 | 4 |
| 5 | Add the amounts on lines 1 and 2. Enter the total here | 5 |
| 6 | Enter the smaller of the amount on line 4 or the amount on line 5 | 6 |
| 7 | If you have home equity debt, enter the smaller of $100,000 ($50,000 if married filing separately) or your limited amount. See the line 7 instructions for the limit which may apply to you | 7 |
| 8 | Add the amounts on lines 6 and 7. Enter the total. This is your qualified loan limit | 8 |

**Part II Deductible Home Mortgage Interest**

| | | | | |
|---|---|---|---|---|
| 9 | Enter the total of the average balances of all mortgages on all qualified homes. See line 9 instructions. | | 9 | |
| | * If line 8 is less than line 9, go on to line 10. | | | |
| | * If line 8 is equal to or more than line 9, stop here. All of your interest on all the mortgages included on line 9 is deductible as home mortgage interest on Schedule A (Form 1040). | | | |
| 10 | Enter the total amount of interest that you paid. See line 10 instructions | | 10 | |
| 11 | Divide the amount on line 8 by the amount on line 9. Enter the result as a decimal amount (rounded to three places) | | 11 | × |

http://www.irs.gov/publications/p936/ar02.html                                    1/22/2014

000391

| 12 | Multiply the amount on line 10 by the decimal amount on line 11. Enter the result. **This is your deductible home mortgage interest**. Enter this amount on Schedule A (Form 1040) | | 12 | |
| 13 | Subtract the amount on line 12 from the amount on line 10. Enter the result. **This is not home mortgage interest**. See line 13 instructions | | 13 | |

**Home equity debt only.** If all of your mortgages are home equity debt, do not fill in lines 1 through 5. Enter zero on line 6 and complete the rest of Table 1.

Average Mortgage Balance

You have to figure the average balance of each mortgage to determine your qualified loan limit. You need these amounts to complete lines 1, 2, and 9 of Table 1. You can use the highest mortgage balances during the year, but you may benefit most by using the average balances. The following are methods you can use to figure your average mortgage balances. However, if a mortgage has more than one category of debt, see *Mixed-use mortgages*, later, in this section.

**Average of first and last balance method.** You can use this method if all the following apply.

- You did not borrow any new amounts on the mortgage during the year. (This does not include borrowing the original mortgage amount.)

- You did not prepay more than one month's principal during the year. (This includes prepayment by refinancing your home or by applying proceeds from its sale.)

- You had to make level payments at fixed equal intervals on at least a semi-annual basis. You treat your payments as level even if they were adjusted from time to time because of changes in the interest rate.



To figure your average balance, complete the following worksheet.

| 1 | Enter the balance as of the first day of the year that the mortgage was secured by your qualified home during the year (generally January 1) | |
| 2 | Enter the balance as of the last day of the year that the mortgage was secured by your qualified home during the year (generally December 31) | |
| 3 | Add amounts on lines 1 and 2 | |
| 4 | Divide the amount on line 3 by 2. Enter the result | |

**Interest paid divided by interest rate method.** You can use this method if at all times in 2013 the mortgage was secured by your qualified home and the interest was paid at least monthly.



Complete the following worksheet to figure your average balance.

| 1 | Enter the interest paid in 2013. Do not include points, mortgage insurance premiums, or any interest paid in 2013 that is for a year after 2013. However, do include interest that is for 2013 but was paid in an earlier year | |
| 2 | Enter the annual interest rate on the mortgage. If the interest rate varied in 2013, use the lowest rate for the year | |
| 3 | Divide the amount on line 1 by the amount on line 2. Enter the result | |

**Example.**

Mr. Blue had a line of credit secured by his main home all year. He paid interest of $2,500 on this loan. The interest rate on the loan was 9% (.09) all year. His average balance using this method is $27,778, figured as follows.

| 1 | Enter the interest paid in 2013. Do not include points, mortgage insurance premiums, or any interest paid in 2013 that is for a year after 2013. However, do include interest that is for 2013 but was paid in an earlier year | $2,500 |
| 2 | Enter the annual interest rate on the mortgage. If the interest rate varied in 2013, use the lowest rate for the year | .09 |
| 3 | Divide the amount on line 1 by the amount on line 2. Enter the result | $27,778 |

**Statements provided by your lender.** If you receive monthly statements showing the closing balance or the average balance for the month, you can use either to figure your average balance for the year. You can treat the balance as zero for any month the mortgage was not secured by your qualified home.

For each mortgage, figure your average balance by adding your monthly closing or average balances and dividing that total by the number of months the home secured by that mortgage was a qualified home during the year.

If your lender can give you your average balance for the year, you can use that amount.

**Example.**

Ms. Brown had a home equity loan secured by her main home all year. She received monthly statements showing her average balance for each month. She can figure her average balance for the year by adding her monthly average balances and dividing the total by 12.

**Mixed-use mortgages.** A mixed-use mortgage is a loan that consists of more than one of the three categories of debt (grandfathered debt, home acquisition debt, and home equity debt). For example, a mortgage you took out during the year is a mixed-use mortgage if you used its proceeds partly to refinance a mortgage that you took out in an earlier year to buy your home (home acquisition debt) and partly to buy a car (home equity debt).

Complete lines 1 and 2 of Table 1 by including the separate average balances of any grandfathered debt and home acquisition debt in your mixed-use mortgage. Do not use the methods described earlier in this section to figure the average balance of either category. Instead, for each category, use the following method.

1. Figure the balance of that category of debt for each month. This is the amount of the loan proceeds allocated to that category, reduced by your principal payments on the mortgage previously applied to that category. Principal payments on a mixed-use mortgage are applied in full to each category of debt, until its balance is zero, in the following order:

    a. First, any home equity debt,

    b. Next, any grandfathered debt, and

    c. Finally, any home acquisition debt.

2. Add together the monthly balances figured in (1).

3. Divide the result in (2) by 12.

Complete line 9 of Table 1 by including the average balance of the entire mixed-use mortgage, figured under one of the methods described earlier in this section.

**Example 1.**

In 1986, Sharon took out a $1,400,000 mortgage to buy her main home (grandfathered debt). On March 2, 2013, when the home had a fair market value of $1,700,000 and she owed $1,100,000 on the mortgage, Sharon took out a second mortgage for $200,000. She used $180,000 of the proceeds to make substantial improvements to her home (home acquisition debt) and the remaining $20,000 to buy a car (home equity debt). Under the loan agreement, Sharon must make principal payments of $1,000 at the end of each month. During 2013, her principal payments on the second mortgage totaled $10,000.

To complete Table 1, line 2, Sharon must figure a separate average balance for the part of her second mortgage that is home acquisition debt. The January and February balances were zero. The March through December balances were all $180,000, because none of her principal payments are applied to the home acquisition debt. (They are all applied to the home equity debt, reducing it to $10,000 [$20,000 − $10,000].) The monthly balances of the home acquisition debt total $1,800,000 ($180,000 × 10). Therefore, the average balance of the home acquisition debt for 2013 was $150,000 ($1,800,000 ÷ 12).

**Example 2.**

The facts are the same as in *Example 1*. In 2014, Sharon's January through October principal payments on her second mortgage are applied to the home equity debt, reducing it to zero. The balance of the home acquisition debt remains $180,000 for each of those months. Because her November and December principal payments are applied to the home acquisition debt, the November balance is $179,000 ($180,000 − $1,000) and the December balance is $178,000 ($180,000 − $2,000). The monthly balances total $2,157,000 [($180,000 × 10) + $179,000 + $178,000]. Therefore, the average balance of the home acquisition debt for 2014 is $179,750 ($2,157,000 ÷ 12).

**Line 1**

Figure the average balance for the current year of each mortgage you had on all qualified homes on October 13, 1987 (grandfathered debt). Add the results together and enter the total on line 1. Include the average balance for the current year for any grandfathered debt part of a mixed-use mortgage.

**Line 2**

Figure the average balance for the current year of each mortgage you took out on all qualified homes after October 13, 1987, to buy, build, or substantially improve the home (home acquisition debt). Add the results together and enter the total on line 2. Include the average balance for the current year for any home acquisition debt part of a mixed-use mortgage.

**Line 7**

If you have home equity debt, complete line 7.

The amount on line 7 cannot be more than the smaller of:

1. $100,000 ($50,000 if married filing separately), or
2. The total of each home's fair market value (FMV) reduced (but not below zero) by the amount of its home acquisition debt and grandfathered debt. Determine the FMV and the outstanding home acquisition and grandfathered debt for each home on the date that the last debt was secured by the home.

See *Home equity debt limit* under *Home Equity Debt*, earlier, for more information about fair market value.

**Line 9**

Figure the average balance for the current year of each outstanding home mortgage. Add the average balances together and enter the total on line 9. See *Average Mortgage Balance*, earlier.

**Note.** When figuring the average balance of a mixed-use mortgage, for line 9, determine the average balance of the entire mortgage.

**Line 10**

If you make payments to a financial institution, or to a person whose business is making loans, you should get Form 1098 or a similar statement from the lender. This form will show the amount of interest to enter on line 10. Also include on this line any other interest payments made on debts secured by a qualified home for which you did not receive a Form 1098. Do not include points or mortgage insurance premiums on this line.

**Claiming your deductible points.**   Figure your deductible points as follows.

1. Figure your deductible points for the current year using the rules explained under *Points* in *Part I*.
2. Multiply the amount in item (1) by the decimal amount on line 11. Enter the result on Schedule A (Form 1040), line 10 or 12, whichever applies. This amount is fully deductible.
3. Subtract the result in item (2) from the amount in item (1). This amount is not deductible as home mortgage interest. However, if you used any of the loan proceeds for business or investment activities, see the instructions for line 13, next.

**Claiming your deductible mortgage insurance premiums.**   If your adjusted gross income on Form 1040, line 38, is more than $109,000 ($54,500 if married filing separately), you cannot deduct your mortgage insurance premiums. Otherwise, figure your deductible mortgage insurance premiums for the current year using the rules explained under *Mortgage Insurance Premiums* in *Part I*. If the amount on Form 1040, line 38, is $100,000 or less ($50,000 if married filing separately), enter the full amount of your qualified mortgage insurance premiums on Schedule A (Form 1040), line 13. If the amount on Form 1040, line 38, is more than $100,000 ($50,000 if married filing separately), your deduction is limited. Enter your qualified mortgage insurance premiums on line 1 of the *Mortgage Insurance Premiums Deduction Worksheet* in the instructions for Schedule A (Form 1040) to figure the amount to enter on Schedule A (Form 1040), line 13.

**Line 13**

You cannot deduct the amount of interest on line 13 as home mortgage interest. If you did not use any of the proceeds of any mortgage included on line 9 of the worksheet for business, investment, or other deductible activities, then all the interest on line 13 is personal interest. Personal interest is not deductible.

Publication 936 (2013), Home Mortgage Interest Deduction

Page 12 of 14

Table 2. **Where To Deduct Your Interest Expense**

| IF you have | THEN deduct it on | AND for more information go to ... |
|---|---|---|
| deductible student loan interest | Form 1040, line 33, or Form 1040A, line 18 | Publication 970, Tax Benefits for Education. |
| deductible home mortgage interest and points reported on Form 1098 | Schedule A (Form 1040), line 10 | this publication (936). |
| deductible home mortgage interest not reported on Form 1098 | Schedule A (Form 1040), line 11 | this publication (936). |
| deductible points not reported on Form 1098 | Schedule A (Form 1040), line 12 | this publication (936). |
| deductible mortgage insurance premiums | Schedule A (Form 1040), line 13 | this publication (936). |
| deductible investment interest (other than interest incurred to produce rents or royalties) | Schedule A (Form 1040), line 14 | Publication 550, Investment Income and Expenses. |
| deductible business interest (non-farm) | Schedule C or C-EZ (Form 1040) | Publication 535. |
| deductible farm business interest | Schedule F (Form 1040) | Publications 225, Farmer's Tax Guide, and 535. |
| deductible interest incurred to produce rents or royalties | Schedule E (Form 1040) | Publications 527 and 535. |
| personal interest | not deductible. | |

If you did use all or part of any mortgage proceeds for business, investment, or other deductible activities, the part of the interest on line 13 that is allocable to those activities can be deducted as business, investment, or other deductible expense, subject to any limits that apply. Table 2 shows where to deduct that interest. See *Allocation of Interest* in chapter 4 of Publication 535 for an explanation of how to determine the use of loan proceeds.

The following two rules describe how to allocate the interest on line 13 to a business or investment activity.

- If you used all of the proceeds of the mortgages on line 9 for one activity, then all the interest on line 13 is allocated to that activity. In this case, deduct the interest on the form or schedule to which it applies.

- If you used the proceeds of the mortgages on line 9 for more than one activity, then you can allocate the interest on line 13 among the activities in any manner you select (up to the total amount of interest otherwise allocable to each activity, explained next).

You figure the total amount of interest otherwise allocable to each activity by multiplying the amount on line 10 by the following fraction.

$$\frac{\text{Amount on line 9}}{\text{allocated to that activity}}{\text{Total amount on line 9}}$$

**Example.**

Don had two mortgages (A and B) on his main home during the entire year. Mortgage A had an average balance of $90,000, and mortgage B had an average balance of $110,000.

Don determines that the proceeds of mortgage A are allocable to personal expenses for the entire year. The proceeds of mortgage B are allocable to his business for the entire year. Don paid $14,000 of interest on mortgage A and $16,000 of interest on mortgage B. He figures the amount of home mortgage interest he can deduct by using Table 1. Since both mortgages are home equity debt, Don determines that $15,000 of the interest can be deducted as home mortgage interest.

The interest Don can allocate to his business is the smaller of:

1. The amount on Table 1, line 13 of the worksheet ($15,000), or

2. The total amount of interest allocable to the business ($16,500), figured by multiplying the amount on line 10 (the $30,000 total interest paid) by the following fraction.

$$\frac{\$110,000 \text{ (the average balance}}{\text{of the mortgage allocated}}{\text{to the business)}}{\$200,000 \text{ (the total average}}{\text{balance of all mortgages)}}$$

Because $15,000 is the smaller of items (1) and (2), that is the amount of interest Don can allocate to his business. He deducts this amount on his Schedule C (Form 1040)

How To Get Tax Help

Whether it's help with a tax issue, preparing your tax return or a need for a free publication or form, get the help you need the way you want it: online, use a smart phone, call or walk in to an IRS office or volunteer site near you.

**Free help with your tax return.** You can get free help preparing your return nationwide from IRS-certified volunteers. The Volunteer Income Tax Assistance (VITA) program helps low-to-moderate income, elderly, people with disabilities, and limited English proficient taxpayers. The Tax Counseling for the Elderly (TCE) program helps taxpayers age 60 and older with their tax returns. Most VITA and TCE sites offer free electronic filing and all volunteers will let you know about credits and deductions you may be entitled to claim. In addition, some VITA and TCE sites provide taxpayers the opportunity to prepare their own return with help from an IRS-certified volunteer. To find the nearest VITA or TCE site, you can use the VITA Locator Tool on IRS.gov, or call

As part of the TCE program, AARP offers the Tax-Aide counseling program. To find the nearest AARP Tax-Aide site, visit AARP's website at www.aarp.org/money/taxaide or call. For more information on these programs, go to IRS.gov and enter "VITA" in the search box.

**Internet.** IRS.gov and IRS2Go are ready when you are —24 hours a day, 7 days a week.

- Download the free IRS2Go app from the iTunes app store or from Google Play. Use it to check your refund status, order transcripts of your tax returns or tax account, watch the IRS YouTube channel, get IRS news as soon as it's released to the public, subscribe to filing season updates or daily tax tips, and follow the IRS Twitter news feed, @IRSnews, to get the latest federal tax news, including information about tax law changes and important IRS programs.

- Check the status of your 2013 refund with the Where's My Refund? application on IRS.gov or download the IRS2Go app and select the Refund Status option. The IRS issues more than 9 out of 10 refunds in less than 21 days. Using these applications, you can start checking on the status of your return within 24 hours after we receive your e-filed return or 4 weeks after you mail a paper return. You will also be given a personalized refund date as soon as the IRS processes your tax return and approves your refund The IRS updates Where's My Refund? every 24 hours, usually overnight, so you only need to check once a day.

- Use the Interactive Tax Assistant (ITA) to research your tax questions. No need to wait on the phone or stand in line. The ITA is available 24 hours a day, 7 days a week, and provides you with a variety of tax information related to general filing topics, deductions, credits, and income. When you reach the response screen, you can print the entire interview and the final response for your records. New subject areas are added on a regular basis.
Answers not provided through ITA may be found in Tax Trails, one of the Tax Topics on IRS.gov which contain general individual and business tax information or by searching the IRS Tax Map, which includes an international subject index. You can use the IRS Tax Map, to search publications and instructions by topic or keyword. The IRS Tax Map integrates forms and publications into one research tool and provides single-point access to tax law information by subject. When the user searches the IRS Tax Map, they will be provided with links to related content in existing IRS publications, forms and instructions, questions and answers, and Tax Topics.

- Coming this filing season, you can immediately view and print for free all 5 types of individual federal tax transcripts (tax returns, tax account, record of account, wage and income statement, and certification of non-filing) using Get Transcript. You can also ask the IRS to mail a return or an account transcript to you. Only the mail option is available by choosing the Tax Records option in the IRS2Go app by selecting Mail Transcript on IRS.gov or by calling . Tax return and tax account transcripts are generally available for the current year and the past three years.

- Determine if you are eligible for the EITC and estimate the amount of the credit with the Earned Income Tax Credit (EITC) Assistant.

- Visit Understanding Your IRS Notice or Letter to get answers to questions about a notice or letter you received from the IRS.

- If you received the First Time Homebuyer Credit, you can use the First Time Homebuyer Credit Account Look-up tool for information on your repayments and account balance.

- Check the status of your amended return using Where's My Amended Return? Go to IRS.gov and enter Where's My Amended Return? in the search box. You can generally expect your amended return to be processed up to 12 weeks from the date we receive it. It can take up to 3 weeks from the date you mailed it to show up in our system.

- Make a payment using one of several safe and convenient electronic payment options available on IRS.gov. Select the Payment tab on the front page of IRS.gov for more information.

- Determine if you are eligible and apply for an online payment agreement, if you owe more tax than you can pay today.

- Figure your income tax withholding with the IRS Withholding Calculator on IRS.gov. Use it if you've had too much or too little withheld, your personal situation has changed, you're starting a new job or you just want to see if you're having the right amount withheld.

- Determine if you might be subject to the Alternative Minimum Tax by using the Alternative Minimum Tax Assistant on IRS.gov.

- Request an Electronic Filing PIN by going to IRS.gov and entering Electronic Filing PIN in the search box.

- Download forms, instructions and publications, including accessible versions for people with disabilities.

- Locate the nearest Taxpayer Assistance Center (TAC) using the Office Locator tool on IRS.gov, or choose the Contact Us option on the IRS2Go app and search Local Offices. An employee can answer questions about your tax account or help you set up a payment plan. Before you visit, check the Office Locator on IRS.gov, or Local Offices under Contact Us on IRS2Go to confirm the address, phone number, days and hours of operation, and the services provided. If you have a special need, such as a disability, you can request an appointment. Call the local number listed in the Office Locator, or look in the phone book under United States Government, Internal Revenue Service.

- Apply for an Employer Identification Number (EIN). Go to IRS.gov and enter Apply for an EIN in the search box.

- Read the Internal Revenue Code, regulations, or other official guidance.

- Read Internal Revenue Bulletins.

- Sign up to receive local and national tax news and more by email. Just click on "subscriptions" above the search box on IRS.gov and choose from a variety of options.

**Phone.**    You can call the IRS, or you can carry it in your pocket with the IRS2Go app on your smart phone or tablet. Download the free IRS2Go app from the iTunes app store or from Google Play.

- Call to locate the nearest volunteer help site, or you can use the VITA Locator Tool on IRS.gov, or download the IRS2Go app. Low-to-moderate income, elderly, people with disabilities, and limited English proficient taxpayers can get free help with their tax return from the nationwide Volunteer Income Tax Assistance (VITA) program. The Tax Counseling for the Elderly (TCE) program helps taxpayers age 60 and older with their tax returns. Most VITA and TCE sites offer free electronic filing. Some VITA and TCE sites provide IRS-certified volunteers who can help prepare your tax return. Through the TCE program, AARP offers the Tax-Aide counseling program; call to find the nearest Tax-Aide location.

- Call the automated Where's My Refund? information hotline to check the status of your 2013 refund 24 hours a day, 7 days a week at . If you e-file, you can start checking on the status of your return within 24 hours after the IRS receives your tax return or 4 weeks after you've mailed a paper return. The IRS issues more than 9 out of 10 refunds in less than 21 days. Where's My Refund? will give you a personalized refund date as soon as the IRS processes your tax return and approves your refund. Before you call the automated hotline, have your 2013 tax return handy so you can enter your social security number, your filing status, and the exact whole dollar amount of your refund. The IRS updates Where's My Refund? every 24 hours, usually overnight, so you only need to check once a day. Note, the above information is for our automated hotline. Our live phone and walk-in assistors can research the status of your refund only if it's been 21 days or more since you filed electronically or more than 6 weeks since you mailed your paper return.

- Call the Amended Return Hotline, , to check the status of your amended return. You can generally expect your amended return to be processed up to 12 weeks from the date we receive it. It can take up to 3 weeks from the date you mailed it to show up in our system.

- Call ( ) to order current-year forms, instructions, publications, and prior-year forms and instructions (limited to 5 years). You should receive your order within 10 business days.

- Call TeleTax, , to listen to pre-recorded messages covering general and business tax information. If, between January and April 15, you still have questions about the Form 1040, 1040A, or 1040EZ (like filing requirements, dependents, credits, Schedule D, pensions and IRAs or self-employment taxes), call .

- Call using TTY/TDD equipment, to ask tax questions or order forms and publications. The TTY/TDD telephone number is for people who are deaf, hard of hearing, or have a speech disability. These individuals can also contact the IRS through relay services such as the Federal Relay Service.

**Walk-in.**  You can find a selection of forms, publications and services — in-person.

- Products. You can walk in to some post offices, libraries, and IRS offices to pick up certain forms, instructions, and publications. Some IRS offices, libraries, and city and county government offices have a collection of products available to photocopy from reproducible proofs.

- Services. You can walk in to your local TAC for face-to-face tax help. An employee can answer questions about your tax account or help you set up a payment plan. Before visiting, use the Office Locator tool on IRS.gov, or choose the Contact Us option on the IRS2Go app and search Local Offices for days and hours of operation, and services provided.

**Mail.**  You can send your order for forms, instructions, and publications to the address below. You should receive a response within 10 business days after your request is received.

Internal Revenue Service
1201 N. Mitsubishi Motorway
Bloomington, IL 61705-6613

The Taxpayer Advocate Service Is Here to Help You  The Taxpayer Advocate Service (TAS) is your voice at the IRS. Our job is to ensure that every taxpayer is treated fairly and that you know and understand your rights.

What can TAS do for you? We can offer you free help with IRS problems that you can't resolve on your own. We know this process can be confusing, but the worst thing you can do is nothing at all! TAS can help if you can't resolve your tax problem and:

- Your problem is causing financial difficulties for you, your family, or your business.

- You face (or your business is facing) an immediate threat of adverse action.

- You've tried repeatedly to contact the IRS but no one has responded, or the IRS hasn't responded by the date promised.

If you qualify for our help, you'll be assigned to one advocate who'll be with you at every turn and will do everything possible to resolve your problem. Here's why we can help.

- TAS is an independent organization within the IRS.
- Our advocates know how to work with the IRS.
- Our services are free and tailored to meet your needs.
- We have offices in every state, the District of Columbia, and Puerto Rico.

How can you reach us? If you think TAS can help you, call your local advocate, whose number is in your local directory and at Taxpayer Advocate, or call us toll-free at .

How else does TAS help taxpayers?

TAS also works to resolve large-scale, systemic problems that affect many taxpayers. If you know of one of these broad issues, please report it to us through our Systemic Advocacy Management System.

*Low Income Taxpayer Clinics*

Low Income Taxpayer Clinics (LITCs) serve individuals whose income is below a certain level and need to resolve tax problems such as audits, appeals and tax collection disputes. Some clinics can provide information about taxpayer rights and responsibilities in different languages for individuals who speak English as a second language. Visit Taxpayer Advocate or see IRS Publication 4134, Low Income Taxpayer Clinic List.

Prev                           Up                              Next
                              Home

                    More Online Publications

Publication 527 (2013), Residential Rental Property                    Page 1 of 5



1.  Rental Income and Expenses (If No Personal Use of Dwelling)

**Table of Contents**

- Rental Income
  - When To Report
  - Types of Income
- Rental Expenses
  - When To Deduct
  - Types of Expenses

This chapter discusses the various types of rental income and expenses for a residential rental activity with no personal use of the dwelling. Generally, each year you will report all income and deduct all out-of-pocket expenses in full. The deduction to recover the cost of your rental property—depreciation—is taken over a prescribed number of years, and is discussed in chapter 2, Depreciation of Rental Property.



If your rental income is from property you also use personally or rent to someone at less than a fair rental price, first read the information in chapter 5, Personal Use of Dwelling Unit (Including Vacation Home).

Rental Income

In most cases, you must include in your gross income all amounts you receive as rent. Rental income is any payment you receive for the use or occupation of property. In addition to amounts you receive as normal rental payments, there are other amounts that may be rental income.

*When To Report*

When you report rental income on your tax return generally depends on whether you are a cash basis taxpayer or use an accrual method. Most individual taxpayers use the cash method.

**Cash method.**   You are a cash basis taxpayer if you report income on your return in the year you actually or constructively receive it, regardless of when it was earned. You constructively receive income when it is made available to you, for example, by being credited to your bank account.

**Accrual method.**   If you are an accrual basis taxpayer, you generally report income when you earn it, rather than when you receive it. You generally deduct your expenses when you incur them, rather than when you pay them.

**More information.**   See Publication 538, Accounting Periods and Methods, for more information about when you constructively receive income and accrual methods of accounting.

*Types of Income*

The following are common types of rental income.

**Advance rent.**   Advance rent is any amount you receive before the period that it covers. Include advance rent in your rental income in the year you receive it regardless of the period covered or the method of accounting you use.

**Example.**

On March 18, 2013, you signed a 10-year lease to rent your property. During 2013, you received $9,600 for the first year's rent and $9,600 as rent for the last year of the lease. You must include $19,200 in your rental income in the first year.

**Canceling a lease.**   If your tenant pays you to cancel a lease, the amount you receive is rent. Include the payment in your income in the year you receive it regardless of your method of accounting.

**Expenses paid by tenant.**   If your tenant pays any of your expenses, those payments are rental income. Because you must include this amount in income, you can also deduct the expenses if they are deductible rental expenses. For more information, see Rental Expenses, later.

**Example 1.**

Your tenant pays the water and sewage bill for your rental property and deducts the amount from the normal rent payment. Under the terms of the lease, your tenant does not have to pay this bill. Include the utility bill paid by the tenant and any amount received as a rent payment in your rental income. You can deduct the utility payment made by your tenant as a rental expense.

**Example 2.**

While you are out of town, the furnace in your rental property stops working. Your tenant pays for the necessary repairs and deducts the repair bill from the rent payment. Include the repair bill paid by the tenant and any amount received as a rent payment in your rental income. You can deduct the repair payment made by your tenant as a rental expense.

**Property or services.**   If you receive property or services as rent, instead of money, include the fair market value of the property or services in your rental income.

If the services are provided at an agreed upon or specified price, that price is the fair market value unless there is evidence to the contrary.

**Example.**

Your tenant is a house painter. He offers to paint your rental property instead of paying 2 months rent. You accept his offer.

Include in your rental income the amount the tenant would have paid for 2 months rent. You can deduct that same amount as a rental expense for painting your property.

Publication 527 (2013), Residential Rental Property                                                                    Page 2 of 5

**Security deposits.** Do not include a security deposit in your income when you receive it if you plan to return it to your tenant at the end of the lease. But if you keep part or all of the security deposit during any year because your tenant does not live up to the terms of the lease, include the amount you keep in your income in that year.

   If an amount called a security deposit is to be used as a final payment of rent, it is advance rent. Include it in your income when you receive it.

Other Sources of Rental Income

**Lease with option to buy.** If the rental agreement gives your tenant the right to buy your rental property, the payments you receive under the agreement are generally rental income. If your tenant exercises the right to buy the property, the payments you receive for the period after the date of sale are considered part of the selling price.

**Part interest.** If you own a part interest in rental property, you must report your part of the rental income from the property.

**Rental of property also used as your home.** If you rent property that you also use as your home and you rent it less than 15 days during the tax year, do not include the rent you receive in your income and do not deduct rental expenses. However, you can deduct on Schedule A (Form 1040), Itemized Deductions, the interest, taxes, and casualty and theft losses that are allowed for nonrental property. See chapter 5, Personal Use of Dwelling Unit (Including Vacation Home).

Rental Expenses

In most cases, the expenses of renting your property, such as maintenance, insurance, taxes, and interest, can be deducted from your rental income.

**Personal use of rental property.** If you sometimes use your rental property for personal purposes, you must divide your expenses between rental and personal use. Also, your rental expense deductions may be limited. See chapter 5, Personal Use of Dwelling Unit (Including Vacation Home).

**Part interest.** If you own a part interest in rental property, you can deduct expenses you paid according to your percentage of ownership.

**Example.**

Roger owns a one-half undivided interest in a rental house. Last year he paid $968 for necessary repairs on the property. Roger can deduct $484 (50% × $968) as a rental expense. He is entitled to reimbursement for the remaining half from the co-owner.

*When To Deduct*

You generally deduct your rental expenses in the year you pay them.

If you use the accrual method, see Publication 538 for more information.

*Types of Expenses*

Listed below are the most common rental expenses.

- Advertising
- Auto and travel expenses
- Cleaning and maintenance
- Commissions
- Depreciation
- Insurance
- Interest (other).
- Legal and other professional fees.
- Local transportation expenses.
- Management fees.
- Mortgage interest paid to banks, etc.
- Points.
- Rental payments
- Repairs
- Taxes.
- Utilities.

Some of these expenses, as well as other less common ones, are discussed below.

**Depreciation.** Depreciation is a capital expense. It is the mechanism for recovering your cost in an income producing property and must be taken over the expected life of the property.

   You can begin to depreciate rental property when it is ready and available for rent. See *Placed in Service* under *When Does Depreciation Begin and End* in chapter 2.

**Insurance premiums paid in advance.** If you pay an insurance premium for more than one year in advance, for each year of coverage you can deduct the part of the premium payment that will apply to that year. You cannot deduct the total premium in the year you pay it. See chapter 6 of Publication 535 for information on deductible premiums.

**Interest expense.** You can deduct mortgage interest you pay on your rental property. When you refinance a rental property for more than the previous outstanding balance, the portion of the interest allocable to loan proceeds not related to rental use generally cannot be deducted as a rental expense. Chapter 4 of Publication 535 explains mortgage interest in detail.

*Expenses paid to obtain a mortgage.* Certain expenses you pay to obtain a mortgage on your rental property cannot be deducted as interest. These expenses, which include mortgage commissions, abstract fees, and recording fees, are capital expenses that are part of your basis in the property.

*Form 1098, Mortgage Interest Statement.* If you paid $600 or more of mortgage interest on your rental property to any one person, you should receive a Form 1098 or similar statement showing the interest you paid for the year. If you and at least one other person (other than your spouse if you file a joint return) were liable for, and paid interest on, the mortgage, and the other person received the Form 1098, report your share of the interest on Schedule E (Form 1040), line 13. Attach a statement to your return showing the name and address of the other person. On the dotted line next to line 13, enter "See attached."

**Legal and other professional fees.** You can deduct, as a rental expense, legal and other professional expenses such as tax return preparation fees you paid to prepare Schedule E, Part I. For example, on your 2013 Schedule E you can deduct fees paid in 2013 to prepare Part I of your 2012 Schedule E. You can also deduct, as a rental expense, any expense (other than federal taxes and penalties) you paid to resolve a tax underpayment related to your rental activities

**Local benefit taxes.** In most cases, you cannot deduct charges for local benefits that increase the value of your property, such as charges for putting in streets, sidewalks, or water and sewer systems. These charges are nondepreciable capital expenditures and must be added to the basis of your property. However, you can deduct local benefit taxes that are for maintaining, repairing, or paying interest charges for the benefits.

**Local transportation expenses.** You may be able to deduct your ordinary and necessary local transportation expenses if you incur them to collect rental income or to manage, conserve, or maintain your rental property. However, transportation expenses incurred to travel between your home and a rental property generally constitute nondeductible commuting costs unless you use your home as your principal place of business. See Publication 587, Business Use of Your Home, for information on determining if your home office qualifies as a principal place of business.

Generally, if you use your personal car, pickup truck, or light van for rental activities, you can deduct the expenses using one of two methods: actual expenses or the standard mileage rate. For 2013, the standard mileage rate for business use is 56.5 cents per mile. For more information, see chapter 4 of Publication 463.



To deduct car expenses under either method, you must keep records that follow the rules in chapter 5 of Publication 463. In addition, you must complete Form 4562, Part V, and attach it to your tax return.

**Pre-rental expenses.** You can deduct your ordinary and necessary expenses for managing, conserving, or maintaining rental property from the time you make it available for rent.

**Rental of equipment.** You can deduct the rent you pay for equipment that you use for rental purposes. However, in some cases, lease contracts are actually purchase contracts. If so, you cannot deduct these payments. You can recover the cost of purchased equipment through depreciation.

**Rental of property.** You can deduct the rent you pay for property that you use for rental purposes. If you buy a leasehold for rental purposes, you can deduct an equal part of the cost each year over the term of the lease.

**Travel expenses.** You can deduct the ordinary and necessary expenses of traveling away from home if the primary purpose of the trip is to collect rental income or to manage, conserve, or maintain your rental property. You must properly allocate your expenses between rental and nonrental activities. You cannot deduct the cost of traveling away from home if the primary purpose of the trip is to improve the property. The cost of improvements is recovered by taking depreciation. For information on travel expenses, see chapter 1 of Publication 463.



To deduct travel expenses, you must keep records that follow the rules in chapter 5 of Publication 463.

**Uncollected rent.** If you are a cash basis taxpayer, do not deduct uncollected rent. Because you have not included it in your income, it is not deductible.

If you use an accrual method, report income when you earn it. If you are unable to collect the rent, you may be able to deduct it as a business bad debt. See chapter 10 of Publication 535 for more information about business bad debts.

**Vacant rental property.** If you hold property for rental purposes, you may be able to deduct your ordinary and necessary expenses (including depreciation) for managing, conserving, or maintaining the property while the property is vacant. However, you cannot deduct any loss of rental income for the period the property is vacant.

*Vacant while listed for sale.* If you sell property you held for rental purposes, you can deduct the ordinary and necessary expenses for managing, conserving, or maintaining the property until it is sold. If the property is not held out and available for rent while listed for sale, the expenses are not deductible rental expenses.

### Points

The term "points" is often used to describe some of the charges paid, or treated as paid, by a borrower to take out a loan or a mortgage. These charges are also called loan origination fees, maximum loan charges, or premium charges. Any of these charges (points) that are solely for the use of money are interest. Because points are prepaid interest, you generally cannot deduct the full amount in the year paid, but must deduct the interest over the term of the loan.

The method used to figure the amount of points you can deduct each year follows the original issue discount (OID) rules. In this case, points are equivalent to OID, which is the difference between:

- The amount borrowed (redemption price at maturity, or principal) and
- The proceeds (issue price)

The first step is to determine whether your total OID (which you may have on bonds or other investments in addition to the mortgage loan), including the OID resulting from the points, is insignificant or *de minimis*. If the OID is not *de minimis*, you must use the constant-yield method to figure how much you can deduct.

**De minimis OID.** The OID is *de minimis* if it is less than one-fourth of 1% (.0025) of the stated redemption price at maturity (principal amount of the loan) multiplied by the number of full years from the date of original issue to maturity (term of the loan).

If the OID is *de minimis*, you can choose one of the following ways to figure the amount of points you can deduct each year.

- On a constant-yield basis over the term of the loan.
- On a straight line basis over the term of the loan.
- In proportion to stated interest payments.
- In its entirety at maturity of the loan.

You make this choice by deducting the OID (points) in a manner consistent with the method chosen on your timely filed tax return for the tax year in which the loan is issued.

**Example.**

Carol Madison took out a $100,000 mortgage loan on January 1, 2013, to buy a house she will use as a rental during 2013 The loan is to be repaid over 30 years. During 2013, Carol paid $10,000 of mortgage interest (stated interest) to the lender. When the loan was made, she paid $1,500 in points to the lender. The points reduced the principal amount of the loan from $100,000 to $98,500, resulting in $1,500 of OID Carol determines that the points (OID) she paid are *de minimis* based on the following computation.

| Redemption price at maturity (principal amount of the loan) | $100,000 |
|---|---|
| Multiplied by: The term of the loan in complete years | ×30 |
| Multiplied by | × .0025 |
| De minimis amount | $7,500 |

The points (OID) she paid ($1,500) are less than the *de minimis* amount ($7,500). Therefore, Carol has *de minimis* OID and she can choose one of the four ways discussed earlier to figure the amount she can deduct each year. Under the straight line method, she can deduct $50 each year for 30 years.

**Constant-yield method.**  If the OID is not *de minimis*, you must use the constant-yield method to figure how much you can deduct each year

You figure your deduction for the first year in the following manner.

1  Determine the issue price of the loan. If you paid points on the loan, the issue price generally is the difference between the principal and the points

2  Multiply the result in (1) by the yield to maturity (defined later).

3  Subtract any qualified stated interest payments (defined later) from the result in (2). This is the OID you can deduct in the first year.

*Yield to maturity (YTM).*  This rate is generally shown in the literature you receive from your lender. If you do not have this information, consult your lender or tax advisor. In general, the YTM is the discount rate that, when used in computing the present value of all principal and interest payments, produces an amount equal to the principal amount of the loan.

*Qualified stated interest (QSI).*  In general, this is the stated interest that is unconditionally payable in cash or property (other than another loan of the issuer) at least annually over the term of the loan at a fixed rate.

**Example—Year 1.**

The facts are the same as in the previous example  The yield to maturity on Carol's loan is 10.2467%, compounded annually.

She figured the amount of points (OID) she could deduct in 2013 as follows

| Principal amount of the loan | $100,000 |
|---|---|
| Minus: Points (OID) | −1,500 |
| Issue price of the loan | $98,500 |
| Multiplied by: YTM | × .102467 |
| Total | 10,093 |
| Minus: QSI | −10,000 |
| Points (OID) deductible in 2013 | $93 |

To figure your deduction in any subsequent year, you start with the adjusted issue price. To get the adjusted issue price, add to the issue price figured in Year 1 any OID previously deducted. Then follow steps (2) and (3), earlier

**Example—Year 2.**

Carol figured the deduction for 2014 as follows

| Issue price | $98,500 |
|---|---|
| Plus: Points (OID) deducted in 2013 | +93 |
| Adjusted issue price | $98,593 |
| Multiplied by: YTM | × .102467 |
| Total | 10,103 |
| Minus: QSI | −10,000 |
| Points (OID) deductible in 2014 | $103 |

**Loan or mortgage ends.**  If your loan or mortgage ends, you may be able to deduct any remaining points (OID) in the tax year in which the loan or mortgage ends A loan or mortgage may end due to a refinancing, prepayment, foreclosure, or similar event. However, if the refinancing is with the same lender, the remaining points (OID) generally are not deductible in the year in which the refinancing occurs, but may be deductible over the term of the new mortgage or loan.

**Points when loan refinance is more than the previous outstanding balance.**  When you refinance a rental property for more than the previous outstanding balance, the portion of the points allocable to loan proceeds not related to rental use generally cannot be deducted as a rental expense. For example, if an individual refinanced a loan with a balance of $100,000, the amount of the new loan was $120,000, and the taxpayer used $20,000 to purchase a car, points allocable to the $20,000 would be treated as nondeductible personal interest

Repairs and Improvements

Generally, an expense for repairing or maintaining your rental property may be deducted if you are not required to capitalize the expense.

**Improvements.**  You must capitalize any expense you pay to improve your rental property. An expense is for an improvement if it results in a betterment to your property, restores your property, or adapts your property to a new or different use

*Betterments.*  Expenses that may result in a betterment to your property include expenses for fixing a pre-existing defect or condition, enlarging or expanding your property, or increasing the capacity, strength, or quality of your property.

*Restoration.*  Expenses that may be for restoration include expenses for replacing a substantial structural part of your property, repairing damage to your property after you properly adjusted the basis of your property as a result of a casualty loss, or rebuilding your property to a like-new condition.

*Adaptation.*  Expenses that may be for adaptation include expenses for altering your property to a use that is not consistent with the intended ordinary use of your property when you began renting the property.



Separate the costs of repairs and improvements, and keep accurate records. You will need to know the cost of improvements when you sell or depreciate your property

The expenses you capitalize for improving your property can generally be depreciated as if the improvement were separate property

Table 1-1. Examples of Improvements

| Additions | Miscellaneous | Plumbing |
|---|---|---|
| Bedroom | Storm windows, doors | Septic system |
| Bathroom | New roof | Water heater |
| Deck | Central vacuum | Soft water system |
| Garage | Wiring upgrades | Filtration system |
| Porch | Satellite dish | |
| Patio | Security system | Interior Improvements |
| | | Built-in appliances |
| Lawn & Grounds | Heating & Air Conditioning | Kitchen modernization |
| Landscaping | Heating system | Flooring |
| Driveway | Central air conditioning | Wall-to-wall carpeting |
| Walkway | Furnace | |
| Fence | Duct work | Insulation |
| Retaining wall | Central humidifier | Attic |
| Sprinkler system | Filtration system | Walls, floor |
| Swimming pool | | Pipes, duct work |

Prev                                    Up                                    Next

Home

More Online Publications

# EXHIBIT "3"

# EXHIBIT "3"

000402

317 San Juan Way
La Canada, CA
Sale

 

This page is part of your document - DO NOT DISCARD



## 20090715456

Pages:
0002

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

05/14/09 AT 08:00AM

| | |
|---|---|
| FEES: | 13.00 |
| TAXES: | 1,864.50 |
| OTHER: | 0.00 |
| PAID: | 1,877.50 |





L E A D S H E E T



200905140140011

00000525829



002105703

SEQ:
10

DAR - Title Company (Hard Copy)



THIS FORM IS NOT TO BE DUPLICATED     t21

RECORDING REQUESTED BY
F    FIDELITY-VAN NUYS COMPANY

AND WHEN RECORDED MAIL TO:
Ronald Y. Lee and Sandra Sun Kyung Lee

Order No.: 3225470-93    19593940
Escrow No.: LC-01703-LA
A.P.N.: 5819-014-018

/ 9 593940

SPACE ABOVE THIS LINE IS FOR RECORDER'S USE

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX IS $1,864.50        CITY TRANSFER TAX IS $.00

[ x ]    computed on full value of property conveyed, or
[   ]    computed on full value less value of liens or encumbrances remaining at time of sale.
[   ]    unincorporated area    [ x ] City of La Canada Flintridge AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**Jay W. Johnson and Debra F. Johnson, husband and wife as joint tenants**

hereby GRANT(S) to

**Ronald Y. Lee and Sandra S.** Lee, husband and wife as joint tenants

the following described real property in the County of **Los Angeles**, State of California:

Lots 140 and 141 of Tract No. 4815, in the City of La Canada Flintridge, County of Los
Angeles, State of California, as per map recorded in Book 56, Page(s) 75, inclusive, of Maps,
in the office of the County Recorder of said County.

AKA: 317 San Juan Way, La Canada Flintridge, CA 91011

Dated: **March 31, 2009**
STATE OF CALIFORNIA
COUNTY OF Los Angeles    } ss

On 3-31-09    before me
M. Lisa Abbott
Notary Public, personally appeared
Jay W. Johnson and
Debra F. Johnson

who proved to me on the basis of satisfactory evidence
to be the person(s) whose name(s) is/are subscribed to
the within instrument and acknowledged to me that
he/she/they executed the same in his/her/their
authorized capacity(ies) and that by his/her/their
signature(s) on the instrument the person(s), or the
entity upon behalf of which the person(s), acted,
executed the instrument.

I certify under PENALTY OF PERJURY under the laws
of the State of California that the foregoing paragraph is
true and correct.

WITNESS my hand and official seal.

Signature    M. Lisa Abbott
Signature of Notary

Commission Expiration Date: 2/20/10

Jay W. Johnson

Debra F. Johnson

M. LISA ABBOTT
Commission # 1646669
Notary Public - California
Los Angeles County
My Comm. Expires Feb 20, 2010

(This area for official notarial seal)

MAIL TAX STATEMENTS TO: Ronald Y. Lee and Sandra Sun Kyung Lee, , , CA



This page is part of your document - DO NOT DISCARD



04 3177799

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
**12/09/04 AT 08:00am**

## DEED



**TITLE(S) :**

FEE

FEE $13    F
         3

CODE
20

CODE
19

CODE
9

D.T.T

NOTIFICATION SENT $4

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.

Number of AIN's Shown

5 8 1 9 - 0 1 4 - 0 1 8

0 0 1



THIS FORM NOT TO BE DUPLICATED

12/9/04

RECORDING REQUESTED BY:
SOUTHLAND TITLE COMPANY

04   3177799

AND WHEN RECORDED MAIL TO:

Mr. and Mrs. Jay W. Johnson
317 San Juan Way
La Canada Flintridge, CA  91011

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: 13076591 | Escrow No.: 18223-7 |
|---|---|

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
**DOCUMENTARY TRANSFER TAX is $1,540.00**
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X]  City of La Canada Flintridge **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**L.G. Development, LLC, a California Limited Liability Company**

hereby GRANT(s) to:

**Jay W. Johnson and Debra F. Johnson, Husband and Wife as Joint Tenants**

the real property in the City of La Canada Flintridge, County of Los Angeles, State of California, described as:
Lots 140 and 141 of Tract No. 4815, in the City of La Canada Flintridge, County of Los Angeles, State of California, as per Map recorded in Book 56, Page 75 of Maps, in the Office of the County Recorder of Los Angeles County, California.
Also Known as:  317 San Juan Way, La Canada Flintridge, CA  91011
AP#: 5819-014-018

*see Exhibit "A"*

DATED August 27, 2004
STATE OF CALIFORNIA
COUNTY OF _____
On _____
Before me, _____
A Notary Public in and for said State, personally appeared
_____
_____
_____

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

L.G. Development, LLC, a California Limited Liability Company

By: _____
Lawrence Gillins

Signature_____                 (This area for official notarial seal)
MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

12/9/04

## ALL PURPOSE ACKNOWLEDGMENT

$3$

STATE OF CALIFORNIA

COUNTY OF Los Angeles

On August 27, 2004

before me, C. Salerno, a Notary Public in and for said State, personally appeared

Lawrence Gillins

personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____

C. SALERNO
COMM. # 1325859
NOTARY PUBLIC ● CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 31, 2005

(This area for official notarial seal)

04 3177799

000407

12/9/04

ORDER NO. 13076591

**EXHIBIT "A"**

Lots 140 and 141 of Tract No. 4815, in the City of La Canada-Flintridge, County of Los Angeles, State of California, as per map recorded in Book 56 Page 75 of Maps, in the Office of the County Recorder of said County.

04 3177799

3

313 San Juan Way
La Canada, CA

This page is part of your document - DO NOT DISCARD



04 0620300

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
03/16/04 AT 08:00am

TITLE(S) :        DEED



L E A D     S H E E T

FEE                                                    D.T.T

FEE
$7
M

CODE
20

CODE
19

CODE
9

Assessor's Identification Number (AIN)
To be completed by Examiner OR Title Company in black ink.     Number of AIN's Shown



5 8 1 9 - 0 1 4 - 0 1 9              0 0 1

THIS FORM NOT TO BE DUPLICATED



3/16/04

RECORDING REQUESTED BY:
SOUTHLAND TITLE COMPANY

04  0620300

AND WHEN RECORDED MAIL TO:

Ms. Danielle M. McPherson
4710 Oakwood Avenue
La Canada, CA  91011

THIS SPACE FOR RECORDER'S USE ONLY:

Title Order No.: 13076104 | Escrow No.: 16986-7

**GRANT DEED**

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
**DOCUMENTARY TRANSFER TAX is $1,320.00**
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of La Canada Flintridge AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

**L.G. DEVELOPMENT, LLC, a California Limited Liability Company**

hereby GRANT(s) to:

**Danielle   . McPherson, an Unmarried Woman**

the real property in the City of La Canada Flintridge, County of Los Angeles, State of California, described as:
Lots 142 annd 143 of Tract No. 4815, in the City of La Canada Flintridge, County of Los Angeles, State of
California, as per Map recorded in Book 56, Page 75 of Maps, in the Office of the County Recorder of Los
Angeles County, California.
Also Known as: 311 San Juan Way, La Canada Flintridge, CA  91011
AP#: 5819-014-019

DATED January 9, 2004
STATE OF CALIFORNIA
COUNTY OF __Los Angeles__
On February 12, 2004
Before me, __Christopher Schulkey__
A Notary Public in and for said State, personally appeared
__Lawrence M. Gillins__

L.G. DEVELOPMENT, LLC, a California Limited
Liability Company

By __Lawrence M. Gillins__

~~personally known to me~~ (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized capacity(ies), and that by his/her/their signature(s)
on the instrument the person(s), or the entity upon behalf of
which the person(s) acted, executed the instrument.
WITNESS my hand and official seal.

CHRISTOPHER SCHULKEY
COMM. # 1445428
NOTARY PUBLIC • CALIFORNIA
LOS ANGELES COUNTY
Comm. Exp. OCT. 14, 2007

Signature _____

(This area for official notarial seal)

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

# EXHIBIT "4"

# EXHIBIT "4"

*5282  Gould Ave.*
*La Canada. CA.*
*purchase*

**This page is part of your document - DO NOT DISCARD**

## 03-1257447

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA

MAY 02 2003  AT 8 AM

**TITLE(S) :**  *Deed*



L E A D   S H E E T

**FEE**

| FEE $13 | 00 |
|---------|----|
|         | 3  |

D.T.T
$440⁹⁹



NOTIFICATION SENT $4 ◎

**CODE**
**20**

**CODE**
**19**

**CODE**
**9**

SURVEY, MONUMENT FEE $10. CODE 9 *9*

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.

**Number of Parcels Shown**

58 16 - 015 - 001                    003

THIS FORM NOT TO BE DUPLICATED

RECORDING REQUESTED BY

ACT

AND WHEN RECORDED MAIL THIS DEED AND, UNLESS
OTHERWISE SHOWN BELOW, MAIL TAX STATEMENTS TO:

W.
JAY /JOHNSON
4600 VIRO ROAD
LA CANADA, CALIFORNIA 91011

**03 1257447**

―――― SPACE ABOVE THIS LINE FOR RECORDER'S USE ――――

| 5816 | 015 | 001 | ALL |
| | | | PTN |

Title Order No. ___113692-04___
Escrow or Loan No. ___16070-SR___

# GRANT DEED

THE UNDERSIGNED GRANTOR(s) DECLARE(s)
DOCUMENTARY TRANSFER TAX is $ ___440.00___         CITY TAX $ _____
XX computed on full value of property conveyed, or
☐ computed on full value less value of liens or encumbrances remaining at time of sale.
☐ Unincorporated area:  XX City of ___LA CANADA___ , and

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
ANAHIT BLIKIAN, A MARRIED WOMAN AS HER SOLE AND SEPARATE PROPERTY
hereby GRANT(S) to
JAY /JOHNSON, A MARRIED MAN AS HIS SOLE AND SEPARATE PROPERTY
the following described real property in the County of      LOS ANGELES           State of California

AS PER EXHIBIT "A" ATTACHED:

Dated ___APRIL 3, 2003___

_Blikian_
ANAHIT BLIKIAN

STATE OF CALIFORNIA
COUNTY OF ___LOS ANGAELES___  } SS.
On ___APRIL 3, 2003___ before me,
___SHIRLEY ALINE RUGG___
personally appeared ___
___ANAHIT BLIKIAN___

personally known to me (or proved to me on the basis of satisfactory
evidence) to be the person(s) whose name(s) is/are subscribed to the
within instrument and acknowledged to me that he/she/they executed
the same in his/her/their authorized capacity(ies), and that by his/her/
their signature(s) on the instrument the person(s), or the entity upon
behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature ___Shirley Aline Rugg___

SHIRLEY ALINE RUGG
COMM. #1284376
My Comm. ...

(This area for official notarial seal)

Exhibit "A"

CALIFORNIA, COUNTY OF LOS ANGELES AND IS DESCRIBED AS FOLLOWS:

PARCEL 1:  THAT PORTION OF LOT 1 OF TRACT NO. 9192, IN THE CITY OF LA CANADA FLINTRIDGE, COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 158 PAGES 30 AND 31 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT THE INTERSECTION OF THE NORTHWESTERLY PROLONGATION OF THE CENTER LINE OF TROMBLY STREET, 60 FEET WIDE, AS SAID STREET IS SHOWN ON MAP OF TRACT NO. 10589, RECORDED IN BOOK 166 PAGE 42 OF SAID MAPS, WITH THE NORTHEASTERLY LINE OF THE LAND DESCRIBED AS PARCEL 17 IN THE DECREE OF CONDEMNATION FOR FLOOD CONTROL PURPOSES ENTERED IN CASE NO. 515606 SUPERIOR COURT OF SAID COUNTY, A CERTIFIED COPY THEREOF HAVING BEEN RECORDED IN BOOK 24703 PAGE 128 OF OFFICIAL RECORDS OF SAID COUNTY; THENCE PARALLEL WITH THE EASTERLY LINE OF SAID LOT 1 NORTH 0 DEGREES 12' 42" EAST 182.00 FEET; THENCE SOUTH 89 DEGREES 47' 18" EAST 291.66 FEET TO SAID EASTERLY LINE; THENCE ALONG SAID EASTERLY LINE NORTH 0 DEGREES 12' 42" EAST 272.89 FEET TO THE TRUE POINT OF BEGINNING; THENCE NORTH 89 DEGREES 47' 18" WEST 241.52 FEET; THENCE PARALLEL WITH SAID EASTERLY LINE NORTH 0 DEGREES 12' 42" EAST 297.11 FEET TO THE NORTHERLY LINE OF SAID LOT 1; THENCE ALONG SAID NORTHERLY LINE SOUTH 89 DEGREES 11' 15" EAST 241.53 FEET, MORE OR LESS, TO THE NORTHEAST CORNER OF SAID LOT 1; THENCE ALONG THE EAST LINE OF SAID LOT SOUTH 0 DEGREES 12' 42" WEST 294.58 FEET, MORE OR LESS, TO THE TRUE POINT OF BEGINNING.

3

03 1257447



ORDER NO. 113692-04

PARCEL 2:   AN EASEMENT FOR INGRESS AND EGRESS FOR USE IN COMMON WITH OTHERS, OVER THOSE PORTIONS OF PARCEL 1, AS SHOWN ON PARCEL MAP NO. 5494, FILED IN BOOK 64 PAGES 87 AND 88 OF PARCEL MAPS AND LOT 1 OF TRACT NO. 9192, INCLUDED WITHIN A STRIP OF LAND 30 FEET WIDE, AND LYING 15 FEET ON EACH SIDE OF THE FOLLOWING DESCRIBED CENTERLINE:

BEGINNING AT A POINT IN THE SOUTHWESTERLY LINE OF SAID PARCEL 1 DISTANT THEREON NORTH 27 DEGREES 01' 35" WEST 33 FEET FROM THE MOST SOUTHERLY CORNER THEREOF; THENCE NORTH 62 DEGREES 58' 20" EAST 78.40 FEET; THENCE NORTH 15 DEGREES 58' 20" EAST 26.68 FEET; THENCE NORTH 7 DEGREES 01' 40" WEST 28 FEET; THENCE NORTH 30 DEGREES 01' 40" WEST 100.00 FEET; THENCE NORTH 24 DEGREES 31' 40" WEST 90.00 FEET; THENCE NORTH 3 DEGREES 31' 40" WEST 50.00 FEET; WEST 90.00 FEET; THENCE NORTH 3 DEGREES 31' 40" WEST 50.00 FEET; THENCE NORTH 46 DEGREES 28' 40" EAST 50.00 FEET; THENCE NORTH 76 DEGREES 28' 20" EAST 62.00 FEET TO THE BEGINNING OF A TANGENT CURVE CONCAVE WESTERLY AND HAVING A RADIUS OF 50 FEET; THENCE ALONG SAID CURVE NORTHEASTERLY TO THE SOUTHERLY LINE OF PARCEL 1.

PARCEL 3:   AN EASEMENTS FOR INGRESS AND EGRESS OVER THAT PORTION OF PARCEL 1 PARCEL 5494 FILED IN BOOK 64 PAGES 87 AND 88 OF PARCEL MAPS, INCLUDED WITHIN A STRIP OF LAND 20 FEET WIDE LYING 20 FEET SOUTHERLY AND WESTERLY OF THE FOLLOWING DESCRIBED LINE:

BEGINNING AT A POINT IN THE NORTHERLY LINE OF GOULD AVENUE, SAID POINT BEING DESCRIBED AS THE POINT OF BEGINNING IN THE DEED TO LUCIEN W. SHAW AND JAN SHAW, HUSBAND AND WIFE, RECORDED JANUARY 19, 1956 AS INSTRUMENT NO. 598; THENCE ALONG THE WESTERLY BOUNDARY OF THE LAND DESCRIBED IN SAID DEED NORTH 59 DEGREES 58' 47" WEST 75.78 FEET; THENCE NORTH 27 DEGREES 47' 08" WEST 1.72 FEET; THE SIDE LINES OF SAID STRIP TO BE PROLONGED OR SHORTENED TO INTERSECT THE NORTHERLY LINE OF SAID GOULD AVENUE

4

03 1257447

5282 Gould Ave.
La Canada. CA.
sale



This page is part of your document - DO NOT DISCARD



**20081490570**  Pages: 004

Recorded/Filed in Official Records
Recorder's Office, Los Angeles County,
California

08/19/08 AT 08:00AM

| | |
|---|---|
| Fee: | 18.00 |
| Tax: | 1,045.00 |
| Other: | 0.00 |
| Total: | 1,063.00 |

200808190200008   Title Company

TITLE(S) :  **DEED**



L E A D   S H E E T

**Assessor's Identification Number (AIN)**
To be completed by Examiner OR Title Company in black ink.     Number of AIN's Shown



**THIS FORM IS NOT TO BE DUPLICATED**

RECORDING REQUESTED BY.
Fidelity National Title Co

AND WHEN RECORDED MAIL TO:

CHA and Associates, LP
2852 Foothill Boulevard
La Crescenta, CA 91214

09/19/08



**20081490570**

THIS SPACE FOR RECORDER'S USE ONLY.

| Title Order No. 19563007 | | Escrow No.: 19296-12 |
|---|---|---|
| | **GRANT DEED** | |

(36)

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
              **DOCUMENTARY TRANSFER TAX is $1,045 00**
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale
[ ] Unincorporated area    [X] City of La Canada Flintridge **AND**

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Jay W. Johnson and Debra F. Johnson, Husband and Wife

hereby GRANT(s) to
C.H.A and Associates, L.P., a California Limited Partnership
~~CHA and Associates, a California Limited Partnership~~

the real property in the City of La Canada Flintridge, County of Los Angeles, State of California, described as:
That portion of Lot 1 of Tract No 9192, as per complete legal description set forth on Exhibit "A" attached hereto
and made part hereof
Also Known as: 5284 Gould Avenue, La Canada Flintridge, CA 91011
AP# 5816-015-001

**SEE EXHIBIT "ONE"
ATTACHED**

DATED March 18, 2008
STATE OF CALIFORNIA
COUNTY OF Los Angeles
On March 18, 2008
before me, Sharon D. Power
A Notary Public in and for said State personally appeared
Jay W. Johnson and
Debra F. Johnson
who proved to me on the basis of satisfactory evidence to be
the person(s) whose name(s) ~~is~~/are subscribed to the within
instrument and acknowledged to me that he/she/they
executed the same in his/her/their authorized capacity(ies),
and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s)
acted, executed the instrument
I certify under PENALTY OF PERJURY under the laws of the State
of California that the foregoing paragraph is true and correct
WITNESS my hand and official seal.

Signature _____

Jay W. Johnson

Debra F Johnson

SHARON D. POWER
Commission # 1713428
Notary Public - California
Los Angeles County
My Comm. Expires Dec 30, 2010

(Seal)
MAIL TAX STATEMENTS TO PARTY SHOWN BELOW, IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE.

Order No. 19563007 - B

## LEGAL DESCRIPTION

## EXHIBIT "ONE"

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF LOS ANGELES, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel 1:

That Portion of Lot 1, of Tract No. 9192, in the County of Los Angeles, State of California, as per map recorded in Book 158 Page(s) 30 and 31 of maps, in the office of the County Recorder of said county, described as follows:

Beginning at the intersection of the Northwesterly prolongation of the center line of Trombly Street 60 feet wide, as said street is shown on map of Tract No. 10589, recorded in Book 166, Page 42 of said maps, with the Northeasterly line of the land described as Parcel 17 in the decree of condemnation for flood control purposes entered in Case No. 515606 superior court of said county, a certified copy thereof having been recorded in Book 24703, Page 128 of Official Records of said County; thence parallel with the Easterly line of said Lot 1 North 0°12'42" East 182.00 feet; thence South 89°47'18" East 291.66 feet to said Easterly line; thence along said Easterly line North 0°12'42" East 272.89 feet to the true point of beginning; thence North 89°47'18" West 241.52 feet; thence parallel with said Easterly line North 0°12'42" East 297.11 feet to the Northerly line of said Lot 1; thence along said Northerly line South 89°11'15" East 241.53 feet, more or less to the Northeast corner of said Lot 1; thence along the East line of said Lot South 0°12'42" West 294.58 feet, more or less, to the true point of beginning.

Parcel 2:

An easement for ingress and egress for use in common with others, over those portions of Parcel 1, as shown on Parcel Map No. 5494, filed in Book 64, Pages 87 and 88 of Parcel Maps and Lot 1 of Tract No. 9192, included within a strip of land 30 feet wide, and lying 15 feet on each side of the following described centerline:

Beginning at a point in the Southwesterly line of said Parcel 1 distant thereon North 27°01'35" West 33 feet from the most Southerly corner thereof; thence North 62°58'20" East 78.40 feet; thence North 15°58'20" East 26.68 feet; thence North 7°01'40" West 28 feet; thence North 30°01'40" West 100.00 feet; thence North 24°31'40" West 50.00 feet, West 90.00 feet; thence North 3°31'40" West 50.00 feet; thence North 46°28'40" East 50.00 feet; thence North 76°28'20" East 62.00 feet to the beginning of a tangent curve concave Westerly and having a radius of 50 feet; thence along said curve Northeasterly to the Southerly line of Parcel 1.

Parcel 3:

An easement for ingress and egress over that portion of Parcel 1, of Parcel Map No. 5494 filed in Book 64, Pages 87 and 88 of Parcel Maps, included within a strip of land 20 feet wide lying 20 feet Southerly and Westerly of the following described line:

Beginning at a point in the Northerly line of Gould Avenue, said point being described as the point of beginning in the deed to Lucien W. Shaw, husband and wife, recorded January 15, 1956 as Instrument No. 598; thence along the Westerly boundary of the land described in said deed North 59°58'47" West 75.78 feet; thence North 27°47'08" West 1.72 feet; the side lines of said strip to be prolonged or shortened to intersect the Northerly line of said Gould

2        CLTA Preliminary Report Form - Modified (11/17/06)

Order No. 19563007 - B

Avenue.

Parcel 4:

An easement for ingress and egress over that portion of Lot 1, of Tract No. 9192, in the County of Los Angeles, State of California, as per map recorded in Book 158 Page(s) 30 and 31 of maps, in the office of the County Recorder of said county, included within a strip of land 20 feet wide and lying 10 feet on each side of the following described center line:

Beginning at the Northwesterly terminus of that certain course described in Parcel 2 above as North 30°52'35" West 92.42 feet; thence South 67°41'40" West 10.06 feet to the true point of beginning; thence North 16°02'22" West 47.79 feet; thence North 13°21'23" East 40.27 feet; thence North 48°28'32" East 47.01 feet; thence North 57°54'21" East 151.93 feet to the Northwesterly corner of the land described in Parcel 1 above; the side lines of said strip of land are to be prolonged or shortened so as to intersect at all angle points and are to terminate Northeasterly in the Northerly line of the land described in Parcel 1 above and Southerly in a line that bears South 67°41'40" West and North 67°41'40" East from the true point of beginning of this easement.

Assessor's Parcel No: 5816-015-001

03
1490570

3     CLTA Preliminary Report Form - Modified (11/17/06)

# EXHIBIT "5"

# EXHIBIT "5"

000421

*12 Fallbrook CA LOTS*
*purchase*

2

RECORDING REQUESTED BY
Commonwealth Land Title Co.
WHEN RECORDED MAIL THIS DOCUMENT
AND TAX STATEMENTS TO:

8000M, L.L.C.
c/o Steven F. Nelson
3464 N. Peck Road
El Monte, CA 91731

APN: 121-220-67-72, 74-79
Escrow No: 03202499-609-PL1
Title No: 3202499-3-

DOC # 2004-0688482

20591

JUL 22, 2004     3:56 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J SMITH, COUNTY RECORDER
FEES:      3580 20
OC:           OC
PAGES:       3

2004-0688482

## LIMITED PARTNERSHIP
## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)
DOCUMENTARY TRANSFER TAX IS $3,577.20, CITY TAX $ 0.00
☒  computed on full value of property conveyed, OR
☐  computed on full value less value of liens or encumbrances remaining at time of sale
☐  unincorporated area       ☐ City of Fallbrook, AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

JASDEC Partners

a LIMITED PARTNERSHIP organized and existing under the laws of the State of  California  hereby GRANT(S) to

8000M, L.L.C., a California limited liability company,

the following described real property in the City of Fallbrook County of San Diego, State of California:

See Exhibit A attached hereto and made a part hereof.

Commonly known as: 12 Lots, Fallbrook, CA

Dated: July 15, 2004

JASDEC Partners, a California Limited Partnership

By: The Rottman Group, a California corporation
General Partner

By: Steven Rottman, President

STATE OF CALIFORNIA
COUNTY OF Santa Barbara        } SS:

On July 19, 2004             , before me, G. Choichuichai               Notary Public,
personally appeared  Steven Rottman
personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized
capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the
person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Signature g. Choichuichai

G CHOICHUICHAI
Commission # 1304753
Notary Public - California
Santa Barbara County
My Comm Expires May 6, 2005

PLACE NOTARY SEAL OR STAMP

MAIL TAX STATEMENTS AS DIRECTED ABOVE

Exhibit A

20592

All that certain real property situated in the County of San Diego, State of California, described as follows:

Lots 1 through 6 and 8 through 13 of County of San Diego Tract No. 4867-1, in the County of San Diego, State of California, according to Map thereof No. 13880 filed in the San Diego County Recorder's Office November 30, 1999 and was refilled as Map No. 13892, December 15, 1999.

20593

## GOVERNMENT CODE 27361.7

I CERTIFY UNDER PENALTY OF PERJURY THAT THE NOTARY SEAL ON THE
DOCUMENT TO WHICH THIS STATEMENT IS ATTACHED READS AS FOLLOWS:

Name of the Notary:_____ G . OHOI CHU ICHAI _____

Commission Number:_____ 1304753 ____ Date Commission Expires: 5/17/05

County Where Bond is Filed:_____ SANTA BARBARA _____

Manufacturer or Vendor Number:_____ NNA) _____
(Located on both sides of the notary seal border)

Signature:_____
                    Firm Name (if applicable)

Place of Execution:_____ SAN DIEGO _____ Date:__ 7/22/04 __

Fallbrook Lot 1, 121-220-67-00

DOC # 2004-0819921

RECORDING REQUESTED BY:
First American Title Company

AND WHEN RECORDED MAIL TO:

Mr. and Mrs. Harry Iverson
Mutual Trust Funding
22342 Avenida Empresa #165
Rancho Santa Margarita, CA  92688

26783

AUG 27, 2004       3:40 PM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
GREGORY J. SMITH, COUNTY RECORDER
FEES:      555.50
DC:        AFNF
PAGES:       3

Title Order No.: 1560856-9    1560856-9 GRANT DEED        Escrow No.: 07834-JP

THE UNDERSIGNED GRANTOR(S) DECLARE(S)                    2004-0819921
                DOCUMENTARY TRANSFER TAX is $522.50
[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[X] Unincorporated area   [ ] City of AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

8000 M. L..L.C., a California Limited Liability Company

hereby GRANT(s) to:

Harry Iverson and Irene Ward IVerson, Husband and Wife as
Community Proprty

the real property in the  County of San Diego, State of California, described as:
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
Also Known as:  APN # 121-220-67  (Circa De Loma) Lot 1, Fallbrook, CA  92028

DATED August 4, 2004
STATE OF CALIFORNIA                              8000 M. L..L.C., a California Limited Liability Company
COUNTY OF ___ LOS ANGELES
On ___ AUGUST 18, 2004
Before me, MARIBEL MUNOZ                         By: _____
A Notary Public in and for said State, personally appeared   Jay Johnson   Steven F. Nelson
STEVEN F. NELSON

personally known to me (or proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s)
is/are subscribed to the within instrument and acknowledged
to me that he/she/they executed the same in his/her/their
authorized  capacity(ies),  and  that  by  his/her/their
signature(s) on the instrument the person(s), or the entity
upon behalf of which the person(s) acted, executed the
instrument.
WITNESS my hand and official seal.


MARIBEL MUNOZ
Commission # 1377451
Notary Public - California
Los Angeles County
My Comm. Expires Sep 18, 2004

Signature_____
                                                (This area for official notarial seal)
MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

Order Number: 1560856 (09)
Page Number: 6

26784

*EXH. "A"*

**LEGAL DESCRIPTION**

Real property in the unincorporated area of the County of San Diego, State of California, described as follows:

PARCEL 1:

LOT 1 OF COUNTY OF SAN DIEGO TRACT NO. 4867-1, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 13880, FILED NOVEMBER 30, 1999 AND RE-FILED AS MAP NO. 13892, IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, DECEMBER 15, 1999.

RESERVING THEREFROM IN FAVOR OF THE GRANTOR AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS, ROAD AND UTILITY PURPOSES, INCLUDING BUT NOT LIMITED TO ELECTRIC POWER, TELEPHONE, GAS, WATER, SEWER AND CABLE TELEVISION LINES AND APPURTENANCES THERETO, OVER, UNDER, ALONG AND ACROSS THAT PORTION OF SAID LOT DELINEATED AND DESIGNATED AS "40' PROPOSED PRIVATE ROAD AND PUBLIC UTILITY EASEMENT" ON SAID MAP NO. 13880 AND RE-FILED AS MAP NO. 13892.

PARCEL 2:

AN EASEMENT AND RIGHT OF WAY FOR ROAD PURPOSES, TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 60.00 FEET IN WIDTH LYING WITHIN LOT 1 IN SECTION 19, TOWNSHIP 10 SOUTH, RANGE 3 EAST, SAN BERNARDINO MERIDIAN, AND WITHIN THE EAST HALF OF SECTION 24, TOWNSHIP 10 SOUTH, RANGE 4 WEST, SAN BERNARDINO MERIDIAN, ALL BEING IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO OFFICIAL PLAT THEREOF THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

BEGINNING AT SAID POINT "W" HEREINABOVE DESIGNATED BEING AN ANGLE POINT IN THE BOUNDARY OF LAND DESCRIBED IN DEED TO SAN DIEGO TRUST AND SAVINGS BANK AS TRUSTEE NO. P.T. 1-1181-07: RECORDED DECEMBER 26, 1967 AS FILE/PAGE NO. 202807 OF OFFICIAL RECORDS, BEING ALSO AN ANGLE POINT IN THE BOUNDARY OF RECORD OF SURVEY MAP NO. 7102, FILED IN THE OFFICE OF THE COUNTY RECORDER, JUNE 12, 1969, AND BEING ALSO A POINT ON THE ARC OF A 280.00 FOOT RADIUS CURVE IN THE BOUNDARY OF SAID TRUST LAND, CONCAVE WESTERLY; THENCE ALONG THE BOUNDARY OF SAID TRUST LAND, CONCAVE WESTERLY, THENCE ALONG THE BOUNDARY OF SAID TRUST LAND AS FOLLOWS: NORTHERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 28 DEG 27' 27" A DISTANCE OF 139.07 FEET; TANGENT TO SAID CURVE, NORTH 06 DEG 48' 41" WEST (RECORD-NORTH 06 DEG 46' 00" WEST) 460.37 FEET TO THE BEGINNING OF A TANGENT 350.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY; NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 66 DEG 28' 50" A DISTANCE OF 406.11 FEET; TANGENT TO SAID CURVE NORTH 59 DEG 04' 09" EAST (RECORD NORTH 59 DEG 42' 50" EAST) 154.01 FEET TO THE BEGINNING OF A TANGENT 300.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY; NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 28 DEG 55' 40" A DISTANCE OF 151.47 FEET; TANGENT TO SAID CURVE NORTH 88 DEG 35' 49" EAST (RECORD NORTH 88 DEG 30' 20" EAST) 230.25 FEET TO THE BEGINNING OF A TANGENT 1000.00 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY, NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 15 DEG 02' 50" A DISTANCE OF 262.62 FEET; TANGENT TO SAID CURVE NORTH 73 DEG 32' 59" EAST, 279.84 FEET (RECORD NORTH 73 DEG 35' 40" EAST, 284.25 FEET) TO THE BEGINNING OF A TANGENT 500.00 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY; NORTHEASTERLY ALONG THE ARC

*First American Title*

OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 11 DEG 36' 00" A DISTANCE OF 101.23 FEET;
TANGENT TO SAID CURVE NORTH 61 DEG 56' 59" EAST, (RECORD NORTH 61 DEG 59' 40"
EAST) 155.70 FEET TO THE BEGINNING OF TANGENT 302.87 FOOT (RECORD 321.23 FOOT)
FOOT RADIUS CURVE, CONCAVE SOUTHERLY AND EASTERLY ALONG THE ARC OF SAID CURVE,
THROUGH A CENTRAL ANGEL OF 44 DEG 00' 21" AS DEFINED IN THE CONDITIONS AND
STIPULATIONS CONTAINED HEREIN 231.62 FEET (RECORD CENTRAL ANGLE OF 44 DEG 04' 10"
A DISTANCE OF 247.07 FEET); THENCE LEAVING SAID BOUNDARY, TANGENT TO SAID CURVE
SOUTH 74 DEG 02' 40 EAST, 827.00 FEET, MORE OR LESS, TO THE CENTER LINE OF COUNTY
ROAD SURVEY NO. 731.64 KNOWN AS OLIVE HILL ROAD AS SHOWN ON SAID RECORD OF
SURVEY MAP NO. 7192, SAID EASEMENT TO TERMINATE EASTERLY IN THE CENTER LINE OF
SAID OLIVE HILL ROAD.

PARCEL 3:

AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS, ROAD AND UTILITY
PURPOSES, INCLUDING BUT NOT LIMITED TO ELECTRIC POWER, TELEPHONE, GAS, WATER,
SEWER AND CABLE TELEVISION LINES AND APPURTENANCES THERETO, OVER, UNDER, ALONG
AND ACROSS THAT PORTION OF MAP 13880 AND RE-FILED AS MAP NO. 13892 DELINEATED
AND DESIGNATED AS "40' PROPOSED PRIVATE ROAD AND PUBLIC UTILITY EASEMENT".
EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL 1 HEREIN ABOVE DESCRIBED.

APN: 121-220-67-00

First American Title

10 - Fallbrook, CA 1078-1819

Recording Requested By
Lawyers Title

DOC # 2012-0467298

RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO AND MAIL
TAX BILLS TO:

AUG 08, 2012    8:00 AM
OFFICIAL RECORDS
SAN DIEGO COUNTY RECORDER'S OFFICE
Ernest J. Dronenburg, Jr., COUNTY RECORDER
FEES:        3974.85
OC:          INC

Scott Olsen, Manager
OG Partners, LLC
2331 Delia Drive
Salt Lake City, Utah 84109

5312    PAGES:    4

03202499

Space Above For Recorder's Use

**GRANT DEED**

APN's:    121-220-68, 69, 70, 72, 74, 75, 76, 77, 78 and 79

The undersigned grantor declares:    85
Documentary Transfer Tax is $3,930.84.
(X)    computed on full value of property conveyed; or
( )    computed on full value less value of liens and
          encumbrances remaining at time of transfer.
( )    Unincorporated area; ( ) City of _____

    FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,
**8000M, L.L.C., a California Limited Liability Company** ("Grantor"), hereby GRANTS to
**OG Partners, LLC, a Utah limited liability company** (Grantee"), the following described real
property in the County of ~~Los Angeles~~, State of California:
                    **San Diego**

        PER ATTACHED LEGAL DESCRIPTION

This grant of real property is subject to non-delinquent taxes, all easements, covenants,
conditions and restrictions, and all other matters of record affecting title to such property.

Dated: July 13 , 2012        **8000 M, L.L.C.**
                                      **A California limited liability company**

                                      By: _____
                                            Steven F. Nelson, Sole Member

1
G:\Law\Clients\M-N\Nelson\OG Partners, LLC\GRANT DEED (6-29-12).docx

5313

## ACKNOWLEDGMENT

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF ___Los Angeles___ )

On __7-3-12__, before me, *M Camero Notary Public*
personally appeared Steven F. Nelson, ~~personally known to me (or~~ proved to me on the basis of
satisfactory evidence) to be the person(s) whose name(s) is/~~are~~ subscribed to the within
instrument and acknowledged to me that he/~~she/they~~ executed the same in his/~~her/their~~
authorized capacity(~~ies~~), and that by his/~~her/their~~ signature(~~s~~) on the instrument the person(~~s~~), or
the entity upon behalf of which the person(~~s~~) acted, executed the instrument. *I certify under*
*PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph*
*is true and correct.*
WITNESS my hand and official seal.

_____
*M Camero*
Notary/Public

(Seal)

```
M. CAMERO
Commission # 1905219
Notary Public - California
Los Angeles County
My Comm. Expires Sep 24, 2014
```

G:\Law\Clients\M-N\Nelson\OG Partners, LLC\GRANT DEED (6-29-12).docx

000429

5314

# LEGAL DESCRIPTION

REAL PROPERTY IN THE UNICORPORATED AREA OF THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, DESCRIBED AS FOLLOWS:

PARCEL 1:

LOTS 2, 3, 4, 6, 8, 9, 10, 11, 12 AND 13 OF COUNTY OF SAN DIEGO TRACT NO. 4867-1, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO MAP THEREOF NO. 13880, FILED NOVEMBER 30, 1999 AND RE-FILED AS MAP NO. 13892, IN THE OFFICE OF THE COUNTY RECORDER OF SAN DIEGO COUNTY, DECEMBER 15, 1999.

RESERVING THEREFROM IN FAVOR OF THE GRANTOR AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS, ROAD AND UTILITY PURPOSES, INCLUDING BUT NOT LIMITED TO ELECTRIC POWER, TELEPHONE, GAS, WATER, SEWER AND CABLE TELEVISION LINES AND APPURTENANCES THERETO, OVER, UNDER, ALONG AND ACROSS THAT PORTION OF SAID LOT DELINEATED AND DESIGNATED AS "40' PROPOSED PRIVATE ROAD AND PUBLIC UTILITY EASEMENT" ON SAID MAPS.

PARCEL 2:

AN EASEMENT AND RIGHT OF WAY FOR ROAD PURPOSES, TO BE USED IN COMMON WITH OTHERS OVER A STRIP OF LAND 60.00 FEET IN WIDTH LYING WITHIN LOT 1 IN SECTION 19, TOWNSHIP 10 SOUTH, RANGE 3 EAST, SAN BERNARDINO MERIDIAN, AND WITHIN THE EAST HALF OF SECTION 24, TOWNSHIP 10 SOUTH, RANGE 4 WEST, SAN BERNARDINO MERIDIAN, ALL BEING IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO OFFICIAL PLAT THEREOF THE CENTER LINE OF SAID STRIP BEING DESCRIBED AS FOLLOWS:

BEGINNING AT SAID POINT "W" HEREINABOVE DESIGNATED BEING AN ANGLE POINT IN THE BOUNDARY OF LAND DESCRIBED IN DEED TO SAN DIEGO TRUST AND SAVINGS BANK AS TRUSTEE NO. P.T. 1-1181-07: RECORDED DECEMBER 26, 1967 AS INSTRUMENT NO. 202807 OF OFFICIAL RECORDS, BEING ALSO AN ANGLE POINT IN THE BOUNDARY OF RECORD OF SURVEY MAP NO. 7102, FILED IN OTHE OFFICE OF THE COUNTY RECORDER, JUNE 12, 1969, AND BEING ALSO A POINT ON THE ARC OF A 280.00 FOOT RADIUS CURVE IN THE BOUNDARY OF SAID TRUST LAND, CONCAVE WESTERLY; THENCE ALONG THE BOUNDARY OF SAID TRUST LAND, CONCAVE WESTERLY, THENCE ALONG THE BOUNDARY OF SAID TRUST LAND AS FOLLOWS: NORTHERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 28 DEG 27' 27" A DISTANCE OF 139.07 FEET; TANGENT TO SAID CURVE, NORTH 06 DEG 48' 41" WEST (RECORD-NORTH 06 DEG 46' 00" WEST) 460.37 FEET TO THE BEGINNING OF A TANGENT 350.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY; NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 66 DEG 28' 50" A DISTANCE OF 406.11 FEET; TANGENT TO SAID CURVE NORTH 59 DEG 04' 09" EAST (RECORD NORTH 59 DEG 42' 50" EAST) 154.01 FEET TO THE BEGINNING OF A TANGENT 300.00 FOOT RADIUS CURVE, CONCAVE SOUTHEASTERLY; NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 28 DEG 55' 40" A DISTANCE OF 151.47 FEET; TANGENT TO SAID CURVE NORTH 88 DEG 35' 49" EAST (RECORD NORTH 88 DEG 30' 20" EAST) 230.25 FEET TO THE BEGINNING OF A TANGENT 1000.00 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY; NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 15 DEG 02' 50" A DISTANCE OF 262.62 FEET; TANGENT TO SAID CURVE NORTH 73 DEG 32' 59" EAST, 279.84 FEET (RECORD
NORTH 73 DEG 35' 40" EAST, 284.25 FEET) TO THE BEGINNING OF A TANGENT 500.00 FOOT RADIUS CURVE, CONCAVE NORTHWESTERLY; NORTHEASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 11 DEG 36' 00" A DISTANCE OF 101.23 FEET; TANGENT TO SAID CURVE NORTH 61 DEG 56' 59" EAST, (RECORD NORTH 61 DEG 59' 40" EAST) 155.70 FEET TO THE BEGINNING OF A TANGENT 302.87 FOOT

3

000430

5315

(RECORD 321.23 FOOT) FOOT RADIUS CURVE, CONCAVE SOUTHERLY AND EASTERLY ALONG THE ARC OF SAID CURVE, THROUGH A CENTRAL ANGLE OF 44 DEG 00' 21" AS DEFINED IN THE CONDITIONS AND STIPULATIONS CONTAINED HEREIN 231.62 FEET (RECORD CENTRAL ANGLE OF 44 DEG 04' 10" A DISTANCE OF 247.07 FEET); THENCE LEAVING SAID BOUNDARY, TANGENT TO SAID CURVE SOUTH 74 DEG 02' 40" EAST, 827.00 FEET, MORE OR LESS, TO THE CENTER LINE OF COUNTY ROAD SURVEY NO. 731.64 KNOWN AS OLIVE HILL ROAD AS SHOWN ON SAID RECORD OF SURVEY MAP NO. 7192, SAID EASEMENT TO TERMINATE EASTERLY IN THE CENTER LINE OS SAID OLIVE HILL ROAD.

PARCEL 3:

AN EASEMENT AND RIGHT OF WAY FOR INGRESS AND EGRESS, ROAD AND UTILITY PURPOSES, INCLUDING BUT NOT LIMITED TO ELECTRIC POWER, TELEPHONE, GAS, WATER, SEWER AND CABLE TELEVISION LINES AND APPURTENANCES THERETO, OVER, UNDER, ALONG AND ACROSS THAT PORTION OF MAP 13880 AND RE-FILED AS MAP NO. 13892 DELINEATED AND DESIGNATED AS "40 PROPOSED PRIVATE ROAD AND PUBLIC UTILITY EASEMENT".

EXCEPTING THEREFROM THAT PORTION LYING WITHIN PARCEL 1 HEREIN ABOVE DESCRIBED

APN: 121-220-68, 69, 70, 72, 74, 75, 76, 77, 78, AND 79

000431

**Chart 27**
## JJ&A Payments for Debtors Personal Master Charge and Visa Bills in the Year 2000
[Exhibit 4A (T83) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 1-20-2000 | 1182 | $1,000 | B of A | T77, page 541, T228, page 2346 |
| 2-17-2000 | 1248 | 500 | Bank of America (Visa) | T83,p.730, T77,p.543, T228, p.2347 |
| 3-20-2000 | 1300 | 1,000 | B of A (4024-0250-0026-0720) | T77, page 546, T228, page 2348 |
| 4-27-2000 | 1348 | 1,000 | Bank of America (Visa) | T83,p.730, T77,p.548, T228, p.2348 |
| 5-22-2000 | 1403 | 1,000 | Bank of America (Visa) | T83,p.730, T77,p.551, T228, p.2349 |
| 6-19-2000 | 1464 | 2,000 | Bank of America (Visa) | T83,p.731, T77,p.553, T228, p.2350 |
| 7-4-2000 | 1528 | 2,000 | Bank of America (Visa) | T83,p.731, T77,p.555, T228, p.2351 |
| 9-1-2000 | 1577 | 2,000 | B of A (Visa) | T77, page 557, T228, page 2352 |
| 9-19-2000 | 1614 | 5,000 | Bank of America (Visa) | T83,p.731, T77,p.559, T228, p.2352 |
| 10-23-2000 | 1679 | 2,500 | Bank of America (Visa) | T83,p.732, T77,p.562, T228, p.2353 |
| 12-1-2000 | 1742 | 500 | B of A (Visa) | T77, page 565, T228, page 2354 |
| 12-20-2000 | 1781 | 1,000 | Bank of America (Visa) | T83,p.732, T77,p.567, T228, p.2355 |
| 12-29-2000 | 1801 | 3,000 | Bank of America (Visa) | T77, page 569, T228, page 2355 |
| 1-20-2000 | 1183 | 1,000 | Chase Visa (Visa) | T77, page 541, T228, page 2346 |
| 2-17-2000 | 1247 | 500 | Chase Visa (4226-6104-5048-5665) | T83, p.733, T77,p. 543, T228, p.2347 |
| 3-20-2000 | 1301 | 500 | Chase Visa | T83,p.734, T77,p.546, T228, p.2348 |
| 4-27-2000 | 1349 | 500 | Chase Visa | T83,p.734, T77,p.548, T228, p.2348 |
| 5-22-2000 | 1402 | 500 | Chase Visa | T83,p.734, T77,p.551, T228, p.2349 |
| 6-19-2000 | 1463 | 500 | Chase Visa | T83,p.735, T77,p.553, T228, p.2350 |
| 7-26-2000 | 1527 | 1,000 | Chase Visa | T83,p.735, T77,p.555, T228, p.2351 |
| 9-1-2000 | 1578 | 1,000 | Chase Visa | T77, page 557, T228, page 2352 |
| 9-19-2000 | 1675 | 1,500 | Chase Visa | T83,p.735, T77,p.559, T228, p.2352 |
| 10-23-2000 | 1678 | 2,500 | Chase Platinum M/C | T83,p.736, T77,p.562, T228, p.2353 |
| 12-1-2000 | 1741 | 200 | Chase Platinum M/C (5222-7600-0030-0533) | T83,p.736, T77,p.565, T228, p.2354 |
| 12-12-2000 | 1763 | 31 | Chase Platinum M/C | T83,p.736, T77,p.567, T228, p.2355 |
| | | $32,231 | | |

### Chart 28
### JJ&A Payments for Debtors Personal Medical Expenses in the Year 2000
[Exhibit 4A (T84) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee | Reference |
|---|---|---|---|---|
| 2-10-2000 | 1212 | $10 | Basil M. Amer, DDS | T84,p.739, T77,p.542, T228,p.2346 |
| 2-10-2000 | 1215 | 40 | Roger Wynn Anderson | T84,p.739, T77,p.542, T228,p.2346 |
| 2-10-2000 | 1217 | 350 | Descanso Dermatology Medical Group | T84,p.739, T77,p.542, T228,p.2346 |
| 2-17-2000 | 1233 | 766 | Blue Cross of California | T84,p.740, T77,p.543, T228,p.2347 |
| 2-17-2000 | 1243 | 83 | Roger Wynn Anderson, DDS | T84,p.739, T77,p.543, T228,p.2347 |
| 2-17-2000 | 1234 | 70 | Descanso Dermatology Medical Group | T84,p.740, T77,p.543, T228,p.2347 |
| 2-24-2000 | 1255 | 140 | The Huntington Plaza OB/GYN | T84,p.740, T77,p.543, T228,p.2347 |
| 2-24-2000 | 1256 | 200 | Descanso Dermatology Medical Group | T84,p.740, T77,p.543, T228,p.2347 |
| 3-10-2000 | 1279 | 270 | Descanso Dermatology | T84,p.741, T77,p.545, T228,p.2347 |
| 4-5-2000 | 1317 | 252 | Blue Cross of CA | T77,p.548, T228,p.2348 |
| 4-19-2000 | 1336 | 766 | Blue Cross of CA | T77,p.548, T228,p.2348 |
| 4-19-2000 | 1338 | 80 | Keith Serxner, DDS | T84,p.741, T77,p.548, T228,p.2348 |
| 5-22-2000 | 1366 | 330 | Descanso Dermatology Medical Group | T84,p.741, T77,p.549, T228,p.2349 |
| 5-22-2000 | 1386 | 252 | Blue Cross of California | T84,p.742, T77,p.551, T228,p.2349 |
| 5-22-2000 | 1394 | 68 | Roger Wynn Anderson, DDS | T84,p.742, T77,p.551, T228,p.2349 |
| 5-22-2000 | 1400 | 200 | Richard J. Atkins, M.D., Inc. | T84,p.742, T77,p.551, T228,p.2349 |
| 5-22-2000 | 1401 | 125 | Madison Memorial Hospital | T84,p.743, T77,p.551, T228,p.2349 |
| 5-31-2000 | 1411 | 500 | Dr. Jong Kwon, DDS | T84,p.743, T77,p.551, T228,p.2349 |
| 6-19-2000 | 1453 | 766 | Blue Cross of California | T84,p.743, T77,p.553, T228,p.2350 |
| 6-19-2000 | 1468 | 79 | Verdugo Optical | T84,p.744, T77,p.553, T228,p.2350 |
| 6-19-2000 | 1470 | 200 | Glendale Anesthesia Specialists, Inc. | T84,p.743, T77,p.553, T228,p.2350 |
| 6-30-2000 | 1486 | 340 | Glendale Anesthesia Specialists, Inc. | T84,p.744, T77,p.553, T228,p.2350 |
| 7-26-2000 | 1526 | 252 | Blue Cross of California | T84,p.744, T77,p.555, T228,p.2351 |
| 8-29-2000 | 1564 | 766 | Blue Cross of CA | T77,p.557, T228,p.2352 |
| 7-15-2000 | 1600 | 252 | Blue Cross of California | T84,p.745, T77,p.558, T228,p.2352 |
| 10-23-2000 | 1681 | 766 | Blue Cross of California | T84,p.745, T77,p.562, T228,p.2353 |
| 12-1-2000 | 1740 | 252 | Blue Cross of California | T84,p.746, T77,p.565, T228,p.2354 |
| 12-8-2000 | 1762 | 794 | Blue Cross of California | T84,p.747, T77,p.567, T228,p.2355 |
| | | $8,969 | | |

TRIAL DECLARATION OF RICHARD LAMBES, TRUSTEE'S DESIGNATED EXPERT

### Chart 29

### JJ&A Payments for Debtors Car Debts in the Year 2000

[Exhibit 4A (T93) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements, Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee | Reference |
|------|------|--------|-------|-----------|
| 1-20-2000 | 1179 | $439 | Ford Motor Credit Co. | T77, page 540, and T228, page 2346 |
| 2-17-2000 | 1238 | 439 | Ford Motor Credit Co. | T93,p.779, T77,p.543, T228,p.2347 |
| 3-20-2000 | 1295 | 439 | Ford Motor Credit Co. | T93,p.779, T77,p.546, T228,p.2347 |
| 4-5-2000 | 1316 | 3,000 | Mel Clayton Ford | T77, page 546, and T228, page 2348 |
| 5-23-2000 | 1414 | 491 | Mel Clayton Ford | T228, page 2349 |
| 6-8-2000 | 1433 | 2,812 | Smith Motor Cars | T77, page 551, and T228, page 2350 |
| 6-19-2000 | 1451 | 491 | Ford Motor Credit Co. | T93,p.779, T77,p.553, T228,p.2350 |
| 6-30-2000 | 1482 | 665 | Banamerica Auto Finance | T77, page 553, and T228, page 2365 |
| 7-18-2000 | 1514 | 491 | Ford Motor Credit Co. | T93,p.779, T77,p.554, T228,p.2351 |
| 8-11-2000 | 1552 | 491 | Ford Motor Credit Co. | T93,p.780, T77,p.556, T228,p.2351 |
| 9-15-2000 | 1606 | 491 | Ford Motor Credit Co. | T93,p.780, T77,p.559, T228,p.2352 |
| 10-17-2000 | 1669 | 491 | Ford Motor Credit Co. | T93,p.780, T77,p.562, T228,p.2353 |
| 11-22-2000 | 1725 | 491 | Ford Motor Credit Co. | T93,p.781, T77,p.565, T228,p.2354 |
| 12-1-2000 | 1759 | 491 | Ford Motor Credit Co. | T93,p.781, T77,p.567, T228,p.2355 |
| | | $11,722 | | |

### Chart 30

### JJ&A Payments for Debtors Car Repairs / Gasoline in the Year 2000

[Exhibit 4A (T95) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements, Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee | Reference |
|------|------|--------|-------|-----------|
| 2-10-2000 | 1218 | $267 | Shell | T77, page 543, and T228, page 2346 |
| 2-24-2000 | 1257 | 200 | Shell | T95,p.786, T77,p.543, T228,p.2347 |
| 4-19-2000 | 1345 | 200 | Shell | T95,p.786, T77,p.548, T228,p.2348 |
| 5-22-2000 | 1393 | 400 | Shell | T95, page 786, and T228, page 2349 |
| 6-30-2000 | 1484 | 534 | Shell | T95, page 786, and T77, page 553 |
| 8-11-2000 | 1556 | 275 | Shell | T95, page 787, and T228, page 2352 |
| 9-15-2000 | 1595 | 565 | Shell | T95,p.787, T77,p.559, T228,p.2352 |
| 10-6-2000 | 1645 | 354 | Shell | T95,p.787, T77,p.561, T228,p.2353 |
| 10-23-2000 | 1677 | 268 | Shell | T77, page 562, and T228, page 2353 |
| | | $3,063 | | |

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 31
### JJ&A Payments for Debtors Parking and Traffic Tickets
[Exhibit 4A (T97) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 7-18-2000 | 1517 | $25 | City of Pasadena (citation #8-359-661) | T97, page 796, T77, page 554, and T228, page 2351 |
| 6-12-2000 | 1415 | 115 | Los Angeles Superior Court | T97,p.796, T77,p.551, T228,p.2349 |
| | | $140 | | |

(the Debtor also used his AIA bank account to pay his traffic tickets as shown in **Chart 42**))

### Chart 32
### JJ&A Pays For Debtors Premiums for Car, Life, and Liability Insurance
[Exhibit 4A (T96) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 4-10-2000 | 1322 | $621 | Mercury Casualty (AP4183027) – Car Insur. | T96,p.791, T77,p.548, T228,p.2348 |
| 6-19-2000 | 1450 | 61 | Mercury Casualty (Car Insurance) | T96,p.791, T77,p.553, T228,p.2350 |
| 7-18-2000 | 1504 | 106 | Mercury Casualty (Car Insurance) | T96,p.791, T77,p.555, T228,p.2351 |
| 7-25-2000 | 1529 | 749 | Mercury Casualty (Car Insurance) | T96,p.792, T77,p.555, T228,p.2351 |
| 9-29-2000 | 1633 | 749 | Mercury Casualty (Car Insurance) | T96,p.792, T77,p.559, T228,p.2353 |
| 10-10-2000 | 1653 | 384 | Mercury Casualty (Car Insurance) | T96,p.792, T77,p.561, T228,p.2353 |
| 3-6-2001 | 1910 | 649 | Mercury Casualty (Car Insurance) | T96, page 793, and T77, page 572 |
| 7-26-2000 | 1525 | 879 | 1st Penn Pacific Life Ins. Co. (Life Insurance) | T96,p.793, T77,p.555, T228,p.2351 |
| 2-17-2000 | 1241 | 10 | State Farm Insurance (Liability Insurance) | T96,p.794, T77,p.543, T228,p.2347 |
| 11-29-2000 | 1731 | 325 | State Farm Insurance (Liability Insurance) | T96,p.794, T77,p.565, T228,p.2354 |
| | | $4,533 | | |

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

**Chart 33**

**JJ&A Payments to Q Financial[*1] in the Year 2000**

[Exhibit 4A (T85) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee | Reference |
|---|---|---|---|---|
| 4-6-2000 | 1318 | $3,000 | Q Financial Grp. | T77, page 548, and T228, page 2348 |
| 5-23-2000 | 1413 | 5,000 | Q Financial Group | T85,p.750, T77,p.551, T228, p. 2349 |
| 6-2-2000 | 1428 | 4,750 | Q Financial Group | T85,p.750, T77,p.551, T228, p. 2350 |
| 6-19-2000 | 1471 | 5,000 | Q Financial Group | T85,p.750, T77,p.554, T228, p. 2350 |
| 6-28-2000 | 1474 | 5,000 | Q Financial Group | T85,p.751, T77,p.554, T228, p. 2350 |
| 8-16-2000 | 1559 | 10,000 | Q Financial Group | T85,p.751, T77,p.557, T228, p. 2352 |
| 9-20-2000 | 1616 | 10,000 | Q Financial Group | T85,p.751, T77,p.559, T228, p. 2352 |
| 11-3-2000 | 1702 | 15,000 | Q Financial Grp. | T77, page 563, and T228, page 2354 |
| | | **$57,750** | | |

[*1] The debtor Jay Johnson testified that there was no reason for JJ&A to pay Q Financial for anything [JJ Depo, 275:6-12].

Q Financial's address shown on its Federal Income Tax Returns and Federal Income Tax Forms was the same as the Debtor's address at 4600 Viro Road, La Canada, CA 91011 (Exhibit 82 (T232), Exhibit 83 (T233), Exhibit 155 (T234), and Exhibit 194 (T235). I also discovered that Q Financial Group was filing California and Federal tax forms and showing its address as 4600 Viro Road, La Canada, CA 91011 [see Exhibit 155, (T130, pp.1698-1699)]. We also discovered that Q Financial was issuing W-2 Forms showing Q's address as 4600 Viro Road, La Canada, CA 91011 [see Exhibit 155 (T130, pp.1700-1701)].

Q Financial also paid many of the Debtor's personal debts and obligations (see **Chart 56** and **Chart 57**).

**Chart 34**

**JJ&A Payments for Debtors Misc. Personal Expenses in the Year 2000**

[Exhibit 4A (T98) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee | Reference |
|---|---|---|---|---|
| 6-1-2000 | 1426 | $1,988 | Sports Placement Services | T98,p.798, T77,p.551, T228,p.2350 |
| 6-9-2000 | 1434 | 1,600 | Sports Placement Services | T98,p.798, T77,p.552, T228,p.2350 |
| 10-12-2000 | 1656 | 750 | Tina Castaldi – "Boot Camp" | T98,p.799, T77,p.562, T228,p.2353 |
| 10-12-2000 | 1657 | 750 | Tina Castaldi – "Boot Camp" | T98,p.799, T77,p.562, T228,p.2353 |
| | | **$5,088** | | |

000436

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

**Chart 35**
**JJ&A Payments for AIA's Rent Obligation**[*1] **in the Year 2000**
[Exhibit 4A (T100) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements,
Exhibit 190 (T228) for JJ&A Financial Statements for the Year 2000]

| Date | Ck # | Amount | Payee | Reference |
|------|------|--------|-------|-----------|
| 2-2-2000 | 1204 | $1,200 | Richard Frazier | T100,p.804, T77,p.541, T228,p.2346 |
| 3-7-2000 | 1270 | 1,200 | Richard Frazier | T100,p.804, T77,p.543, T228,p.2347 |
| 4-6-2000 | 1321 | 1,200 | Richard Frazier | T100,p.804, T77,p.548, T228,p.2348 |
| 5-2-2000 | 1359 | 1,200 | Richard Frazier | T100,p.805, T77,p.549, T228,p.2349 |
| 6-6-2000 | 1427 | 1,200 | Richard Frazier | T100,p.805, T77,p.552, T228,p.2350 |
| 7-5-2000 | 1492 | 1,200 | Richard Frazier | T100,p.805, T77,p.554, T228,p.2351 |
| 8-1-2000 | 1576 | 2,400 | Richard Frazier | T100,p.806, T77,p.557, T228,p.2352 |
| 10-3-2000 | 1639 | 1,200 | Richard Frazier | T100,p.806, T77,p.562, T228,p.2353 |
| 11-3-2000 | 1698 | 1,200 | Richard Frazier | T100,p.806, T77,p.565, T228,p.2354 |
| 12-8-2000 | 1747 | 1,200 | Richard Frazier | T77, page 566, and T228, page2354 |
| | | $13,200 | | |

[*1] The debtor Jay Johnson testified that his architectural business property located at 1125 Foothill Blvd., La Canada, CA 91011 was leased to his 100%-owned AIA corporation, and the debtor does not remember any lease ever executed by JJ&A on that property (JJ Depo, 182:25 to 184:13).

000437
TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 36
### Summary of Debtor Jay Johnson's Year 1999 Income Utilizing Checks Method [*1]
(Trustee did not have all JJ&A checks, all JJ&A deposit records, or JJ&A Financial Statements for 1999)

| Source of Income | Amount | Reference |
|---|---|---|
| JJ&A Payments to Debtor and Debtor's 100%-Owned AIA (partial) | $30,000 | Chart 37A |
| JJ&A Payments to Debtor's Creditor in the Year 1999 (partial) [*2] | 50,000 | Chart 37B |
| Debtor Deposited Undisclosed Income into JJ&A Bank Account (partial) [*1] | 83,101 | Chart 37C |
| **Minimum** [*1] JJ&A Income in the year 1999 (Checks Method) | **$163,101** | |
| JJ&A Reported Income per Debtor's Federal Income Tax Return | Zero | Exb.201 (T239) |
| | | |
| Claimed AIA Salary ($152,700 less 3,154 claimed AIA corp. expenses) | $149,546 | Ex.201 (T239) |
| AIA Payments for Debtors Personal Bills/Expenses for his Benefit [*3] | 58,332 | Chart 38 |
| Minimum AIA Income for the year 2000 | **$207,878** | |
| | | |
| Total Minimum JJ Income for the Year 1999 from JJ&A and AIA | **$370,979** | 2.5x reported |
| Total 1999 Income JJ Reported on Bankruptcy Schedules | $149,500 | |
| | | |
| AIA's 1999 Total Gross Income per AIA's Federal Tax Return | $479,520 | Ex.185 (T221) |
| Claimed AIA Corporate Expenses | <479,520> | Ex.185 (T221) |
| AIA's 1999 Total Net Income Shown on AIA's Federal Tax Return | Zero ("0") | Ex.185 (T221) |
| | | |
| JJ&A's 1999 Total Gross Income Shown on JJ&A's Tax Return | <$233> | Ex.192 (T226) |
| Claimed JJ&A Corporate Expenses | 800 | Ex.192 (T226) |
| JJ&A's 1999 Total Net Income Shown on AIA's Federal Tax Return | <$1,033> | Ex.192 (T226) |

[*1] Trustee did not have all JJ&A checks, all JJ&A deposit records, or JJ&A Financial Statements for 1999

[*2] The debtor Jay Johnson testified that JJ&A paid many of his personal bills and expenses, including payments for his BMW car, Insurance payments, medical expenses, travel expenses, physical therapy bills, his children's dental bills, his wife's OB/GYN appointments, his Master Charge bills, his Visa bills, his family members health insurance payments, and life insurance payments (JJ Depo, 228:25 to 229:6; 230:2 to 231:12; and 238:14 to 239:8).

[*3] The debtor Jay Johnson testified that AIA paid many of his personal bills and expenses including his Master Charge bills, Visa bills, family members health insurance payments, and life insurance payments (JJ Depo, 44:20 to 45:2, 238:14 to 239:8).

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 37A
### JJ&A Payments to Debtor and Debtor's 100%-Owned AIA in 1999

[Exhibit 4A (T79) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements]
(Trustee did not have all JJ&A checks, or JJ&A Financial Statements for 1999)

| Date | Ck # | Amount | Payee | Reference |
|------|------|--------|-------|-----------|
| 5-5-1999 | 93 | $10,000 | Jay Johnson AIA & Assoc. Inc. | Exb. 4A (T79, p.662), 4B (T77, p.528) |
| 5-6-1999 | 94 | 10,000 | Jay Johnson AIA & Assoc. Inc. | Exb. 4A (T79, p.662), 4B (T77, p.528) |
| 5-7-1999 | 95 | 10,000 | Jay Johnson | Exb. 4A (T79, p.662), 4B (T77, p.528) |
|  |  | $30,000 |  |  |

### Chart 37B
### JJ&A Payments to Debtor's Creditor in 1999

[Exhibit 4A (T79) for JJ&A checks, Exhibit 4B (T77) for JJ&A Bank Statements]
(Trustee did not have all JJ&A checks, or JJ&A Financial Statements for 1999)

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 5-18-1999 | 96 | $20,000 | Paid to: Jack Adams "Repayment on Loan" | Exb. 4A (T79, p. 663), 4B (T77, p. 528) |
| 6-10-1999 | 99 | 30,000 | Paid to: Jack Adams "Repayment on Loan" | Exb. 4A (T79, p. 663), 4B (T77, p. 528) |
|  |  | $50,000 |  |  |

### Chart 37C
### Debtor Deposited Undisclosed Income Into JJ&A Bank Account in 1999

[Exhibit 4C (T78) for copies of checks, Exhibit 4B (T77) for JJ&A Bank Statements]
(Trustee did not have all JJ&A checks, all JJ&A deposit records, or JJ&A Financial Statements for 1999)

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 5-5-1999 | 1086 | $50,000 | From William or Judy Kerler "780 Greenridge – Partial Profit" *1 | Exb. 4C, (T78,p.641), 4B (T77,p.528) |
| 6-11-1999 | 1089 | 33,101 | From William or Judy Kerler "780 Greenridge – Final Bonus" *1 | Exb. 4C,(T78,p.642), 4B (T77,p.530) |
|  |  | $83,101 |  |  |

*1 Debtor Did Not report any income from 780 Greenridge on his Individual Tax Return for 1999 (T239).
JJ&A Did Not report any income from 780 Greenridge on its Corporation Tax Return for 1999 (T225).

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 38
### AIA Made Disbursements and Additional Payments for the Benefit of Debtor in the Year 1999

| AIA's Payments Made | Amount | Reference |
|---|---|---|
| **Payments Made for Debtors Personal Master Charge and Visa bills** | 19,370 | **Chart 39** |
| Payments Made for Debtors Personal Medical Bills | 5,375 | **Chart 40** |
| Payments Made for Viro Road Construction Expenses and Real Estate Taxes | 2,014 | **Chart 41** |
| **Payments Made for Debtor's Personal Parking Tickets** | 53 | **Chart 42** |
| **Payments Made for Debtor's Personal Loans and Other Disbursements** | 31,510 | **Chart 43** |
| Total Payments to / for Benefit of Debtor from AIA in the Year 1999 | **$58,332** | |

000440

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

**Chart 39**
**AIA Paid for Debtor's Master Charge and Visa Bills in the Year 1999**
[Exhibit 20A (T102) for AIA checks, and Exhibit 20B (T125) for AIA Bank Statements]

| Date | Ck # | Amount | Payee | Reference |
|------|------|--------|-------|-----------|
| 1-27-1999 | 9444 | $620 | Chase Visa | T102, p. 857, T125, p. 1343 |
| 3-12-1999 | 9536 | 3,500 | Chase Visa | T102, p. 858, T125, p. 1345 |
| 3-12-1999 | 9537 | 3,500 | Bank Americard | T102, p. 859, T125, p. 1345 |
| 2-19-1999 | 9498 | 500 | Chase Visa, | T102, p. 860, T125, p. 1345 |
| 2-22-1999 | 9505 | 500 | Bank Americard Visa | T102, p. 860, T125, p. 1345 |
| 4-21-1999 | 9601 | 500 | Bank of America, | T102, p. 861, T125, p. 1347 |
| 4-22-1999 | 9612 | 500 | Chase Visa | T102, p. 862, T125, p. 1347 |
| 5-27-1999 | 9676 | 500 | Chase Visa | T102, p. 863, T125, p. 1351 |
| 6-30-1999 | 9724 | 1,250 | Chase Visa | T102, p. 865, T125, p. 1353 |
| 6-30-1999 | 9722 | 300 | Bank of America | T102, p. 864, T125, p. 1353 |
| 7-30-1999 | 9775 | 1,000 | Bank of America | T102, p. 866, T125, p. 1355 |
| 7-29-1999 | 9769 | 300 | Chase Visa | T102, p. 866, T125, p. 1355 |
| 8-28-1999 | 1609 | 300 | Chase Visa | T102, p. 867, T125, p. 1355 |
| 8-25-1999 | 1617 | 300 | Bank of America | T102, p. 868, T125, p. 1355 |
| 10-1-1999 | 1660 | 300 | Chase Visa | T102, p. 869, T125, p. 1359 |
| 10-1-1999 | 1661 | 500 | Bank of America | T102, p. 870, T125, p. 1359 |
| 10-20-1999 | 1706 | 1,000 | Bank of America | T102, p. 871, T125, p. 1359 |
| 10-12-1999 | 1682 | 500 | Chase Visa | T102, p. 872, T125, p. 1359 |
| 11-23-1999 | 1751 | 1,000 | Bank of America | T102, p. 873, T125, p. 1361 |
| 11-23-1999 | 1752 | 500 | Chase Visa | T102, p. 873, T125, p. 1361 |
| 12-22-1999 | 1800 | 1,500 | Bank of America | T102, p. 874, T125, p. 1363 |
| 12-21-1999 | 1799 | 500 | Chase Visa | T102, p. 875, T125, p. 1363 |
| | | $19,370 | | |

000441

**Chart 40**

**AIA Paid for Debtors' Medical Expenses in the Year 1999**

[Exhibit 20A (T103) for AIA checks, and Exhibit 20B (T125) for AIA Bank Statements]

| Date | Ck # | Amt. | Payee | Reference |
|---|---|---|---|---|
| 1-27-1999 | 9449 | $200 | Basil Amer, DDS, | T103, p. 931, T125, p.1343 |
| 1-27-1999 | 9446 | 260 | Descanso Dermatology, | T103, p. 932, T125, p.1343 |
| 2-8-1999 | 9481 | 352 | Keith Serxner, DDS, | T103, p. 933, T125, p.1343 |
| 2-3-1999 | 9473 | 500 | Jeong Con Kuon, DDS, | T103, p. 933, T125, p.1343 |
| 3-8-1999 | 9510 | 250 | Verdugo Hills Contact Lens, | T103, p. 934, T125, p.1345 |
| 3-8-1999 | 9507 | 71 | Verdugo Optical, | T103, p. 935, T125, p.1345 |
| 3-1-1999 | 9515 | 220 | Vasil Amer, DDS, | T103, p. 936, T125, p.1345 |
| 3-1-1999 | 9514 | 88 | Roger Anderson, DDS, | T103, p. 937, T125, p.1345 |
| 3-3-1999 | 9520 | 500 | Collin Chiropractic, | T103, p. 938, T125, p.1345 |
| 4-21-1999 | 9606 | 68 | Roger Anderson, DDS, | T103, p. 939, T125, p.1347 |
| 4-21-1999 | 9605 | 310 | Basil Amer, DDS, | T103, p. 940, T125, p.1347 |
| 4-21-1999 | 9607 | 55 | Keith Serxner, DDS, | T103, p. 941, T125, p.1349 |
| 8-10-1999 | 9785 | 30 | Hospital Physicians Medical, | T103, p. 942, T125, p.1355 |
| 8-25-1999 | 1616 | 325 | Basil Amer, DDS, | T103, p. 943, T125, p.1355 |
| 8-25-1999 | 1615 | 97 | Kenneth Lam, DDS, | T103, p. 944, T125, p.1357 |
| 9-29-1999 | 1655 | 69 | Roger Anderson, DDS, | T103, p. 945, T125, p.1359 |
| 10-21-1999 | 1707 | 400 | Basil Amer, DDS, | T103, p. 946, T125, p.1360 |
| 10-21-1999 | 1709 | 350 | Glendale Adventist Medical, | T103, p. 947, T125, p.1360 |
| 10-21-1999 | 1708 | 400 | Keith Serxner, DDS, | T103, p. 948, T125, p.1360 |
| 11-10-1999 | 1737 | 400 | Basil Amer, DDS, | T103, p. 949, T125, p.1361 |
| 10-29-1999 | 1715 | 300 | Open Systems M.R.I., | T103, p. 950, T125, p.1361 |
| 10-22-1999 | 1805 | 62 | Kenneth Lam, DDS, | T103, p. 951, T125, p.1364 |
| 12-22-1999 | 1808 | 68 | Roger Anderson, DDS, | T103, p. 952, T125, p.1364 |
|  |  | $5,375 |  |  |

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 41
### AIA Paid the Debtor's Viro Road Construction Expenses And Real Estate Taxes in the Year 1999
[Exhibit 20A (T104) for AIA checks, and Exhibit 20B (T125) for AIA Bank Statements]

| Date | Ck # | Amount | Payee / Memo | Reference |
|---|---|---|---|---|
| 8-18-1999 | 9803 | $114 | L.A. County Tax Collector | T104, p. 1077, T125, page 1356 |
| 12-30-1999 | 1824 | 1,900 | Uprising Construction | T104, pp.1073-1074, T125, p.1365 |
| | | $2,014 | | |

### Chart 42
### AIA Paid Debtor's Parking Tickets in the Year 1999
[Exhibit 20A (T105) for AIA check, and Exhibit 20B (T125) for AIA Bank Statements]

| Date | Ck # | Amount | Memo | Reference |
|---|---|---|---|---|
| 8-17-1999 | 9801 | $53 | Parking Violations Bureau | T105, p.1083, T125, p.1356 |
| | | $53 | | |

### Chart 43
### AIA Paid the Debtor's Personal Loans And for Other Disbursements in the Year 1999
[Exhibit 20A (T105) for AIA checks, and Exhibit 20B (T125) for AIA Bank Statements]

| Date | Ck # | Amount | Payee / Memo | Reference |
|---|---|---|---|---|
| 2-13-1999 | 9490 | $25,005 | Citizens Bank – "Fidelity Bank" | T105, p.1098, T125, p.1343 |
| 4-18-1999 | 9594 | 3,000 | Citizens Bank – "Loan to Dean Hemstreet | T105, p. 1099, T125, p.1347 |
| 5-3-1999 | 9642 | 3,505 | Citizens Bank – "P. W. Wickerstram" | T105, p. 1100, T125, p.1349 |
| | | $31,510 | | |

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

**Chart 44**

**Bank Deposits into the Main JJ&A Bank Account #04889-04352 at Bank of America**
from May 5, 1999 to May 7, 2004

[Exhibit 4B (T77)]

| Year | Deposits | Reference |
|------|----------|-----------|
| 1999 | $127,897 | T77, pages 528-539 |
| 2000 | 512,815 | T77, pages 539-568 |
| 2001 | 767,457 | T77, pages 566-593 |
| 2002 | 435,134 | T77, pages 592-617 |
| 2003 | 115,186 | T77, pages 616-635 |
| 2004 | 950 | T77, pages 635-640 |
| | $1,959,439 [*1] | |

[*1] A previous Lapides Declaration showed the Year 2000 JJ&A deposits were $468,802 (original Lapides Decl. at ¶32; 10:12-13) and total deposits made into the JJ&A Bank Account were $1,959,439 (original Lapides Decl. at ¶83 and ¶86). The Lapides Supplemental Declaration and this Declaration for trial showed that the Year 2000 JJ&A bank deposits were $512,815 and that the total JJ&A bank deposits from May 5, 1999 to May 7, 2004 were the same **$1,959,439**. The small difference in the yearly deposits was due to the fact that this Declaration utilized the calendar year 1-1-2000 to 12-31-2000, while the original Declaration utilized the JJ&A bank account statement periods from 12-8-1999 to 12-7-2000.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 45
### Other Deposits into Undisclosed JJ&A Accounts
[Exhibits 20A and 3A (T80) for checks, and Exb. 20B (T125) and 3B (T126) for Bank Statements]

| Transfers to JJ&A | | | |
|---|---|---|---|
| Account # 04889-04352 | | | |
| From Debtor's AIA Business Account | | | |
| [Exb. 20A(T80) for cks, 20B(T125) Bk. Stmts.] | | | |
| Date | Check # | Amount | T80 pg. Ref. |
| 1-19-00 | 1855 JJ | $17,500 | pp. 665-666 |
| 11-29-00 | 1889 JJ | 4,000 | pp. 667-668 |
| 3-16-01 | 1920 JJ | 300 | pp. 669-670 |
| 8-15-01 | 2014 JJ | 3,600 | pp. 671-672 |
| 7-13-01 | 1968 JJ | 900 | pp. 673-674 |
| 2-4-02 | 2052 JJ | 663 | page 675 |
| 5-17-02 | 2077 JJ | 2,000 | page 676 |
| 5-31-02 | 2085 JJ | 5,415 | page 677 |
| 6-14-02 | 2100 JJ | 6,000 | page 678 |
| 12-13-02 | 2152 JJ | 3,500 | page 679 |
| 12-17-02 | 2154 | 5,000 | T125, p.1423 |
| 12-27-02 | 2167 JJ | 7,000 | page 680 |
| 12-30-02 | 2166 JJ | 1,000 | page 680 |
| 2-13-03 | 2188 JJ | 6,000 | page 681 |
| 3-5-03 | 2213 JJ | 1,500 | page 682 |
| 2-20-03 | 2205 JJ | 1,500 | page 682 |
| 3-19-03 | Co.Ck. JJ | 400 | page 683 |
| 3-19-03 | 2230 JJ | 3,500 | page 683 |
| 4-14-03 | 2255 JJ | 3,000 | page 684 |
| 5-16-03 | 2313 JJ | 1,400 | page 685 |
| 7-17-03 | 2400 JJ | 2,000 | page 686 |
| 8-5-03 | 2416 JJ | 4,600 | page 687 |
| 7-31-03 | 2414 JJ | 2,500 | page 687 |
| 9-10-03 | 2445 JJ | 2,000 | page 688 |
| 11-5-03 | 2509 JJ | 1,200 | page 689 |
| Total | | $86,478 | |

| Transfers to JJ&A | | | |
|---|---|---|---|
| Payroll Account #04882-05393 | | | |
| From Debtor's AIA Business Account | | | |
| [Exb. 20A(T80) for cks, 20B(T125) Bk. Stmts.] | | | |
| Date | Check # | Amount | T80 pg. Ref. |
| 12-12-02 | 2151 JJ | $4,000 | page 690 |
| 11-29-02 | 2141 JJ | 5,000 | page 691 |
| 2-27-03 | 2206 JJ | 5,600 | page 692 |
| 2-10-04 | 2602 JJ | 250 | page 693 |
| Total | | $14,850 | |

| Transfers to JJ&A | | | |
|---|---|---|---|
| Account # 04889-04352 | | | |
| From Debtor's Personal Account | | | |
| [Exhibit 3A(T80) for cks, 3B(T126) Bk. Stmts.] | | | |
| 3-15-01 | 2092 JJ | $1,000 | pp. 694-695 |
| 2-28-02 | 2179 JJ | 2,000 | page 696 |
| 5-20-02 | 2519 JJ | 5,000 | page 697 |
| 9-17-02 | 2796 JJ | 400 | page 698 |
| 9-13-02 | 2716 JJ | 2,500 | page 698 |
| 9-30-02 | 2768 JJ | 2,000 | page 690 |
| 10-30-02 | 2857 JJ | 6,000 | page 700 |
| Total | | $18,900 | |

| Total Transfers by Debtor into Undisclosed | |
|---|---|
| JJ&A Bank Accounts | $120,228 |

JJ indicates that the check was signed by the debtor Jay Johnson.

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

**Chart 46**

**Undisputed Viro Road Property Facts From the Court's ORDER on**
**Findings of Fact and Conclusions of Law for MSJ filed as doc 358, and doc 354**

| Summary of Now-Undisputed Viro Road Facts from the Court's Oct. 18, 2011 Oral Ruling | Item / Pg. Ref |
|---|---|
| Whether the debtor received the property before of after the discharge is immaterial | page 178 |
| Debtor Jay Johnson paid for the Viro Road Property Building Permit for the 2nd-floor addition | Item 29, p.170 |
| Debtor credited $10,000 Sec. Dep. placed into Escrow and used towards the Down Payment | pp.184-185 |
| Entire $1,067.35 Viro Road Purchase Escrow Refund was given to the Debtor Jay Johnson | item 30, p.170 |
| Debtor paid $20,000 to Paynter Construction for the Viro Road construction expenses | 32 – p.170-171 |
| There is evidence Debtor may have paid $90,228 for Viro Rd. property construction expenses | page 185 |
| Debtor testified he did not keep any accounting of construction pmts. he made on Viro Property | page 185 |
| Debtor paid many of the mortgage payments on the Viro Purchase and Construction Loan | page 185 |
| Debtor paid mortgage payment of the Viro Property from his AIA business account | page 185 |
| Debtor paid for the Viro Property Mortgage from one of his personal bank accounts | 36, p.171,185 |
| Debtor pd. 1st TD and Refi from pers. acct., AIA acct., or reimbursement to RJ for pmts. made | page 185 |
| Debtor testified that he paid the Viro Road Property Insurance premium payments | item 37, p.171 |
| Debtor directly paid the Viro Road Property 1st and 2nd Trust Deed mortgage payments | item 43, p.172 |
| Debtors deducted $38,087 for their Viro Home Mortgage Interest on Year 2000 Tax Return | item 45, p.172 |
| Debtors deducted $60,156 for their Viro Home Mortgage Interest on Year 2002 Tax Return | item 46, p.172 |
| Debtors deducted $42,270 for their Viro Home Mortgage Interest on Year 2003 Tax Return | 47- p.172-173 |
| Randy Johnson did not report any Rental Income from Viro on his 1996-1999 Tax Returns | page 185 |
| Randy Johnson did not take any Viro Road property mortgage interest deduction for 1995 | page 185 |
| Debtor testified he paid for the Viro mortgages, real estate taxes, and other Viro expenses | page 185 |
| Debtors paid Viro Mortgage pmts. and took Mortgage interest deduction when in McFall's name | page 186 |
| Debtors testified rent they paid was equal to the mortgage, real estate taxes, & other expenses | page 185 |
| Proceeds from $500,000 2nd from Michael McFall was placed in a Q Financial Bank Account | Item 33, p.171 |
| Randy Transferred Viro Road property to Michael McFall under curious circumstances | Items 35, 38-44 |
| Debtors paid mortgage pmts. and took deductions - raises issue as to their interest in property | page 186 |
| Fact that Viro was not titled in Debtors' names is not dispositive of their interest in the property | page 187 |

000446

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

## Chart 47
## Debtor Jay Johnson Paid for Viro Road Construction and Remodel Expenses
[Ex. 6 (T249), Ex. 3A (T49) pers. checks, 20A (T49) for AIA cks, and 3B (T126), 20B (T125) bank stmts.]

| Date | Check # | Amount | Payee / Memo | Reference |
|------|---------|--------|--------------|-----------|
| 12-16-96 | Trd. Svc. | $21,000 | Architectural services provided | Exb. 6 (T249, page 2718) |
| 12-16-96 | Trd. Svc. | 13,000 | Landscaping - West Coast Nursery | Exb. 6 (T249, page 2718) |
| 12-16-96 | Trd. Svc. | 20,000 | Construction - Paynter Construction | Exb. 6 (T249, page 2719) |
| 11-21-97 | 8694 B[*1] | 4,500 | Paynter Construction - David Paynter | Exb. 20A (T49,pp. 326-327) |
| 12-5-97 | 8713 B | 1,000 | Paynter Construction - David Paynter | Exb. 20A (T49,pp. 328-329) |
| 2-28-97 | 8425 B | 221 | Behr Construction | Exb. 20A (T49,pp. 330-331) |
| 11-6-97 | 8664 B | 1,707 | Behr Construction | Exb. 20A (T49,pp. 332-333) |
| 5-21-98 | 8972 B | 288 | Gopher Construction Company | Exb. 20A (T49,pp. 334-335) |
| 12-30-99 | 1824 B | 1,900 | Uprising Construction | Exb. 20A (T49,pp. 326-327) |
| 12-24-03 | 2567 B | 4,000 | Garden's, Inc. | Exb. 20A (T49, page 338) |
| 9-19-97 | 1201 P[*2] | 600 | David Paynter (contractor) | Exb. 3A (T49, pp. 339-340) |
| 1-9-98 | 1367 P | 600 | Dave Paynter  (contractor) | Exb. 3A (T49, pp. 341-343) |
| 3-21-97 | 978 P | 100 | G & G Air Conditioning | Exb. 3A (T49, pp. 344-345) |
| 3-26-97 | 944 P | 802 | Architectural Lighting & Design | Exb. 3A (T49, pp. 346-347) |
| 1-8-99 | 1325 P | 700 | Brankers & Assoc. labeled "House" | Exb. 3A (T49, pp. 348-349) |
| 12-29-99 | 1962 P | 640 | David Anderson | Exb. 3A (T49, pp. 350-351) |
| 2-10-00 | 1429 P | 391 | Hickmet labeled "House Repairs" | Exb. 3A (T49, pp. 352-353) |
| 10-1-00 | 2056 P | 1,250 | David Anderson | Exb. 3A (T49, pp. 354-355) |
| 11-12-01 | 2477 P | 1,250 | David Anderson | Exb. 3A (T49, page 356) |
| 11-24-01 | 2368 P | 375 | David K. Arnold Construction | Exb. 3A (T49, page 357) |
| 6-3-02 | 2521 P | 400 | Hickmet | Exb. 3A (T49, page 358) |
| 8-30-02 | 2707 P | 746 | Anderson Co. labeled "Deck Repairs" | Exb. 3A (T49, page 359) |
| 8-30-02 | 2708 P | 283 | Hickmet labeled "Balance Repairs" | Exb. 3A (T49, page 360) |
| 9-20-02 | 3140 P | 1,000 | Sanca Painting labeled "Painting" | Exb. 3A (T49, page 361) |
| 10-14-02 | 2772 P | 1,000 | Sanca Painting labeled "Painting" | Exb. 3A (T49, page 362) |
| 10-13-02 | 3145 P | 1,458 | Terry Lumber "Fencing materials" | Exb. 3A (T49, page 363) |
| 5-21-03 | 3163 P | 1,808 | Felikian's Carpet labeled "carpet" | Exb. 3A (T49, page 364) |
| | | $81,019 | | |

[*1] B indicates from one of debtor Jay Johnson's AIA business bank accounts at Citizens Bus. Bank
[*2] P indicates from one of debtor Jay Johnson's personal bank accounts at Citizens Business Bank

### Chart 48
### Debtor Jay Johnson Paid for Viro Road Interior Design Expenses
[Exhibit 3A (T50) for checks, and Exhibit 3B (T126) for Bank Statements]

| Date | Check # | Amount | Payee / Memo | Reference |
|------|---------|--------|--------------|-----------|
| 2-25-97 | 1224 P | $461 | Jeanette Oaks | Ex. 3A (T50, pp.366-367), 3B(T126 p.1461) |
| 12-2-97 | Co.Ck. P | 2,248 | Dona Jeanette Interiors | Ex. 3A (T50, pp.368-369), 3B(T126,p.1479) |
| 1-2-98 | 1249 P | 2,000 | Dona Jeanette Interiors | Ex. 3A (T50, pp.370-371), 3B(T126,p.1479) |
| 1-2-98 | 1362 P | 1,500 | Dona Jeanette Interiors | Ex. 3A (T50, pp.373-374), 3B(T126,p.1479) |
| 7-23-99 | 1557 P | 2,000 | Judith B. Design Team | Ex. 3A (T50, pp.375-376), 3B(T126,p.1519) |
| 8-17-99 | 1469 P | 1,000 | Judith B. Design Team | Ex. 3A (T50, pp.377-378), 3B(T126,p.1521) |
| | | $9,209 | | |

### Chart 49
### Debtors Paid for Viro Road Pest Control Expenses
[Exhibit 3A (T51) and Exhibit 28A (T51) for checks and Ex. 3B (T126) for Bank Statements]

| Date | Ck # | Amo. | Payee / Memo | Reference |
|------|------|------|--------------|-----------|
| 12-8-98 | 1732 P[*1] | $68 | Perfect Pest Control Co., Inc. | T51, pp.379-380, T126, p.1504 |
| 12-30-99 | 1407 P | 68 | Perfect Pest Control | T51, pp.381-382, T126, p.1507 |
| 7-10-00 | 1580 DJ[*2] | 68 | Orkin Pest Control (DJ account) | T51, page 383 |
| 2-20-01 | 2324 P | 68 | Orkin Pest Control | T51,p p.384-385, T126, p.1558 |
| 9-13-02 | 1791 DJ | 68 | Dewey Pest (DJ account) | T51, page 386 |
| | | $340 | | |

[*1] P  indicates from one of debtor Jay Johnson's personal bank accounts
[*2] DJ indicates from one of debtor Debra Johnson's personal bank accounts

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

## Chart 50
## Viro Road 1st TD Mortgage Payments Made by Debtor Jay Johnson
[Exhibit 3A (T47) for checks, and Exhibit 3B (T126) for Bank Statements]

| Date | Ck # | Amount | Payee / Memo |
|------|------|--------|--------------|
| 12-7-01 | 2102 | $5,013.02 | Wells Fargo Home Mortgage, Inc. "Loan #4356271 Michael McFall" |
| 1-4-02 | 2106 | 5,013.02 | Wells Fargo Home Mortgage, Inc. "For Michael McFall Loan #4356271" |
| 2-10-02 | 2120 | 5,013.02 | Wells Fargo Home Mortgage, Inc. "For Michael McFall Loan #4356271" |
| 4-6-02 | 2744 | 5,013.02 | Wells Fargo Home Mortgage "For Mike McFall #435-6271" |
| 5-8-02 | 2697 | 5,013.02 | Wells Fargo Home Mortgage "For Michael McFall #435-6271" |
| 6-10-02 | 2531 | 5,013.02 | Wells Fargo Home Mortgage "For Mike McFall #435-6271" |
| 7-11-02 | 2782 | 5,013.02 | Wells Fargo Home Mortgage, Inc. "For Mike McFall #435-6271" |
| 8-12-02 | 2193 | 5,013.02 | Wells Fargo Home Mortgage, Inc. "Loan #435-6271 for Mike McFall" |
| 9-10-02 | 2715 | 5,015.50 | Wells Fargo Mortgage "For Mike McFall #435-6271" |
| 10-10-02 | 2771 | 5,013.02 | Wells Fargo Home Mortgage, Inc. "for Mike McFall #435-6271" |
| 11-12-02 | 2719 | 5,013.02 | Wells Fargo Bank Home Mortgage "#435-6271 for Mike McFall" |
| 12-11-02 | 2829 | 5,013.29 | Wells Fargo Home Mortgage "Mike McFall #435-6271" |
| 1-10-03 | 2209 | 5,013.02 | Wells Fargo Home Mortgage, Inc. "Loan #435-6271 for Mike McFall" |
| 2-12-03 | 2938 | 5,013.02 | Wells Fargo Mortgage "For Mike McFall #435-6271" |
| 3-12-03 | 2965 | 5,013.02 | Wells Fargo Home Mortgage "For McFall #435-6271" |
| 4-14-03 | 2969 | 5,013.02 | Wells Fargo Home Mortgage "#591000935627106 for McFall" |
| 5-14-03 | 3076 | 5,047.69 | Wells Fargo Home Mortgage "For McFall #435-6271" |
| 6-12-03 | 3090 | 5,082.36 | Wells Fargo Home Mortgage "For McFall #435-6271" |
|  |  | $90,341.12 |  |

000449
TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

## Chart 51
### Viro Road 2nd TD Mortgage Payments Made by Debtor Jay Johnson
[Exhibit 3A (T48) for checks, and Exhibit 3B (T126) for Bank Statements]

| Date | Ck # | Amount | Payee / Memo |
|------|------|--------|--------------|
| 12-11-01 | 2646 | 657.76 | Wells Fargo Bank<br>"For Michael McFall #4516457444" |
| 1-21-02 | 2648 | 365.24 | Wells Fargo Bank West, NA<br>"For Mike McFall #451-6457444" |
| 3-11-02 | 2186 | 684.29 | Wells Fargo<br>"#451-645-7444  Mike McFall" |
| 4-19-02 | 2750 | 350.34 | Wells Fargo Bank West<br>"For Michael McFall #4516457444" |
| 5-14-02 | 2761 | 339.04 | Wells Fargo Bank West<br>"For Mike McFall #4516457444" |
| 6-14-02 | 2532 | 350.38 | Well Fargo Bank West<br>"For Mike McFall #4516457444" |
| 7-22-02 | 2783 | 339.04 | Wells Fargo Bank |
| 8-15-02 | 2196 | 350.35 | Wells Fargo Bank West, NA<br>"Loan #4516457444 for Mike McFall" |
| 9-19-02 | 2202 | 350.34 | Wells Fargo Bank, NA<br>"Acc #451-645-7444 Mike McFall" |
| 10-22-02 | 3146 | 339.04 | Wells Fargo<br>"McFall #451-645-7444" |
| 11-22-02 | 2798 | 400.34 | Wells Fargo Bank |
| 12-23-02 | 2805 | 336.99 | Wells Fargo Bank West |
| 1-16-03 | 2905 | 318.49 | Wells Fargo Bank West |
| 2-17-03 | 2943 | 318.50 | Wells Fargo Bank West<br>"For Mike McFall #451-645-7444" |
| 3-26-03 | 2914 | 287.67 | Wells Fargo Bank<br>"#451-645-7444" |
| 4-18-03 | 2928 | 318.49 | Wells Fargo<br>"For McFall #451-645-7444" |
| 5-19-03 | 3116 | 308.22 | Wells Fargo Bank<br>"For McFall #451-645-7444" |
| 6-20-03 | 3126 | 318.49 | Wells Fargo Bank<br>"For Mike McFall #451-645-7444" |
|  |  | **$6,733.01** |  |

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

000450

## Chart 52
### Viro Road Property Summary When Titled in Name of Michael McFall

| **Facts About Viro Road Property When Titled in the Name of Michael McFall** | **Reference** |
|---|---|
| Debtors never made <u>any</u> rent payments to Michael McFall for the entire time the property was in the name of McFall. | JJ Depo, 56:21-25 |
| Debtor's paid <u>all</u> the 1st TD mortgage payments and deducted the Home Owner's mortgage interest deduction for the entire time property titled in McFall's name. | Undisputed per Order, doc 358, 354, i.43, p.172 |
| Debtor's paid <u>all</u> the 2nd TD mortgage payments on the Viro Road property for the entire time property was titled in McFall's name. | Undisputed per Order, doc 358, 354, i.43, p.172 |
| Buyer's entire $13,125 Loan Fee on McFall's $875,000 new 1st TD Loan was debited from seller Randy Johnson's account in escrow. | <u>Exhibit 29</u> (T52, p. 387, and 390) |
| Buyer's entire $3,461.01 Interest from close of escrow 10-11-01 until 11-1-01 (for after the close of escrow), was debited from seller Randy Johnson's account. | Undisputed per Order, doc 358, 354, i.38, p.171 |
| Buyer's entire $1,125 Loan fee on McFall's $75,000 new 2nd TD Loan, was debited from seller Randy Johnson's account. | Undisputed per Order, doc 358, 354, i.39, p. 171 |
| Buyer's future $849 for insurance premium for the next year (10/10/01 to 10/10/02), was debited from seller Randy Johnson's account. | Undisputed per Order, doc 358, 354, i.40, p.171 |
| Buyer's future real estate taxes $3,563.41 for the period of time until Dec. 31, 2001 was debited from seller Randy Johnson's account. | Undisputed per Order, doc 358, 354, i.41, p.171 |
| The Viro Road property buyer Michael McFall never occupied the Viro Road property at any time. | JJ Depo, 80:25 to 81:2; 98:21 to 99:3 |
| All Purchase paper work showed buyer McFall was to be the occupant of Viro property, and the Grant Deed and final paper work was mailed to Viro Road. | <u>Exhibit 29</u> (T52, pp. 389-395) |
| The buyer McFall never paid any of the new $875,000 Viro 1st TD mortgage payments, but the Debtor Jay Johnson paid all of these mortgage payments. | JJ Depo 63:15 to 64:2 and **Chart 50** |
| The buyer McFall never paid any of the new $75,000 Viro 2nd TD mortgage payments, but the Debtor Jay Johnson paid all of these mortgage payments. | JJ Depo 63:15 to 64:2 and **Chart 51** |
| The Viro Road property fire Insurance bill was sent to the Debtor Jay Johnson at the Viro Road address and paid for by the Debtor. | Exhibits 74 and 75 (T52, p. 293, 394) |
| The debtor Jay Johnson testified that he paid for the Viro real property insurance premiums when the property was titled in McFall's name. | JJ Depo, 51:21 to 52:1 55:1 to 56:1; 56:13-14 |
| Seller Randy Johnson's account was debited for all of the Buyer's expenses including expenses that covered the entire next year after the close of escrow. | Undisputed per Order, doc 358, 354, i.42, p.186 |
| All of the Buyer McFall's purchase expenses were all taken out of the Viro Road property's equity. | Undisputed per Order, doc 358, 354, i.42, p.172 |
| McFall requested that all of the Viro Rd. property information and tax bills be sent to the debtor Jay Johnson's address at 4600 Viro Road, La Canada, CA 91011. | <u>Exhibit 77</u> (T22, p. 130) |
| The Debtor testified that he thought he paid the Viro Road real property Insurance premiums when the property was in the name of Michael McFall. | JJ Depo, 55:23 56:1, and 56:2-14 |

000451

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 53
### La Forest Drive Property Summary When Titled in Name of Randy Johnson and JJ&A

| Facts About La Forest When Titled in Name of Randy Johnson and JJ&A | Reference |
|---|---|
| On 6/8/2000 a $500,000 2nd TD Loan from McFall's company placed on Viro. property and initial draw of $348,207 deposited to Q Financial Bank Account | Exb. 17,68,69,70 (T68), and Exb. 65 (T128, p. 1673) |
| On 8/31/2000 La Forest Drive purchased with 2 purchaser deposits of $25,000 and $212,339.02. | Exhibit 66 and Exhibit 67 (T66) |
| $25,000 deposit paid by ck #1191 on 6-12-2000 from the Q Fin. bank account. The $212,339.02 deposit transferred from Q Fin. bank acct. from the Viro Road property Refinance proceeds. | Ex.17,68,69,70(T68), 27A, 46 (T64), 37, 65 (T67), and JJ Depo, 159:16-19 |
| Randy Johnson was asked where the 2 La Forest down payments of $25,000 and $212,339.02 came from, and Randy Johnson refused to answer this question. | 2003 RJ Depo. 76:1-10 |
| Debtor Jay Johnson testified that he could have paid the $25,000 down payment on the La Forest Drive property. | JJ Depo. 162:12-21 |
| At his deposition, Debtor Jay Johnson referred to the La Forest Dr. property as: "… the property we were purchasing.". | JJ Depo. 156:7-25 |
| Randy Johnson refused to answer the Trustee's question if he ever purchased the La Forest Dr. property, and if he paid the down payment for the La Forest Drive property purchase. | 2003 RJ Depo:61:20-23; 62:5-8; 67:11-14; 76:1-10; & 2004 Depo:35:14-25; 36:1-3 |
| JJ&A paid for the La Forest Drive Mortgage payments both Before and After the La Forest Drive property was transferred to JJ&A on 11-14-2001. | Chart 54 |
| JJ&A paid for the La Forest Drive development expenses Before the La Forest Drive property was transferred to JJ&A on 11-14-2001. | Chart 55 |
| On 11/14/2001, Randal A. Johnson transferred the La Forest Drive property to JJ&A for zero (0) consideration. | Exhibit 46 (T72) |
| JJ&A was shown as an Asset Owned on the Debtor Jay Johnson's 100%-Owned AIA's Balance Sheet. | Exhibit 91 (T242, page 2673) |
| Defendants' Expert, Mr. Turner, used all of the money deposited to the JJ&A bank account, including the proceeds from La Forest sale, to value the Debtor's AIA. | Exb. 222, Turner Report, doc 411, p. 20¶3; and p. 23¶1. |
| Q Financial's address shown on its Tax Returns and Forms was the same as the Debtors' Jay & Debra Johnson's address at 4600 Viro Rd., La Canada, CA. | Ex.82(T232), Ex.83(T233), Ex155(T234), Ex.194(T235) |
| Q Financial also Made payments for the Debtor Jay Johnson's personal debts (Paid From Viro 2nd TD Refinance Proceeds) | Chart 56 |
| Q Financial also Paid for some of the Debtor's Viro Rd. Mortgage Payments (Paid From Viro 2nd TD Refinance Proceeds) | Chart 57 |
| Debtor testified that the proceeds from the Viro Road property Refinance would be used to make the La Forest mortgage payments. | JJ Depo, 160:22 to 161:4 |
| Q Financial also paid for some of the La Forest Drive Mortgage Payments (Paid From Viro 2nd TD Refinance Proceeds) | Chart 58 |
| Q Financial also paid for some of the La Forest Drive Development Expenses (Paid From Viro 2nd TD Refinance Proceeds) | Chart 59 |
| On 11/21/2001, Randal A. Johnson transferred the La Forest Drive property to Daniel & Lynn O'Leary for a sales price of $775,000. Proceeds deposited to JJ&A. | Exb.87,88(T73),4B(T77,p.591) and Exb.223 (T256, p. 2859) |
| JJ&A made payments to Q Financial | Chart 60 |
| Debtor JJ testified there was no reason for JJ&A to pay Q Financial for anything | JJ Depo, 275:6-12. |
| Q Financial made payments to JJ&A | Chart 61 |

000452

## Chart 54
### JJ&A Paid for the La Forest Drive Mortgage Payments
(La Forest Property Transferred to JJ&A on 11-14-2001)
[Exhibit 4A (T90) for checks, and Exhibit 191 (T229) for JJ&A 2001 Financial Statements]

| Date | Check # | Amount | Payee / Memo | Reference |
|------|---------|--------|--------------|-----------|
| 7-12-01 | 2135 | $5,054 | IndyMac – "La Forest Loan" | Ex. 191 (T229, p. 2383) |
| 7-18-01 | wire | 5,054 | IndyMac Bank | Ex. 4A (T90, page 764) |
| 8-24-01 | 2165 | 5,329 | IndyMac – "La Forest Loan" | Ex. 191 (T229, p. 2384) |
| 9-20-01 | 2190 | 5,047 | IndyMac – "Mortgage" | Ex. 191 (T229, p. 2384) |
| 10-16-01 | 2235 | 5,047 | IndyMac – "Mortgage" | Ex. 191 (T229, p. 2385) |
| 11-19-01 | 2280 | 5,047 | IndyMac – "Mortgage" | Ex. 191 (T229, p. 2386) |
| | | $30,578 | | |

## Chart 55
### JJ&A Paid for the La Forest Drive Development Expenses[*1]
(La Forest Property Transferred to JJ&A on 11-14-2001)
[Exhibit 4A (T89) for checks, and Exhibit 191 (T229) for JJ&A Financial Statements]

| Date | Ck # | Amt. | Payee / Memo | Reference |
|------|------|------|--------------|-----------|
| 6-7-2000 | 1432 | $1,000 | Rolf Jensen & Assoc., Inc. | Ex. 4A (T89, page 761) |
| 3-21-01 | 1945 | 150 | Miller Geoscience (invoice 2320) | Ex. 4A (T89, page 761) |
| 3-23-01 | 1953 | 750 | Miller Geosciences – "5485 La Forest" | Ex. 4A (T89, page 761) |
| | | $1,900 | | |

[*1] Debtor Jay Johnson testified that he thought that La Forest property Development expenses were paid by JJ&A (JJ Depo, 264:3-6).

TRIAL DECLARATION OF RICHARD BARDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 56
### Q Financial Paid Debtor's Creditor in the Year 2000 (Paid From Viro Refi Proceeds)
[Exhibit 65 (T61), Exb. 3B (T61), Exb. 3A (T63), Exb. 27A (T69)]

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 6-8-2000 | wire | $10,000 | From Q to Debtor's Personal Bk.Acct. | Exhibit 65 (T61, pg. 445) |
| 6-9-2000 | wire | 10,000 | Transfer from Q Received by Debtor | Exhibit 3B (T62, pg. 447) |
| 6-8-2000 | 2258 | 10,000 | Richard Lapides | Exb. 3A (T63, pp. 450-452) |
| 6-28-2000 | 1207 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 482) |
| 7-22-2000 | 1225 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 483) |
| 9-1-2000 | 1258 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 484) |
| 9-29-2000 | 1301 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 485) |
| 10-27-2000 | 1310 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 486) |
| 12-1-2000 | 1311 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 487) |
| 12-27-2000 | 1339 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 488) |
| 2-1-2001 | 1334 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 489) |
| 3-9-2001 | 1382 | 2,500 | Richard Lapides | Exhibit 27A (T69, pg. 490) |
| | | $32,500 | | |

### Chart 57
### Q Financial Payments for Some of Viro 1st and 2nd TD Mortgage Payments
### Real Estate Taxes and Development Expenses (Paid From Viro Refi Proceeds)
[Exhibit 27A, 27B (T127)]

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 7-12-2000 | 1211 | $4,428 | Viro Rd. 2nd TD mortgage payment | Ex. 27A,27B (T127,p.1640) |
| 8-4-2000 | 1227 | 4,428 | Viro Rd. 2nd TD mortgage payment | Ex. 27A,27B (T127,p.1642) |
| 9-1-2000 | 1250 | 4,428 | Viro Rd. 2nd TD mortgage payment | Ex. 27A,27B (T127,p.1644) |
| 9-25-2000 | 1293 | 4,428 | Viro Rd. 2nd TD mortgage payment | Ex. 27A,27B (T127,p.1644) |
| 10-25-2000 | 1296 | 825 | Christopher Cox, Viro Landscaping | Ex. 27A, 27B (T127,p.1646) |
| 10-10-2000 | 1304 | 1,000 | Christopher Cox, Viro Landscaping | Ex. 27A, 27B (T127,p.1646) |
| 10-27-2000 | 1305 | 3,511 | Viro Road Real Estate Tax Payment | Ex. 27A, 27B (T127,p.1646) |
| 11-10-2000 | 1309 | 4,428 | Viro Rd. 2nd TD mortgage payment | Exhibit 27B (T127, pg.1648) |
| 12-20-2000 | 1325 | 4,428 | Viro Rd. 2nd TD mortgage payment | Exhibit 27B (T127, pg.1650) |
| 11-6-2000 | wire | 3,195 | Viro Rd. 1st TD Mortgage Payment | Exhibit 27B (T127, pg.1648) |
| 12-29-2000 | 1337 | 4,428 | Viro Rd. 2nd TD mortgage payment | Exhibit 27B (T127, pg.1650) |
| 2-14-01 | 1371 | 4,428 | Viro Rd. 2nd TD mortgage payment | Exhibit 27B (T127, pg.1655) |
| | | $43,955 | | |

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

### Chart 58
### Q Financial Paid for Some of the La Forest Drive Mortgage Payments[*1]
(Paid From Viro Refinance Proceeds)
(La Forest Property Transferred to JJ&A on 11-14-2001)

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 10-24-2000 | 1288 | $5,054 | La Forest Dr. 1st TD Payment | Exb. 27A, 27B (T127,p.1646) |
| 11-16-2000 | 1318 | 5,047 | La Forest Dr. 1st TD Payment | Exb. 27A, 27B (T127,p.1648) |
| 1-12-2001 | 1341 | 10,101 | IndyMac for 12-00 and 1-01 LF pmts. | Exhibit 27B (T127, page 1652) |
| 2-9-2001 | 1369 | 5,047 | IndyMac, for LF mortgage payment | Exhibit 27B (T127, page 1655) |
| 3-15-2001 | wire | 5,047 | IndyMac, for LF mortgage payment | Exhibit 27B (T127, page 1657) |
| 4-16-2001 | wire | 5,047 | IndyMac, for LF mortgage payment | Exhibit 27B (T127, page 1660) |
|  |  | $35,343 |  |  |

[*1] Debtor Jay Johnson testified that the La Forest Drive property mortgage payments were going to be made using funds from the Viro Road property refinance proceeds (JJ Depo, 160:22 to 161:4). These La Forest Drive Mortgage Payments from the Q Financial bank account were made after the $348,207 Viro Road Refinance proceeds were deposited into the Q Financial bank account on 6-8-2000.

### Chart 59
### Q Financial Paid for Some of the La Forest Drive Development Expenses[*1]
(Paid From Viro Refinance Proceeds Deposited into the Q Bank account on 6-8-2000*)
(La Forest Property Transferred to JJ&A on 11-14-2001)

| Date | Ck # | Amount | Payee / Memo | Reference |
|------|------|--------|--------------|-----------|
| 1-22-2001 | 1350 | $810 | Christopher Cox for LF Landscaping | Exhibit 27B (T127,p.1653) |
| 1-22-2001 | 1351 | 2,200 | CalCivic for LF Develop. Expense | Exhibit 27B (T127,p.1655) |
|  |  | $3,010 |  |  |

[*1] These La Forest Drive property Development expenses were made after the $348,207 Viro Road Refinance proceeds were deposited into the Q Financial bank account on 6-8-2000.

## Chart 60
## JJ&A Payments Made to Q Financial[1]

| Date | Amount | Check # | Reference |
|---|---|---|---|
| 4-6-00 | $3,000 | 1318 | Exhibit 190 (T228, p. 2348) |
| 5-23-00 | 5,000 | 1413 | Exhibit 4A (T85, page 750) |
| 6-2-00 | 4,750 | 1428 | Exhibit 4A (T85, page 750) |
| 6-19-00 | 5,000 | 1471 | Exhibit 4A (T85, page 750) |
| 6-29-00 | 5,000 | 1474 | Exhibit 4A (T85, page 751) |
| 8-16-00 | 10,000 | 1559 | Exhibit 4A (T85, page 751) |
| 9-20-00 | 10,000 | 1616 | Exhibit 4A (T85, page 751) |
| 11-3-00 | 15,000 | 1702 | Exhibit 190 (T228, p. 2354) |
| 1-17-01 | 30,000 | 1829 | Exhibit 4A (T85, page 752) |
| Total | **$87,750** | | |

[1] Debtor Jay Johnson testified there was No Reason for JJ&A to pay Q Financial for anything (JJ Depo,275:6-12). Nevertheless, JJ&A issued $87,750 in payments to Q Financial and JJ&A deducted these payments on its Federal Income Tax Returns as a valid JJ&A business expenses.

## Chart 61
## Q Financial Payments Made to JJ&A

| Date | Ck # | Amount | Memo | Reference |
|---|---|---|---|---|
| 11-30-2000 | 1322 | **$5,000** | Q Financial to JJ&A | Exb. 27A (T130, pp. 1702-1703) |

127

000456

## Chart 62
## Summary of Debtor's Undisclosed Real Estate Transactions

| Property Location | Property Bought | | Property Sold | | Reference |
|---|---|---|---|---|---|
| | Date | Price | Date | Price | |
| 4600 Viro Rd., La Canada - SFR | 12-15-95 | $325,000 | 7-25-03 | $1,495,000 | 209 (T245), 99-100 (T110),101-102 (T111) |
| 5485 La Forest, La Canada - Lot | 8-31-2000 | 720,000 | 11-21-01 | 775,000 | Ex. 66-67 (T66), and Ex. 87-88 (T73) |
| 5282 Gould Ave., La Canada - Lot | 5-2-03 | 400,000 | 8-19-08 | 950,000 | Exb. 130-132 (T116), and LA doc.1490570 |
| San Juan/Carmel, La Canada-Lots[*1] | 12-27-01 | 1,070,000 | Sold in 3 separate sales 975k, 1200k, and 1695k | | Ex. 103,108,134-146, 152-153 (T117) |
| 4810 Carmel Rd., La Canada-SFR | Bought 3 lots together for $1,070,000 | | 3-24-04 | 975,000 | Ex. 103,108,134-146, 152-153 (T117) |
| 313 San Jun, La Canada - SFR | Bought 3 lots together for $1,070,000 | | 3-16-04 | 1,200,000 | Ex. 103,108,134-146, 152-153 (T117), and LA doc.04-0620300 |
| 317 San Juan, La Canada - SFR | 12-9-04 | 1,400,000 $420k down | 5-14-09 | 1,695,000 | Ex. 104-109 (T112), and LA doc.715456 |
| 12 SFR Lots, Fallbrook, CA[*2] | 7-22-04 | 3,252,000 (all cash dn) | Sold in 3 separate sales 475k, 475k, and 3573.5k | | Exb. 3A,3B,118-132 (T115) |
| Parcel 67, Fallbrook, CA - Lot | Bought 12 Lots Together for $3,252,000 all cash | | 8-27-04 | 475,000 | Exb. 3A,3B,118-132 (T115) |
| Parcel 71, Fallbrook, CA - Lot | Bought 12 Lots Together for $3,252,000 all cash | | 8-27-04 | 475,000 | Exb. 3A,3B,118-132 (T115) |
| 10 Remain. Fallbrook Lots Sold | Part of 12 Lots Bought Bought: $271,000 per lot, Sold 357k & 475k per lot | | 8-8-12 | 3,573,500 | LA Co. Rec. doc.467298 |
| 1127 Atlee Dr., La Canada - SFR | 8-26-09 | $661,000 | property still owned by Jay & Debra Johnson | | LA County recorded doc. #1310620 |

[*1] The three (3) San Juan and Carmel residences were titled in the name of L.G. Development, LLC (a California Limited Liability Company). Nevertheless, Debtor Jay Johnson testified that he had a **30% ownership interest** in the two houses that were being developed (i.e.: 313 San Juan Way, La Canada, CA and 4810 Carmel Road, La Canada, CA 91011) with Larry Gillins (JJ Depo, 246:23 to 247:18), and that he had an Option to purchase the 317 San Juan Way, La Canada, CA house for $1,400,000 that he was living in "rent free" (JJ Depo, 252:6-9, and 254:5-13). Debtor Jay Johnson was directly involved in the sales and signing of the seller's paperwork for these properties as documented in Exhibits 103, 108, 134 to 146, 152, and Exhibit 153 (T117).

[*2] The twelve (12) properties were titled in the name of 8000 M, LLC (a California Limited Liability Company). Nevertheless debtor Jay Johnson issued the original $20,000 deposit check from one of his personal bank accounts at Citizens Business Bank and personally signed all of the original acquisition papers, contracts, and documents as verified in Exhibits 3A, 3B, 118 to 132 (T115). In addition, both of the two sale Grant Deeds showed the seller as 8000 M LLC with the debtor Jay Johnson's name typed in, but the debtor's name was lined out, the name Steven Nelson hand-written in, and documents were signed by Steven Nelson.

000457

TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEE'S DESIGNATED EXPERT

| In re:<br>JAY W. JOHNSON and DEBRA F.JOHNSON, Debtor(s). | CHAPTER 7<br>CASE NUMBER: ADV. NO. 8:06-ap-01313 ES<br>(Consolidated with Adv. No. 8:06-ap-1311 ES) |
| --- | --- |

NOTE: When using this form to indicate service of a proposed order, DO NOT list any person or entity in Category I.
Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
21515 Hawthorne Boulevard, Suite 1150, Torrance, CA 90503.

A true and correct copy of the foregoing document described as:  TRIAL DECLARATION OF RICHARD LAPIDES, TRUSTEES
DESIGNATED EXPERT will be served or was served (a) on the judge in chambers in the form and manner required by LBR
5005-2(d); and (b) in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local
Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On January 23, 2014, I
checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic
Mail Notice List to receive NEF transmission at the email address(es) indicated below:

J Scott Bovitz    bovitz@bovitz-spitzer.com
Rosendo Gonzalez (TR)    rgonzalez@ecf.epiqsystems.com, dgomez@gonzalezplc.com
James Andrew Hinds    jhinds@jhindslaw.com, zbilowit@jhindslaw.com
Cristina F Keith    ckeith@jhindslaw.com
Weneta    M    Kosmala    (TR)                                   Weneta.Kosmala@7trustee.net,
ca15@ecfcbis.com;wkosmala@kosmalalaw.com;dfitzger@kosmalalaw.com;kgeorge@kosmalalaw.com
Hanna    B    Raanan                                   hraanan@marlinsaltzman.com,
jhawkes@marlinsaltzman.com;smcgrath@marlinsaltzman.com;irvinefileclerk@marlinsaltzman.com
David M Reeder    david@reederlaw.com, jessica@reederlaw.com
Paul R Shankman    pshankman@jhindslaw.com
United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):**
On January 23, 2014, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary
proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an
overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later
than 24 hours after the document is filed.

**The Hon. Erithe Smith (Via Federal Express)**
United States Bankruptcy Judge
411 West Fourth St., Room 5041
Santa Ana, CA 92701-4593

☐   Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):**
Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on January 23, 2014, I served the following person(s) and/or entity(ies) by personal
delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge
here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*                                                                      **F 9013-3.1**

| In re:<br>JAY W. JOHNSON and DEBRA F.JOHNSON, Debtor(s). | CHAPTER 7<br>CASE NUMBER:  ADV. NO. 8:06-ap-01313 ES<br>(Consolidated with Adv. No. 8:06-ap-1311 ES) |
|---|---|

**Richard and Janis Lapides (Via E-Mail)**
5107 Castle Rd
La Canada, CA 91011

**Burton V. McCullough, Esq.  (Via E-Mail)**
Law Offices of Burton V. McCullough
4205 Encinas Drive
La Canada Flintridge, California 91011-3108

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| January 23, 2014 | Michelle Patino-Patroni | /s/ Michelle Patino-Patroni |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*

**F 9013-3.1**

```
 1                UNITED STATES BANKRUPTCY COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3                          --oOo--

 4   In Re:                    ) Case No. 8:06-bk-10373-ES
                               )
 5   JAY JOHNSON,              ) Chapter 7
                               )
 6         Debtor.            ) Santa Ana, California
                              ) Thursday, October 23, 2014
 7   _____ ) 9:00 a.m.
                               )
     GONZALEZ, ET AL.,         )
 8                             ) Adv. No. 8:06-ap-01313-ES
           Plaintiffs,         )
 9                             )
                               )
10      vs.                    )
                               )
     Jj & A ARCHITECTS, INC.,  )
11   ET AL.,                   )
                               )
12         Defendants.         )
                               )
13   _____ )

14                             CONT'D TRIAL RE: COMPLAINT TO
                               AVOID AND RECOVER FRAUDULENT
15                             TRANSFERS PURSUANT TO 11
                               U.S.C. 544 AND 550, and
16                             CALIFORNIA CIVIL CODE 3439.04,
                               3439.05 AND 3439.07 FOR
17                             CONSTRUCTIVE TRUSTS; AND
                               INJUNCTIVE RELIEF

18        TRANSCRIPT OF EXCERPTED PORTION OF PROCEEDINGS
               BEFORE THE HONORABLE ERITHE SMITH
19             UNITED STATES BANKRUPTCY JUDGE

20   APPEARANCES:

21   For the Plaintiffs:      JAMES A. HINDS, ESQ.
                              Hinds & Shankman, LLP
22                            21257 Hawthorne Boulevard
                              Second Floor
23                            Torrance, California 90503
                              (310) 316-0500
24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

11

1  architectural projects.  He participates with people in real

2  estate transactions and he receives a significant amount of

3  money from this activity in addition to his architectural

4  fees.

5  Q    So, in your analysis, you took both the architectural

6  income that he received, and income from these other real

7  estate related sources, correct?

8  A    That's correct.

9  Q    So, if you combine the architectural fees, the deals

10 he's in and the participations in projects, is it possible

11 for Mr. Johnson to have earned $2,000,000?

12 A    Absolutely.

13 Q    Now, Mr. McCullough asked you if there was some

14 subjectivity in how you employed the bank deposit method and

15 the checks method, and I believe you said, yes, there is.

16 A    Yes.

17 Q    Now, if I understand it, there's more subjectivity at

18 the beginning when you do the checks method, is that

19 correct?

20 A    That's correct.

21 Q    Unless subjectivity as you apply the bank deposit

22 method?

23 A    That's correct.

24 Q    And did you employ those two methodologies in

25 accordance with your training?

*Briggs Reporting Company, Inc.*

12

1  A    I did.

2        MR. HINDS:  Your Honor, I don't think I have any

3  more questions for this witness.

4        THE COURT:  All right.  Any re-recross?

5                  RECROSS EXAMINATION

6  BY MR. MCCULLOUGH:

7  Q    Now, Mr. Lapides, this morning I asked you if you had

8  found your temple recommend.  You said, no.  You said you

9  didn't look for it.  You said the last time you got it was

10 with a wedding.  You said that was the Hick's wedding, which

11 was several years ago.  And then all of the sudden you come

12 up with your temple recommend.  Was there a reason why you

13 didn't tell us the truth to begin with?

14 A    I told you the truth to begin with.

15 Q    And five minutes later you come up and say, I just

16 found it?

17 A    I sometimes keep my temple recommend in the right-hand

18 side of my top dresser drawer.  Sometimes I keep it in my

19 wallet when I'm thinking of going soon.  I didn't know it

20 was in my wallet, but I looked and it was in my wallet this

21 time and it was not in my home dresser drawer.  I did not

22 look for it last night.  I stayed up late doing the research

23 you asked me to do.

24 Q    Uh-huh.  But you couldn't -- you said the last time you

25 got it was when you went to the Hick's wedding, and yet now,

**Briggs Reporting Company, Inc.**

13

1   it's just a couple of months --

2   A     No, no.  That was the one I recall.  I also got a

3   recent one a couple of months ago.

4   Q     Yeah.  And you didn't remember that when I asked you

5   the question?

6   A     I didn't remember it.  I don't remember everything.

7             MR. MCCULLOUGH:  No further questions.

8             Can we excuse Mr. Lapides from the stand then,

9   your Honor, unless the Court has some questions.

10            THE COURT:  No.

11        (Clapping.)

12            THE COURT:  I think that's the first time that's

13  ever happened in the middle of a trial.

14            MR. HINDS:  From all sides.

15            MR. MCCULLOUGH:  Do we need the lights on?

16            MR. HINDS:  Lights up.

17            THE COURT:  Well, Mr. Lapides, thank you for your

18  testimony, and you're leaving in a hail of applause.

19            THE WITNESS:  Thank you, your Honor.

20            MR. HINDS:  While he is cleaning up the area, our

21  next witness would be Jay Johnson called as an adverse

22  witness, your Honor.

23            MR. MCCULLOUGH:  Your Honor, would it be possible

24  to take about a 10-minute break?  I know it's a little

25  strange, but --

*Briggs Reporting Company, Inc.*

14

1      THE COURT:  All right.

2      MR. MCCULLOUGH:  Thank you.

3      MR. HINDS:  Great.  Thank you.

4      THE COURT:  Okay.

5      Rick, let me know when you're ready.

6   (Proceedings recessed briefly.)

7      THE CLERK:  Please remain seated and come to

8  order.  This United States Bankruptcy Court is again in

9  session.  The Honorable Erithe Smith, Bankruptcy Judge,

10 presiding.

11      THE COURT:  It seems a little strange to not say,

12 Mr. Lapides, you are still under oath.

13      MR. HINDS:  Well, let's try another witness.

14 Let's try Jay Johnson, your Honor.

15      THE COURT:  All right.  Mr. Johnson.

16      As he's approaching the witness stand, is there an

17 agreement between the parties regarding the scope of the

18 examination?

19      MR. MCCULLOUGH:  Wide open.

20      THE COURT:  I'm sorry?

21      MR. MCCULLOUGH:  Wide open.

22      THE COURT:  Wide -- okay.  Great.

23      MR. HINDS:  Wide open.

24      THE CLERK:  Please raise your right hand to be

25 sworn.

15

1                       JAY JOHNSON - DEBTOR - SWORN

2            THE CLERK:  Please be seated and state your name

3    and spell your last name for the record.  I think you can

4    probably say it fast.

5            THE WITNESS:  Jay Johnson.

6            THE CLERK:  Thank you.

7            MR. HINDS:  Can we turn the lights down and up

8    Exhibit Number 1, please.

9            THE WITNESS:  Good morning, your Honor.

10           THE COURT:  Good morning.

11                       CROSS EXAMINATION

12   BY MR. HINDS:

13   Q    Good morning, Mr. Johnson.  I hope you brought you

14   glasses.

15   A    I have to see if I can use mine or I have to use my

16   wife's.

17   Q    Okay.  We're going to start with Exhibit Number 1.

18           MR. HINDS:  And if we could just highlight the top

19   of the page, please.

20   BY MR. HINDS:

21   Q    Do you recognize this as the voluntary petition that

22   you and your wife filed in this case before the United

23   States Bankruptcy Court?

24   A    Yes.

25   Q    All right.  We're going to flip into this a couple of

16

1  pages and I'm going to just ask you a couple questions about

2  just individual pages.

3       MR. HINDS:  If we could go to Exhibit 1, page 22,

4  and blow up just the top half.

5  BY MR. HINDS:

6  Q   Now, this is the declaration concerning Debtors'

7  schedules.  Do you recognize your signature and your wife's

8  signature?

9  A   Yes.

10 Q   And did you in fact sign the declaration under penalty

11 of perjury by individual debtor on or about April 20, 2001?

12 A   Yes.

13 Q   Now, you understood that, as it says, you're declaring

14 under penalty of perjury that you've read the foregoing

15 summary and schedules consisting of 15 pages, and that they

16 are true and correct to the best of your knowledge,

17 information and belief.  You see that?

18 A   Yes.

19 Q   And you understood that you were required, just as you

20 are today, and the Court just gave you the oath, to tell the

21 truth to the best of your knowledge and information and

22 belief, correct?

23 A   Yes.

24 Q   You took that oath here on this page seriously and

25 tried very hard to make sure that the information in the

17

1  Debtors' schedules was completely accurate, right?

2  A    To the best of my ability.

3  Q    Well, that would include looking at all available

4  sources of information to show your assets, liabilities,

5  income and expenses as they existed for you as of April 20,

6  2001, right?

7  A    That's not what happened.

8  Q    You didn't look at all available sources of

9  information?

10 A    No.

11 Q    All right.  Let's just jump ahead then to page -- this

12 is in the same Exhibit, 001, page 27.  And, again, just the

13 top of the page.  Do you recognize your signatures on the

14 declaration under penalty of perjury by individual debtor,

15 which is on page 27 of this Exhibit?

16 A    Yes.

17 Q    And, again, this says you're answering the questions in

18 the statement of financial affairs under penalty of perjury

19 to the best of your knowledge, information and belief.  Do

20 you see that?

21 A    Yes.

22 Q    And in order to do that, you and your wife collected

23 together all the available sources of information prior to

24 April 1 in order to answer the questions in the schedules,

25 correct?

18

1   A     No.

2   Q     All right.  If you turn two more pages into the

3   Exhibit, to Exhibit 1, page 29.  Let's do the bottom of the

4   page.  Do you recognize the signatures here?

5   A     Yes.

6   Q     And that is you and your wife, Debbie, right?

7   A     Yes.

8           MR. HINDS:  Could we go to the top of the page,

9   please?

10  BY MR. HINDS:

11  Q     Now, here, you were making an amendment to the schedule

12  E (sic.) that had originally been filed, is that accurate?

13  A     Yes.

14  Q     All right.  Let's turn to the next page and see what

15  exhibit E (sic.) now shows.  Yes.  It looks like you added

16  or amended creditor number one, the Hamiltons (phonetic), to

17  say you owed them $930,000, is that correct?

18  A     That's what it shows.

19  Q     Well, did you in fact, as of April -- July 24, 2001,

20  owe Dennis and Michelle Hamilton $930,000?

21  A     I believe so.

22  Q     What documents did you look at in order to do this July

23  24, 2001 amendment to your schedules?

24  A     I don't remember.

25  Q     Has the debt to the Hamiltons been paid since July 24,

*Briggs Reporting Company, Inc.*

19

1  2001?

2  A     No.

3  Q     Okay.  If you'll turn one more page in to Exhibit 1,

4  page 31.  And again, we'll just do the bottom.  Is that your

5  signature and your wife's signature?

6  A     Yes.

7  Q     All right.  Go to the top of this document.  And it

8  appears that you were, again, now amended schedule E (sic.)

9  a second time, is that correct?

10  A     It appears to be, yes.

11  Q     All right.  Let's turn to the next page, which is the

12  amended schedule F.  And that is correct.  You added the

13  Bank of Newport, custodian.

14          THE COURT:  I'm sorry.  Mr. Hinds, I don't mean to

15  interrupt you.  You asked before about the amendments, and

16  you're asking specifically about amendment to schedule E?

17          MR. HINDS:  I believe it was F.  I'm sorry if I

18  misspoke.  The first one was to schedule F.  That's page 30.

19          THE COURT:  Okay.  Never mind.  You said "E" --

20          MR. HINDS:  Yeah, I --

21          THE COURT:  -- but I think you meant F.

22          MR. HINDS:  I did, and I apologize if I

23  confused --

24          THE COURT:  I think for both of those you meant F?

25          MR. HINDS:  Yes.

1             UNITED STATES BANKRUPTCY COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3                 --oOo--

4 In Re:             ) Case No. 8:06-bk-10373-ES
                  )
5 JAY JOHNSON,        ) Chapter 7
                  )
6      Debtor.      ) Santa Ana, California
                  ) Tuesday, February 25, 2014
7 _____) 9:00 a.m.
GONZALEZ, ET AL.,     )
8                   ) Adv. No. 8:06-ap-01313-ES
     Plaintiffs,   )
9                   )
   vs.             )
10                   )
Jj & A ARCHITECTS, INC.,  )
11 ET AL.,             )
                  )
12      Defendants.   )
                  )
13 

14                       CONT'D TRIAL RE: COMPLAINT TO
                      AVOID AND RECOVER FRAUDULENT
15                       TRANSFERS PURSUANT TO 11
                      U.S.C. 544 AND 550, AND
16                       CALIFORNIA CIVIL CODE 3439.04,
                      3439.05 AND 3439.07; FOR
17                       CONSTRUCTIVE TRUSTS; AND
                      INJUNCTIVE RELIEF

18           TRANSCRIPT OF PROCEEDINGS
       BEFORE THE HONORABLE ERITHE SMITH
19         UNITED STATES BANKRUPTCY JUDGE

20 APPEARANCES:

21 For the Plaintiffs:      JAMES A. HINDS, ESQ.
                      Hinds & Shankman, LLP
22                       21257 Hawthorne Boulevard
                      Second Floor
23                       Torrance, California 90503
                      (310) 316-0500
24

25 Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

*Briggs Reporting Company, Inc.*

ii

1  APPEARANCES:  (cont'd.)

2  For the Plaintiffs:          CRISTINA F. KEITH, ESQ.
                                Fogle, Keller & Purdy
3                               300 East Main Street
                                Suite 400
4                               Lexington, Kentucky 40507

5  For the Defendants:          BURTON V. McCULLOUGH, ESQ.
                                4205 Encinas Drive
6                               La Canada, California 91011
                                (818) 952-5596
7

8  Court Recorder:              R. Reid
                                United States Bankruptcy Court
9                               411 West Fourth Street
                                Suite 2030
10                              Santa Ana, California 92701

11 Transcriber:                 Briggs Reporting Company, Inc.
                                4455 Morena Boulevard
12                              Suite 104
                                San Diego, California 92117
13                              (310) 410-4151

14

15

16

17

18

19

20

21

22

23

24

25

*Briggs Reporting Company, Inc.*

iii

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Rosendo Gonzalez | -- | 2 | 60 | -- |
| Richard Lapides | -- | 73 | -- | -- |

| EXHIBITS: | | IDENTIFIED | RECEIVED |
|---|---|---|---|
| Joint | | | |
| 1 | Document | 13 | -- |
| 9-A | Tax return | 63 | -- |
| 9-B | Tax return | 65 | -- |
| 10 | Document | 67 | -- |
| 11 | Document | 67 | -- |
| 118 | Vacant land purchase agreement | 77 | -- |
| 118.011 | First page of vacant land purchase agreement | 77 | -- |
| 119 | Land America Commonwealth receipt and check from Jay Johnson | 81 | -- |
| 120 | Counteroffer 1 | 81 | -- |
| 121 | Counteroffer 2 | 82 | -- |
| 122 | Document | 82 | -- |
| 123 | Document | 84 | -- |
| 124 | Third party deposit instructions | 85 | -- |
| 125 | Escrow Amendment/Supplement | 85 | -- |
| 126.001 | Escrow Amendment/Supplement | 85 | -- |
| 127 | Document | 86 | -- |

iv

| EXHIBITS: (cont'd) | IDENTIFIED | RECEIVED |
|---|---|---|
| Joint | | |
| 127.003 Document | 89 | -- |
| 127.004 Document | 89 | -- |
| 127.005 Document | 90 | -- |
| 128.001 Grant deed | 90 | -- |
| 128.002 Legal description | 91 | -- |
| 128.003 Legal description | 91 | -- |
| 128.004 Document | 92 | -- |
| 129   Grant deed | 92 | -- |

*Briggs Reporting Company, Inc.*

000474

1

1    SANTA ANA, CALIFORNIA  TUESDAY, FEBRUARY 25, 2014  9:00 AM

2                        --oOo--

3        (Call to order of the Court.)

4            THE COURT:  Continuing with the trial in Gonzalez

5    versus Johnson.

6            Appearances.

7            MR. HINDS:  Good morning, your Honor.  James

8    Hinds, Hinds and Shankman, representing the trustee Rosendo

9    Gonzalez, who is present in court.

10           MS. KEITH:  Good morning, your Honor.  Cristina

11   Keith with Fogle, Keller and Purdy representing Rosendo

12   Gonzalez, the trustee.

13           MR. McCULLOUGH:  Good morning, your Honor.  Burt

14   McCullough representing the defendants.

15           THE COURT:  Mr. Hinds?

16           MR. HINDS:  Your Honor, we had discussed yesterday

17   that Mr. Gonzalez would come this morning and be called out

18   of order.  We are prepared to proceed with Mr. Gonzalez, the

19   trustee.

20           THE COURT:  Very well.

21           Mr. Gonzalez, if you would take the stand.

22           THE CLERK:  Please raise your right hand and be

23   sworn.

24       ROSENDO GONZALEZ - PLAINTIFF'S WITNESS - SWORN

25           THE CLERK:  Please be seated and state your full

2

1 name for the record.

2         THE WITNESS:  Rosendo Gonzalez.

3         MR. HINDS:  And, your Honor, we would move the

4 admission of the trial declaration of Rosendo Gonzalez filed

5 in this matter.

6         THE COURT:  Okay.

7         Any cross-examination, Mr. McCullough?

8         MR. McCULLOUGH:  I do have one or two questions.

9         THE COURT:  Very well.

10         MR. McCULLOUGH:  Thank you, your Honor.

11                 CROSS EXAMINATION

12 BY MR. McCULLOUGH:

13 Q    Good morning, Mr. Gonzalez.

14 A    Good morning.

15 Q    As I read through your declaration, I noticed that in

16 deciding to bring the lawsuit against the defendants that

17 you relied on Richard Lapides and your counsel in making

18 that decision; is that correct?

19 A    That is correct.

20 Q    Just to further clarify that, if I might just refer to

21 a couple of paragraphs in your declaration.  First

22 paragraph --

23 A    Mr. McCullough, I don't have it in front of me.  I know

24 that I read it when I signed it.

25 Q    Oh.

3

```
 1  A    I don't know if you want to -- is it --
 2  Q    Well --
 3  A    -- have it in front of me for -- if you're going to
 4  point to certain paragraphs --
 5  Q    Sure.
 6  A    -- it might be a good idea or wise for --
 7        THE COURT:  Somebody have an extra copy of his
 8  declaration?
 9        MR. McCULLOUGH:  Have you got a copy?
10        UNIDENTIFIED MALE SPEAKER:  I do.
11        THE WITNESS:  Your Honor, I think I may have a
12  copy in my briefcase if it's quicker.
13        THE COURT:  Okay.  If you want to check.
14        THE WITNESS:  Can I go down now?
15        THE COURT:  Yes.
16        Oh.
17        MR. McCULLOUGH:  He's got one.
18        THE COURT:  Okay.  They've got a copy.  Thank you.
19        UNIDENTIFIED MALE SPEAKER:  I know the trustee
20  brought a copy with him.
21      (Pause.)
22        THE WITNESS:  It's not a conformed copy but I
23  think it's the same one that was filed.
24  BY MR. McCULLOUGH:
25  Q    I guess we'll find out, but I'm sure it is.
```

4

1     Well, you indicated that in deciding to bring this

2 lawsuit, you relied upon Mr. Lapides and your counsel and I

3 just wanted to make a couple -- point out a couple of places

4 in your declaration where you indicate that.  If you'd turn

5 to page seven, paragraph 15.

6     At the very beginning of it, you simply say:  "At the

7 request of my counsel, I agree" -- I think you mean to say

8 "I agreed" -- "to retain Mr. Lapides to act as a potential

9 expert witness in this case."

10     Then if we go to paragraph 18, at the very beginning

11 you simply say, "After examining with my counsel certain

12 documents provided by the debtors or Randy Johnson, based on

13 conversation with Mr. Lapides" and then you go on there.

14     And then if you turn to paragraph 19, the last

15 sentence, you say -- or second to the last sentence:  "As

16 trustee, I expected that my" --

17 A    Sir --

18 Q    Yes.

19 A    Oh, the one starting on line eight?

20 Q    Yes.

21 A    Okay.

22 Q    Well, sort of in between eight and nine.

23 A    Right, I see it.

24 Q    Okay.  It says:  "As trustee I expected that my counsel

25 engage in an exhaustive investigation into these

*Briggs Reporting Company, Inc.*

5

1   relationships."

2          And then if we go to paragraph 24, you say "The

3   evidence adduced by my counsel" and then you go on there.

4          And then lastly paragraph 25, you begin by saying "I

5   believe that the evidence adduced by my lawyers as part of

6   Gonzalez I," etc., and you go on.

7          So I think it's pretty clear and it would be fair to

8   say that you placed heavy reliance upon your attorney to do

9   his investigation, and on Mr. Lapides for the work that he

10  would do as an expert, in making your decision that there

11  was a sufficient basis for bringing the claims against the

12  defendants?

13  A    That's always the case when I'm the trustee.  I'm

14  always going to rely on whatever professionals are employed

15  to assist in my role as a trustee.

16         But at the beginning of the case, I initially make a

17  decision about a case or a debtor to determine whether

18  there's grounds for further action.

19         So to answer your question, it's yes but not complete.

20  Q    Okay.  I appreciate that.

21         Now, if in fact it turned out that your attorneys did

22  not make a complete or thorough investigation or Mr. Lapides

23  was not qualified to give an opinion on the matters at issue

24  in this case, and instead were just basing his opinions on

25  speculation and facts that weren't there, that I'm sure

6

1  would have had some impact on your decision to file the

2  case; is that correct?

3  A    That's always the case.  I -- before taking any steps

4  to file any lawsuit, I review my professionals'

5  recommendations and whatever evidence and compare it to what

6  I originally discover in the case to make a conclusion

7  whether to proceed or not.

8        I don't blindly just take somebody's opinion to file a

9  lawsuit or not to file a lawsuit.  Since I'm a trial lawyer

10  first, I know the issues involved in bankruptcy, so I bring

11  a certain amount of knowledge and experience before making a

12  decision.

13  Q    Yes, I'm sure you do.  And you answered my question by

14  saying yes, and then you went some distance after that.  And

15  that's okay, but if you could please just answer the

16  question, that would probably be a little helpful.

17        Now, at the beginning of your declaration, you discuss

18  a little bit about what the law is, how bankruptcy law is

19  for debtors who are honest or forthright, who give complete

20  and accurate information to you as the trustee.  And that's

21  all fine and good, but whether the debtors are honest is

22  really -- the ultimate question is for the Court to decide,

23  right?

24  A    No.

25  Q    Isn't that why we're here?

*Briggs Reporting Company, Inc.*

000480

7

1  A    Sometimes people have made misrepresentations of law or

2  fraudulent statements to me that through my investigation I

3  discovered not to be accurate.

4       Now, ultimately whether I'm right or wrong will be

5  determined by a judge.

6  Q    On that --

7  A    But I can initially make a determination whether

8  somebody's telling me the truth or not.

9  Q    Okay.  No, I understand.  I don't have any quarrel with

10 that.

11      But my question was, that in the end, regardless of

12 what your opinion was concerning the truthfulness or the

13 honesty or the accuracy of the information given to you,

14 that isn't going to result in, say, a discharge being

15 revoked; it has to go to a court for a court to determine,

16 right?

17 A    Correct.

18 Q    Okay.  I just wanted to make sure that we are straight

19 on that.

20      Now, as I read your report, it appeared to me that

21 until Mr. Lapides came along and spoke with you and said

22 things don't quite add up, you didn't have any reason to

23 question the debtors in this matter, did you?

24 A    That's not true, and I can't answer the question

25 because you said "report."  Are you talking about my

8

1   declaration?  Because you said "report."  I don't know what

2   you're referring to.

3   Q   Oh, I'm sorry.  In your declaration, it appeared to me

4   that you said that in June at the first meeting of the

5   creditors, I think it was, that's when you first met Mr.

6   Lapides.  And I think it was either then or shortly after

7   that that Mr. Lapides said to you something to the effect,

8   "Things don't add up" and then explained what he meant.

9       Up to that point in time, you didn't have any reason or

10  cause to think that the debtors were being dishonest in

11  their bankruptcy, did you?

12  A   I can't answer the question the way you phrased it.

13      At the initial meeting of creditors -- which I believe

14  was in May, not in June -- I asked for information.  And

15  based on the testimony they gave me, I had concerns about

16  the case.

17      I give every debtor the benefit of the doubt at the

18  beginning of my involvement.  I asked for information,

19  documentation.  If the debtors are not providing that fully

20  and truthfully and timely, then I start getting worried

21  about the truthfulness of what they're representing.

22  Q   Okay.

23  A   Which happened in this case.

24  Q   Well, you mention on page five of your declaration,

25  paragraph nine, in paragraph (c), that -- and here, you're

9

1  talking about the examination on May 8th and on June 12th

2  where you say you asked the debtors to produce certain

3  documents.

4       In paragraph (c), you said that as to the alleged

5  $450,000 transaction between the debtors and Randy Johnson,

6  you asked for copies of documentation regarding Jj & A

7  Associates, AIA, regarding all the transfers such as the

8  articles, bylaws, solutions (sic) for both entities,

9  corporate -- I guess corporate resolutions for both entities

10 related to the alleged transfer of $450,000.

11      Do you see where I read that?

12 A    Yes, sir.

13 Q    What $450,000 transaction between the debtors and Randy

14 Johnson did you have in mind?

15 A    Now, again, I don't have the transcript, but my

16 recollection was, I asked at the initial meeting of

17 creditors in May of 2001 with respect to transfers or

18 transactions between the debtors and third parties,

19 including Jj & A and Associates, Inc.

20      In my recollection, there was also on Schedule F a debt

21 of $450,000 purportedly owing by the debtors to that entity.

22 So I asked for information regarding that particular debt

23 and transactions between the debtor and that creditor.

24 Q    Well, if we go down to the bottom of this on line 25

25 and 26, you say what was missing was any documentation on

*Briggs Reporting Company, Inc.*

(Official Form 1) (6/97) West Group, Rochester, NY

| FORM B1 | United States Bankruptcy Court<br>*CENTRAL* District of *CALIFORNIA* | Voluntary Petition |
|---|---|---|

| Name of Debtor (If Individual, enter Last, First, Middle):<br>*Johnson, Jay W.* | Name of Joint Debtor (Spouse)(Last, First, Middle):<br>*Johnson, Debra F.* |
|---|---|
| All Other Names used by the Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>*NONE* | All Other Names used by the Joint Debtor in the last 6 years<br>(include married, maiden, and trade names):<br>*NONE* |
| Soc. Sec./Tax I.D. No. (If more than one, state all):<br>*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* | Soc. Sec./Tax I.D. No. (If more than one, state all):<br>*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* |
| Street Address of Debtor (No. & Street, City, State & Zip Code):<br>*4600 Viro Road*<br>*LaCanada -*<br>*Flintridge CA  91011* | Street Address of Joint Debtor (No. & Street, City, State & Zip Code):<br>*4600 Viro Road*<br>*LaCanada -*<br>*Flintridge CA  91011* |
| County of Residence or of the<br>Principal Place of Business: | County of Residence or of the<br>Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>*SAME* | Mailing Address of Joint Debtor (if different from street address):<br>*SAME* |
| Location of Principal Assets of Business Debtor<br>(If different from street address above): *NOT APPLICABLE* | |

### Information Regarding the Debtor (Check the Applicable Boxes)

Venue   (Check any applicable box)
- [X] Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.
- [ ] There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

| Type of Debtor   (Check all boxes that apply) | | Chapter or Section of Bankruptcy Code Under Which the Petition is Filed   (Check one box) | |
|---|---|---|---|
| [X] Individual(s) | [ ] Railroad | [X] Chapter 7 | [ ] Chapter 11 | [ ] Chapter 13 |
| [ ] Corporation | [ ] Stockbroker | [ ] Chapter 9 | [ ] Chapter 12 | |
| [ ] Partnership | [ ] Commodity Broker | [ ] Sec. 304 - Case ancillary to foreign proceeding | | |
| [ ] Other _____ | | | | |

| Nature of Debts   (Check one box) | | Filing Fee   (Check one box) |
|---|---|---|
| [X] Consumer/Non-Business | [ ] Business | [X] Full Filing Fee attached |

**Chapter 11 Small Business**   (Check all boxes that apply)
- [ ] Debtor is a small business as defined in 11 U.S.C. § 101
- [ ] Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e) (Optional)

- [ ] Filing Fee to be paid in installments (Applicable to individuals only) Must attach signed application for the court's consideration certifying that the debtor is unable to pay fee except in installments. Rule 1006(b). See Official Form No. 3.

Statistical/Administrative Information   (Estimates only)
- [ ] Debtor estimates that funds will be available for distribution to unsecured creditors.
- [X] Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for distribution to unsecured creditors.

| Estimated Number of Creditors | 1-15 | 16-49 | 50-99 | 100-199 | 200-999 | 1000-over |
|---|---|---|---|---|---|---|
| | [X] | [ ] | [ ] | [ ] | [ ] | [ ] |

| Estimated Assets | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | [X] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] |

| Estimated Debts | $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001 to<br>$1 million | $1,000,001 to<br>$10 million | $10,000,001 to<br>$50 million | $50,000,001 to<br>$100 million | More than<br>$100 million |
|---|---|---|---|---|---|---|---|---|
| | [ ] | [ ] | [ ] | [X] | [ ] | [ ] | [ ] | [ ] |

04/05/2001   **FILED**  10:25
**LA01-20244ES**
DEBTOR:
  JOHNSON, JAY W
JUDGE: HON. E. Smith - 553
TRUSTEE: BT62  CH: 07  (INCOMPLETE)
341A MTG: 05/08/2001 01:30  F01
ADR: 221 N. Figueroa St., #101  L.A.

CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIF. ID: 786
RECEIPT NO: LA-013396  $ 200.00

Gonzalez v. Johnson
SA 06-01313
**EXHIBIT**
001.001

000484

(Official Form 1) (9/97) West Group, Rochester, NY

| Voluntary Petition | Name of Debtor(s): | FORM B1, Page 2 |
| --- | --- | --- |
| (This page must be completed and filed in every case) | Jay W. Johnson and Debra F. Johnson | |

**Prior Bankruptcy Case Filed Within Last 6 Years (If more than one, attach additional sheet)**

| Location Where Filed: | Case Number: | Date Filed: |
| --- | --- | --- |
| NONE | | |

**Pending Bankruptcy Case Filed by any Spouse, Partner or Affiliate of this Debtor (If more than one, attach additional sheet)**

| Name of Debtor: | Case Number: | Date Filed: |
| --- | --- | --- |
| NONE | | |
| District: | Relationship: | Judge: |

**Signatures**

### Signature(s) of Debtor(s) (Individual/Joint)

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X /s/ Jay W. Johnson
Signature of Debtor

X /s/ Debra F. Johnson
Signature of Joint Debtor

Telephone Number (if not represented by attorney)

April 4, 2001
Date

### Signature of Attorney

X /s/ David M. Reeder
Signature of Attorney for Debtor(s)

David M. Reeder 133150
Printed Name of Attorney for Debtor(s)

Law Offices of David M. Reeder
Firm Name

1900 Avenue of the Stars
Address

Suite 1700

Los Angeles CA 90067

310.557.8911      April 4, 2001
Telephone Number      Date

### Exhibit A

(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11)

☐ Exhibit A is attached and made a part of this petition.

### Exhibit B

(To be competed if debtor is an individual whose debts are primarily consumer debts)
I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter.

X /s/ David M. Reeder
Signature of Attorney for Debtor(s)

April 4, 2001
Date

### Signature of Debtor (Corporation/Partnership)

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
Signature of Authorized Individual

_____
Printed Name of Authorized Individual

_____
Title of Authorized Individual

_____
Date

### Signature of Non-Attorney Petition Preparer

I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

_____
Printed Name of Bankruptcy Petition Preparer

_____
Social Security Number

_____
Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document:

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

X _____
Signature of Bankruptcy Petition Preparer

_____
Date

A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both 11 U.S.C. § 110; 18 U.S.C. § 156.

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.002

000485

Local Rule 104 - (Rev. 6/95)

1995 USBC, Central District of California

## STATEMENT OF RELATED CASES
### INFORMATION REQUIRED BY LOCAL RULE ·1015–2
### UNITED STATES BANKRUPTCY COURT, CENTRAL DISTRICT OF CALIFORNIA

1.  A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor, his/her spouse, an affiliate of the debtor, any copartnership or joint venture of which debtor is or formerly was a general or limited partner, or member, or any corporation of which the debtor is a director, officer, or person in control, as follows: (Set forth the complete number and title of such prior proceeding, date filed, nature thereof, the Bankruptcy Judge and court to whom assigned, whether still pending, and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    None

2.  (If petitioner is a partnership or joint venture) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Reform Act of 1978 has previously been filed by or against the debtor or an affiliate of the debtor, or a general partner in the debtor, a relative of the general partner, general partner of, or person in control of the debtor, partnership in which the debtor is a general partner, general partner of the debtor, or person in control of the debtor as follows: (Set forth the complete number and title of such prior proceeding, date filed, nature of the proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    N/A

3.  (If petitioner is a corporation) A petition under the Bankruptcy Act of 1898 or the Bankruptcy Act of 1978 has previously been filed by or against the debtor, or any of its affiliates or subsidiaries, a director of the debtor, an officer of the debtor, a person in control of the debtor, a partnership in which the debtor is general partner, a general partner of the debtor, a relative of the general partner, director, officer, or person in control of the debtor, or any persons, firms or corporations owning 20% or more of its voting stock as follows: (Set forth the complete number and title of such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    N/A

4.  (If petitioner is an individual) A petition under the Bankruptcy Reform Act, including amendments thereof, has been filed by or against the debtor within the last 180 days: (Set forth the complete number and title of such prior proceeding, date filed, nature of proceeding, the Bankruptcy Judge and court to whom assigned, whether still pending, and, if not, the disposition thereof. If none, so indicate. Also, list any real property included in Schedule A that was filed with any such prior proceeding(s).)

    None

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Los Angeles _____, California.

Dated April 4, 2001 _____

X _____
Jay W. Johnson          Debtor

X _____
Debra F. Johnson      Joint Debtor

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.003

000486

Notice of Available Chapters (Rev. 4/98)                    1998 USBC, Central District of California

Name: David M. Reeder, Esq.
      Law Offices of David M. Reeder
Address: 1900 Avenue of the Stars, Suite 1700

Los Angeles, CA 90067

Telephone: (310) 557-8911   Fax: (310) 557-0380
Bar No.: 133150
[X] Attorney for Debtor
[ ] Debtor in Pro Per

---

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| List all names including trade names, used by Debtor(s) within last 6 years: | Case No. |
|---|---|

Social Security No. 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 _____ Debtor

Social Security No. 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 _____ Joint Debtor

Debtor(s) EIN No. _____

# NOTICE OF AVAILABLE CHAPTERS

---

1. Section 342(b) of 11 U.S.C. (" The Bankruptcy Code ") states:
   "Prior to the commencement of a case under this title by an individual whose debts are primarily consumer debts, the clerk shall give written notice to such individual that indicates each chapter of this title under which such individual may proceed."

2. You are eligible to file under Chapter 7, whereby debts are discharged and your non-exempt assets are liquidated by the trustee for the benefit of your creditors.

3. You are eligible to file under Chapter 11 for debt reorganization upon payment of the additional fee required.

4. If your noncontingent, liquidated debts are less than $269,250.00 unsecured and $807,750.00 secured (11 U.S.C. § 109(e)), you are also eligible to file under Chapter 13 and to use future income to pay all or a portion of your debts.

5. If you are a family farmer, with a regular annual income, as defined by 11 U.S.C. § 101 (18) (19), you are eligible to file under Chapter 12.

6. To determine which chapter to file under, it is recommended that you consult an attorney.

JON D. CERETTO
Clerk of Court

"I HAVE READ THE ABOVE "NOTICE OF AVAILABLE CHAPTERS."

_____          April 4, 2001
Signature of Debtor                 Date
Gayle W. Johnson

_____          April 4, 2001
Signature of Joint Debtor (if applicable)   Date
Debra F. Johnson

If the Court has previously ordered that you may not file bankruptcy for 180 days or any period, you may not file bankruptcy without prior leave of the Court.

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.004

000487

Verification of Creditor Mailing List - (Rev. 6/98)                                  1998 USBC, Central District of California

# MASTER MAILING LIST
## Verification Pursuant to Local Rule 1007-2(4)

Name _David M. Reeder_

Address _1900 Avenue of the Stars Suite 1700 Los Angeles, CA 90067_

Telephon _310.557.8911_

[X]   Attorney for Debtor(s)
[ ]   Debtor In Pro Per

---

## UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA

| List all names including trade names, used by Debtor(s) withi last 6 years:<br>In re   _Jay W. Johnson_<br><br>and     _Debra F. Johnson_ | Case No.<br><br>Chapter  7 |
|---|---|
| Social Security No. _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_        Debtor<br>Social Security No. _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_        Joint Debtor<br>Debtor(s) EIN No. _____ | |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.005

000488

# VERIFICATION OF CREDITOR MAILING LIST

The above named debtor(s), or debtor's attorney if applicable, do hereby certify under penalty of perjury that the attached Master Mailing List of creditors, consisting of __4__ sheet(s) is complete, correct and consistent with the debtor's schedules pursuant to Local Rule 1007-2(4) and I/we assume all responsibility for errors and omissions.

Date: _April 4, 2001_

/s/ Jay W. Johnson
Debtor: *Jay W. Johnson*

/s/ David M. Reeder
Attorney: *David M. Reeder*

/s/ Debra F. Johnson
Joint Debtor: *Debra F. Johnson*

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.006

000489

FORM B6 (6/90) West Group, Rochester, NY

FILED

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA PM 3:58

CLERK U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CA

In re *Jay W. Johnson and Debra F. Johnson*

Case No. *LA01 20244 ES*

BY_____ DEPUTY

Chapter *7*

_____ / Debtor

## SUMMARY OF SCHEDULES

Indicate as to each schedule whether that schedule is attached and state the number of pages on each. Report the totals from Schedules A, B, D, E, F, I, and J in the boxes provided. Add the amounts from Schedules A and B to determine the total amount of the debtor's assets. Add the amounts from Schedules D, E and F to determine the total amount of the debtor's liabilities.

| NAME OF SCHEDULE | Attached (Yes/No) | No. of Sheets | AMOUNTS SCHEDULED | | |
|---|---|---|---|---|---|
| | | | ASSETS | LIABILITIES | OTHER |
| A-Real Property | Yes | 1 | $        0.00 | | |
| B-Personal Property | Yes | 3 | $    19,850.00 | | |
| C-Property Claimed as Exempt | Yes | 1 | | | |
| D-Creditors Holding Secured Claims | Yes | 1 | | $        0.00 | |
| E-Creditors Holding Unsecured Priority Claims | Yes | 2 | | $        0.00 | |
| F-Creditors Holding Unsecured Nonpriority Claims | Yes | 2 | | $  1,690,999.00 | |
| G-Executory Contracts and Unexpired Leases | Yes | 1 | | | |
| H-Codebtors | Yes | 1 | | | |
| I-Current Income of Individual Debtor(s) | Yes | 1 | | | $    10,200.00 |
| J-Current Expenditures of Individual Debtor(s) | Yes | 1 | | | $    13,550.00 |
| Total Number of Sheets in All Schedules ► | | 14 | | | |
| Total Assets ► | | | $    19,850.00 | | |
| Total Liabilities ► | | | | $  1,690,999.00 | |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.007

000490

FORM B6A (10/89) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_____ / Debtor    Case No._____

                                                                                        (If known)

## SCHEDULE A-REAL PROPERTY

Except as directed below, list all real property in which the debtor has any legal, equitable, or future interest, including all property owned as a cotenant, community property, or in which the debtor has a life estate. Include any property in which the debtor holds rights and powers exercisable for the debtor's own benefit.  If the debtor is married, state whether the husband, wife, or both own the property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."  If the debtor holds no interest in real property, write "None" under "Description and Location of Property."

Do not include interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases.

If an entity claims to have a lien or hold a secured interest in any property, state the amount of the secured claim. See Schedule D. If no entity claims to hold a secured interest in the property, write "None" in the column labeled "Amount of Secured Claim."

If the debtor is an individual or if a joint petition is filed, state the amount of any exemption claimed in the property only in Schedule C-Property Claimed as Exempt.

| Description and Location of Property | Nature of Debtor's Interest in Property | Husband—H Wife—W Joint—J Community—C | Current Market Value of Debtor's Interest, In Property Without Deducting any Secured Claim or Exemption | Amount of Secured Claim |
|---|---|---|---|---|
| None | | | | None |
| | | | | |
| | | | | |
| | | | | |
| No continuation sheets attached | | **TOTAL $** (Report also on Summary of Schedules.) | 0. 00 | |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.008

000491

FORM B6B (10/89) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson*  / Debtor   Case No. *LA01 20244 ES*
(if known)

# SCHEDULE B-PERSONAL PROPERTY

Except as directed below, list all personal property of the debtor of whatever kind. If the debtor has no property in one or more of the categories, place an "X" in the appropriate position in the column labeled "None." If additional space is needed in any category, attach a separate sheet properly identified with the case name, case number, and the number of the category. If the debtor is married, state whether husband, wife, or both own property by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community." If the debtor is an individual or a joint petition is filed, state the amount of any exemptions claimed only in Schedule C-Property Claimed as Exempt.

Do not list interests in executory contracts and unexpired leases on this schedule. List them in Schedule G-Executory Contracts and Unexpired Leases. If the property is being held for the debtor by someone else, state that person's name and address under "Description and Location of Property."

| Type of Property | None | Description and Location of Property | Husband-H Wife-W Joint-J Community-C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 1. Cash on hand. | | Cash<br>Location: In debtor's possession | C | $ 100.00 |
| 2. Checking, savings or other financial accounts, certificates of deposit, or shares in banks, savings and loan, thrift, building and loan, and homestead associations, or credit unions, brokerage houses, or cooperatives. | | Savings Account – Account No. 121-00917-0<br>Location: California Federal Bank,<br>LaCanada-Flintridge Branch | C | $ 0.00 |
| | | Checking Account – Acct. No 795-400411-0<br>Location: California Federal Bank,<br>LaCanada-Flintridge | C | $ 300.00 |
| | | Checking Account – Account no. 795-400921-8<br>Location: California Federal Bank,<br>LaCanada-Flintridge Branch | C | $ 300.00 |
| | | Checking Account – Account No. 04886604127<br>Location: Bank of America, LaCanada-Flintridge Branch | C | $ 500.00 |
| | | Checking Account – Account No. 252226994<br>Location: Citizen's bank, LaCanada-Flintridge | C | $ 1,500.00 |
| 3. Security deposits with public utilities, telephone companies, landlords, and others. | X | | | |
| 4. Household goods and furnishings, including audio, video, and computer equipment. | | Household goods and furnishings<br>Location: In debtor's possession | C | $ 12,150.00 |
| 5. Books, pictures and other art objects, antiques, stamp, coin, record, tape, compact disc, and other collections or collectibles. | X | | | |
| 6. Wearing apparel. | X | | | |

Page 1 of 3

Gonzalez v. Johnson<br>SA 06-01313<br>EXHIBIT<br>001.009

FORM B6B (10/89) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson* / Debtor     Case No. *LA01 20244 ES*
                                                                              (if known)

## SCHEDULE B-PERSONAL PROPERTY
### (Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband–H Wife–W Joint–J Community–C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| 7. Furs and jewelry. | X | | | |
| 8. Firearms and sports, photographic, and other hobby equipment. | X | | | |
| 9. Interests in insurance policies. Name insurance company of each policy and itemize surrender or refund value of each. | | Term insurance policies - no cash value Location: In debtor's possession | C | $ 0.00 |
| . Annuities. Itemize and name each issuer. | X | | | |
| 11. Interests in IRA, ERISA, Keogh, or other pension or profit sharing plans. Itemize. | X | | | |
| 12. Stock and interests in incorporated and unincorporated businesses. Itemize. | | Pooled Investment account Location: Benton Nicolas | C | $ 1,500.00 |
| | | Stock in Jay Johnson AIA and Associates, Inc. Location: In debtor's possession | H | $ 0.00 |
| 13. Interests in partnerships or joint ventures. Itemize. | X | | | |
| 14. Goverment and corporate bonds and other negotiable and non-negotiable instruments. | X | | | |
| . ccounts Receivable. | X | | | |
| 16. Alimony, maintenance, support, and property settlements to which the debtor is or may be entitled. Give particulars. | X | | | |
| 17. Other liquidated debts owing debtor include tax refunds. Give particulars. | X | | | |
| 18. Equitable or future interests, life estates, and rights or powers exercisable for the benefit of the debtor other than those listed in Schedule of Real Property. | X | | | |
| 19. Contingent and non-contingent interests in estate of a decedent, death benefit plan, life insurance policy, or trust. | X | | | |
| 20. Other contingent and unliquidated claims of every nature, including tax refunds, counterclaims of the debtor, and rights to setoff claims. Give estimated value of each. | | Claim against Richard Lapides for collection actions, including levys on bank accounts, based on a void judgment. Location: In debtor's possession | C | Unknown |
| | | Potential right to payment from "profits" of troubled real estate project.  Canynon Meadows Investents.  No profits are projected. | H | $ 0.00 |

Page  2  of  3

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.010

000493

FORM B6B (10/89) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_ _____ / Debtor     Case No. _LA01 20244 ES_
                                                                                (if known)

## SCHEDULE B-PERSONAL PROPERTY
(Continuation Sheet)

| Type of Property | N o n e | Description and Location of Property | Husband–H Wife–W Joint–J Community–C | Current Market Value of Debtor's Interest, in Property Without Deducting any Secured Claim or Exemption |
|---|---|---|---|---|
| | | Location: In debtor's possession | | |
| 21. Patents, copyrights, and other intellectual property. Give particulars. | X | | | |
| 22. Licenses, franchises, and other general intangibles. Give particulars. | X | | | |
| 23. Automobiles, trucks, trailers and other vehicles. | X | | | |
| 24. Boats, motors, and accessories. | X | | | |
| 25. Aircraft and accessories. | X | | | |
| 26. Office equipment, furnishings, and supplies. | X | | | |
| 27. Machinery, fixtures, equipment and supplies used in business. | X | | | |
| 28. Inventory. | X | | | |
| 29. Animals. | X | | | |
| 30. Crops - growing or harvested. Give particulars. | X | | | |
| 31. Farming equipment and implements. | X | | | |
| 32. Farm supplies, chemicals, and feed. | X | | | |
| 33. Other personal property of any kind not already listed. Itemize. | | Beneficial interest in custodial account. Debtor can not access without custodian's permission.  Custodian is William Johnson Location: William Johnson | H | $ 3,500.00 |
| | | | Total → | $ 19,850.00 |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.011

Page __3__ of __3__

(Report total also on Summary of Schedules.)
Include amounts from any continuation sheets attached.

FORM B6C (6/90) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson* _____ / Debtor    Case No. *LA01 20244 ES* _____
                                                                                                  (if known)

## SCHEDULE C-PROPERTY CLAIMED AS EXEMPT

Debtor elects the exemptions to which debtor is entitled under:

(Check one box)

☐ 11 U.S.C. § 522(b) (1):  Exemptions provided in 11 U.S.C. § 522(d). Note: These exemptions are available only in certain states.

☒ 11 U.S.C. § 522(b) (2):  Exemptions available under applicable nonbankruptcy federal laws, state or local law where the debtor's domicile has been located for the 180 days immediately preceding the filing of the petition, or for a longer portion of the 180-day period than in any other place, and the debtor's interest as a tenant by the entirety or joint tenant to the extent the interest is exempt from process under applicable nonbankruptcy law.

| Description of Property | Specify Law Providing each Exemption | Value of Claimed Exemption | Current Market Value of Property Without Deducting Exemptions |
|---|---|---|---|
| *Checking Account* | *Calif. C.C.P. §703.140 (b) (5)* | $ 300.00 | $ 300.00 |
| *Checking Account* | *Calif. C.C.P. §703.140 (b) (5)* | $ 300.00 | $ 300.00 |
| *Checking Account* | *Calif. C.C.P. §703.140 (b) (5)* | $ 1,500.00 | $ 1,500.00 |
| *Household goods and furnishings* | *Calif. C.C.P. §703.140 (b) (3)* | $ 12,150.00 | $ 12,150.00 |
| *Pooled Investment account* | *Calif. C.C.P. §703.140 (b) (5)* | $ 1,500.00 | $ 1,500.00 |
| *Claim against Richard Lapides* | *Calif. C.C.P. §703.140 (b) (5)* | $ 6,000.00 | *Unknown* |
| *Checking Account* | *Calif. C.C.P. §703.140 (b) (5)* | $ 500.00 | $ 500.00 |
| *Beneficial interest in custodial account* | *Calif. C.C.P. §703.140 (b) (5)* | $ 3,500.00 | $ 3,500.00 |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.012

Page No. __1__ of __1__

000495

FORM B6D (6/90) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_ _____/ Debtor     Case No. _____

                                                                              (if known)

## SCHEDULE D-CREDITORS HOLDING SECURED CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding claims secured by property of the debtor as of the date of filing of the petition. List creditors holding all types of secured interests such as judgment liens, garnishments, statutory liens, mortgages, deeds of trust, and other security interests. List creditors in alphabetical order to the extent practicable. If all secured creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column marked "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☒ Check this box if debtor has no creditors holding secured claims to report on this Schedule D.

| Creditor's Name and Mailing Address Including Zip Code | Codebtor | Date Claim was Incurred, Nature of Lien, and Description and Market Value of Property Subject to Lien H—Husband W—Wife J—Joint C—Community | Contingent | Unliquidated | Disputed | Amount of Claim Without Deducting Value of Collateral | Unsecured Portion, if any |
|---|---|---|---|---|---|---|---|
| Account No: | | | | | | | |
| | | Value: | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |
| Account No: | | | | | | | |
| | | Value: | | | | | |
| No continuation sheets attached | | | | | Subtotal $ (Total of this page) | 0.00 | |
| | | | | | Total $ (Use only on last page. Report total also on Summary of Schedules) | 0.00 | |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.013

FORM B6E (4/98) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_____ / Debtor      Case No._____
                                                                                            (if known)

# SCHEDULE E-CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

A complete list of claims entitled to priority, listed separately by type of priority, is to be set forth on the sheets provided. Only holders of unsecured claims entitled to priority should be listed in this schedule. In the boxes provided on the attached sheets, state the name and mailing address, including zip code, and account number, if any, of all entities holding priority claims against the debtor or the property of the debtor, as of the date of the filing of the petition.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report the total of claims listed on each sheet in the box labeled "Subtotal" on each sheet. Report the total of all claims listed on this Schedule E in the box labeled "Total" on the last sheet of the completed schedule. Repeat this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured priority claims to report on this Schedule E.

## TYPES OF PRIORITY CLAIMS

Check the appropriate box(es) below if claims in that category are listed on the attached sheets.

☐ **Extensions of credit in an involuntary case**
  Claims arising in the ordinary course of the debtor's business or financial affairs after the commencement of the case but before the earlier of the appointment of a trustee or the order for relief. 11 U.S.C. § 507(a)(2).

☐ **Wages, salaries, and commissions**
  Wages, salaries, and commissions, including vacation, severance, and sick leave pay owing to employees and commissions owing to qualifying independent sales representatives up to $4300* per person earned within 90 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(3).

☐ **Contributions to employee benefit plans**
  Money owed to employee benefit plans for services rendered within 180 days immediately preceding the filing of the original petition, or the cessation of business, whichever occurred first, to the extent provided in 11 U.S.C. § 507(a)(4).

☐ **Certain farmers and fishermen**
  Claims of certain farmers and fishermen, up to $4300* per farmer or fisherman, against the debtor, as provided in 11 U.S.C. § 507(a)(5).

☐ **Deposits by individuals**
  Claims of individuals up to $1950* for deposits for the purchase, lease, or rental of property or services for personal, family, or household use, that were not delivered or provided. 11 U.S.C. § 507(a)(6).

☐ **Alimony, Maintenance or Support**
  Claims of a spouse, former spouse, or child of the debtor, for alimony, maintenance or support, to the extent provided in 11 U.S.C. § 507(a)(7).

☒ **Taxes and Certain Other Debts Owed to Governmental Units**
  Taxes, custom duties, and penalties owing to federal, state, and local governmental units as set forth in 11 U.S.C. § 507(a)(8).

☐ **Commitments to Maintain the Capital of an Insured Depository Institution**
  Claims based on commitments to FDIC, RTC, Director of the Office of Thrift Supervision, Comptroller of the Currency, or Board of Governors of the Federal Reserve System, or their predecessors or successors, to maintain the capital of an insured depository institution. 11 U.S.C. § 507(a)(9).

*Amounts are subject to adjustment on April 1, 2001, and every three years thereafter with respect to cases commenced on or after the date of adjustment.

_1___ continuation sheets attached



Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.014

000497

FORM B6E (10/89) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_____ / Debtor     Case No._____
                                                                              (if known)

# SCHEDULE E-CREDITORS HOLDING UNSECURED PRIORITY CLAIMS

(Continuation Sheet)

TYPE OF PRIORITY   _Taxes and Certain Other Debts Owed to Governmental Units_

| Creditor's Name and Mailing Address including Zip Code | Codebtor | Date Claim was Incurred, and consideration for Claim | Contingent | Unliquidated | Disputed | Total Amount of Claim | Amount Entitled to Priority |
|---|---|---|---|---|---|---|---|
| **Account No:**<br>Creditor # : 1<br>Franchise Tax Board<br>P.O. Box 2952<br>Sacramento CA 95812 | C | State income tax due, if any. | | | | Unknown | $ 0.00 |
| **Account No:**<br>Creditor # : 2<br>Internal Revenue Service<br>4062 Federal Bldg., Stop 5022<br>300 North Los Angeles St.<br>Los Angeles CA 90012 | C | Federal income taxes due, if any | | | | Unknown | $ 0.00 |
| **Account No:** | | | | | | | |
| **Account No:** | | | | | | | |
| **Account No:** | | | | | | | |
| **Account No:** | | | | | | | |
| **Account No:** | | | | | | | |

Sheet No. _1_ of _1_  continuation sheets attached to
Schedule of Creditors

Subtotal $
(Total of this page)

Total $          0.00
(Use only on last page of the completed Schedule E. Report total also on Summary of Schedules)

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.015

FORM B6F (9/97) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_ _____ / Debtor     Case No. _IA01 20244 ES_

(If known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| Creditor's Name and Mailing Address including Zip Code | Codebtor | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| Account No:   10-1375-752436<br>Creditor # : 1<br>Bank of America Auto Lease<br>P.O. Box<br>Brea CA 92822 | C | Lease of GMC Yukon XV | | | | Unknown |
| Account No:   4024-0250-0026-0720<br>Creditor # : 2<br>Bank of America Visa<br>Bank of America<br>P.O. Box 53132<br>Phoenix AZ 85072-3132 | C | Credit Card Purchases | | | | $ 6,700.00 |
| Account No:   5222-7600-0030-0533<br>Creditor # : 3<br>Chase Platinum MasterCard<br>P.O. Box 52064<br>Phoenix AZ 85072-2064 | C | Credit Card Purchases | | | | $ 2,700.00 |
| Account No:<br>Creditor # : 4<br>Honda Finance<br>6261 Katella, No. 1A<br>Cypress CA 90630 | C | Lease of Honda Civic | | | | Unknown |
| Account No:<br>Creditor # : 5<br>Jay Johnson AIA & Assoc., Inc.<br>1125 Foothill Blvd.,<br>LaCanada-Flint. CA 91011 | C | Loans to shareholder | | X | | $ 450,000.00 |

_1_ continuation sheets attached

Subtotal $     459,400.00
(Total of this page)

Total $
(Report total also on Summary of Schedules)

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.016

FORM B6F (9/97) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson* _____ / Debtor    Case No. *LA01 20244 ES*
(if known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

(Continuation Sheet)

| Creditor's Name and Mailing Address including Zip Code | Codebtor | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. H-Husband W-Wife J-Joint C-Community | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| Account No:  Creditor # : 6  John Mahl  1244 Green Lane  LaCanada-Flint. CA 91011 | H | Promissory note | | | | $ 25,000.00 |
| Account No: 5490-9957-6721-8867  Creditor # : 7  MBNA Mastercard  MBNA America  P.O. Box 15019  Wilmington DE 19850-5019 | C | Credit Card Purchases | | | | $ 4,399.00 |
| Account No:  Creditor # : 8  Randy Johnson  5118 Circle Vista Dr.  LaCrescenta CA 91214 | H | Advances for payment of living expenses and for payments to Richard Lapides | | | | $ 100,000.00 |
| Account No:  Creditor # : 9  Richard Lapides  5107 Castle Road  LaCanada  intfidge CA 91011 | C | All claims asserted and unasserted, including an alleged judgment (approx ($650,000) and all other claims.  *Subject to Setoff | X | X | X | $ 1,100,000.00 |
| Account No: 5490-8400-0080-4885  Creditor # : 10  Wells Fargo MasterCard  Wells Fargo Card Services  P.O. Box 522  Des Moines IA 50305-9907 | C | Credit Card Purchases | | | | $ 2,200.00 |
| Account No: | | | | | | |
| Account No: | | | | | | |

Sheet No. *1* of *1* continuation sheets attached to Schedule of Creditors Holding Unsecured Nonpriority Claims

Subtotal $ (Total of this page)  1,231,599.00
Total $ (Report total also on Summary of Schedules)  1,690,999.00

Gonzalez v. Johnson  SA 06-01313  EXHIBIT  001.017

FORM B6G (10/89) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson* _____ / Debtor    Case No. _____
                                                                              (if known)

## SCHEDULE G-EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests.
State nature of debtor's interests in contract, i.e., "Purchaser," "Agent," etc. State whether debtor is the lessor or lessee of a lease.
Provide the names and complete mailing addresses of all other parties to each lease or contract described.

NOTE: A party listed on this schedule will not receive notice of the filing of this case unless the party is also scheduled in the appropriate schedule of
creditors.

☐ Check this box if the debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, including Zip Code, of other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether Lease is for Nonresidential Real Property. State Contract Number of any Government Contract. |
|---|---|
| *Bank of America Lease* <br> *P.O. Box 2240* <br> *Brea CA  92882* | Contract Type: *Vehicle lease* <br> Terms: <br> Beginning date: <br> Debtor's Interest: <br> Description: *GMC Yukon XV* <br><br> Buyout Option: |
| *Honda Finance* <br> *6261 Katella, No. 1a* <br> *Cypress CA  90630* | Contract Type: *Vehicle lease* <br> Terms: <br> Beginning date: <br> Debtor's Interest: <br> Description: *Honda Civic* <br><br> Buyout Option: |

Gonzalez v. Johnson
SA 06-01313
**EXHIBIT**
001.018

Page __1__ of __1__

FORM B6H (6/90) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson* _____ / Debtor   Case No. *LA01 20244 ES* ____
                                                                                              (if known)

## SCHEDULE H-CODEBTORS

Provide the information requested concerning any person or entity, other than a spouse in a joint case, that is also liable on any debts listed by debtor in the schedules of creditors. Include all guarantors and co-signers. In community property states, a married debtor not filing a joint case should report the name and address of the nondebtor spouse on this schedule. Include all names used by the nondebtor spouse during the six years immediately preceding the commencement of this case.

☒ Check this box if the debtor has no codebtors.

| Name and Address of Codebtor | Name and Address of Creditor |
|---|---|
| | |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.019

FORM B6I (6/90) West Group, Rochester, NY

In re *Jay W. Johnson and Debra F. Johnson* / Debtor     Case No. *LA01 20244 ES*

(if known)

## SCHEDULE I-CURRENT INCOME OF INDIVIDUAL DEBTOR(S)

The column labeled "Spouse" must be completed in all cases filed by joint debtors and by a married debtor in a chapter 12 or 13 case whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.

| Debtor's Marital | DEPENDENTS OF DEBTOR AND SPOUSE | | |
|---|---|---|---|
| Status: | NAMES | AGE | RELATIONSHIP |
| *Married* | *Jennifer Johnson* | *19* | *Daugher* |
| | *Kelly Johnson* | *16* | *Daugher* |
| | *Cheryl Johnson* | *14* | *Daugher* |
| | *Steven Johnson* | *11* | *Son* |
| | *Kimberly Johnson* | *8* | *Daugher* |

| EMPLOYMENT: | DEBTOR | SPOUSE |
|---|---|---|
| Occupation | *Architect* | *Housewife, parttime child care* |
| Name of Employer | *JJ&A, Inc.* | *self* |
| How Long Employed | *17 yrs.* | *child care 5 years* |
| Address of Employer | *1125 Foothill Blvd.* | *4600 Viro Rd.* |
| | *LaCanada-Flint. CA  91011* | *LaCanada-Flint. CA  91011* |

| Income: (Estimate of average monthly income) | | DEBTOR | SPOUSE |
|---|---|---|---|
| Current Monthly gross wages, salary, and commissions (pro rate if not paid monthly) | $ | 4,000.00 | $ 0.00 |
| Estimated Monthly Overtime | $ | 0.00 | $ 0.00 |
| SUBTOTAL | $ | 4,000.00 | $ 0.00 |
| LESS PAYROLL DEDUCTIONS | | | |
| a. Payroll Taxes and Social Security | $ | 800.00 | $ 0.00 |
| b. Insurance | $ | 0.00 | $ 0.00 |
| c. Union Dues | $ | 0.00 | $ 0.00 |
| d. Other (Specify): | $ | 0.00 | $ 0.00 |
| SUBTOTAL OF PAYROLL DEDUCTIONS | $ | 800.00 | $ 0.00 |
| TOTAL NET MONTHLY TAKE HOME PAY | $ | 3,200.00 | $ 0.00 |
| Regular income from operation of business or profession or farm (attach detailed statement) | $ | 0.00 | $ 1,500.00 |
| Income from Real Property | $ | 0.00 | $ 0.00 |
| Interest and dividends | $ | 0.00 | $ 0.00 |
| Alimony, maintenance or support payments payable to the debtor for the debtor's use or that of dependents listed above. | $ | 0.00 | $ 0.00 |
| Social Security or other government assistance Specify: | $ | 0.00 | $ 0.00 |
| Pension or retirement income | $ | 0.00 | $ 0.00 |
| Other monthly income Specify: *Consulting Fees* | $ | 500.00 | $ 0.00 |
| *Loans from family members* | $ | 5,000.00 | $ 0.00 |
| TOTAL MONTHLY INCOME | $ | 8,700.00 | $ 1,500.00 |
| TOTAL COMBINED MONTHLY INCOME | $ | 10,200.00 | |
| (Report also on Summary of Schedules) | | | |

Describe any increase or decrease of more than 10% in any of the above categories anticipated to occur within the year following the filing of this document:

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.020

Page No. __1__ of __1__

000503

FORM B6J (6/90) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_ _____ / Debtor      Case No. _LA01 20244 ES_ _____
                                                                                        (if known)

## SCHEDULE J-CURRENT EXPENDITURES OF INDIVIDUAL DEBTOR

Complete this schedule by estimating the average expenses of the debtor and the debtor's family. Pro rate any payments made bi-weekly, quarterly, semi-annually, or annually to show monthly rate.

☐ Check this box if a joint petition is filed and debtor's spouse maintains a separate household. Complete a separate schedule of expenditures labeled "Spouse."

| | | |
|---|---|---:|
| Rent or home mortgage payment (include lot rented for mobile home) | $ | 4,000.00 |
| Are real estate taxes included?  Yes ☐  No ☒ | | |
| Is property insurance included?  Yes ☐  No ☒ | | |
| Utilities: Electricity and heating fuel | $ | 500.00 |
|     Water and sewer | $ | 200.00 |
|     Telephone | $ | 100.00 |
|     Other | $ | 0.00 |
| Home maintenance (Repairs and upkeep) | $ | 400.00 |
| Food | $ | 1,000.00 |
| Clothing | $ | 500.00 |
| Laundry and dry cleaning | $ | 100.00 |
| Medical and dental expenses | $ | 300.00 |
| Transportation (not including car payments) | $ | 200.00 |
| Recreation, clubs and entertainment, newspapers, magazines, etc. | $ | 400.00 |
| Charitable contributions | $ | 2,000.00 |
| Insurance (not deducted from wages or included in home mortgage payments) | | |
|     Homeowner's or renter's | $ | 100.00 |
|     Life | $ | 150.00 |
|     Health | $ | 0.00 |
|     Auto | $ | 300.00 |
|     Other | $ | 0.00 |
| Taxes (not deducted from wages or included in home mortgage) | | |
| Specify:  _Taxes on Jay Johnson AIA Incom_ | $ | 100.00 |
| Installment payments: (in chapter 12 and 13 cases, do not list payments to be included in the plan) | | |
|     Auto | $ | 0.00 |
|     Other:  _Auto leases payments_ | $ | 900.00 |
| Alimony, maintenance, and support paid to others | $ | 0.00 |
| Payments for support of additional dependents not living at your home | $ | 0.00 |
| Regular expenses from operation of business, profession, or farm (attach detailed statement) | $ | 0.00 |
| Other:  _support of daugher in college_ | $ | 800.00 |
| Other:  _Exp. re Debra's child care_ | $ | 1,000.00 |
| **TOTAL MONTHLY EXPENSES**    (Report also on Summary of Schedules) | $ | 13,050.00 |



Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.021

000504

FORM B6 (6/90) West Group, Rochester, NY

In re _Jay W. Johnson and Debra F. Johnson_ _____ / Debtor    Case No. _____
                                                                                    (if known)

# DECLARATION CONCERNING DEBTOR'S SCHEDULES

### DECLARATION UNDER PENALTY OF PERJURY BY AN INDIVIDUAL DEBTOR

I declare under penalty of perjury that I have read the foregoing summary and schedules, consisting of _____15_____ sheets, and that they are true and correct to the best of my knowledge, information and belief.

Date: _April 20, 2001_      Signature _/s/ Jay W. Johnson_ _____
                                    Jay W. Johnson

Date: _April 20, 2001_      Signature _/s/ Debra F. Johnson_ _____
                                    Debra F. Johnson

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.022

000505

Form 7 (10/89) West Group, Rochester, NY

# UNITED STATES BANKRUPTCY COURT
# CENTRAL DISTRICT OF CALIFORNIA

In re *Jay H. Johnson*
and
*Debra F. Johnson*

Case No. *LA01 20244 ES*
Chapter *7*

_____ / Debtor

## STATEMENT OF FINANCIAL AFFAIRS

This statement is to be completed by every debtor. Spouses filing a joint petition may file a single statement on which the information for both spouses is combined. If the case is filed under chapter 12 or chapter 13, a married debtor must furnish information for both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed. An individual debtor engaged in business as a sole proprietor, partner, family farmer, or self-employed professional, should provide the information requested on this statement concerning all such activities as well as the individual's personal affairs.

Questions 1-15 are to be completed by all debtors. Debtors that are or have been in business, as defined below, also must complete Questions 3-21. If the answer to any question is "None," or the question is not applicable, mark the box labeled "None." If additional space is needed for the answer to any question, use and attach a separate sheet properly identified with the case name, case number (if known), and the number of the question.

---

### DEFINITIONS

"In business." A debtor is "in business" for the purpose of this form if the debtor is a corporation or partnership. An individual debtor is "in business" for the purpose of this form if the debtor is or has been, within the two years immediately preceding the filing of this bankruptcy case, any of the following: an officer, director, managing executive, or person in control of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or self-employed.

"Insider." The term "insider" includes but is not limited to: relatives of the debtor; general partners of the debtor and their relatives; corporations of which the debtor is an officer, director, or person in control; officers, directors, and any person in control of a corporate debtor and their relatives; affiliates of the debtor and insiders of such affiliates; any managing agent of the debtor. 11 U.S.C. §101.

---

### 1. Income from employment or operation of business.

State the gross amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date this case was commenced. State also the gross amounts received during the two years immediately preceding this calendar year. (A debtor that maintains, or has maintained, financial records on the basis of a fiscal rather than a calendar year may report fiscal year income. Identify the beginning and ending dates of the debtor's fiscal year.) If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income of both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| AMOUNT | SOURCE (if more than one) |
|---|---|
| Year to date: $13,000 | Employment – Jay Johnson |
| | Child care– Debra Johnson |
| 3,000 | Employment – Jay Johnson |
| Last Year: $55,000 | Child care– Debra Johnson |
| $10,000 | Employment – Jay Johnson |
| Year before: $149.500 | Child care– Debra Johnson |
| $10,000 | |

---

### 2. Income other than from employment or operation of business.

State the amount of income received by the debtor other than from employment, trade, profession, or operation of the debtor's business during the two years immediately preceding the commencement of this case. Give particulars. If a joint petition is filed, state income for each spouse separately. (Married debtors filing under chapter 12 or chapter 13 must state income for each spouse whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Statement of Affairs - Page 1

Gonzalez v. Johnson
SA 06-01313
**EXHIBIT**
001.023

000506

Form 7 (10/89) West Group, Rochester, NY

**3a. Payments to creditors.**

List all payments on loans, installment purchases of goods or services, and other debts, aggregating more than $600 to any creditor, made within 90 days immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF CREDITOR | DATES OF PAYMENTS | AMOUNT PAID | AMOUNT STILL OWING |
|---|---|---|---|
| Creditor: See attached sheet Address: | | | |

**3b.** List all payments made within one year immediately preceding the commencement of this case to or for the benefit of creditors who are or were insiders. (Married debtors filing under chapter 12 or chapter 13 must include payments by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**4a. Suits and administrative proceedings, executions, garnishments and attachments.**

List all suits and administrative proceedings to which the debtor is or was a party within one year immediately preceding the filing of this bankruptcy case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**4b.** Describe all property that has been attached, garnished or seized under any legal or equitable process within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**5. Repossessions, foreclosures and returns.**

List all property that has been repossessed by a creditor, sold at a foreclosure sale, transferred through a deed in lieu of foreclosure or returned to the seller, within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**6a. Assignments and receiverships.**

Describe any assignment of property for the benefit of creditors made within 120 days immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include any assignment by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**6b.** List all property which has been in the hands of a custodian, receiver, or court-appointed official within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include information concerning property of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**7. Gifts.**

List all gifts or charitable contributions made within one year immediately preceding the commencement of this case except ordinary and usual gifts to family members aggregating less than $200 in value per individual family member and charitable contributions aggregating less than $100 per recipient.(Married debtors filing under chapter 12 or chapter 13 must include gifts or contributions by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF PERSON OR ORGANIZATION | RELATIONSHIP TO DEBTOR, IF ANY | DATE OF GIFT | DESCRIPTION AND VALUE OF GIFT |
|---|---|---|---|
| Name: 1. Church of Jesus Christ of Latter Day Saints ($26,000 in 2000) 2. Boy Scouts of America (1,000) | | | Description: Value: |

**8. Losses.**

List all losses from fire, theft, other casualty or gambling within one year immediately preceding the commencement of this case or since the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include losses by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

Statement of Affairs - Page 2

Gonzalez v. Johnson
SA 06-01313
**EXHIBIT**
001.024

Form 7 (10/89) West Group, Rochester, NY

**9. Payments related to debt counseling or bankruptcy.**

List all payments made or property transferred by or on behalf of the debtor to any persons, including attorneys, for consultation concerning debt consolidation, relief under the bankruptcy law or preparation of a petition in bankruptcy within one year immediately preceding the commencement of this case.

| NAME AND ADDRESS OF PAYEE | DATE OF PAYMENT, NAME OF PAYOR IF OTHER THAN DEBTOR | AMOUNT OF MONEY OR DESCRIPTION AND VALUE OF PROPERTY |
|---|---|---|
| Payee: Law Offices of David M. Reeder Address: 1900 Avenue of the Stars, Suite 1700, Los Angeles, CA 90067 | Date of Payment: March, April, 2001 Payor: Debtor, funds advanced to Debtor by Jay Johnson AIA & Associates, Inc. | $7,300 plus filing fee |

**10. Other transfers.**

List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**11. Closed financial accounts.**

List all financial accounts and instruments held in the name of the debtor or for the benefit of the debtor which were closed, sold, or otherwise transferred within one year immediately preceding the commencement of this case. Include checking, savings, or other financial accounts, certificates of deposit, or other instruments; shares and share accounts held in banks, credit unions, pension funds, cooperatives, associations, brokerage houses and other financial institutions. (Married debtors filing under chapter 12 or chapter 13 must include information concerning accounts or instruments held by or for either or both spouses whether or not a joint petition is filed, unless spouses are separated and a joint petition is not filed.)

☒ NONE

**12. Safe deposit boxes.**

List each safe deposit or other box or depository in which the debtor has or had securities, cash, or other valuables within one year immediately preceding the commencement of this case.(Married debtors filing under chapter 12 or chapter 13 must include boxes or depositories of either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**13. Setoffs.**

List all setoffs made by any creditor, including a bank, against a debt or deposit of the debtor within 90 days preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include information concerning either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

☒ NONE

**14. Property held for another person.**

List all property owned by another person that the debtor holds or controls.

☒ NONE

**15. Prior address of debtor.**

If the debtor has moved within the two years immediately preceding the commencement of this case, list all premises which the debtor occupied during that period and vacated prior to the commencement of this case. If a joint petition is filed, report also any separate address of either spouse.

☒ NONE

---

The following questions are to be completed by every debtor that is a corporation or partnership and by any individual debtor who is or has been, within two years immediately preceding the commencement of this case, any of the following: an officer, director, managing executive, or owner of more than 5 percent of the voting securities of a corporation; a partner, other than a limited partner, of a partnership; a sole proprietor or otherwise self-employed.

(An individual or joint debtor should complete this portion of the statement only if the debtor is or has been in business, as defined above, within the two years immediately preceding the commencement of this case.)

Statement of Affairs - Page 3

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.025

000508

Form 7 (10/89)  West Group, Rochester, NY

**16. Nature, location and name of business.**

a. If the debtor is an individual, list the names and addresses of all businesses in which the debtor was an officer, director, partner, or managing executive of a corporation, partnership, sole proprietorship, or was a self-employed professional within the two years immediately preceding the commencement of this case, or in which the debtor owned 5 percent or more of the voting or equity securities within the two years immediately preceding the commencement of this case.

b. If the debtor is a partnership, list the names and addresses of all businesses in which the debtor was a partner or owned 5 percent or more of the voting securities, within the two years immediately preceding the commencement of this case.

c. If the debtor is a corporation, list the names and addresses of all businesses in which the debtor was a partner or owned 5 percent or more of the voting securities within the two years immediately preceding the commencement of this case.

| NAME AND ADDRESS | NATURE OF BUSINESS | BEGINNING AND ENDING DATES OF OPERATION |
|---|---|---|
| *Debtor is an Individual: Jay Johson AIA and Associates, Inc. Business Address:* | *Architechts* | *1984-present* |

**17a. Books, records and financial statements.**

List all bookkeepers and accountants who within the six years immediately preceding the filing of this bankruptcy case kept or supervised the keeping of books of account and records of the debtor.

☒ NONE

**17b.** List all firms or individuals who within the two years immediately preceding the filing of this bankruptcy case have audited the books of account and records, or prepared a financial statement of the debtor.

☒ NONE

**17c.** List all firms or individuals who at the time of the commencement of this case were in possession of the books of account and records of the debtor. If any of the books of account and records are not available, explain.

☒ NONE

**17d.** List all financial institutions, creditors and other parties, including mercantile and trade agencies, to whom a financial statement was issued within two years immediately preceding the commencement of this case by the debtor.

☒ NONE

**18a. Inventories.**

List the dates of the last two inventories taken of your property, the name of the person who supervised the taking of each inventory, and the dollar amount and basis of each inventory.

☒ NONE

**18b.** List the name and address of the person having possession of the records of each of the two inventories reported in a., above.

☒ NONE

**19a. Current Partners, Officers, Directors and Shareholders.**

If the debtor is a partnership, list the nature and percentage of partnership interest of each member of the partnership.

☒ NONE

**19b.** If the debtor is a corporation, list all officers and directors of the corporation, and each stockholder who directly or indirectly owns, controls, or holds 5 percent or more of the voting securities of the corporation.

☒ NONE

**20a. Former partners, officers, directors and shareholders.**

If the debtor is a partnership, list each member who withdrew from the partnership within one year immediately preceding the commencement of this case.

☒ NONE

**20b.** If the debtor is a corporation, list all officers, or directors whose relationship with the corporation terminated within one year immediately preceding the commencement of this case.

☒ NONE

Statement of Affairs - Page 4

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.026

Form 7 (10/89) West Group, Rochester, NY

## DECLARATION UNDER PENALTY OF PERJURY BY INDIVIDUAL DEBTOR

I declare under penalty of Perjury that I have read the answers contained in the foregoing statement of financial affairs and any attachments thereto and that they are true and correct to the best of my knowledge, information, and belief.

Date _April 20, 2001_     Signature _/s/ Jay R. Johnson_
                                    Jay R. Johnson

Date _April 20, 2001_     Signature _/s/ Debra F. Johnson_
                                    Debra F. Johnson

Penalty for making a false statement: Fine of up to $500,000 or imprisonment for up to 5 years or both, 18 U.S.C. § 152 and § 3571.

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.027

Form B8 (Official Form 8) – (Rev. 3/98)

UNITED STATES BANKRUPTCY COURT
Central  DISTRICT OF California

| In re Jay W. Johnson and Debra F. Johnson | Case No.: LA01 20244 ES |
|---|---|
| Debtor | Chapter: 7 |

## CHAPTER 7 INDIVIDUAL DEBTOR'S STATEMENT OF INTENTION

1. I have filed a schedule of assets and liabilities which includes consumer debts secured by property of the estate.
2. I intend to do the following with respect to the property of the estate which secures those consumer debts:

    a. *Property to Be Surrendered.*

    **Description of Property**               **Creditor's name**

    none

    b. *Property to Be Retained.*             *[Check any applicable statement.]*

| Description of Property | Creditor's Name | Property is claimed as exempt | Property will be redeemed pursuant to 11 U.S.C. § 722 | Debt will be reaffirmed pursuant to 11 U.S.C. § 524(c) |
|---|---|---|---|---|
| none | | | | |

Date: *April 20, 2001*

*Signature of Debtor*
Jay W. Johnson and Debra F. Johnson

---

### CERTIFICATION AND SIGNATURE OF NON-ATTORNEY BANKRUPTCY PETITION PREPARER (See 11 U.S.C. § 110)

    I certify that I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110, that I prepared this document for compensation, and that I have provided the debtor with a copy of this document.

Printed or Typed Name of Bankruptcy Petition Preparer           Social Security Number

Address

Names and Social Security numbers of all other individuals who prepared or assisted in preparing this document.

If more than one person prepared this document, attach additional signed sheets conforming to the appropriate Official Form for each person.

X _____           Date: _____
Signature of Bankruptcy Petition Preparer

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both.  11 U.S.C. § 110; 18 U.S.C. § 156.*

B8

Gonzalez v. Johnson
SA 06-01313
**EXHIBIT**
**001.028**

000511

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

In Re: Jay W. Johnson      )
     )
     )
     )
     )
     )
     )

Case No. <u>LA01 20244 ES</u>

Chapter 7 <u>x</u> , 11 <u>____</u> , 13 <u>____</u>

## A M E N D E D   S C H E D U L E S

Indicate which schedule is being amended.  Schedules "D" thru "F" requires $20.00 fee plus addendum mailing list attached if adding to creditor list.

___ A, ___ B, ___ C, ___ D, ___ E, <u>x</u> F, ___ G, ___ H, ___ I, ___ J,

___ Statement of Affairs      ___ Statement of Intentions      ___ Other

I, <u>Jay W. and Debra F. Johnson</u> , the person(s) who subscribed to the foregoing Amended Schedule do hereby declare under penalty of perjury that the foregoing is true and correct.

DATED: ~~June 1, 2001~~ July 24 2001

x _(signature)_
Debtor Signature
Jay W. Johnson

x _(signature)_
Co-Debtor Signature
Debra F. Johnson

** SEE REVERSE SIDE **

```
** FOR COURT USE ONLY **
07/26/2001   **FILED**   13:47
          LA01-20244ES
DEBTOR:
   JOHNSON, JAY W
JUDGE: HON. E. Smith - 553
TRUSTEE: BT62
CHAPTER: 07

   CLERK, U.S. BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIF. ID: 766
RECEIPT NO: LA-029580  $ 20.00
```

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.029

45- C

000512

FORM B6F (9/97) West Group, Rochester, NY

In re *Jay and Debra Johnson - 1st amm to sched* / Debtor   Case No. _____
(If known)

# SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an "X" in more than one of these three columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| Creditor's Name and Mailing Address including Zip Code | Codebtor | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. | Contingent | Unliquidated | Disputed | Amount of Claim |
|---|---|---|---|---|---|---|
| Account No: Creditor # : 1 Dennis and Michelle Hamilton 3253 Barn Circle Dr. Glendale CA 91208 | | *8 year old claim - not pursued by creditor.* | | | X | $ 930,000.00 |
| Account No: | | | | | | |
| Account No: | | | | | | |
| Account No: | | | | | | |
| Account No: | | | | | | |

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.030

No continuation sheets attached

Subtotal $ 930,000.00
Total $ 930,000.00
(Report total also on Summary of Schedules)

000513

## UNITED STATES BANKRUPTCY COURT

### CENTRAL DISTRICT OF CALIFORNIA

In Re: Jay W. Johnson and Debra F. )
Johnson                            )
                                   )      Case No. _____
                                   )
                                   )      Chapter 7 _x_ , 11 _____ , 13 _____
                                   )
                                   )
                                   )
                                   )
                                   )
_____  )

## A M E N D E D   S C H E D U L E S

Indicate which schedule is being amended.   Schedules "D" thru "F" requires $20.00
fee plus addendum mailing list attached if adding to creditor list.

____ A,  ____ B,  ____ C,  ____ D,  ____ E, _x_ F, ____ G, ____ H, ____ I, ____ J,

____ Statement of Affairs        ____ Statement of Intentions        _X_ Other (Matrix)

_____

.I, _Jay Johnson & Debra Johnson_ , the person(s) who subscribed to the foregoing
Amended Schedule do hereby declare under penalty of perjury that the foregoing is
true and correct.

DATED: _____

_____
Debtor Signature
Jay W. Johnson

_____
Co-Debtor Signature.
Debra F. Johnson

** SEE REVERSE SIDE **

** F( 10/29/2002. **FILED** 12:29
**LA01-20244ES**
DEBTOR:
  JOHNSON, JAY W
  JUDGE: HON. E. Smith - 553
  TRUSTEE: BT62
  CHAPTER: 07

  CLERK, U.S. BANKRUPTCY COURT
  CENTRAL DISTRICT OF CALIF. ID: 778
  RECEIPT NO: LA-044871  $ 20.00

57

Gonzalez v. Johnson
SA 06-01313
EXHIBIT
001.031

LB

000514

FORM B6F (9/97) West Group, Rochester, NY

In re _Jay Johnson & Debra Johnson_____ / Debtor     Case No._____
                                                                              (If known)

## SCHEDULE F-CREDITORS HOLDING UNSECURED NONPRIORITY CLAIMS

State the name, mailing address, including zip code, and account number, if any, of all entities holding unsecured claims without priority against the debtor or the property of the debtor, as of the date of filing of the petition. Do not include claims listed in Schedules D and E. If all creditors will not fit on this page, use the continuation sheet provided.

If any entity other than a spouse in a joint case may be jointly liable on a claim, place an "X" in the column labeled "Codebtor," include the entity on the appropriate schedule of creditors, and complete Schedule H - Codebtors. If a joint petition is filed, state whether husband, wife, both of them, or the marital community may be liable on each claim by placing an "H," "W," "J," or "C" in the column labeled "Husband, Wife, Joint, or Community."

If the claim is contingent, place an "X" in the column labeled "Contingent." If the claim is unliquidated, place an "X" in the column labeled "Unliquidated." If the claim is disputed, place an "X" in the column labeled "Disputed." (You may need to place an 'X' in more than one of these three  columns.)

Report total of all claims listed on this schedule in the box labeled "Total" on the last sheet of the completed schedules. Report this total also on the Summary of Schedules.

☐ Check this box if debtor has no creditors holding unsecured nonpriority claims to report on this Schedule F.

| Creditor's Name and Mailing Address Including Zip Code | C o d e b t o r | Date Claim was Incurred, and Consideration for Claim. If Claim is Subject to Setoff, so State. H--Husband W--Wife J--Joint C--Community | C o n t i n g e n t | U n l i q u i d a t e d | D i s p u t e d | Amount of Claim |
|---|---|---|---|---|---|---|
| Account No: Creditor # : 1 Bank of Newport, Custodian c/o Per Trebler, Esq. 2121 East Coast Highway, #280 Corona Del Mar CA 92625-2603 | | Promissory Note, 1992 | | | | $ 8,000.00 |
| Account No: Creditor # : 2 Carter B. Wurts & K.M. Wurts c/o Per Trebler, Esq. 2121 East Coast Highway, #280 Corona Del Mar CA 92625-2603 | | Promissory notes, 2/92, 12/92 | | | | $ 50,000.00 |
| Account No: Creditor # : 3 Kenneth D. Agran c/o Per Trebler, Esq. 2121 East Coast Highway, #280 Corona Del Mar CA 92625-2603 | | Promissory note, 1992 | | | | $ 8,000.00 |
| Account No: Creditor # : 4 William L. Speros, Custodian c/o Per Trebler, Esq. 2121 East Coast Highway, #280 Corona Del Mar CA 92625-2603 | | Promissory note, 1992 | | | | $ 2,000.00 |
| Account No: | | | | | | |

Gonzalez v. Johnson
SA 06-01313
**EXHIBIT**
001.032

_57A_

|  |  |
|---|---|
| No continuation sheets attached | Subtotal $ 68,000.00 |
| | (Total of this page) |
| | Total $ 68,000.00 |
| | (Report total also on Summary of Schedules) |

# PROOF OF SERVICE

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 21257 Hawthorne Blvd., Second Floor, Torrance, California 90503.

On October 6, 2016, I served the following document described as **SUPPLEMENTAL EXCERPTS OF RECORD VOL. 3** on all other parties to this action by placing a true copy of the above document enclosed in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

**/XX/   BY OVERNIGHT MAIL** - I placed each such sealed envelope, postage thereon fully prepaid for first-class mail, for collection and mailing at 21515 Hawthorne Blvd., Suite 1150, Torrance, California 90503, following ordinary business practices. I am familiar with the practice of Hinds & Shankman, LLP for collection and processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

**/XX/   BY MAIL** - I placed each such sealed envelope, postage thereon fully prepaid for first-class mail, for collection and mailing at 21515 Hawthorne Blvd., Suite 1150, Torrance, California 90503, following ordinary business practices. I am familiar with the practice of Hinds & Shankman, LLP for collection and processing of correspondence, said practice being that in the ordinary course of business, correspondence is deposited in the United States Postal Service the same day as it is placed for collection.

**/XX/   BY COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**

I declare under penalty of perjury and the laws of the State of California that the above is true and correct.

Executed on this 6th day of October 2016, at Torrance, California.

_____
MAYRA DURAN

## SERVICE LIST

**Via CM/ECF:**

- James Andrew Hinds , Jr
  jhinds@jhindslaw.com

- Mitchell B Ludwig
  mbl@kpclegal.com

- Burton V McCullough
  lexchexrex@sbcglobal.net

**BY MAIL:**

Burton V McCullough, Esq.                    Attorney for Appellants
Burton V McCullough Law Offices
4205 Encinas Drive
La Canada, CA 91011

Mitchell B Ludwig, Esq.                      Attorney for Appellees
Knapp Petersen and Clarke                    Richard and Janis Lapides
550 North Brand Boulevard Suite 1500
Glendale, CA 91203-1094

**BY OVERNIGHT MAIL:**

Honorable Beverly Reid O'Connell
United States District Court Judge
United States Courthouse
312 N. Spring Street, Courtroom 14 (Spring Street Level)
Los Angeles, CA 90012